## IN THE UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT

STATE OF WASHINGTON and )
STATE OF OREGON, )
                                 )    No. 24-1204
    *Petitioners*, )

v. )

FEDERAL ENERGY REGULATORY )
COMMISSION, )
                                 )
    *Respondent*. )
_____ )

U.S. COURT OF APPEALS
RECEIVED
*July 11, 2024*
FIFTH CIRCUIT

## PETITION FOR REVIEW

The State of Washington, at the request of the Governor, and the State of

Oregon ("the States") hereby petition the Court for review of three orders from the

Federal Energy Regulatory Commission:

1. Order Issuing the Certificate for the Gas Transmission Northwest Xpress Project, dated October 23, 2023 ("Certificate Order") (attached as Ex. A)

2. Order Addressing Arguments Raised on Rehearing and Dismissing Stay, dated April 16, 2024 (attached as Ex. B)

3. The Commission's denial by operation of law of the States' request for further rehearing of the Order Addressing Arguments Raised on Rehearing and Dismissing Stay. *See* 15 U.S.C. § 717r(a); Notice of Denial of Rehearing, dated June 17, 2024 (attached as Ex. C)

On October 23, 2023, the Federal Energy Regulatory Commission issued a

Certificate Order authorizing Gas Transmission Northwest to construct and operate

Gas Transmission Northwest Xpress, a project to expand the capacity of its natural

gas pipeline. *See* Ex. A. The States of Washington and Oregon ("States") timely sought rehearing of the Certificate Order, which the Commission rejected in its Rehearing Order on April 16, 2024. *See* Ex. B. The States' subsequently requested further rehearing of the Rehearing Order on May 15, 2024. The Commission failed to act on the States' request for further rehearing within thirty days. As a result, the States' second request for rehearing is deemed denied by operation of law. *See* Ex. C; 15 U.S.C. § 717r(a).

The States already petitioned for review of the Certificate Order in this Court, which the Court consolidated with other petitions seeking review of the same order and transferred to the Fifth Circuit pursuant to 28 U.S.C. § 2112(a)(5). *See* Pet. Review, *Washington & Oregon v. FERC*, No. 24-1025 (Feb. 15, 2024); Order, *Riverkeeper v. FERC*, No. 24-1002 (May 13, 2024). The Fifth Circuit has yet to determine the appropriate venue for those consolidated proceedings.

The Commission's Orders harm the States. The States' standing is self-evident. *See Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). Gas Transmission Northwest intends to construct and operate its pipeline facilities in the States of Washington and Oregon. The construction and operation of the expansion project will increase air pollution, harm wildlife owned by the States of Washington and Oregon, and increase safety hazards to state-owned property near the pipeline. The expansion project will also increase greenhouse gas emissions in

2

Washington and Oregon, which will exacerbate climate change harms to state-owned coastal land, forests, parks, and other property. These injuries also harm State residents, whom the States represent as *parens patriae*. *See Maryland People's Couns. v. FERC*, 760 F.2d 318, 322 (D.C. Cir. 1985). A favorable decision from this Court would prevent or mitigate the harms that this project will cause to the States and their citizens.

This Court has jurisdiction pursuant to 15 U.S.C. § 717r(b). The States timely filed this petition within sixty days after the Commission issued its Order on Rehearing on April 16, 2024, and within sixty days after the Commission denied the States' second request for rehearing by operation of law on June 14, 2024. *See* 15 U.S.C. § 717r(b).

Petitioners respectfully request that this Court vacate the challenged Orders because they violate the Natural Gas Act, 15 U.S.C. § 717 *et seq*., and the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*., and are arbitrary, capricious, and contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.

USCA Case #24-1204   Document #2064211   Filed: 07/11/2024   Page 8 of 238

Respectfully submitted this 17th day of June, 2024.

FOR THE STATE OF WASHINGTON:

ROBERT W. FERGUSON
Attorney General of Washington

 *s/ Megan Sallomi*
MEGAN SALLOMI
D.C. Cir. Bar No. 64513
Assistant Attorney General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Tel: (206) 389-2437
Megan.Sallomi@atg.wa.gov

FOR THE STATE OF OREGON:

ELLEN F. ROSENBLUM
Attorney General of Oregon

 *s/ Paul Garrahan*
PAUL GARRAHAN
D.C. Cir. Bar No. 54297
Attorney-in-Charge
STEVE NOVICK
D.C. Cir. Bar No. 61156
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel: (503) 947-4540
Paul.Garrahan@doj.oregon.gov
Steve.Novick@doj.oregon.gov

# EXHIBIT A

185 FERC ¶ 61,035
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
James P. Danly, Allison Clements,
and Mark C. Christie.

| | |
|---|---|
| Gas Transmission Northwest, LLC | Docket No. CP22-2-000 |

ORDER ISSUING CERTIFICATE

(Issued October 23, 2023)

1.     On October 4, 2021, Gas Transmission Northwest LLC (GTN) filed an application in Docket No. CP22-2-000, under section 7(c) of the Natural Gas Act (NGA)[1] and Part 157 of the Commission's regulations,[2] for authorization to install, construct, modify, and operate certain natural gas compression facilities at the existing No. 5 Athol, No. 7 Starbuck, and No. 10 Kent Compressor Stations, located in Kootenai County, Idaho, Walla Walla County, Washington, and Sherman County, Oregon, respectively (GTN XPress Project).  The project is designed to enable GTN to provide an additional 150,000 dekatherms per day (Dth/d) of firm transportation service on its mainline system. As discussed below, we grant the requested authorization, subject to certain conditions.

## I.     Background and Proposal

2.     GTN,[3] a Delaware limited liability company, is a natural gas company, as defined by section 2(6) of the NGA,[4] engaged in the transportation of natural gas in interstate commerce and subject to the Commission's jurisdiction.  GTN owns and operates a natural gas pipeline system extending from the Idaho border with British Columbia, through Washington, to the Oregon-California border.

3.     GTN states that there is rising demand for natural gas in the Pacific Northwest, driven by residential, commercial, and industrial customer market growth.  Additionally, it states that West Coast markets served by Rocky Mountain supply basins need an

---

[1] 15 U.S.C. § 717f(c).

[2] 18 C.F.R. pt. 157 (2022).

[3] GTN is a wholly owned direct subsidiary of TC Pipelines, LP.

[4] 15 U.S.C. § 717a(6).

alternative source of gas for reliability purposes, as production in the Rockies has declined. Further, the alternate sources of natural gas will allow natural gas consumers to access lower-cost natural gas supplies. Therefore, GTN proposes the GTN XPress Project, to provide 150,000 Dth/d of incremental firm transportation service from its Kingsgate Meter Station, located at the Idaho border with British Columbia, Canada, to its Malin Meter Station, in Klamath County, Oregon. To increase the capacity of its system, GTN proposes to modify existing compression facilities at its No. 5 Athol, No. 7 Starbuck, and No. 10 Kent Compressor Stations.[5]

4.      Specifically, GTN proposes to:

- modify the existing No. 5 Athol Compressor Station, located in Kootenai County, Idaho, to increase the total certificated horsepower (HP) from 49,300 International Organization Standardization (ISO) HP to 58,470 ISO HP by uprating an existing Solar Turbine Titan 130 gas-fired turbine compressor from 14,300 ISO HP to 23,470 ISO HP by reprogramming the unit's software controls;

- modify the existing No. 7 Starbuck Compressor Station, located in Walla Walla County, Washington, to increase the total certificated horsepower from 54,000 ISO HP to 86,640 ISO HP by (a) installing a new 23,470 ISO HP Solar Turbine Titan 130 gas-fired turbine compressor and related appurtenant facilities, including piping, (b) uprating an existing Solar Turbine Titan 130 gas-fired turbine compressor from 14,300 ISO HP to 23,470 ISO HP by reprogramming the unit's software controls, and (c) installing three additional gas cooling bays and associated piping; and

- modify the existing No. 10 Kent Compressor Station, located in Sherman County, Oregon, to increase the total certificated horsepower from 47,900 ISO HP to 57,070 ISO HP by (a) uprating an existing Solar Turbine Titan 130 gas-fired turbine compressor from 14,300 ISO HP to 23,470 ISO HP by reprogramming the unit's software controls and (b) installing auxiliary facilities including four additional gas cooling bays and associated piping.

5.      GTN states that it held a binding open season and request for turnback capacity from July 31, 2019, to September 6, 2019. As a result of the open season, GTN signed precedent agreements with three shippers, Cascade Natural Gas Corporation (Cascade), Intermountain Gas Company (Intermountain), and Tourmaline Oil Marketing Corporation (Tourmaline), for the entire 150,000 Dth/d of firm transportation service attributable to the expansion facilities. The primary terms for the precedent agreements

---

[5] GTN Application at 3-5.

range from 30 to 33 years at negotiated rates.[6]  GTN did not receive any offers for turnback capacity.

6.      The estimated cost of the GTN XPress Project is $75,138,691.[7]  GTN proposes to use its existing system recourse reservation and commodity rates under Rate Schedule FTS-1 as the initial maximum recourse charges for transportation service.[8]  GTN also requests a predetermination that it may roll the project costs into its existing rates in a future NGA section 4 rate case.[9]

## II.      **Procedural Matters**

### A.      **Notice, Interventions, and Comments**

7.      The Commission issued public notice of GTN's application on October 19, 2021.[10]  The notice established November 9, 2021, as the deadline for filing comments and interventions.  The following entities filed timely, unopposed motions to intervene: Tourmaline Oil Marketing Corporation, Canadian Association of Petroleum Producers, Pacific Gas & Electric Company (PG&E), and the American Gas Association.[11]  Puget Sound Energy, Inc. (PSE) and Columbia Riverkeeper filed late, opposed,[12] motions to intervene, which were granted by notice.[13]  Rogue Climate filed a late, unopposed, motion to intervene that was granted by notice.[14]  On August 22, 2022, during the

---

[6] *Id.* at 7-8.

[7] *Id.* at 8 & Ex. K.

[8] *Id.* at 14.

[9] *Id.* at 13.

[10] Notice of the application was published in the *Federal Register* on October 25, 2021.  86 Fed. Reg. 58,902 (Oct. 25, 2021).

[11] Timely, unopposed motions to intervene are granted by operation of Rule 214 of the Commission's Rules of Practice and Procedure.  18 C.F.R. § 385.214(c) (2022).

[12] The motions to intervene were opposed by GTN.

[13] Secretary's February 8, 2022 Notice Granting Late Interventions.

[14] Secretary's April 5, 2022 Notice Granting Late Intervention.

Document Accession #: 20231023-3042     Filed Date: 10/23/2023
Docket No. CP22-2-000                                                                         - 4 -

comment period for the draft EIS, the States of Washington, Oregon, and California filed a joint motion to intervene.**[15]**

8.      As discussed further below, the Commission received numerous comments from individuals and groups regarding various issues.  Commenters in support of the project assert that the project will provide benefits such as meeting increased demand, enhancing system reliability, increasing access to lower priced natural gas, and supporting jobs. Commenters in opposition to the project raise issues including project purpose and need; alternatives; the request for a predetermination of rolled-in rate treatment; air quality; noise; socioeconomic impacts; environmental justice; cumulative impacts; safety; greenhouse gases (GHG); and climate change.  These concerns are addressed in the final Environmental Impact Statement (EIS) and/or below.

## B.      Answers

9.      On December 16, 2021, GTN filed an answer to PG&E's and PSE's protests regarding GTN's request for a predetermination of rolled-in rate treatment, discussed further below.  On December 28, 2021, PSE filed an answer to GTN's answer. Additionally, on September 6, 2022, GTN filed an answer to Washington, California, and Oregon's joint protest.

10.     The Commission's Rules of Practice and Procedure prohibit answers to protests and answers to answers unless ordered by the decisional authority.**[16]**  However, we will accept the answers here because they provide information that has assisted in our decision making.

## C.      Request for a Technical Conference

11.     PG&E requests a technical conference to address issues related to GTN's request for a predetermination of rolled-in rate treatment.  As demonstrated by the discussion

---

**[15]** See 18 C.F.R. §§ 157.10(a)(2), 380.10(a)(1)(i) (2022) (providing that motions to intervene on environmental grounds filed during a draft environmental impact statement (EIS) comment period are deemed timely).  Washington, Oregon, and California became party to the proceeding at the close of the 15-day opposition period.  On September 21, 2022, GTN opposed the States' motion.  Because oppositions to motions to intervene must be filed within 15 days after the motion to intervene is filed, 18 C.F.R. § 385.214(c)(1), GTN's opposition was not timely.

**[16]** 18 C.F.R. § 385.213(a)(2) (2022).

Document Accession #: 20231023-3042    Filed Date: 10/23/2023

below, the existing written record provides enough basis to resolve the issues relevant to the proceeding.[17]  Therefore, we deny PG&E's request.

## III. Discussion

12.    Because the proposed facilities for the GTN XPress Project will be used to transport natural gas in interstate commerce, subject to the jurisdiction of the Commission, the construction and operation of the facilities and capacity are subject to the requirements of subsections (c) and (e) of section 7 of the NGA.[18]

### A. Certificate Policy Statement

13.    The Certificate Policy Statement provides guidance for evaluating proposals to certificate new construction.[19]  The Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest.  The Certificate Policy Statement explains that, in deciding whether to authorize the construction of new pipeline facilities, the Commission balances the public benefits against the potential adverse consequences.  The Commission's goal is to appropriately consider the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

14.    Under this policy, the threshold requirement for applicants proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers.  The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, and landowners and communities affected by the route of the new

---

[17] *See Trunkline Gas Co., LLC*, 147 FERC ¶ 61,041, at P 27 (2014) (rejecting a request for a technical conference and finding that there was no material issue of fact that could not be resolved on the basis of the written record in the proceeding).

[18] 15 U.S.C. § 717f(c), (e).

[19] *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227, *corrected*, 89 FERC ¶ 61,040 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).  On March 24, 2022, the Commission issued an order converting the policy statements issued in February 2022 to draft policy statements.  *See Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,197 (2022) (Order on Draft Policy Statements).

Document Accession #: 20231023-3042   Filed Date: 10/23/2023

Docket No. CP22-2-000                                                         - 6 -

pipeline facilities.  If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects.  This is essentially an economic test.  Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis, where other interests are considered.

### 1.    No Subsidy Requirement

15.     As discussed above, the threshold requirement for pipelines proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers.  Washington, Oregon, and California argue that GTN's existing customers will subsidize the project because the costs of previous compressor unit replacements at the Athol, Kent, and Starbuck compressor stations, which were constructed in prior notice proceedings, [20] are not included in the GTN XPress Project costs.  GTN responds that the previous compressor unit replacements were carried out under section 2.55 of the Commission's regulations and are appropriately excluded from the GTN XPress Project costs.[21]

16.     At each location GTN replaced a Rolls Royce Avon compressor unit (roughly, 14,500 HP) with a Solar Titan 130 compressor unit (roughly, 20,500HP).  It then restricted the capacity of the new units through electronic controls such that the delivery capacity remained the same as the original units.  GTN explains that it considered smaller-sized replacements (Solar Mars 100), but the smaller units could not meet the same power output as the Avon units in colder temperatures.[22]  As relevant here, Commission regulations allow for replacement of physically deteriorated or obsolete facilities if "the replacement will have substantially equivalent designed delivery capacity."[23]  The undisputed evidence shows that GTN restricted the horsepower of the

---

[20] In March 2020, GTN submitted notice that it was planning on replacing compressor units at the Athol, Kent, and Starbuck compressor stations.  GTN, Filings, Docket Nos. CP20-82-000, CP20-85-000, and CP20-86-000 (all filed March 10, 2020).  The replacement units were put into service in October and November 2021.  GTN April 18, 2023 Filing at 11.  The compressor units that were replaced were originally installed in the early 1970s.  GTN April 18, 2023 Filing at 12.

[21] GTN December 16, 2021 Filing at 4-10; GTN April 18, 2023 Filing at 11-13.

[22] GTN April 18, 2023 Filing at 12-13.

[23] 18 C.F.R. 2.55(b)(ii) (2022).

Docket No. CP22-2-000                                                - 7 -

new units to the same horsepower as the old units.**24**  Additionally, GTN provides an adequate explanation for why it selected the Solar Titan units over the Solar Mars units – at cold weather site conditions the smaller Solar Mars units would not have supplied the required compression (i.e., the system design would have failed at colder temperatures).**25** We also note that GTN placed the replacement compressor units in service in 2021, well before receiving authorization for the GTN XPress Project.

17.     As discussed in the rates section below,**26** GTN demonstrates that the illustrative incremental rates for the GTN XPress Project are lower than its existing system rates under Rate Schedule FTS-1.  Accordingly, we find that GTN's proposal to charge its existing applicable system reservation rates as the initial recourse rates for the project will not result in existing customers subsidizing the GTN XPress Project.  However, because this project will involve the removal of the horsepower restrictions on the replacement compressor units, we believe that the parties to a future general section 4 rate proceeding should be able to raise the question of whether some allocation of the compression costs to the GTN Xpress Project is appropriate.  Therefore, as is discussed below, we will not be granting GTN a predetermination of rolled-in rate treatment.  For these reasons, we find that the Certificate Policy Statement's threshold requirement of no subsidization is satisfied.

## 2.    Project Need

18.     GTN has entered long-term precedent agreements with shippers for 100% of the project's capacity.  Precedent agreements for 100% of the project's capacity are significant evidence of the need for the proposed project.

19.     GTN states that Cascade and Intermountain are local distribution companies that need capacity to serve their growing customer base and load demands in the Pacific Northwest.**27**  The projected end use for this gas is residential, commercial, and industrial users.**28**  It states that Tourmaline is a producer of natural gas that will provide low-cost

---

**24** GTN April 18, 2023 Filing at 9-10.

**25** *Id.* at 12.

**26** *See infra* PP 40-55.

**27** Application at 4.

**28** *Id.* at 9.

Document Accession #: 20231023-3042    Filed Date: 10/23/2023

natural gas to West Coast markets serving residential, commercial, industrial, and electric generation needs.[29]

| Project Shipper | Transportation demand of Project Capacity (Dth/d) | Primary Term (Years) | Project End Use | Location (by state) of End-Use |
|---|---|---|---|---|
| Cascade | 20,000 | 31 | Residential, Commercial, and Industrial Uses | Oregon and Washington |
| Intermountain | 79,000 | 30 | Residential, Commercial, and Industrial Uses | Idaho |
| Tourmaline | 51,000 | 33 | West Coast Natural Gas Markets | |

20.    All of the shippers state their support of and need for the project.  Cascade states that

> [t]he additional firm capacity provided by the Project will help Cascade continue to meet increasing residential, commercial, and industrial natural gas requirements throughout its system, particularly central Oregon. . . .  GTN is the principle upstream pipeline that transports gas to Cascade's central Oregon distribution system customers. Currently, Cascade's [Integrated Resource Plan] indicates that without the Project Cascade does not have sufficient GTN capacity to serve future load growth in central Oregon.[30]

---

[29] *Id.* at 4.

[30] Cascade November 8, 2021 Filing at 1; *see also* Cascade January 13, 2023

Intermountain states that the project will "bolster reliable and dispatchable natural gas service in Southern Idaho and will provide GTN's shippers with access to additional supplies and increased liquidity"[31] and that "GTN XPress Project is essential to Intermountain's ability to continue to provide 'firm' natural gas supplies to its customers . . . ."[32] Tourmaline indicates that the project will allow Tourmaline to "provide reliable and consistent service to downstream customers and provide access to sustainable Canadian gas reserves resulting in long-term gas supply certainty for customers," and to "assuage demand in southern markets when intermittent renewables, such as wind and solar, are not available."[33]

21.    GTN states that "Cascade is faced with peak day supply shortfalls in Oregon, expected as early as 2024, as well as an annual average load growth rate of 2.12% in Zone GTN of Cascade's system."[34] Citing Intermountain's Integrated Resource Plan, GTN asserts that Intermountain's "residential and commercial customers are forecasted to grow at an annualized rate of 3.3%."[35] GTN notes that Intermountain is replacing firm transportation capacity that it held on the Northwest Pipeline (Northwest), which supplies natural gas from the Rockies, with capacity on GTN XPress. GTN asserts that this will create a continuous firm transportation path from the supply source in Alberta, Canada, to Intermountain's service area. GTN states that the project will help both local distribution companies to meet peak day load with low-cost natural gas, while enhancing supply diversity and mitigating constraints on other transportation options.[36] As noted above, GTN asserts that natural gas supplies from the Rockies have declined in recent years and the decline is forecast to accelerate in the next 30 years. GTN states that the GTN XPress Project is necessary, in part, to replace this supply.[37] GTN describes Tourmaline as Canada's largest natural gas producer and argues that Tourmaline is well-positioned to

_____

Filing at 1 ("Cascade continues to support GTN's application and reiterates its need for the Project.").

[31] Intermountain November 9, 2021 Filing at 1.

[32] GTN April 18, 2023 Filing at attach. B.

[33] Tourmaline November 9, 2021 Filing at 3.

[34] Application at 11.

[35] *Id.* at 12.

[36] *Id.* at 11-12.

[37] *Id.* at 13.

supply West Coast markets and that its capacity commitment is evidence of market need.**38**

22.     The U.S. Environmental Protection Agency (EPA) recommends that the Commission include a description of local and regional energy grids and markets that may be impacted by the GTN XPress Project and recommends that information from the Energy Information Administration's Energy Atlas also be included so that the public can better understand the need for the project.**39**  The Energy Atlas can be used to generate a map showing the interstate natural gas pipelines in the Pacific Northwest along with natural gas-fired power plants in the region.**40**

23.     Consistent with EPA's recommendation, we provide further information here. The GTN XPress Project would be within the U.S. Pacific Northwest natural gas and electricity markets.  The following natural gas utilities/local distribution companies operate in the U.S. Pacific Northwest:  Avista Utilities, Cascade, Portland General Electric, , Dominion Energy, Pacific Power, Intermountain, NW Natural, and Puget Sound Energy.**41**  Per GTN's application, shipper Cascade serves areas in Washington and Oregon, while shipper Intermountain serves southern Idaho.**42**  The U.S. Pacific Northwest is located adjacent to two natural gas producing regions, Western Canada and the Rockies.  Western Canada is the larger source.  Staff analysis of state-level data from the Energy Information Administration shows that the majority of the natural gas consumed in the region comes from Western Canada, primarily through TC Energy's NGTL system and Enbridge's BC Pipeline System.**43**  Two interstate pipeline systems

---

**38** *Id.* at 12-13.

**39** Energy Information Administration, Energy Atlas, Accessed January 5, 2023, https://atlas.eia.gov/.

**40** U.S. Energy Information Administration, *Natural Gas| U.S. Energy Atlas*, https://atlas.eia.gov/apps/3652f0f1860d45beb0fed27dc8a6fc8d/explore (last accessed July 9, 2023).

**41** Northwest Gas Association, *2022 Pacific Northwest Gas Market Outlook*, https://www.nwga.org/_files/ugd/054dfe_207b3155de904ebb8d4513ef2790cfb9.pdf (last accessed July 9, 2023).

**42** Application at 11-12.

**43** U.S. Energy Information Administration, *International and Interstate Movements of Natural Gas by State, Washington, Oregon, and Idaho, Annual, 2018-2021*, https://www.eia.gov/dnav/ng/ng_move_ist_a2dcu_SWA_a.htm.  U.S. Energy Information Administration, *State Profiles and Energy Estimates, Washington and Oregon*, Accessed July 9, 2023, https://www.eia.gov/state/?sid=US.  U.S. Energy

Case: 24-60354    Document: 1-3    Page: 16    Date Filed: 07/15/2024

Document Accession #: 20231023-3042    Filed Date: 10/23/2023
USCA Case #24-1204    Document #2064211    Filed: 07/11/2024    Page 20 of 238
Docket No. CP22-2-000                                                              - 11 -

operate in the region:  the GTN system and Williams' Northwest Pipeline System.  The GTN system is a 1,377-mile pipeline system that transports natural gas from Western Canada to Washington, Oregon, and California with a capacity of 2.7 billion cubic feet per day.[44]  The Northwest Pipeline System is a 3,900-mile bi-directional pipeline system that transports natural gas from Western Canada, Rocky Mountain, and San Juan Basin gas supplies to the Western U.S. with a total capacity of 3.8 billion cubic feet per day.[45]

24.     Commenters, including the States of Washington, Oregon, and California, argue that the Commission should consider whether alternative technologies, including renewable alternatives, can better serve consumers' need for energy.[46]  We disagree.  The Commission's role under the NGA is to decide "whether to adopt an applicant's proposal and, if so, to what degree, not to engage in resource planning for energy end-users."[47]  Here, the project's purpose is to serve the firm natural gas transportation requirements of its shippers due to increased demand, provide access to lower-cost gas, enhance reliability, and increase supply diversity.[48]  The record does not establish that energy efficiency or other non-gas alternatives would satisfy the needs expressed by the project shippers in this proceeding.

25.     Commenters, including the States of Washington, Oregon, and California, also argue that the project capacity is not needed because state policies intended to reduce GHG emissions will significantly reduce regional demand for natural gas.[49]  Some

---

Information Administration, *Natural Gas Consumption by End Use, Washington, Oregon, and Idaho, Annual, 2018-2021,* https://www.eia.gov/dnav/ng/ng_cons_sum_dcu_SWA_a.htm.

[44] TC Energy, *TC Energy-Gas Transmission Northwest*, https://www.tcenergy.com/operations/natural-gas/gas-transmission-northwest/ (last accessed July 9, 2023).

[45] Williams, *Northwest Pipeline*, https://www.williams.com/pipeline/northwest-pipeline/ (last accessed July 9, 2023).

[46] *See, e.g.*, Washington, Oregon, & California August 22, 2022 Protest at 28; Rogue Climate June 8, 2023 Comment at Ex. A & B.

[47] *Transcon. Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,148, at P 82 (2023) (internal quotation and citation omitted).

[48] Application at 3-4.

[49] *See, e.g.*, Washington, Oregon, & California August 22, 2022 Protest at 15-19; Oregon Citizens' Utility Board January 27, 2023 Comment at 3 ("Until Cascade completes a new Integrated Resource Plan that reflects the impact of Oregon carbon

commenters further assert that the precedent agreements with Cascade, Intermountain, or Tourmaline do not demonstrate that the project is needed for various reasons, as discussed further below, including because state climate legislation will reduce demand.[50] In contrast, commenters supporting the project, including the State of Idaho,[51] argue that the project is needed to meet growing demand, increase supply diversity, provide low-cost and reliable natural gas, and provide economic benefits. Idaho argues that the 30-year precedent agreements for the project's entire capacity demonstrate need.[52]  It notes that Intermountain serves more than 400,000 customers in 74 communities in Idaho.  It argues that basing "infrastructure determinations off of arbitrary 'clean energy standards' adopted by Idaho's neighboring states" directly conflicts with Commission precedent, Supreme Court precedent, and the Natural Gas Act, and that "[a]ttempts to use the NGA to impose individual state policy preferences on other states would be misguided and clearly conflict with observable, real-life need for additional pipeline capacity."[53]

---------------------------------

regulation, and federal electrification policies, growth-related investments, including this pipeline expansion, should be avoided."); Rogue Climate June 8, 2023 Comment at 1 & Ex. A.

[50] Washington, Oregon, & California August 22, 2022 Protest at 19-23; Rogue Climate June 8, Comment at 1 ("The precedent agreements and the market/need evidence submitted by GTN are insufficiently probative of project need. . . ."). Rogue Climate appears to make the argument that the Cascade and Intermountain precedent agreements are not reliable indicators of need because both entities are subsidiaries of MDU Resources. Rogue June 8, 2023 Comment at 1 & Ex. A. We note that an affiliation between shippers does not raise the same concerns as an affiliation between a pipeline company and a shipper. A core reason for looking behind an affiliate precedent agreement between a pipeline company and a shipper is to assure that the proposed project will not impose excessive costs on the affiliate and its captive ratepayers. *See Spire STL Pipeline LLC,* 181 FERC ¶ 61,232, at P 37, at n.104 (2022) (*citing Envtl. Def. Fund v. FERC*, 2 F.4th 953, 973 (D.C. Cir 2021) & *Chinook Power Transmission, LLC*, 126 FERC ¶ 61,134 (2009)). That concern is not implicated in affiliations between shippers.

[51] Idaho Governor's Office of Energy & Mineral Resources February 22, 2022 Comment; State of Idaho October 24, 2022 Comment (The was a letter signed by Idaho's Governor, Brad Little, and its entire U.S. Congressional delegation, Senators James Risch and Mike Crapo and Congressmen Mike Simpson and Russ Fulcher); Senator James Risch June 12, 2023 Comment.

[52] State of Idaho October 24, 2022 Comment at 1-2.

[53] *Id.* at 2.

26.     As discussed below, in considering the record, the Commission finds that the existence of binding precedent agreements for 100% of the project capacity is significant evidence of need.  Moreover, we note that the project will likely decrease costs to consumers and increase supply diversity.  And as the Commission has explained, state policies do not, by themselves, limit the Commission's authority to find that a project is required by the public convenience and necessity.[54]

Cascade Precedent Agreement

27.     Washington, Oregon, and California and others argue that the Cascade precedent agreement does not demonstrate need because Cascade's future demand projections, as stated in its 2020 Integrated Resource Plan (IRP), do not take into account legislation intended to reduce GHG emissions.[55]  They assert that these legislative efforts will result in decreased demand for natural gas.  GTN disputes the assertion that state energy policies undermine the demonstration of need through precedent agreements.[56]  It argues that the effect of this legislation on natural gas demand is speculative and should not dissuade the Commission from adhering to its well-established precedent and policy of relying on precedent agreements as the soundest evidence of market support.[57]  To support this position, it provides data showing that throughput on the GTN system has increased steadily over the last decade, including over the past few years, when the climate legislation has been in place.[58]  We find, as we have in other proceedings, that the existence of state legislation intended to reduce GHGs does not undercut our finding that need is demonstrated by the precedent agreements.  This approach is consistent with the Commission's recent orders.[59]  In some of those recent orders, the Commission rejected

---

[54] *Transcon. Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,148 at P 26.

[55] Washington, Oregon, & California August 22, 2022 Joint Intervention & Protest at 19-20; *see also* Rogue Climate June 8, 2023 Filings at Ex. A (arguing that Cascade has not adequately accounted for Washington climate legislation in its demand estimates.); Columbia Riverkeeper March 8, 2023 Comment.

[56] GTN April 18, 2023 Filing at 3-4.

[57] *Id.* at 4.

[58] *Id.* at 4-5.

[59] *Transcon. Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,148 at P 70 (collecting examples of cases addressing this) (citing *Gas Transmission Nw. LLC*, 181 FERC ¶ 61,234, at PP 14-15 (2022); *Tenn. Gas Pipeline Co., L.L.C.*, 179 FERC ¶ 61,041, at P 17, *order on reh'g*, 181 FERC ¶"61,051, at PP 15-17 (2022); *Iroquois Gas Transmission Sys.*, 178 FERC ¶ 61,200, at P 15 (2022)).

Case: 24-60354   Document: 1-3   Page: 19   Date Filed: 07/15/2024

Document Accession #: 20231023-3042   Filed Date: 10/23/2023
USCA Case #24-1204   Document #2064211   Filed: 07/11/2024   Page 23 of 238

Docket No. CP22-2-000                                                              - 14 -

the argument that it was unnecessary to authorize natural gas infrastructure that would add additional capacity because New York enacted climate legislation that establishes statewide greenhouse gas (GHG) emissions reduction targets over time.**[60]**  The Commission explained that the New York climate legislation did not undermine the findings of project need, which were based on precedent agreements for 100% of the project capacity.**[61]**  The same applies here.**[62]**  Washington, Oregon, and California have not submitted evidence that their climate legislation has actually resulted in reduced demand for natural gas.  Moreover, more than 50% of the project capacity is subscribed by Intermountain, a local distribution company serving customers in Idaho and not in Washington, Oregon, or California.

28.      Washington, Oregon, and California also argue that, even accepting Cascade's IRP projections, Cascade will not need the capacity on the GTN XPress Project until well past 2040.**[63]**  We disagree.  First, as Cascade clarified in its comments, because Cascade signed its precedent agreement in 2019, the GTN Xpress Project capacity was included as part of the capacity available to Cascade in the 2020 IRP which Cascade previously submitted to Washington and Oregon.**[64]**  Moreover, the States' own analysis shows that a theoretical peak day in Cascade's GTN service area will likely need some of the project's additional capacity much sooner than 2040.**[65]**  Cascade states that it is contracting for

---

**[60]** *Id*. (citing *Tenn. Gas Pipeline Co., L.L.C*., 179 FERC ¶ 61,041 at P 17, *order on reh'g*, 181 FERC ¶ 61,051 at PP 15-17; *Iroquois Gas Transmission Sys*., 178 FERC ¶ 61,200 at P 15).

**[61]** *Id*. (citing *Gas Transmission Nw. LLC*, 181 FERC ¶ 61,234 at P 15 (stating that the climate change legislative enactments and prohibition on the state's issuance of site certificates for Oregon-based fossil fuel electric generation facilities do not undercut the Commission's need determination); *Tenn. Gas Pipeline Co., L.L.C*., 179 FERC ¶ 61,041 at P 17, *order on reh'g*, 181 FERC ¶ 61,051 at P 16; *Iroquois Gas Transmission Sys*., 178 FERC ¶ 61,200 at P 15).

**[62]** In addition to GHG emission reduction targets, Washington has enacted a building code requiring most new residential homes, commercial buildings, and multifamily structures to be built with heat pumps.  We do not think that a single state limiting new gas hook ups materially changes the finding of need where the ban, has exceptions, exists in only one of several states being served by the project, and where there is no showing of the extent to which the measure will reduce demand.

**[63]** Washington, Oregon, & California August 22, 2023 Protest at 20.

**[64]** GTN April 18, 2023 Filing, attach. A.

**[65]** *See* Washington, Oregon, and California August 22, 2022 Protest Ex. B at 19 ("Then, assuming Cascade's Peak Day in 2023 equals this 42,223 Dth per day capacity,

Case: 24-60354    Document: 1-3    Page: 20    Date Filed: 07/15/2024

Document Accession #: 20231023-3042    Filed Date: 10/23/2023
    USCA Case #24-1204    Document #2064211    Filed: 07/11/2024    Page 24 of 238

Docket No. CP22-2-000                                           - 15 -

20,000 dth/d because it has estimated that it will need the additional capacity
incrementally between now and 2040. Local distribution companies often base their
contracted capacity on anticipated needs to satisfy peak demand. We will not second
guess Cascade's decision to contract for the full amount of capacity that it anticipates it
will need, and to do so now, when the capacity is being offered at certain terms and
conditions, including price, rather than Cascade contracting for a smaller amount now
with uncertainty about its ability to contract under similar terms at a later date to satisfy
demand.**[66]**

Intermountain Precedent Agreement

29.    Washington, Oregon, and California argue that the precedent agreement with
Intermountain, which serves customers in Idaho, does not support a finding of need
because the capacity on GTN would be replacing capacity on Northwest.**[67]** They cite the
Commission's Certificate Policy Statement for the proposition that projects designed "to
serve markets already served by another pipeline" require a greater showing of public
need and benefits.**[68]** The States also object to Intermountain's agreement to pay for
service from Kingsgate to Malin, but only use service to Stanfield, and allege that this
agreement may not conform with GTN's tariff.**[69]**

---

and assuming the 2.12% average annual load growth from 42,223 Dth per day, Page 2
Exhibit GML-3 shows that even extending 2.12% annual growth to 2040, the 2040 Peak
day is 60,316 Dth per day, an increase of approximately 18,000 Dth per day over the 17-
year period from 2023 to 2040. This compares to the 20,000 Dth per day subscription
level of Cascade to the GTNX Project. In other words, Cascade does not project needing
the full 20,000 Dth/d it contracted for in the next 17 years.").

**[66]** We note that the Commission's findings under the NGA regarding whether the
project is required by the public convenience and necessity do not preclude state
regulators from undertaking an after-the-fact prudency review of any purchase agreement
by an LDC, consistent with the state's jurisdiction. The Commission has held that
oversight of the procurement decisions of LDCs is best left to state regulators. *See
Transcontinental Gas Pipe Line Co. LLC*, 182 FERC ¶ 61,148, at P 28 (2023).

**[67]** Washington, Oregon, & California August 22, 2022 Protest Ex. B at 23.

**[68]** Certificate Policy Statement, 88 FERC ¶ 61,227 at 25.

**[69]** Washington, Oregon, & California May 5, 2023 Comment at 5.

30.    GTN and Intermountain respond that the GTN XPress Project is not competing with capacity on Northwest.[70] They note that Northwest is the only interstate pipeline providing Intermountain with service directly into Southern Idaho.  They state that Northwest informed Intermountain that 59,000 MMBtu per day of service it held on Northwest in the Rocky Mountain region under release of long-term temporary segmented capacity from other third parties would no longer be available past the current expiration date.  To replace the expiring capacity, Northwest offered, and Intermountain accepted, a contract for firm primary path capacity on Northwest with a receipt point at the Stanfield, Oregon, interconnect with GTN instead of the receipt points in the Rocky Mountain region.  GTN and Intermountain state that the receipt point at Stanfield will still allow for delivery into Southern Idaho on Northwest.  However, Intermountain does not currently have the same amount of firm capacity on GTN delivering to the Stanfield interconnect as it has on Northwest taking gas from that point.  They further note that even prior to this latest agreement with Northwest, Intermountain's firm capacity on GTN delivering to Stanfield was less than its capacity from that point and it was already relying at times on either secondary firm capacity on GTN or direct purchase of gas supplies delivered from other suppliers at Stanfield to provide ultimate delivery on Northwest to Southern Idaho.  Therefore, Intermountain signed a precedent agreement with GTN to secure 79,000 Dth/d of firm service, or more than half of the proposed expansion capacity.[71]

31.    The Certificate Policy Statement states that "projects to serve new demand might be approved on a lesser showing of need and public benefits than those to serve markets already served by another pipeline."[72]  That statement does not mean that precedent agreements for projects to serve markets already served by another pipeline are not significant evidence of need.  The Certificate Policy Statement goes on to say that "contracts or precedent agreements always will be important evidence of demand for a project."[73]  And the NGA states that "[n]othing contained in [NGA section 7] shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company."[74]

---

[70] GTN April 18, 2023 Filing at 7 & attach. B.

[71] *Id.*

[72] Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,748.

[73] *Id*.

[74] 15 U.S.C. § 717f(g).

Case: 24-60354   Document: 1-3   Page: 22   Date Filed: 07/15/2024

Document Accession #: 20231023-3042   Filed Date: 10/23/2023
   USCA Case #24-1204   Document #2064211   Filed: 07/11/2024   Page 26 of 238

Docket No. CP22-2-000                                                              - 17 -

32.     In any event, GTN is not competing with Northwest to serve markets in Southern
Idaho. Rather, Intermountain is changing its receipt point for natural gas service on
Northwest from the Rocky Mountain region to Stanfield, Oregon. Delivery to
Intermountain's distribution system in Southern Idaho will still be on Northwest.
Regarding conformity with GTN's tariff, the States have not identified any specific tariff
provision that GTN's agreement with Intermountain would not conform with here. We
find that that the precedent agreement with Intermountain, for more than 50% of project
capacity, is significant evidence of need.

Tourmaline Precedent agreement

33.     Washington, Oregon, and California argue that the precedent agreement with
Tourmaline is not evidence of need because Tourmaline is a gas producer and not a
consumer.[75] Further, they dispute Tourmaline's ability to sell the gas to West Coast
markets because they assert that there is enough gas currently available to satisfy
demand.[76]

34.     GTN disagrees with these assertions and provides data from Tourmaline showing
that demand for natural gas in the West has remained stable over the last decade despite
significant growth in renewable generation.[77] It also provides data showing natural gas
production in the Rockies has been declining over the same period and production in
Canada has been increasing in order to offset the decline in Rockies production and meet
demand.[78]

35.     Precedent agreements, including agreements with natural gas producers, are
significant evidence of need.[79] None of the arguments from Washington, Oregon, and

---

[75] Washington, Oregon, & California August 22, 2022 Protest at 22-23.

[76] *Id.*

[77] GTN April 18, 2023 Filing at attach. C.

[78] *Id.* at attach. D.

[79] *See Equitrans, L.P.*, 183 FERC ¶ 61,200, at PP 15-16 (2023) (finding that
precedent agreements with natural gas producers are significant evidence of need); *see
also NEXUS Gas Transmission, LLC*, 172 FERC ¶ 61,199, at P 17 (2020) ("We find
transportation service for all shippers as providing public benefits, and do not weigh
different prospective end uses differently for the purpose of determining need."). The
Commission has also previously found precedent agreements with Tourmaline evidence
of need. *ANR Pipeline Co.*, 179 FERC ¶ 61,040, at P 71(2022) ("The proposed project
will enable ANR to provide up to 165,000 Dth/d of firm transportation service, 100% of

California convince us to the contrary. We note that any risk of declining market demand is borne by Tourmaline itself as a producer and marketer, and not by any captive ratepayer.

Project Need Conclusions

36.    Precedent agreements for 100% of a project's capacity are significant evidence of the need for the project. Moreover, we find that the project's incremental firm deliverability will provide shippers with additional flexibility to transport natural gas produced in Western Canada to meet demand in markets in the Northwest and West Coast regions. We also find that the project will provide a tangible benefit to consumers through added reliability and by providing access to lower-cost gas at the Kingsgate Hub (Canada), where prices have historically been substantially lower than at the Rockies hubs serving these markets.

### 3.    Impacts on Existing Customers, Existing Pipelines and Their Customers, and Landowners and Surrounding Communities

37.    As discussed above, we find that GTN's existing shippers will not subsidize the proposed project. Further, the proposed project will have no adverse effect on GTN's existing customers because the proposed expansion facilities are designed to provide incremental service to meet the needs of the project shippers without degradation of service to GTN's existing customers. We also find that there will be no adverse impact on other pipelines in the region or their captive customers. The project shippers will use the project's capacity to serve the incremental growth requirements of their markets. The project will not affect or displace existing service on other pipelines and no pipelines or their captive customers have objected to GTN's proposal.

38.    We are further satisfied that GTN has taken steps sufficient to minimize adverse impacts on landowners and surrounding communities. The proposed facility modifications and additions will be located entirely on property owned by GTN, within a GTN easement, or on temporarily leased space.[80] The total acreage to be disturbed for construction of the project facilities is 46.9 acres, of which only 1.2 would be permanently affected.[81] No physical work or ground disturbance would occur at the Athol Compressor Station. At the Starbuck Compressor Station, the proposed facilities would be located within the fenced boundaries of the site. At the Kent Compressor

_____

the project's capacity, to Tourmaline and TVA, which we find sufficient to demonstrate a need for the project.").

[80] Application at 7.

[81] November 18, 2022 Final EIS at 2-2.

Station, the proposed facilities would be located in an expanded and fenced area abutting the existing site. The nearest residence to either the Starbuck or Kent Compressor Stations is about 0.5 mile away. Therefore, we are satisfied that GTN has taken appropriate steps to minimize adverse impacts on any landowners and communities affected by the project.

### 4. Certificate Policy Statement Conclusion

39. The proposed project will enable GTN to provide 150,000 Dth/d of incremental firm transportation service. The project is fully subscribed, will provide access to lower-cost gas, and will enhance supply diversification and reliability. Accordingly, we find that GTN has demonstrated a need for the project. Further, the project will not have adverse economic impacts on existing shippers or other pipelines and their existing customers and will have minimal economic impacts on the interests of landowners and surrounding communities. Therefore, we conclude that the project is consistent with the criteria set forth in the Certificate Policy Statement and analyze the environmental impacts of the project below.[82]

### B. Rates

40. GTN proposes to use its mileage-based existing system recourse reservation charge of $0.250323 per Dth and a system usage charge of $0.009799 per Dth under Rate Schedule FTS-1 as the initial maximum recourse charges for transportation service.[83] GTN estimates a first-year cost of service of $10,628,781 for the GTN XPress Project.[84] The estimated cost of service incorporates GTN's last Commission-approved depreciation rates of 1.80% for mainline transmission plant, 3.50% for the gas turbine

---

[82] *See* Certificate Policy Statement, 88 FERC at 61,745-46 (explaining that only when the project benefits outweigh the adverse effects on the economic interests will the Commission then complete the environmental analysis).

[83] GTN's reservation charge consists of two components: a non-mileage reservation charge of $0.028612 per Dth and a mileage reservation charge of $0.000362 per Dth. The mileage reservation charge of $0.000362 per Dth is multiplied by the project's delivery path mileage of 612.46 for a product of $0.221711 per Dth. The two components of $0.028612 per Dth and $0.221711 per Dth are then added together for a system reservation charge of $0.250323 per Dth. *See* GTN May 20, 2022 Data Request Response, attach. 1, lines 11-16.

[84] *Id.* at 4. On November 18, 2021, the Commission approved GTN's uncontested settlement, which included the same depreciation and negative salvage rates from its Docket No. RP15-904-000 settlement. *See Gas Transmission Nw. LLC*, 177 FERC ¶ 61,110 (2021)*.

unit, and 0.05% for the negative salvage rate as established in Docket No. RP15-904-000.[85]  GTN states that the rate of return for the project is based upon GTN's last approved after-tax rate of return of 9.66% as established in Docket No. RP94-149-000.[86]

41.     The Commission has generally held that the applicable system recourse rate is appropriate for a project if the estimated cost-based rate is less than the current system rate.  Otherwise, the pipeline is required to establish an incremental rate to ensure that there is no subsidization from existing shippers.[87]  GTN has calculated illustrative incremental reservation and usage charges based on GTN's first-year cost of service and monthly stated billing determinants.[88]  The calculated illustrative incremental reservation charge of $0.191206 per Dth and the illustrative incremental usage charge of $0.003675 per Dth for the project are lower than the currently effective system recourse Rate Schedule FTS-1 charges.[89]

42.     We have reviewed GTN's proposed cost of service and initial rates and find that they are consistent with Commission policy.  Because the rate analysis demonstrates that the maximum Rate Schedule FTS-1 system recourse reservation and usage charges are greater than the illustrative incremental reservation and usage charges, respectively, we approve GTN's request to use its existing system charges under Rate Schedule FTS-1 as the initial recourse charges for the Project.  In addition, GTN is directed to charge the applicable system interruptible rate for the Project.

### 1.     Fuel

43.     GTN proposes to apply its system-wide effective fuel and line loss percentage to recover the costs of fuel and line loss for the project.  GTN states that the current fuel and

---

[85] *See Gas Transmission Nw. LLC*, 177 FERC ¶ 61,110.  The States of Washington, Oregon, and California argue that a modified depreciation rate should be used for the project.  Washington, Oregon, and California August 22, 2022 Protest at 17 and at Ex. C at 27-28.  The Commission's general policy with respect to pipeline expansions is to use the depreciation rate approved in the pipeline's last NGA section 4 general rate proceeding as GTN has done here.  *See Gulf S. Pipeline Co., LP*, 163 FERC ¶ 61,124, at P 23 (2018), *reh'g denied*, 166 FERC ¶ 61,089, at P 30 (2019); *Wyo. Interstate Co.*, 119 FERC ¶ 61,251, at P 22 (2007).

[86] Application at n. 19.

[87] Certificate Policy Statement, 88 FERC at 61,746.

[88] GTN May 20, 2022 Data Request Response, attach. 1.

[89] *Id.* at lines 11-14.

Document Accession #: 20231023-3042   Filed Date: 10/23/2023

line loss percentage for project shippers will be adjusted on a monthly basis in accordance with its tariff. As set forth in Exhibit Z-3, GTN detailed the impact of including the project's incremental throughput and estimated fuel requirements into the total system throughput and actual fuel usage from 2020. GTN states that including the project results in a reduced 2020 average effective fuel and line loss percentage. GTN evaluated the potential effect of the project on the overall system fuel consumption and determined that existing shippers will not subsidize the fuel costs attributable to the project.[90] We have reviewed this information and agree. Therefore, we approve GTN's proposal to apply its system-wide effective fuel and line loss percentage to the project.

### 2.    Predetermination of Rolled-in Rates

44.    GTN requests a predetermination of rolled-in rate treatment for costs associated with the project. In support of its request, GTN asserts that the project will result in incremental revenues exceeding incremental costs.

45.    On November 9, 2021, PG&E protested GTN's request for a predetermination of rolled-in rates.[91] PG&E argues that GTN failed to provide sufficient information on how the proposed project interrelates to other work GTN has indicated it intends to construct. PG&E requests that the Commission defer any decision on the appropriateness of rolled-in rate treatment until GTN's next general NGA section 4 rate case, given the lack of information about the impact of the Project as a whole on existing shippers. PG&E also requests that the Commission convene a technical conference.[92]

46.    On November 17, 2021, PSE also protested GTN's request for a predetermination of rolled-in rate treatment. PSE is not opposed to the GTN XPress Project but argues, similarly to PG&E, the merits of GTN's request for rolled-in rate treatment should be determined in GTN's next general NGA section 4 rate case, after additional information is provided to the Commission. Specifically, PSE notes that GTN has stated its proposal will add approximately $75.1 million in costs to ratepayers, and that the Commission should investigate whether the cost of the excess capacity, approximately $251 million, created by the compressor facilities that were constructed in the prior notice proceedings in Docket Nos. CP20-82-000, CP20-85-000, and CP20-86-000, should be included in the cost of the project.[93]

---

[90] Application at 15 & Ex. Z-3.

[91] PG&E November 9, 2021 Comments at 3-4.

[92] *Id.* at 4.

[93] PSE November 17, 2021 Comments at 4-6.

47.     On December 16, 2021, GTN filed an answer to the PG&E and PSE protests
(GTN Answer).  GTN states that the PG&E and PSE protests are without merit and
should be dismissed.  GTN states that it demonstrated that the estimated revenues
associated with the project will exceed the estimated cost of service associated with the
project facilities,[94] which satisfies the Commission's standard for such a
predetermination.

48.     GTN avers that allocating the costs of the prior reliability work to the project
would be directly contrary to Commission policy and would likely cause a huge windfall
to base system shippers, resulting in project shippers improperly subsidizing reliability
work from which base system shippers benefit.  GTN states that the prior reliability work
was not intended to create incremental capacity and that those projects are already in
service and thus, all costs associated with the section 2.55(b) replacement projects have
been excluded from the predetermination analysis.[95]

49.     On December 28, 2021, PSE filed an answer to GTN's Answer (PSE Answer).
PSE renews its request that the Commission disallow a presumption of rolled-in rate
treatment for the project to protect existing shippers.  Further, PSE states that the
Commission should require GTN, in its next general NGA section 4 rate case proceeding,
to separately account for the construction, operating costs, and revenues from in-kind-
sized replacement compressors prior notice procedures, the uprated portion of the
compressors, and other expansion facilities to ensure that costs are properly allocated
between the prior reliability work and the GTN Xpress Project.[96]

50.     On August 22, 2022, the States of Washington, Oregon, and California filed a
protest arguing, in part, that the cost of the reliability work performed under section 2.55
should be included in the cost of the project.

51.     On September 6, 2022, GTN provided an answer to the States' protest, noting its
previous explanation that costs were properly allocated.

Discussion

52.     To receive a predetermination favoring rolled-in rate treatment, a pipeline must
demonstrate that rolling in the costs associated with the construction and operation of
new facilities will not result in existing customers subsidizing the expansion.  In general,
this means that a pipeline must show that the revenues to be generated by an expansion

---

[94] Application Ex. N, at 1.

[95] GTN Answer at 7-10.

[96] PSE Answer at 6-7.

project will exceed the project costs. To make this determination, we compare the project cost to the revenues generated using actual contract volumes and either the maximum recourse rate or, if the negotiated rate is lower than the recourse rate, the actual negotiated rate.[97]

53.    As noted above, costs associated with the previous reliability work were properly excluded in the application for the GTN XPress Project.[98] However, it appears that a portion of the horsepower from the replacement compressors, which was not necessary or used to replicate the service provided by the old compressors that they were installed to replace, will be activated and used to provide expansion project service. Commission policy is that costs associated with existing capacity that is used for an incremental project should not be included in the incremental project's cost of service for purposes of establishing initial rates since these costs are already in rate base and the initial incremental recourse rates should be designed to reflect only the incremental costs associated with the project.[99] However, while the costs of the replacement compressors appear to be in existing rates,[100] there is a question as to whether the portion of the horsepower being used to support the expansion project is currently in use. We believe that parties should be free to argue in the next rate case that a portion of the compression costs should be assigned to the expansion project. Therefore, in order to fully preserve the ability of the parties to address the allocation issue in a future general NGA section 4 rate case, we will not, in this certificate order, grant a predetermination favoring rolled-in rate treatment in such a proceeding.

### 3.    Reporting Incremental Costs

54.    We require GTN to keep separate books and accounting of costs and revenues attributable to the capacity created by the project in the same manner as required by section 154.309 of the Commission's regulations.[101] The books should be maintained with applicable cross-reference and the information must be in sufficient detail so that the

---

[97] *Tenn. Gas Pipeline Co., L.L.C.*, 144 FERC ¶ 61,219, at P 22 (2013).

[98] *See supra* P 17.

[99] *See Tex. E. Transmission, LP*, 165 FERC ¶ 61,132, at P 19 (2018).

[100] GTN's existing rates are the result of a "black box" settlement. *Gas Transmission Nw. L.L.C.*, 177 FERC ¶ 61,110.

[101] 18 C.F.R. § 154.309 (2022). *See Gulf S. Pipeline Co., LLC*, 173 FERC ¶ 61,049, at P 6 (2020) (for projects that use existing system rates for the initial rates, the Commission's requirement for separate books and accounting applies only to internal books and records).

data can be identified in Statements G, I, and J in any future NGA section 4 or 5 rate case, and the information must be provided consistent with Order No. 710.[102]

### 4. Negotiated Rates

55. GTN proposes to provide service on the project to the project shippers under negotiated rate transportation agreements. GTN must file either its negotiated rate agreements or a tariff record setting forth the essential elements of the agreements in accordance with the Commission's Alternative Rate Policy Statement[103] and the Commission's negotiated rate policies.[104]

### C. Environmental Impacts

56. On January 21, 2022, the Commission issued a *Notice of Intent to Prepare an Environmental Impact Statement for the Proposed GTN XPress Project, Request for Comments on Environmental Issues, and Schedule for Environmental Review.* The notice was published in the *Federal Register*[105] and was mailed to affected landowners (as defined in the Commission's regulations); federal, state, and local officials; Indian tribes; agency representatives; environmental and public interest groups; and local libraries and newspapers. In response to the notice, the Commission received comment letters from

---

[102] *See Revisions to Forms, Statements, & Reporting Requirements for Nat. Gas Pipelines,* Order No. 710, FERC Stats. & Regs. ¶ 31,267, at P 23 (2008). In *Gulf South*, the Commission clarified that a pipeline charging its existing system rates for a project is not required to provide books and accounting consistent with Order No. 710. However, a pipeline is required to maintain its internal books and accounting such that it would have the ability to include this information in a future FERC Form No. 2 if the rate treatment for the project is changed in a future rate proceeding.

[103] *Alts. to Traditional Cost-of-Serv. Ratemaking for Nat. Gas Pipelines; Regul. of Negotiated Transportation Servs. of Nat. Gas Pipelines*, 74 FERC ¶ 61,076, *order granting clarification*, 74 FERC ¶ 61,076, *order granting clarification*, 74 FERC ¶ 61,194, *order on reh'g and clarification*, 75 FERC ¶ 61,024, *reh'g denied*, 75 FERC ¶ 61,066, *reh'g dismissed*, 75 FERC ¶ 61,291 (1996), *petition denied sub nom. Burlington Res. Oil & Gas Co. v. FERC*, 172 F.3d 918 (D.C. Cir. 1998) (Alternative Rate Policy Statement).

[104] *Nat. Gas Pipeline Negotiated Rate Policies & Pracs.; Modification of Negotiated Rate Pol'y*, 104 FERC ¶ 61,134 (2003), *order on reh'g and clarification*, 114 FERC ¶ 61,042, *dismissing reh'g and denying clarification*, 114 FERC ¶ 61,304 (2006).

[105] 87 Fed. Reg. 4578 (Jan. 28, 2022).

the National Park Service, the EPA, Columbia Riverkeeper, Rogue Climate, the Idaho Governor's Office, and Sierra Club. The comments concerned Environmental Impact Statement (EIS) preparation, geology and soils, water resources, threatened and endangered species, environmental justice, land use, cultural resources, air quality and noise, climate change, reliability and safety, and alternatives.

57. To satisfy the requirements of the National Environmental Policy Act of 1969 (NEPA),[106] Commission staff prepared a draft EIS, which was issued on June 30, 2022, with EPA participating as a cooperating agency. The draft EIS addressed all substantive environmental comments received prior to issuance. The draft EIS was filed with the EPA, and the Commission issued a Notice of Availability (NOA) of the draft EIS on June 30, 2022. The draft EIS was noticed in the *Federal Register*[107] on July 7, 2022, establishing a 45-day comment period that ended on August 22, 2022. The NOA was also mailed to project stakeholders. In response to the draft EIS, the Commission received comments from the EPA; the States of Washington, Oregon, and California; various non-governmental organizations including the Crag Law Center, Rogue Climate, Wild Idaho Rising Tide, Earth Ministry, Columbia Riverkeeper, Oregon Physicians for Social Responsibility, Washington Physicians for Social Responsibility, 350 Eugene, 350 Deschutes, 350 PDX, 350 Seattle, Rogue Climate, Oregon Just Transition Alliance, Southern Oregon Climate Action Now, Ministry/Washington Interfaith Power and Light, Red Earth Descendants, Oregon Women's Land Trust, Breach Collective, Southern Oregon Pachamama Alliance, Siskiyou Rising Tide, Climate Solutions, Beyond Toxics, and Columbia River Inter-Tribal Fish Commission; the Pipelines Local 798; and 8 individuals. The comments expressed concerns for environmental justice communities, sensitive species, climate change and GHG emissions, the purpose and need for the project, and cumulative impacts in the project area.

58. Commission staff issued the final EIS for the project on November 18, 2022, and a NOA was published in the *Federal Register* on November 25, 2022.[108] The final EIS addresses geology; soils; groundwater; surface water; wetlands; fisheries and aquatic resources; vegetation and wildlife (including threatened, endangered, and other special-status species); land use and visual resources; cultural resources; socioeconomics (including environmental justice[109]); air quality and noise; GHG and climate change;

---

[106] 42 U.S.C. §§ 4321 *et seq*. *See also* 18 C.F.R. pt. 380 (2022) (Commission's regulations implementing NEPA).

[107] 87 Fed. Reg. 40,516 (July 7, 2022).

[108] 87 Fed. Reg. 72,472 (Nov. 25, 2022).

[109] Under NEPA, the Commission considers impacts to all potentially affected communities. Consistent with Executive Order 12,898 and Executive Order 14,008, the

reliability and safety; cumulative impacts; and alternatives. It addresses all substantive environmental comments received on the draft EIS and concludes that most adverse environmental impacts resulting from the proposed project would be temporary or short-term during construction. Permanent impacts resulting from the proposed project are primarily limited to the expanded aboveground facilities at the Starbuck Compressor Station. The final EIS concludes that impacts would be reduced to less than significant levels through implementation of GTN's proposed avoidance, minimization, and mitigation measures and Commission staff's recommendations, which we have adopted, with a modification discussed below, herein as environmental conditions in the appendix to this order.[110]

59.    In response to the final EIS, the Commission received comments from the EPA, States of Washington, California, and Oregon, non-governmental organizations, and individuals. Many of these comments express concerns regarding safety, environmental justice, sensitive species, climate change and GHG emissions, the public health and safety risks of increasing reliance on natural gas, cultural resources, and the purpose and need for the project. The project shippers, Oregon State Building and Construction Trades Council, the State of Idaho, United States Senators, the MDU Utilities Group, and other individuals filed comments in support of the project. The comments on the final EIS were generally consistent with those received in either scoping or on the draft EIS and were sufficiently addressed within the final EIS. We do, however, address some of these comments below. In addition, GTN also filed comments on the final EIS, including on recommended environmental condition 7, which is discussed below.

60.    After Commission staff issued the final EIS, Congress enacted the *Fiscal Responsibility Act of 2023*.[111]    A section titled "Builder Act" amended NEPA in several

---

Commission separately identifies and addresses "disproportionately high and adverse human health or environmental effects" on environmental justice communities. Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 11, 1994); Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021). *See infra* PP 73-91.

[110] Final EIS at 5-1.

[111] *See* FISCAL RESPONSIBILITY ACT OF 2023, PL 118-5, 137 Stat 10 (June 3, 2023). The Commission relied on the *Fiscal Responsibility Act of 2023* in a recent order. *See Mountain Valley Pipeline, LLC*, 183 FERC ¶ 61,221, at PP 7, 9, 11 n.20 (2023).

Document Accession #: 20231023-3042    Filed Date: 10/23/2023

ways.[112]  NEPA section 102(C), as amended, requires that agencies prepare NEPA documents on:

> **(i)** reasonably foreseeable environmental effects of the proposed agency action;
>
> **(ii)** any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;
>
> **(iii)** a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;
>
> **(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and
>
> **(v)** any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.[113]

The Commission has complied with its NEPA responsibilities under both versions of the statute.[114]

### 1.    Environmental Condition 7

61.    GTN requests that the Commission revise recommended environmental condition 7 to require GTN to employ at least one environmental inspector for the project

---

[112] *See* FISCAL RESPONSIBILITY ACT OF 2023, PL 118-5, 137 Stat 10, at § 321 (June 3, 2023) (providing the "Builder Act").

[113] 42 U.S.C. § 4332(c)(i).

[114] We note that the Council on Environmental Quality recently published a Notice of Proposed Rulemaking to revise its regulations implementing NEPA, including to implement the Builder Act amendments.  88 Fed. Reg. 49,924 (July 31, 2023).  The Commission will monitor this proceeding to inform the Commission's practices going forward.

and not one at each compressor station where physical ground disturbance would occur. We note that this recommended condition was inadvertently changed between the draft EIS and final EIS and agree with the requested revision. Accordingly, environmental condition 7 as adopted in the appendix to this order is revised to state that GTN is required to employ at least one environmental inspector for the project, consistent with the recommendation in the draft EIS.

## 2. Project Safety

62. Several comments discuss safety concerns, including the safety of increasing compression and pressure within the existing pipeline system. As stated in section 4.11 of the final EIS, the Department of Transportation's (DOT) Pipeline and Hazardous Materials Safety Administration administers the national regulatory program to ensure the safe transportation of natural gas and other hazardous materials by pipeline. DOT prescribes the minimum standards for operating and maintaining pipeline and aboveground natural gas facilities, including the requirement to establish a written plan governing these activities.[115] The project facilities would be designed, constructed, operated, and maintained in accordance with the DOT Minimum Federal Safety Standards in 49 C.F.R. 192 (2022). GTN operates its existing facilities, including its pipeline, in compliance with these standards and requirements.[116] In addition, GTN's Emergency Response Plan, which is reviewed yearly with the local fire departments, includes measures to address wildfires.[117]

## 3. Greenhouse Gas Emissions and Climate Change

63. The Council on Environmental Quality (CEQ) defines effects or impacts as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable," which include those effects that "occur at the same time and place" and those that "are later in time or farther removed in distance, but are still reasonably foreseeable."[118] An impact is reasonably foreseeable if it is "sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision."[119]

---

[115] Final EIS at 4-55.

[116] *Id*. at 4-54.

[117] *Id*. at 4-56.

[118] 40 C.F.R. § 1508.1(g) (2022).

[119] *Id.* § 1508.1(aa). *See generally Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) (explaining that "NEPA requires 'a reasonably close causal relationship'

Document Accession #: 20231023-3042    Filed Date: 10/23/2023

64.     For the GTN XPress Project, we find that the construction emissions, operational emissions, and downstream combustion emissions associated with the capacity subscribed by Cascade and Intermountain (together, 99,000 Dth/d) are reasonably foreseeable.[120]  Construction activities are estimated to result in emissions of 6,941 metric tons of carbon dioxide equivalents ($CO_2$e).  In subsequent years, project operations are estimated to result in emissions of 129,932 metric tons of $CO_2$e per year.[121]  Reasonably foreseeable downstream emissions, could result in emissions of 1.9 million metric tons of $CO_2$e per year, assuming that the natural gas would be completely combusted.[122]  The Final EIS estimates that the social cost of GHGs from the project is either \$739,364,852

---

between the environmental effect and the alleged cause" and that "[t]he Court analogized this requirement to the 'familiar doctrine of proximate cause from tort law") (citation omitted); *Food & Water Watch v. FERC*, 28 F.4th 277, 288 (D.C. Cir. 2022) ("Foreseeability depends on information about the 'destination and end use of the gas in question.'") (citation omitted); *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (*Sabal Trail*) ("FERC should have estimated the amount of power-plant carbon emissions that the pipelines will make possible.").

[120] In their comments on the final EIS, the States of Washington, Oregon, and California argue that the final EIS does not adequately explain why the emissions associated with the capacity subscribed by Tourmaline are not considered reasonably foreseeable, as they were in the draft EIS.  Tourmaline is a natural gas producer and the end use for the natural gas which will be transported using its subscribed capacity is not known.  Tourmaline has stated the gas is generally intended for West Coast markets.  Therefore, the downstream emissions associated with the capacity are not reasonably foreseeable.  *See ANR Pipeline Co.*, 179 FERC 61,040, at PP 13, 45 (2022) (excluding from the calculation of reasonably foreseeable downstream emissions the emissions associated with capacity that would "supply . . . other U.S. markets" along the pipeline system).

[121] GTN pointed out in comments on the final EIS that the operational emissions included in the final EIS were incorrect.  The final EIS estimated operational emissions to be 393,065 metric tons of $CO_2$e per year, but this represented the full amount of emissions from the Athol, Starbuck, and Kent Compressor Stations once all proposed modifications are completed.  The incremental increase in operational GHG emissions as a result of the GTN Xpress Project at the compressor stations would be 129,932 metric tons of CO2e per year.  All numbers in the discussion below have been updated to reflect the correct incremental increase.

[122] Final EIS at ES-4, 4-48, 4-50.  Full burn calculations are, in most cases, an overestimate because pipelines only operate at full capacity during limited periods of full demand.

(assuming a discount rate of 5%), $2,895,307,401 (assuming a discount rate of 3%), $4,414,305,120 (assuming a discount rate of 2.5%) or $8,807,239,545 (using the 95th percentile of the social cost of GHGs with a discount rate of 3%).**123**  The final EIS states that "[m]odifying and installing the Project facilities would increase the atmospheric concentration of GHGs in combination with past, current, and future emissions from all other sources globally and contribute incrementally to future climate change impacts."**124**  We clarify that, assuming that the transported gas is not displacing equal- or higher-emitting sources, we recognize that the project's contributions to GHG emissions globally contribute to future climate change impacts,**125** including impacts in the region.**126**

65.    In its comments on the final EIS, the EPA reiterates previous comments that the EIS did not quantify the upstream emissions associated with natural gas production, processing, and transportation.  In addition, Southern Oregon Climate Action Now comments that an estimation of upstream emissions is needed.  This is not required here.  As explained below, the upstream emissions are not reasonably foreseeable.

66.    The environmental effects resulting from natural gas production are generally neither caused by a proposed pipeline project nor are they reasonably foreseeable consequences of our approval of an infrastructure project, as contemplated by CEQ's regulations.**127**  Here, the supply source associated with the capacity subscribed by Cascade and Intermountain is unknown, and it is unknown whether there will be any

---

**123** Final EIS at 4-51.  The Final EIS describes the method and assumptions staff used for calculating the social cost of GHGs.  *Id.* at 4-50 to 4-51.  The IWG draft guidance identifies costs in 2020 dollars.  Interagency Working Group on Social Cost of Greenhouse Gases, United States Government, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990*, at 5 (Table ES-1) (Feb. 2021).

**124** Final EIS at 4-47.

**125** *Id.*

**126** *Id.* at 4-45 to 4-47 (discussing observations from the Fourth Assessment Report).

**127** *E.g.*, *Equitrans, L.P.*, 183 FERC ¶ 61,200, at P 42 (2023); *see, e.g.*, *Transcon. Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,148, at P 93 (2023); *Cent. N.Y. Oil & Gas Co., LLC*, 137 FERC ¶ 61,121, at PP 81-101 (2011), *order on reh'g*, 138 FERC ¶ 61,104, at PP 33-49 (2012), *petition for review dismissed sub nom. Coal. for Responsible Growth v. FERC*, 485 F. App'x. 472, 474-75 (2d Cir. 2012) (unpublished opinion); *see also Nat'l Fuel Gas Supply Corp. Empire Pipeline, Inc.*, 164 FERC ¶ 61,084, at P 102 (2018).

Case: 24-60354     Document: 1-3     Page: 36     Date Filed: 07/15/2024

Document Accession #: 20231023-3042     Filed Date: 10/23/2023
USCA Case #24-1204   Document #2064211      Filed: 07/11/2024   Page 40 of 238

Docket No. CP22-2-000                                                    - 31 -

incremental development of production wells associated with the capacity subscribed by Tourmaline. That natural gas production and transportation facilities are all components of the general supply chain required to bring domestic natural gas to market does not mean that the Commission's approval of a particular infrastructure project will cause additional gas production.**128** Even knowing the identity of a producer of gas to be shipped on a pipeline and the general location of that producer's existing wells would not necessarily reveal whether additional wells would be induced.**129** Therefore, based on the lack of information showing that the project would induce additional production, we conclude that upstream GHG emissions are not reasonably foreseeable.

67.     As we have done in prior certificate orders, we compare estimated project GHG emissions to the total GHG emissions of the United States as a whole and at the state level. This comparison allows us to contextualize the project emissions of the project. We have updated this analysis from that in the final EIS based on comments received from GTN and updated emissions data. At a national level, 5,586 million metric tons of $CO_2e$ were emitted in 2021 (inclusive of $CO_2e$ sources and sinks).**130** Construction emissions from the project could potentially increase $CO_2e$ emissions based on the national 2021 levels by 0.0001%; in subsequent years, the operation and reasonably foreseeable downstream GHG emissions could potentially increase emissions by 0.04%.

68.     At the state level, we compare the project's GHG emissions to Washington's, Oregon's, and Idaho's state emission inventories.**131** The project's total foreseeable downstream emissions were allocated to Washington, Oregon, and Idaho based on the service area of the shippers that have subscribed capacity. As noted above, end use for Tourmaline's subscribed capacity is not reasonably foreseeable. We assume that end use for Intermountain's 79,000 Dth/d of subscribed capacity would occur in Idaho, as that is Intermountain's service area. Cascade's 20,000 Dth/d of subscribed capacity could be

---

**128** *Nat'l Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145, at P 157 (2017), *order on reh'g*, 164 FERC ¶ 61,084.

**129** *Id.* P 163.

**130** EPA, *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2021 at ES-4* (Table ES-2) (April 2023), https://www.epa.gov/system/files/documents/2022-04/us-ghg-inventory-2022-main-text.pdf.

**131** In its comments on the final EIS, GTN stated that the state-wide emission reported in the final EIS for Idaho, Oregon, and Washington were inaccurately represented as metric tons of $CO_2e$ rather than metric tons of carbon dioxide, which led to an overstatement of the contextual weight of GHG emissions attributed to the project. GTN is correct. Commission staff has revised the analysis and the updated numbers are included in this order.

used in either Washington or Oregon based on Cascade's service area, so we allocate the total to each state for purposes of our context calculations, as a conservative approach. In 2020, 19.4 million metric tons of $CO_2$e were emitted in the state of Idaho; 68.4 million metric tons of $CO_2$e were emitted in the state of Washington; and 37.5 million metric tons of $CO_2$e were emitted in the state of Oregon.[132] Accordingly, construction emissions from the project could potentially increase $CO_2$e emissions in Washington by 0.004% and in Oregon by 0.009%. In subsequent years, the operation and reasonably foreseeable downstream GHG emissions could potentially increase emissions by 8% in Idaho, by 0.7% in Washington, and by 1.1% in Oregon.

69.     When states have GHG emissions reduction targets, we will compare the project's GHG emissions to those state goals to provide additional context. The state of Washington has a GHG emissions goal of reducing GHGs by 95% by 2050 based on 1990's GHG emission levels. In 1990, based on EPA's Emissions Inventory, Washington emitted 90.5 million metric tons of $CO_2$e, as such their 2050 reduction goal would be annual GHG emissions of 4,525,000 metric tons of $CO_2$e. The project's operational emissions and reasonably foreseeable downstream emissions would constitute 11% of Washington's 2050 reduction target. The state of Oregon has goals to reduce emissions by 80% of 1990 levels by 2050. In 1990 based on EPA's emissions Inventory, Oregon emitted 43.7 million metric tons of GHGs. As such, their reduction goal would be an annual GHG emissions of 8,740,000 metric tons of $CO_2$e. The project's operational emissions and reasonably foreseeable downstream emissions would constitute 4.6% of Oregon's 2050 reduction target. The state of Idaho does not have statewide GHG emissions goals.

70.     The Pipeline Safety Trust commented that it is unclear how the project would not have increased fugitive emissions at the Athol and Kent Compressor Stations. Emissions from fugitive components were estimated using design documents to determine the quantity of components and using EPA emission factors for oil and gas facilities. We note that although the final EIS states that there would be no increase in fugitive emissions from the Athol and Kent Compressor Stations, Table 4.9-2 of the final EIS shows that the proposed potential to emit (PTE) at the Athol Compressor Station is 15.18 tons per year (tpy) of volatile organic compound (VOC) emissions and 41,793 tpy of $CO_2$e due to equipment leaks. The existing PTE for equipment leaks at the Athol Compressor Station is 8.66 tpy of VOCs and 23,845 tpy of $CO_2$e. Table 4.9-2 shows that the proposed PTE at the Kent Compressor Station is 26.78 tpy of VOC and 73,758 tpy of $CO_2$e due to equipment leaks. The existing PTE for equipment leaks at the Kent

---

[132] U.S. Energy Information Administration, Table 1, State Energy-Related Carbon Dioxide Emissions by Year, Unadjusted (Oct. 11, 2022).

Case: 24-60354    Document: 1-3    Page: 38    Date Filed: 07/15/2024

Document Accession #: 20231023-3042    Filed Date: 10/23/2023
    USCA Case #24-1204   Document #2064211    Filed: 07/11/2024    Page 42 of 238
Docket No. CP22-2-000                                                                - 33 -

Compressor Station is 20.26 tpy of VOCs and 17,948 tpy of $CO_2e$.[133]  Therefore, the final EIS correctly shows that there would be an increase in fugitive emissions at the stations due to the proposed modifications, and we correct the record in regard to the statement in the final EIS that there would not be an increase in fugitive emissions.  As stated in the final EIS, the project would result in continued compliance with the National Ambient Air Quality Standards (NAAQS) and GTN has obtained air quality permits, as applicable. Thus, even noting the increase in fugitive emissions at the stations, we continue to conclude that the project would not result in significant impacts to local or regional air quality.

71.     Several commenters state that the Commission should have determined whether the project's GHG emissions will have a significant environmental impact.  The Final EIS states that it "include[d] a disclosure of the social cost of GHGs . . . to assess climate impacts generated by each additional metric ton of GHGs emitted by the Project."[134]  We clarify that for informational purposes, Commission staff disclosed an estimate of the social cost of GHGs.[135]  While we have recognized in some past orders that social cost of GHGs may have utility in certain contexts such as rulemakings,[136] we have also found that calculating the social cost of GHGs does not enable the Commission to determine credibly whether the reasonably foreseeable GHG emissions associated with a project are significant or not significant in terms of their impact on global climate change.[137] Currently, however, there are no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria.[138]  Nor are we aware of any other currently scientifically accepted method that

---

[133] Final EIS at 4-39 – 4-41.

[134] *Id.* at 4-50.

[135] *Id.* at 4-50 to 4-51.  We note that "Commission staff have not identified a methodology to attribute discrete, quantifiable, physical effects on the environment resulting from the Project's incremental contribution to GHGs."  *Id.* at 4-47.

[136] *Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099, at PP 35-37 (2018).

[137] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 296, (2017), *aff'd sub nom*., *Appalachian Voices v. FERC*, 2019 WL 847199 (D.C. Cir. 2019); *Del. Riverkeeper v. FERC*, 45 F.4th 104, 111 (D.C. Cir. 2022).  The social cost of GHGs tool merely converts GHG emissions estimates into a range of dollar-denominated figures; it does not, in itself, provide a mechanism or standard for judging "significance."

[138] *Tenn. Gas Pipeline Co., L.L.C.*, 181 FERC ¶ 61,051 at P 37; *see also Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 296, *order on reh'g*, 163 FERC ¶ 61,197, at PP 275-297 (2018), *aff'd*, *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at 2 (D.C. Cir. Feb. 19, 2019) (unpublished) ("[The Commission] gave several

Case: 24-60354  Document: 1-3  Page: 39  Date Filed: 07/15/2024

Document Accession #: 20231023-3042  Filed Date: 10/23/2023
USCA Case #24-1204  Document #2064211  Filed: 07/11/2024  Page 43 of 238
Docket No. CP22-2-000  - 34 -

would enable the Commission to determine the significance of reasonably foreseeable GHG emissions.**[139]**  The D.C. Circuit has repeatedly upheld the Commission's decisions not to use the social cost of carbon, including to assess significance.**[140]**  In fact, the D.C. Circuit recently affirmed the Commission's decision to not analyze the Social Cost of Carbon in its NEPA analysis,**[141]** rejected the suggestion that it was required to do so,

_____

reasons why it believed petitioners' preferred metric, the Social Cost of Carbon tool, is not an appropriate measure of project-level climate change impacts and their significance under NEPA or the Natural Gas Act.  That is all that is required for NEPA purposes."); *EarthReports v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) (accepting the Commission's explanation why the social cost of carbon tool would not be appropriate or informative for project-specific review, including because "there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes"); *Tenn. Gas Pipeline Co., L.L.C*., 180 FERC ¶ 61,205, at P 75 (2022); *See, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14 (2023); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206, at P 91 (2022).

**[139]** *See, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026 at P 14 ("there are currently no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria").

**[140]** *See*, *e.g*., *Ctr. For Biological Diversity v. FERC*, 67 F.4th 1176, 1184 (D.C. Cir. 2023) (*Alaska LNG*) (explaining that "the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions," "declined to apply the social cost of carbon for the same reasons it had given in a previous order"; describing those reasons as (1) "the lack of consensus about how to apply the social cost of carbon on a long time horizon," (2) that "the social cost of carbon places a dollar value on carbon emissions but does not measure environmental impacts as such," and (3) "FERC has no established criteria for translating these dollar values into an assessment of environmental impacts"; and recognizing that the Commission's "approach was reasonable and mirrors analysis . . . previously upheld" and that the Commission "had no obligation in this case to consider the social cost of carbon") (citations omitted);  *EarthReports*, 828 F.3d at 956 (upholding the Commission's decision not to use the social cost of carbon tool due to a lack of standardized criteria or methodologies, among other things)); *Del. Riverkeeper v. FERC*, 45 F.4th 104 (also upholding the Commission's decision not to use the social cost of carbon); *Appalachian Voices v. FERC*, 2019 WL 847199 (D.C. Cir. 2019) (same).

**[141]** *Alaska LNG*, 67 F.4th at 1184 ("Rather than use the social cost of carbon, the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions.  It declined to apply the social cost of carbon for the same reasons it had given in a previous order. . . FERC's approach was reasonable and mirrors analysis we have previously upheld.").

found that the petitioner's arguments "fare no better when framed as NGA challenges," and then, in the very same paragraph, sustained the Commission's public interest determination as "reasonable and lawful."[142]

72.    We note that there currently are no accepted tools or methods for the Commission to use to determine significance, therefore the Commission is not herein characterizing these emissions as significant or insignificant.[143]  Accordingly, we have taken the required "hard look" and have satisfied our obligations under NEPA.

### 4.    Environmental Justice

73.    In conducting NEPA reviews of proposed natural gas projects, the Commission follows Executive Order 12898, which directs federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on minority and low-income populations (i.e., environmental justice communities).[144]  Executive Order 14008 also directs agencies to develop "programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."[145]

---

[142] *Id.*

[143] The February 18, 2022 Interim GHG Policy Statement, Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs., 178 FERC ¶ 61,108 (2022) which proposed to establish a NEPA significance threshold of 100,000 tons per year of $CO_2e$ as a matter of policy, has been converted to draft status, and opened to further public comment. *Order on Draft Policy Statements*, 178 FERC ¶ 61,197, at P 2 (2022).

[144] Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994).  While the Commission is not one of the specified agencies in Executive Order 12898, the Commission nonetheless addresses environmental justice in its analysis, in accordance with our governing regulations and guidance, and statutory duties.  15 U.S.C. § 717f; *see also* 18 C.F.R. § 380.12(g) (2022) (requiring applicants for projects involving significant aboveground facilities to submit information about the socioeconomic impact area of a project for the Commission's consideration during NEPA review); FERC, *Guidance Manual for Environmental Report Preparation* at 4-76 to 4-80 (Feb. 2017).

[145] Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021).  The term "environmental justice community" includes disadvantaged communities that have been historically marginalized and overburdened by pollution.  *Id.* at 7629.  The term also includes, but may not be limited to minority populations, low-income

Document Accession #: 20231023-3042      Filed Date: 10/23/2023
Docket No. CP22-2-000                                                      - 36 -

Environmental justice is "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies."[146]

74.     Consistent with the CEQ[147] and EPA[148] guidance and recommendations, the Commission's methodology for assessing environmental justice impacts considers: (1) whether environmental justice communities (e.g., minority or low-income

---

populations, or indigenous peoples. *See* EPA, *EJ 2020 Glossary* (Aug. 18, 2022), https://www.epa.gov/environmentaljustice/ej-2020-glossary.

[146] EPA, *Learn About Environmental Justice*, https://www.epa.gov/environmentaljustice/learn-about-environmental-justice (Sept. 6, 2022). Fair treatment means that no group of people should bear a disproportionate share of the negative environmental consequences resulting from industrial, governmental, and commercial operations or policies. *Id.* Meaningful involvement of potentially affected environmental justice community residents means: (1) people have an appropriate opportunity to participate in decisions about a proposed activity that may affect their environment and/or health; (2) the public's contributions can influence the regulatory agency's decision; (3) community concerns will be considered in the decision-making process; and (4) decision makers will seek out and facilitate the involvement of those potentially affected. *Id.*

[147] CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act* 4 (Dec. 1997) (CEQ's *Environmental Justice Guidance*), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf. CEQ offers recommendations on how federal agencies can provide opportunities for effective community participation in the NEPA process, including identifying potential effects and mitigation measures in consultation with affected communities and improving the accessibility of public meetings, crucial documents, and notices. GTN conducted environmental justice community outreach activities in the vicinity of the Starbuck and Athol Compressor Stations. In addition, GTN has maintained a virtual open house website since October 2021. *See* Final EIS at 4-22. There were also opportunities for public involvement during the Commission's environmental review processes. *See* Final EIS at 4-21 to 4-22.

[148] *See generally* Interagency Working Group for Environmental Justice, *Promising Practices for EJ Methodologies in NEPA Reviews* (Mar. 2016) (*Promising Practices*), https://www.epa.gov/sites/default/files/2016-08/documents/nepa_promising_practices_document_2016.pdf.

populations)[149] exist in the project area; (2) whether impacts on environmental justice communities are disproportionately high and adverse; and (3) possible mitigation measures. As recommended in *Promising Practices*, the Commission uses the 50% and the meaningfully greater analysis methods to identify minority populations.[150] Specifically, a minority population is present where either: (1) the aggregate minority population of the block groups in the affected area exceeds 50%; or (2) the aggregate minority population in the block group affected is 10% higher than the aggregate minority population percentage in the county.[151]

75. CEQ's *Environmental Justice Guidance* also directs low-income populations to be identified based on the annual statistical poverty thresholds from the U.S. Census Bureau. Using *Promising Practices'* low-income threshold criteria method, low-income populations are identified as block groups where the percent of low-income population in the identified block group is equal to or greater than that of the county.

76. To identify potential environmental justice communities in the project area, the final EIS used 2019 U.S. Census American Community Survey data[152] for the race, ethnicity, and poverty data at the state, county, and block group level.[153] Additionally, in accordance with *Promising Practices*, Commission staff used EJScreen, EPA's environmental justice mapping and screening tool, as an initial step to gather information regarding minority and low-income populations, potential environmental quality issues, environmental and demographic indicators, and other important factors.

---

[149] *See generally* Exec. Order No. 12,898, 59 Fed. Reg. 7629. Minority populations are those groups that include: American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic.

[150] See *Promising Practices* at 21-25.

[151] Final EIS at 4-24. The final EIS used Kootenai County, Idaho and Walla Walla County, Washington as the comparable reference communities to ensure that affected environmental justice communities were properly identified. A reference community may vary according to the characteristics of the particular project and the surrounding communities.

[152] U.S. Census Bureau, *American Community Survey 2019 ACS 5-Year Estimates Detailed Tables, File# B17017, Poverty Status in the Past 12 Months by Household Type by Age of Householder*, https://data.census.gov/cedsci/table?q=B17017; File #B03002 Hispanic or Latino Origin By Race, https://data.census.gov/cedsci/table?q=b03002.

[153] *See* final EIS at 4-24.

77.     Once Commission staff collected the block group level data,**[154]** staff conducted an impacts analysis for the identified environmental justice communities and evaluated health or environmental hazards, the natural physical environment, and associated social, economic, and cultural factors to determine whether impacts to environmental justice communities are disproportionately high and adverse.  The final EIS considered whether impacts were disproportionately high and adverse on environmental justice populations consistent with EPA's recommendations in *Promising Practices***[155]** and also whether those impacts were significant.**[156]**  Identified project impacts and GTN's proposed mitigation measures are discussed below.

78.     Staff identified two block groups near the project facilities that exceed the defined thresholds for minority and/or low-income communities and are, therefore, environmental justice communities.  Staff identified one minority population (Kootenai County, Idaho - Census Tract 1.01, Block Group 2) and one minority and low-income population (Kootenai County, Idaho - Census Tract 2.03, Block Group 2) within one mile of the Athol Compressor Station; and one minority population (Walla Walla County, Washington - Census Tract 9200, Block Group 4) within one mile of the Starbuck Compressor Station.**[157]**  No environmental justice communities are present within one mile of the Kent Compressor Station.  The final EIS determined that potential impacts on the identified environmental justice communities may include socioeconomic impacts, traffic impacts, increased demand for temporary housing and public services, and noise and air impacts from construction and operation of the project.  Environmental justice

---

**[154]** *See id.* at 4-82, Table 4.7.2-1 (Minority Populations by Race and Ethnicity and Low-Income Populations in the Project Area).

**[155]** *Promising Practices* at 44-46 (explaining that there are a number of factors used to determine whether an action will cause a disproportionately high and adverse impact, and that one recommended approach is to consider whether an impact would be "predominantly borne by minority populations or low-income populations").  We recognize that EPA and CEQ are in the process of updating their guidance regarding environmental justice and we will review and incorporate that anticipated guidance in our future analysis, as appropriate.

**[156]** *Id.* at 33 (stating that "an agency may determine that impacts are disproportionately high and adverse, but not significant within the meaning of NEPA" and in other circumstances "an agency may determine that an impact is both disproportionately high and adverse and significant within the meaning of NEPA").

**[157]** Staff determined that a 1-mile radius was sufficiently broad considering the likely concentration of air emissions, noise, and traffic impacts proximal to the construction activities.

concerns are not present for other resource areas such as geology, groundwater, surface water, wetlands, wildlife, visual resources, or cultural impacts due to the minimal overall impact the project would have on these resources.

79.     Regarding socioeconomic impacts, the final EIS concludes that construction activities will result in a nominal and temporary increase in non-local workforce. Additionally, the final EIS concludes that no new operational workforce would be required to operate the facilities and, thus, socioeconomic impacts on identified environmental justice communities would be minor and temporary.[158]  For traffic impacts, the final EIS acknowledges that movement of construction personnel, equipment, and materials would result in short-term impacts on roadways.  However, it states that the addition of 50 vehicle round-trips per day that have the potential to occur at the Starbuck Compressor Station and the occasional materials deliveries would not substantially impact traffic or local use of roads.  Additionally, due to the limited duration of the construction period, staff expects that construction workers would use existing temporary housing options such as hotels and motels, and campgrounds and RV parks within one hour's drive and would not require new housing to be constructed by the private sector or communities.  Commission staff found that any impact on local economies, housing, or demand for municipal services would also be minor given the scope of the project.[159]  We agree.

80.     Regarding noise impacts, at the Athol Compressor Station there would be no construction noise.  Operating the modified station would permanently increase noise emitted from the station by about 0.2 decibels (dB), measured at nearby noise-sensitive areas (NSA).  The final EIS states that a 0.2-dB increase in noise would not generally be perceptible at the numerous houses located between 800 and 1,500 feet from the station or in the surrounding community.  Similarly, environmental justice communities near the existing station would not likely experience an observable increase in noise as a result of the project.[160]

81.     At the Starbuck Compressor Station, uprating and installing the project facilities would result in varying noise levels on the closest NSA (a single residence, 0.5 mile from the station) ranging from 33.7 dB to 43.7 dB.  Operating the modified station would permanently increase noise at the nearest NSA by about 2.0 dB.  As stated in the final EIS, a 2.0-dB increase in noise would not generally be perceptible at the nearest NSA or in the surrounding community.  Similarly, environmental justice communities near the

---

[158] *See* Final EIS at 4-31.

[159] *Id.* at 4-31.

[160] *Id.*

existing station would not likely experience an observable increase in noise as a result of the project.**161**

82.     For both the Athol and Starbuck Compressor Stations, construction and operational noise would remain below the Commission's day-night noise level of 55 A-weighted decibels threshold at nearby NSAs. Additionally, a "blow down" event is not expected at the Athol Compressor Station, as GTN only proposes a software upgrade. Should a "blow down" event occur at the Starbuck Compressor Station due to modification and installation activities, the resulting noise would not likely be perceptible at the closest NSA, approximately 0.5 mile away. Therefore, staff concluded, and we agree, that the project facilities would result in a permanent, but minor noise impact on environmental justice communities.**162**

83.     During construction, exhaust emissions and fugitive dust would result in short-term, localized impacts in the immediate vicinity of construction work areas. If necessary, GTN proposes to implement dust suppression measures to minimize the impacts of fugitive dust on sensitive areas.

84.     Operational emissions at the modified compressor stations would come from two primary sources: (1) direct gas releases associated with operation and maintenance of the stations and (2) fugitive emissions. GTN completed an air quality dispersion modeling analysis for the Athol and Starbuck Compressor Stations, which are located within environmental justice communities.

85.     For the Athol Compressor Station, the project's anticipated incremental and cumulative emissions are below the NAAQS for all criteria pollutants. Additionally, the criteria pollutant emissions attributable to the project facilities would not exceed Significant Impact Levels.**163** Staff concluded in the final EIS, and we agree, that the

---

**161** *Id.*

**162** *Id.* at 4-32.

**163** The NAAQS significant impact levels (SILs) are defined by EPA under its statutory authority. The EPA has historically interpreted Clean Air Act section 165(a)(3) and associated regulations to mean that a source must have a "significant impact" on ambient air quality in order to cause or contribute to a violation of the NAAQS. 42 U.S.C. § 7475(a)(3). Under this authority, EPA has established its SILs through its regulations and various guidance documents. *See, e.g.,* EPA, Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program, (April 17, 2018), https://www.epa.gov/sites/default/files/2018-04/documents/sils_policy_guidance_document_final_signed_4-17-18.pdf. SILs are stated as emissions concentrations. Exceeding a SIL triggers additional analyses to

construction and operational emissions at the Athol Compressor Station would not have significant adverse air quality impacts on the environmental justice populations in the project area.[164]

86.    For the Starbuck Compressor Station, the project's anticipated incremental and cumulative emissions of criteria pollutants are below the NAAQS for all pollutants. Additionally, only nitrogen oxide and sulfur dioxide emissions would exceed Significant Impact Levels, and they would do so within 0.25 mile of the existing facility.  The nearest sensitive receptor to the Starbuck Compressor Station is 0.5 mile away; therefore, no receptors would experience emissions above the Significant Impact Level.  Staff concluded in the final EIS, and we agree, that the construction and operational emissions at the Starbuck Compressor Station would not have significant adverse air quality impacts on the environmental justice populations in the project area.[165]

87.    We note that although the project and compressor station would be in compliance with the NAAQS and the NAAQS are designated to protect sensitive populations, NAAQS attainment alone may not assure there is no localized harm to such populations due to project emissions of volatile organic compounds, hazardous air pollutants as well as issues, such as the presence of non-project related pollution sources, local health risk factors, disease prevalence, and access (or lack thereof) to adequate care.  Overall, however, as discussed in section 4.9 of the final EIS,[166] and based on the foregoing, the construction and operational emissions from the project would not have significant adverse air quality impacts.

88.    As to cumulative impacts, no projects were identified within the geographic scope for the Athol and Starbuck Compressor Stations.  Thus, there would be no cumulative environmental justice impacts.

89.    The final EIS concluded that impacts associated with the construction and operation of the Athol and Starbuck Compressor Stations on environmental justice communities would be disproportionately high and adverse as they would be

---

include ambient conditions.  SILs are set conservatively to ensure protection of air quality.

[164] *Id.* at 4-33.

[165] *Id.*

[166] *Id*. at 4-34 – 4-51.

predominately borne by environmental justice communities.  However, these impacts would be less than significant.[167]

90.    Individuals and the Pipeline Safety Trust commented on the final EIS that the negative health impacts of methane gas warming the climate and polluting the air are unacceptable and disproportionately affect tribal, minority, and low-income communities.  As noted above, construction and operation of the project would increase the atmospheric concentration of GHGs, in combination with past and future emissions from all other sources and would contribute incrementally to future climate change impacts.  While the climate change impacts taken individually may be manageable for certain communities, the impacts of compounded extreme events (such as simultaneous heat and drought, or flooding associated with high precipitation on top of saturated soils) may exacerbate preexisting community vulnerabilities and have a cumulative adverse impact on environmental justice communities.  However, as mentioned above, we do not characterize the project's GHG emissions as significant or insignificant because there currently are no accepted tools or methods for the Commission to use to determine significance.[168]

91.    In its comments on the final EIS, GTN states that in the final EIS, staff did not explain its departure from the draft EIS, which GTN contends had concluded that the project would not have disproportionately high and adverse impacts on environmental justice communities.  The draft EIS concluded that "impacts associated with construction and operation of certain Project components may be predominately borne by environmental justice communities."[169]  The draft EIS went on to state that "aside from the previously described insignificant impacts, the Project would not have disproportionately high and adverse impacts on environmental justice communities." [170]  We clarify that the basis on which Commission staff determines impacts would be disproportionately high and adverse is if there are impacts associated with the proposed project that would be predominately borne by environmental justice communities.  In addition, both the draft EIS and final EIS find that project impacts on environmental justice communities would be less than significant.  We agree.

---

[167] *Id.*

[168] *See supra* P 72.

[169] Draft EIS at 4-32.

[170] *Id.*

Case: 24-60354    Document: 1-3    Page: 48    Date Filed: 07/15/2024

Document Accession #: 20231023-3042    Filed Date: 10/23/2023
USCA Case #24-1204    Document #2064211    Filed: 07/11/2024    Page 52 of 238
Docket No. CP22-2-000    - 43 -

## 5.    Alternatives

92.    Washington, Oregon, and California argue that the alternatives analysis in the final EIS is incomplete because it did not consider clean energy alternatives.[171]  Washington, Oregon, and California also state that the final EIS ignores ample evidence that such alternatives, like energy efficiency and electrification, exist.[172]  We disagree.

93.    NEPA provides that agencies include "a detailed statement" of "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal."[173]  The Commission has satisfied these procedural requirements.

94.    An applicant's statement of purpose and need informs the choice of alternatives considered by the Commission under NEPA.[174]  Courts have upheld federal agencies' use of applicants' project purpose and need in environmental documents and as the basis for evaluating alternatives.[175]  When an agency is asked to consider a specific proposal, the needs and goals of the parties involved in the application should be taken into account.[176]

95.    We recognize that a project's purpose and need may not be so narrowly defined as to preclude consideration of reasonable alternatives.  Nonetheless, an agency need only consider alternatives that will bring about the ends of the proposed action, and the evaluation is "shaped by the application at issue and by the function that the agency plays

---

[171] Washington, Oregon, & California February 10, 2023 Comment at 3.

[172] *Id.*

[173] 42 U.S.C. § 4332(c)(iii).

[174] CEQ advises that "a reasonable range of alternatives depends on the nature of the proposal and the facts in each case." *CEQ, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,027 (1981).

[175] *E.g.*, *City of Grapevine v. U.S. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991) (*Citizens Against Burlington*); (explaining that the evaluation of alternatives is "shaped by the application at issue and by the function that the agency plays in the decisional process.").

[176] *Citizens Against Burlington*, 938 F.2d at 196.

Case: 24-60354   Document: 1-3   Page: 49   Date Filed: 07/15/2024

Document Accession #: 20231023-3042    Filed Date: 10/23/2023
USCA Case #24-1204   Document #2064211   Filed: 07/11/2024   Page 53 of 238
Docket No. CP22-2-000                                                - 44 -

in the decisional process."**¹⁷⁷**  Moreover, because the alternatives considered under NEPA are informed both by "the project sponsor's goals," **¹⁷⁸** as well as "the goals that Congress has set for the agency,"**¹⁷⁹** *i.e.*, the goals set in enacting the NGA, the Commission's consideration of alternatives includes the no-action alternative and alternatives that achieve the purpose of the project.

96.  Alternatives may be eliminated if they will not achieve a project's goals or are otherwise unreasonable.**¹⁸⁰**  As stated in the final EIS, the project's purpose is to serve the firm transportation requirements of its shippers.**¹⁸¹**  Energy efficiency and non-gas alternatives were excluded because these alternatives do not provide for the transportation of natural gas and would therefore not achieve the project's aims.**¹⁸²**  Moreover, the Commission has previously recognized that "[u]nsupported, hypothetical alternatives are not reasonable alternatives that warrant further NEPA consideration."**¹⁸³**  Washington, Oregon, and California do not support the energy efficiency and non-gas

---

**¹⁷⁷** *Id.* at 199; *see also Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 598-99 (4th Cir. 2018) (*Sierra Club*) (finding the statement of purpose and need for a Commission-jurisdictional natural gas pipeline project that explained where the gas must come from, where it will go, and how much the project would deliver, allowed for a sufficiently wide range of alternatives but was narrow enough that there were not an infinite number of alternatives).

**¹⁷⁸** *Citizens Against Burlington*, 938 F.2d at 196.

**¹⁷⁹** *Sierra Club v. U.S. Forest Serv.*, 897 F.3d at 598-99.

**¹⁸⁰** *See also Alaska LNG*, 67 F.4th at 1182("Because some alternatives will be impractical or fail to further the proposed action's purpose, agencies may reject unreasonable alternatives after only brief discussion.").

**¹⁸¹** Final EIS at 2.

**¹⁸²** S*ee, e.g., Columbia Gas Transmission, LLC*, 164 FERC ¶ 61,036, at P 65 & n.147 (2018), *order denying reh'g*, 170 FERC ¶ 61,247 (2020) ("As we have concluded with respect to other natural gas transportation infrastructure projects, we do not find that the potential for energy conservation and renewable energy sources to be practical alternatives."); *Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 (2017) (recognizing that "renewable energy is not a comparable replacement for the transportation of natural gas").

**¹⁸³** *Commonwealth LNG, LLC*, 183 FERC ¶ 61,173 (2023) (internal quotation and citation omitted).

alternatives in any detail. For these reasons, we disagree that the final EIS should have considered energy efficiency and non-gas alternatives.

97.     The final EIS examined three alternatives to the proposed project: (1) a no-action alternative; (2) a pipeline looping alternative; and (3) an electrical compression alternative. Even though the no-action alternative would result in fewer environmental impacts than the proposed project, it would not meet the project's objectives. Commission staff evaluated two other alternatives to determine whether environmental impacts associated with the project could be avoided or reduced. Commission staff found that constructing the pipeline loops would impact more than 900 acres of land compared to the 46.9 acres of land required to construct the GTN XPress Project facilities.[184] Additionally, staff found that in order to use an electric compressor, a 38-mile-long, high-voltage transmission line and electric substation would need to be installed, which would impact at least 375 acres of land and require the crossing of at least 23 waterbodies.[185] Staff therefore concluded that these alternatives would result in a significant increase in impacts on the environment. The final EIS properly considered alternatives to the GTN XPress Project.

### 6.    Environmental Impact Conclusion

98.     We have reviewed the information and analysis contained in the final EIS regarding potential environmental effects of the GTN XPress Project, as well as the other information in the record. We are accepting the environmental recommendations, with a modification to recommended environmental condition 7 as discussed above, in the final EIS and are including them as conditions in the appendix to this order. Based on our consideration of this information, as supplemented or clarified herein, we agree with the conclusions presented in the final EIS and find that the project, if implemented as described in the final EIS, and further addressed herein, is an environmentally acceptable action. We note that the analysis in the final EIS provides substantial evidence for our conclusions in this order, but that it is the order itself that serves as the record of decision, consistent with the Commission's obligations under NEPA and the Administrative Procedure Act. For that reason, to the extent that any of the analysis in the final EIS is inconsistent with or modified by the Commission's analysis and findings in the order, it is the order that controls and we do not rely on or adopt any contrary analysis in the final EIS.

---

[184] Final EIS at 3-4.

[185] *Id.* at 3-4 – 3-5.

Document Accession #: 20231023-3042   Filed Date: 10/23/2023

## IV.    Conclusion

99.    The proposed project will enable GTN to provide up to 150,000 Dth/d of firm transportation service on its existing system for delivery into Idaho and Pacific Northwest markets.  We find that GTN has demonstrated a need for the GTN XPress Project, that the project will not have adverse economic impacts on existing shippers or other pipelines and their existing customers, and that the project's benefits will outweigh any adverse economic effects on landowners and surrounding communities.  We have analyzed the technical aspects of the project and conclude that it has been appropriately designed to achieve its intended purpose.  Based on the discussion above, we find under section 7 of the NGA that the public convenience and necessity requires approval of the project, subject to the conditions in this order.

100.    As noted above, the project is an environmentally acceptable action and compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analysis.  Thus, Commission staff carefully reviews all information submitted.  Only when staff is satisfied that the applicant has complied with all applicable conditions will a notice to proceed with the activity to which the conditions are relevant be issued.  We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources during abandonment, construction, and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

101.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate.  The Commission encourages cooperation between interstate pipelines and local authorities.  However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.**[186]**

---

**[186]** *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted) and *Dominion Transmission, Inc. v. Summers,* 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal regulation, or would delay the construction and operation of facilities approved by the Commission).

Case: 24-60354   Document: 1-3   Page: 52   Date Filed: 07/15/2024

Document Accession #: 20231023-3042   Filed Date: 10/23/2023
USCA Case #24-1204   Document #2064211   Filed: 07/11/2024   Page 56 of 238

Docket No. CP22-2-000                                           - 47 -

102.    The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application, as supplemented, and exhibits thereto, and all comments, and upon consideration of the record.

The Commission orders:

(A)    A certificate of public convenience and necessity is issued to GTN, authorizing it to construct and operate the proposed GTN XPress Project, as described and conditioned herein, and as more fully described in the application and subsequent filings, including any commitments made therein.

(B)    The certificate issued in Ordering Paragraph (A) is conditioned on GTN's:

(1)    completion of construction of the proposed facilities and making them available for service within three years of the date of this order pursuant to section 157.20(b) of the Commission's regulations;

(2)    compliance with all applicable Commission's regulations under the NGA including, but not limited to, Parts 154, 157, and 284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations; and

(3)    compliance with the environmental conditions listed in the Appendix to this order.

(C)    GTN shall file a written statement affirming that it has executed firm contracts for the capacity levels and terms of service represented in its filed precedent agreement, prior to commencing construction.

(D)    GTN's existing system recourse charges, fuel rate, and line loss percentage for transportation under Rate Schedule FTS-1 are approved as the initial recourse charges for the project.

(E)    GTN's request for a predetermination that all the costs of the project should be rolled into its system rates in a future general NGA section 4 rate case is denied.

(F)    GTN shall keep separate books and accounting of costs attributable to the proposed services, as more fully described above.

Document Accession #: 20231023-3042     Filed Date: 10/23/2023

Docket No. CP22-2-000                                                                    - 48 -

     (G)    GTN shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies GTN.  GTN shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

By the Commission.  Commissioner Danly is concurring in part and dissenting in part with a separate statement attached.
Commissioner Clements is concurring in part and dissenting in part with a separate statement attached.

( S E A L )

Kimberly D. Bose,
Secretary.

Document Accession #: 20231023-3042    Filed Date: 10/23/2023

## Appendix

### Environmental Conditions

As recommended in the final Environmental Impact Statement (EIS), and otherwise amended herein, this authorization includes the following conditions:

1.  Gas Transmission Northwest LLC (GTN) shall follow the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests) and as identified in the EIS, unless modified by the Order.  GTN must:

    a.  request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);

    b.  justify each modification relative to site-specific conditions;

    c.  explain how that modification provides an equal or greater level of environmental protection than the original measure; and

    d.  receive approval in writing from the Director of the Office of Energy Projects (OEP), or the Director's designee, **before using that modification**.

2.  The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the project.  This authority shall allow:

    a.  the modification of conditions of the Order;

    b.  stop-work authority; and

    c.  the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from project construction and operation activities.

3.  **Prior to any construction**, GTN shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, Environmental Inspectors (EI), and contractor personnel will be informed of the EI's authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming

involved with construction and restoration activities.

4.      The authorized facility locations shall be as shown in the EIS, as supplemented by filed alignment sheets. **As soon as they are available, and before the start of construction**, GTN shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the Order. All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

GTN's exercise of eminent domain authority granted under Natural Gas Act section 7(h) in any condemnation proceedings related to the Order must be consistent with these authorized facilities and locations. GTN's right of eminent domain granted under Natural Gas Act section 7(h) does not authorize it to increase the size of its natural gas pipeline to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.      GTN shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP, or the Director's designee, **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* and/or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

a.      implementation of cultural resources mitigation measures;

b.      implementation of endangered, threatened, or special concern species

Document Accession #: 20231023-3042    Filed Date: 10/23/2023
Docket No. CP22-2-000                                                                   - 51 -

          mitigation measures;

    c.     recommendations by state regulatory authorities; and

    d.     agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.    **Within 60 days of the acceptance of the authorization and before construction begins**, GTN shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP, or the Director's designee.  GTN must file revisions to the plan as schedules change.  The plan shall identify:

    a.     how GTN will implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EIS, and required by the Order;

    b.     how GTN will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

    c.     the number of EIs assigned, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

    d.     company personnel, including EIs and contractors, who will receive copies of the appropriate material;

    e.     the location and dates of the environmental compliance training and instructions GTN will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change);

    f.     the company personnel (if known) and specific portion of GTN's organization having responsibility for compliance;

    g.     the procedures (including use of contract penalties) GTN will follow if noncompliance occurs; and

    h.     for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

        (1)    the completion of all required surveys and reports;

        (2)    the environmental compliance training of onsite personnel;

        (3)     the start of construction; and

        (4)     the start and completion of restoration.

7.    GTN shall employ at least one EI.  The EI shall be:

    a.    responsible for monitoring and ensuring compliance with all mitigation measures required by the Order and other grants, permits, certificates, or other authorizing documents;

    b.    responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

    c.    empowered to order correction of acts that violate the environmental conditions of the Order, and any other authorizing document;

    d.    a full-time position, separate from all other activity inspectors;

    e.    responsible for documenting compliance with the environmental conditions of the Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

    f.    responsible for maintaining status reports.

8.    Beginning with the filing of its Implementation Plan, GTN shall file updated status reports with the Secretary on a **biweekly** basis until all construction and restoration activities are complete.  On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

    a.    an update on GTN's efforts to obtain the necessary federal authorizations;

    b.    the construction status of the project, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally-sensitive areas;

    c.    a listing of all problems encountered and each instance of noncompliance observed by the EI during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

    d.    a description of the corrective actions implemented in response to all instances of noncompliance;

e.    the effectiveness of all corrective actions implemented;

f.    a description of any landowner/resident complaints which may relate to
compliance with the requirements of the Order, and the measures taken to
satisfy their concerns; and

g.    copies of any correspondence received by GTN from other federal, state, or
local permitting agencies concerning instances of noncompliance, and
GTN's response.

9.    GTN must receive written authorization from the Director of OEP, or the
Director's designee, **before commencing construction of any project facilities.**
To obtain such authorization, GTN must file with the Secretary documentation
that it has received all applicable authorizations required under federal law (or
evidence of waiver thereof).

10.   GTN must receive written authorization from the Director of OEP, or the
Director's designee, **before placing the project into service**.  Such authorization
will only be granted following a determination that rehabilitation and restoration
of the right-of-way and other areas affected by the project are proceeding
satisfactorily.

11.   **Within 30 days of placing the authorized facilities in service**, GTN shall file an
affirmative statement with the Secretary, certified by a senior company official:

a.    that the facilities have been constructed in compliance with all applicable
conditions, and that continuing activities will be consistent with all
applicable conditions; or

b.    identifying which of the conditions in the Order GTN has complied with or
will comply with.  This statement shall also identify any areas affected by
the project where compliance measures were not properly implemented, if
not previously identified in filed status reports, and the reason for
noncompliance.

12.   GTN shall file a noise survey with the Secretary **no later than 60 days** after
placing each modified compressor station in service.  If a full power load
condition noise survey is not possible, GTN shall provide an interim survey at
maximum possible horsepower load and provide the full load survey **within 6
months**.  If the noise attributable to the operation of the equipment at each
Compressor Station under interim or full horsepower load conditions exceeds an
day-night sound level of 55 decibels on the A-weighted scale at any nearby noise
sensitive areas, GTN shall file a report on what changes are needed and shall
install the additional noise controls to meet the level **within 1 year** of the in-

Docket No. CP22-2-000                                                           - 54 -

service date.  GTN shall confirm compliance with the above requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Gas Transmission Northwest, LLC                           Docket No.  CP22-2-000

(Issued October 23, 2023)

DANLY, Commissioner, *concurring in part and dissenting in part*:

1.      I write separately to identify the specific aspects of today's order with which I concur and those elements from which I dissent.

## I.      I Concur in Part with Today's Order.

2.      I concur in the Commission's decision to grant Gas Transmission Northwest LLC (GTN) an authorization under section 7(c) of the Natural Gas Act (NGA)[1] to install, construct, modify, and operate certain natural gas compression facilities at the existing No. 5 Athol, No. 7 Starbuck, and No. 10 Kent Compressor Stations, located in Kootenai County, Idaho, Walla Walla County, Washington, and Sherman County, Oregon, respectively (GTN XPress Project).[2]  The need for the project is amply demonstrated by the long-term precedent agreements that GTN entered into with shippers for 100% of the project's capacity.[3]

3.      Additionally, I concur in the determinations in paragraphs 71 and 72:  the social cost of greenhouse gases (GHG) is neither useful nor part of the Commission's decision making and the Commission offers no means by which to assess the significance of GHG emissions.[4]  Specifically, paragraphs 71 and 72 explain: (1) the disclosure of the social cost of GHG emissions is "for informational purposes"; (2) for the social cost of GHGs,

---

[1]  15 U.S.C. § 717f(c).

[2]  *See Gas Transmission Northwest LLC*, 185 FERC ¶ 61,035 (2023) (*GTN*).

[3]  *Id*. P 18 ("GTN has entered long-term precedent agreements with shippers for 100% of the project's capacity.  Precedent agreements for 100% of the project's capacity are significant evidence of the need for the proposed project."); *see also* Application at 1 ("GTN has executed binding amended and restated precedent agreements . . . with three shippers . . . which contemplate GTN's provision of long-term firm transportation service of one hundred percent (100%) of the Project capacity, a total of 150,000 Dth/d, commencing November 1, 2023.").

[4]  *See GTN*, 185 FERC ¶ 61,035 at PP 71-72.

Document Accession #: 20231023-3042    Filed Date: 10/23/2023
Docket No. CP22-2-000 - 2 -

"there are no criteria to identify what monetized values are significant for [National Environmental Policy Act (NEPA)] purposes"; (3) the Commission is not "aware of any . . . method," including the social cost of GHGs, "that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions"; and (4) therefore, there are "no accepted tools or methods for the Commission to use to determine significance."[5] This language made its first appearance in orders on the April 20, 2023 open meeting.[6] I voted for this language, as did two of my colleagues, Chairman Phillips and Commissioner Christie.[7]

4.    Additionally, I concur in the Commission's declaration that it is the Commission's order that controls and therefore any language in the Final Environmental Impact Statement (Final EIS) that is in tension with the Commission's order is not relied upon or adopted by the Commission.[8] We have had to resort to this language due to

---

[5] *Id*.

[6] *See Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at PP 61, 63 (2023); *Tex. LNG Brownsville LLC*, 183 FERC ¶ 61,047, at PP 20-21, 25 (2023); *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046, at PP 92-94, 101 (2023); *see also Tex. LNG Brownsville LLC*, 183 FERC ¶ 61,047 at P 20 ("although we are including the social cost of GHG figures for informational purposes, we find that because the social cost of GHGs tool was not developed for project level review and, as discussed below, does not enable the Commission to credibly determine whether the GHG emissions are significant, section 1502.21 of the [Council on Environmental Quality (CEQ)] regulations does not require its use in this proceeding"); *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 at P 92 (same) (collectively, April Orders).

[7] I pause to note that the referenced language was not included in an order voted on at the July 27, 2023 Commission meeting. *See Transcon. Gas Pipe Line Co., LLC*, 184 FERC ¶ 61,066 (2023). I am pleased that the language is included in this issuance, and I want to emphasize that the language, as included in this order, does not intertwine my colleagues' view that downstream GHG emissions from local distribution companies are reasonably foreseeable—a position that I have consistently disagreed with and continue to disagree with, as explained below—with the language explaining that there is no means by which the Commission can determine the significance of an amount of GHG emissions.

[8] *See GTN*, 185 FERC ¶ 61,035 at P 98 ("We note that the analysis in the [F]inal EIS provides substantial evidence for our conclusions in this order, but that it is the order itself that serves as the record of decision, consistent with the Commission's obligations under NEPA and the Administrative Procedure Act. For that reason, to the extent that any of the analysis in the [F]inal EIS is inconsistent with or modified by the Commission's analysis and findings in the order, it is the order that controls and we do

Case: 24-60354     Document: 1-3     Page: 62     Date Filed: 07/15/2024

Document Accession #: 20231023-3042     Filed Date: 10/23/2023
USCA Case #24-1204   Document #2064211     Filed: 07/11/2024   Page 66 of 238

Docket No. CP22-2-000                                                    - 3 -

inconsistencies between the environmental documents issued by staff and the contents of the Commission's orders.[9]

_____

not rely on or adopt any contrary analysis in the [F]inal EIS.").

[9] *See Transcon. Gas Pipe Line Co., LLC*, 184 FERC ¶ 61,066 (Danly, Comm'r, dissenting in part at P 14) ("We have witnessed environmental documents including language that runs contrary to Commission orders.") (citations omitted). *Compare* WBI Energy Transmission, Inc. Wahpeton Expansion Project Final EIS, Docket No. CP22-466-000, at 4-118 (Apr. 7, 2023) ("The Commission stated in a recent Order that a project's share of contribution to GHG emissions at the national level provides a reasoned basis to consider the significance of the Project's GHG emissions and their potential impact on climate change; and when states have GHG emissions reduction targets, the Commission will endeavor to consider the GHG emissions of a project on those state goals (or state inventories if the state does not have emissions targets.)") (citing *N. Nat. Gas Co.*, 174 FERC ¶ 61,189, at P 29 (2021) (*Northern Natural*)), *with Tenn. Gas Pipeline Co., L.L.C.*, 178 FERC ¶ 61,199 (2022) (Danly, Comm'r, concurring in the judgment at PP 2-3) (disagreeing with *Northern Natural* and explaining that "there is no standard by which the Commission could, consistent with our obligations under the law, ascribe significance to a particular rate or volume of GHG emissions") (citation omitted), *and with Tenn. Gas Pipeline Co., L.L.C.*, 178 FERC ¶ 61,199 (Phillips & Christie, Comm'rs, concurring at P 2) ("depart[ing] from *Northern Natural*, where the Commission stated that emissions for a project were not significant," explaining that "[i]n *Northern Natural*, the Commission disclosed the yearly emissions volumes and the estimated contribution to national and state emissions estimates, and then stated that, based on this record, that the emissions were not significant," and stating that "[i]t is not clear how this determination was made or how a finding of 'significance' would have affected our duties and authority under the Natural Gas Act") (citations omitted). *Compare* Boardwalk Storage Co. LLC BSC Compression Replacement Project Environmental Assessment, Docket No. CP22-494-000, at 48 (Mar. 13, 2023) ("We include a disclosure of the social cost of GHGs (also referred to as the [']social cost of carbon' [SCC]) to assess climate impacts generated by each additional metric ton of GHGs emitted by the Project."), *with Golden Pass LNG Terminal LLC*, 180 FERC ¶ 61,058, at P 24 (2022) (rejecting an argument raised in a comment that "the [Environmental Assessment (EA)] should use the social cost of GHGs (also referred to as the 'social cost of carbon' [SCC]) to assess climate impacts generated by each additional ton of GHGs that would be emitted or saved as a result of authorizing the proposed amendment, and that all GHG emissions are significant" by explaining that "we are not relying on or using the social cost of GHGs estimates to make any finding or determination regarding either the impact of the project's GHG emissions or whether the project is in the public convenience and necessity") (citations omitted). Notably, the Commission does not review or approve the contents of the EAs and EISs issued by staff.

5.    Before I turn to the parts of the order from which I dissent, I want to address an argument raised by commenters who said that the "project capacity is not needed because state policies intended to reduce GHG emissions will significantly reduce regional demand for natural gas" and that "the precedent agreements with Cascade, Intermountain, or Tourmaline do not demonstrate that the project is needed for various reasons, as discussed further below, including because state climate legislation will reduce demand."[10]  The need for this project is readily demonstrated by the precedent agreements for 100% of the project capacity.  Whether or not a party presents evidence that "state policies intended to reduce GHG emissions will significantly reduce regional demand for natural gas"[11] is irrelevant to the inquiry required under section 7 of the NGA.[12]  And while states may enact policies that have an effect on the ultimate consumers of natural gas (generators, gas appliances and the like), these enactments cannot obstruct the Commission's exclusive jurisdiction over the "transportation of natural gas in interstate commerce" and "the sale in interstate commerce of natural gas for resale."[13]  To the extent to which commenters have advanced an argument that restrictions imposed by states on natural gas could implicitly impair FERC's authority and obligations under section 7 of the NGA, those arguments are unavailing.

## II.    I am Compelled to Dissent in Part.

6.    I shall start with a warning to all who take an interest in the Commission's NGA section 7 issuances.  Every such reader should pay close attention to our orders.

---

Staff, for those documents, act under the supervision of the Chairman.  *See also* 42 U.S.C. § 7171(c) (explaining that "[t]he Chairman shall be responsible *on behalf of the Commission* for the executive and administrative operation of the Commission, including functions of the Commission with respect to . . . the supervision of personnel employed by or assigned to the Commission, except that each member of the Commission may select and supervise personnel for his personal staff . . . .") (emphasis added).  But great care must be exercised to ensure that environmental documents adhere to Commission precedent.  *Cf. Great River Hydropower, LLC*, 135 FERC ¶ 61,151, at P 44 (2011) (explaining that if a delegated order "is inconsistent with [Commission] precedent . . . , it was wrongly decided").

[10] *GTN*, 185 FERC ¶ 61,035 at P 25.

[11] *Id.*

[12] *See* 15 U.S.C. § 717f.

[13] 15 U.S.C. § 717(b); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988) ("The NGA confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale.") (citation omitted).

Language in the Commission's orders is changing—and over my objection. While drastic and profound changes were attempted by means of dramatic policy statements less than two years ago, the orders that have issued at this meeting and over the last few months have been putting in place much of the groundwork necessary for later implementation of the very policies set forth in the now-draft policy statements. In particular, pay attention in every issuance to the description of need, my colleagues' discussions on upstream GHG emissions, downstream GHG emissions, and any articulation of standards. Pay attention to the arguments my colleagues intentionally fail to address. Not only do those failures to respond to well-pleaded arguments expose our issuances to remand and possible vacatur under the Administrative Procedure Act upon appeal, they also are quite instructive to the public as they expose the locus of the greatest disagreements among the Commission's members  Ask yourself, in each case, why would at least one of the non-dissenting Commissioners be reluctant (or, for that matter, adamantly refuse) to allow a discussion of that topic in a Commission issuance when failure to respond is so dangerous to the durability of our orders.  Finally, pay attention to Commission staff's environmental documents and whether such documents accurately implement the Commission's position for GHG emissions and social cost of carbon or whether it is more likely an example of staff drafting contrary to the Commission's will. In every case, ask yourself, were we to take this new language and expand it to its logical limits, what policy objectives would be achieved.  I fear that the Commission is now attempting to achieve by seriatim orders what it was unable to achieve through a generic proceeding.  At a minimum, the Commission is preserving its ability to do so in the future.

7.    Before turning to specifics, while there are various individual statements and determinations in this order with which I disagree, there are also larger, more substantial problems which expose this order to profound risk on petition for review.  While this issuance, unlike the orders on the July Commission meeting, at least now acknowledges Congress' recent enactment amending the National Environmental Policy Act, the Commission continues to avoid the implementation of the Fiscal Responsibility Act of 2023, and more specifically the "Builder Act."[14]  Today's order also violates the Administrative Procedure Act (APA), is inconsistent with Supreme Court precedent regarding the implementation of the NEPA, and it unwisely abandons recent Commission practice in our treatment of the social cost of GHGs.

8.    Pausing for a moment to remind the reader of fundamentals, we must first examine the scope of our inquiry under the public convenience and necessity standard.  The Supreme Court has found that NGA section "7(e) requires the Commission to evaluate all

---

[14] *See* Fiscal Responsibility Act of 2023, Pub. L. 118-5, 137 Stat 10, at § 321 (June 3, 2023) (providing the "Builder Act") (FRA).

factors bearing on the public interest."**15**  This obligation, however, is not unlimited in scope and this requirement cannot be read in a vacuum.  The Supreme Court has explained that the inclusion of the term "public interest" in our statute is not "a broad license to promote the general public welfare"—instead, it "take[s] meaning from the purposes of the regulatory legislation."**16**  The purpose of the NGA, as the Supreme Court has instructed us, is "to encourage the orderly development of plentiful supplies of . . . natural gas at reasonable prices."**17**  To the extent to which any Commission issuance attempts to expand the subjects we consider in our inquiry under the public convenience and necessity standard (as, for example, is contemplated by the now-draft Updated Certificate Policy Statement),**18** I reiterate my view that any regime we institute must "take meaning" from the purpose of the NGA.

9.    One more observation—and one that is worth taking a moment to discuss—is the decision to prepare an EIS in this proceeding.  Contrary to suggestions in this order that Commission staff prepared an EIS "[t]o satisfy the requirements of the [NEPA],"**19** an EIS was not required under NEPA.  I am confident that an EA would have sufficed for this proceeding.  Observers of the Commission's proceedings likely noticed an uptick in the number of EISs prepared since 2021.  Such a trend had nothing to do with requirements under NEPA, but rather, stemmed from the whims of the Chairman at that time overseeing staff.**20**  For those unfamiliar with the inner workings of the Commission,

---

**15** *Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391 (1959).

**16** *NAACP v. FPC*, 425 U.S. 662, 669 (1976) (*NAACP*).

**17** *Id.* at 669-70; *accord Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1307 (D.C. Cir. 2015) (quoting *NAACP*, 425 U.S. at 669-70).  I note that the Supreme Court has also recognized the Commission has authority to consider "other subsidiary purposes," such as "conservation, environmental, and antitrust questions." *NAACP*, 425 U.S. at 670 & n.6 (citations omitted).  But all subsidiary purposes are, necessarily, subordinate to the statute's primary purpose.

**18** *Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,107 (2022) (Updated Certificate Policy Statement); *see Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,197, at P 2 (2022) (Order on Draft Policy Statements) (converting the two policy statements issued on February 18, 2022, Updated Certificate Policy Statement, 178 FERC ¶ 61,107 and *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022) (Interim GHG Policy Statement), to "draft" policy statements).

**19** *GTN*, 185 FERC ¶ 61,035 at P 57.

**20** *See, e.g.*, Commissioner Danly Letter Responding to Senator Barrasso Regarding Docket No. CP20-27, *et al.*, at 1 (Nov. 29, 2021),

the Commission itself (*i.e.*, the corporate body composed of the sitting commissioners) does not typically decide whether Commission staff prepares an EIS versus an EA in a particular proceeding.  That power rests, as the director of Commission staff, with the Chairman alone.

### A.    The Commission Should Implement the Builder Act in its NGA Authorizations.

10.    I dissent from the order to the extent that it does not implement the terms of the FRA.  While this order, unlike earlier issuances in July, at least now acknowledges the fact that Congress recently amended the NEPA, the Commission continues to avoid the implementation of the FRA, and more specifically the "Builder Act."[21]  As today's order notes, Congress recently made the first revisions to NEPA since the statute's enactment when it passed the FRA, in particular, that part of the FRA known as the "Builder Act."[22]  The Commission should not be so reticent to pursue substantial changes to the process by which it discharges its duties under NEPA.  The Builder Act does not include an implementation period provision, so the statute became effective when the President signed it into law.  While the order hints that the Commission will wait for CEQ to offer its interpretation of the statute, there is certainly no legal reason that it must (or can) await CEQ's determinations.  Besides which, whether CEQ's interpretations of NEPA in guidance documents or regulations bind independent agencies is a "thorny question,"[23] and there is ample reason to doubt that they do.

11.    Among other revisions, the Builder Act changed the requirement that agencies include in environmental documents an analysis of the "environmental impact of the

---

https://www.ferc.gov/media/commissioner-danly-letter-responding-senator-barrasso-regarding-docket-nos-cp20-27-et-al (explaining that I disagree with Chairman Glick's "frequent[] claim[] . . . that recent judicial precedent . . . requires the Commission to prepare supplemental Environmental Impact Statements (EIS) to satisfy the requirements of the [NEPA], when examining a project's effects on climate change" and further explaining that "the Commission had routinely satisfied its NEPA obligations with Environmental Assessments when evaluating such effects").

[21] *See* FRA, Pub. L. 118-5, 137 Stat 10, at § 321 (providing the "Builder Act").

[22] *See id*.

[23] *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 45 F.4th 291, 300 (D.C. Cir. 2022) (citing *Food & Water Watch v. U.S. Dep't of Agric.*, 1 F.4th 1112, 1119 (D.C. Cir. 2021) (Randolph, J., concurring) (questioning CEQ's authority to promulgate binding regulations)).

Case: 24-60354   Document: 1-3   Page: 67   Date Filed: 07/15/2024

Document Accession #: 20231023-3042   Filed Date: 10/23/2023
     USCA Case #24-1204   Document #2064211   Filed: 07/11/2024   Page 71 of 238
Docket No. CP22-2-000                                                        - 8 -

proposed action"[24] to an analysis of the "reasonably foreseeable environmental effects of the proposed *agency* action."[25]  In my view, Congress's revisions reaffirm *Public Citizen*[26] which held that under NEPA, agencies are only obligated to consider environmental effects for which the *agency action itself* is the legal proximate cause.[27]

12.     Given this new statutory language, FERC has an opportunity to clarify the appropriate metes and bounds of its obligations under NEPA in light of the jurisdictional limits of the NGA.  Such clarification is particularly called for given the U.S. Court of Appeals for the District of Columbia Circuit's (D.C. Circuit) mischaracterization of the scope of FERC's authority in *Sabal Trail*[28] and its progeny.  *Sabal Trail* miscasts the nature of FERC's analysis of the public convenience and necessity under section 7 of the NGA[29] to hold that the Commission has an obligation to consider the GHG emissions from the end use of the gas transported by certificated pipelines.[30]  The NGA, however,

---

[24] 42 U.S.C. § 4332(c)(i) (1970).

[25] 42 U.S.C. § 4332(c)(i) (2023) (emphasis added).

[26] *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004) (*Public Citizen*).

[27] *See id.* at 767.

[28] *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017) (*Sabal Trail*).

[29] 15 U.S.C. § 717f.

[30] *See Sabal Trail*, 867 F.3d at 1373 ("Because FERC could deny a pipeline certificate on the ground that the pipeline would be too harmful to the environment, the agency is a 'legally relevant cause' of the direct and indirect environmental effects of pipelines it approves.  *Public Citizen* thus did not excuse FERC from considering these indirect effects.") (citation & footnote omitted).  I note, however, that *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.* holds that even following a binding judicial issuance, agencies remain free in subsequent proceedings to offer reasonable interpretations of the jurisdiction conferred upon them by their organic statutes.  545 U.S. 967, 982-83 (2005) (*Brand X*).  This proposition, for better or for worse, is now black letter administrative law.  Far from flouting the authority of the courts, I suggest no more than that the Commission act within the remit confirmed in *Brand X* by offering a reasonable interpretation of our statute which would limit our jurisdiction consistent with the NGA's purpose and its plain text.  *See* 15 U.S.C. § 717(b) (listing the exemptions from the Commission's jurisdiction).  And we can do so secure in the knowledge that such an interpretation—again, for better or for worse—will be accorded the deference guaranteed by *Chevron*.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (*Chevron*) ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a

Case: 24-60354   Document: 1-3   Page: 68   Date Filed: 07/15/2024

Document Accession #: 20231023-3042      Filed Date: 10/23/2023
    USCA Case #24-1204   Document #2064211      Filed: 07/11/2024   Page 72 of 238
Docket No. CP22-2-000                                            - 9 -

confers no authority upon FERC to regulate the end use or local distribution of natural gas.[31] Rather, when deciding whether to approve a pipeline, the Commission determines whether there is a demonstrated need for interstate natural gas transportation capacity. Based on this misunderstanding of FERC's authority, the *Sabal Trail* court concludes that FERC must include estimates of the GHG emissions from the end use of the gas or explain why it is unable to do so,[32] and goes even further, in *dicta*, to assert, without any explanation, that FERC has "legal authority to mitigate" the environmental effects that result from that end use.[33]

13.      This mistake provided one (albeit insufficient) rationale for the Commission's now-draft Updated Certificate Policy Statement[34] and Interim GHG Policy Statement,[35] which envisioned a mitigation scheme for the GHG emissions from the end use of gas transported on the interstate natural gas system.[36]  The Builder Act offers the

─────────────────────

permissible construction of the statute.") (footnote omitted).

[31] *See* 15 U.S.C. § 717(b) ("The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, *but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas*.") (emphasis added).

[32] *See Sabal Trail*, 867 F.3d at 1374 ("We conclude that the EIS for the Southeast Market Pipelines Project should have either given a quantitative estimate of the downstream greenhouse emissions that will result from burning the natural gas that the pipelines will transport *or explained more specifically why it could not have done so*.") (emphasis added); *id*. at 1375 ("Our discussion so far has explained that FERC must either quantify and consider the project's downstream carbon emissions *or explain in more detail why it cannot do so*.") (emphasis added).

[33] *Id.* at 1374.

[34] Updated Certificate Policy Statement, 178 FERC ¶ 61,107.

[35] Interim GHG Policy Statement, 178 FERC ¶ 61,108.

[36] *See* Order on Draft Policy Statements, 178 FERC ¶ 61,197 at P 2 (converting the Updated Certificate Policy Statement and the Interim GHG Policy Statement to "draft policy statements").

Commission a rare opportunity to clarify the limits of its authority and move beyond the shadow that the now "draft" policy statements continue to cast over the development of critically needed natural gas infrastructure.

### B.    The Downstream GHG Emissions are Not Reasonably Foreseeable.

14.    Two of the shippers for the project are local distribution companies (LDCs).[37] Today's order finds that downstream emissions from the LDC shippers are reasonably foreseeable.[38] I dissent from this finding. Calculating the downstream GHG emissions based on a full burn calculation cannot accurately determine reasonably foreseeable GHG emissions.[39] And the downstream GHG emissions from LDCs are not reasonably foreseeable.

15.    The Commission is obligated under the APA to engage in reasoned decision making. It is black letter law that reasoned decision making requires responding to the substance raised in litigants' submissions. My colleagues' insistence that all downstream

---

[37] *GTN*, 185 FERC ¶ 61,035 at P 19 ("GTN states that Cascade and Intermountain are local distribution companies that need capacity to serve their growing customer base and load demands in the Pacific Northwest. The projected end use for this gas is residential, commercial, and industrial users. It states that Tourmaline is a producer of natural gas that will provide low-cost natural gas to West Coast markets serving residential, commercial, industrial, and electric generation needs.") (citations omitted).

[38] *See id.* P 64 ("[W]e find that the . . . downstream combustion emissions associated with the capacity subscribed by Cascade and Intermountain (together, 99,000 Dth/d) are reasonably foreseeable."); *id.* P 19 ("GTN states that Cascade and Intermountain are local distribution companies that need capacity to serve their growing customer base and load demands in the Pacific Northwest. The projected end use for this gas is residential, commercial, and industrial users.") (citations omitted). The Commission correctly finds that the downstream emissions for the capacity subscribed by Tourmaline (a producer) are not reasonably foreseeable. *See id.* P 64 n.120 ("Tourmaline is a natural gas producer and the end use for the natural gas which will be transported using its subscribed capacity is not known. Tourmaline has stated the gas is generally intended for West Coast markets. Therefore, the downstream emissions associated with the capacity are not reasonably foreseeable.") (citation omitted).

[39] GTN December 23, 2022 Comments on FEIS at 4 n.6 (explaining that "the actual Project emissions and downstream emissions will be lower" than a full burn calculation) (eLibrary Accession No. 20221223-5039).

emissions from LDCs are reasonably foreseeable does not amount to reasoned decision making.  An agency's decision is

> arbitrary and capricious if the agency has relied on factors
> which Congress has not intended it to consider, entirely failed
> to consider an important aspect of the problem, *offered an*
> *explanation for its decision that runs counter to the evidence*
> *before the agency, or is so implausible that it could not be*
> *ascribed to a difference in view or the product of agency*
> *expertise.*[40]

The Commission "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[41]  The Commission must also base its decisions on substantial record evidence.  Substantial evidence means "more than a mere scintilla," that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[42]

16.     Nowhere in today's order does the Commission explain why it finds the full burn calculation an accurate basis upon which to estimate reasonably foreseeable downstream emissions.  In GTN's application, GTN states that "[e]missions calculations assume all natural gas supplied is combusted, *which is not anticipated for the Project*."[43]  And the Commission recognizes as much, stating that "[f]ull burn calculations are, in most cases, an overestimate because pipelines only operate at full capacity during limited periods of full demand."[44]  Even still, the Commission appears to be establishing a new policy, *sub silentio*, in which, for LDC shippers, the Commission will find, as a categorical matter, and even in cases where the Commission has been presented with unrebutted, contrary record evidence, that a full burn calculation can be used to estimate reasonably

---

[40] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (emphasis added).

[41] *Id.* at 43 (quoting *Burlington Truck Lines, Inc. v. U.S.*, 371 U.S. 156, 168 (1962)); *see also id.* at 56 ("failed to offer the rational connection between facts and judgment required to pass muster under the 'arbitrary and capricious' standard").

[42] *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).

[43] Application at Resource Report 9, § 9.1.5 (emphasis added).

[44] *GTN*, 185 FERC ¶ 61,035 at P 64 n.122.

Case: 24-60354   Document: 1-3   Page: 71   Date Filed: 07/15/2024

Document Accession #: 20231023-3042   Filed Date: 10/23/2023
USCA Case #24-1204   Document #2064211   Filed: 07/11/2024   Page 75 of 238
Docket No. CP22-2-000                                                    - 12 -

foreseeable downstream GHG emissions.**45**  This is bad policy, it is factually unsupportable, and is a violation of the APA.**46**  It affirmatively misleads the public.

17.     Despite the insistence of my colleagues, past and present, that we have been instructed to find downstream emissions from LDC shippers to be reasonably foreseeable, the reality is that such a finding is not legally required.  As in *Food & Water Watch v. FERC*,**47** this case involves adding capacity to provide incremental transportation service to shippers, including LDCs.  In *Food & Water Watch*, the court did conclude "that the end use of the transported gas is reasonably foreseeable"**48** but

---

**45** *See Transcon. Gas Pipe Line Co., LLC*, 184 FERC ¶ 61,066 (Danly, Comm'r, dissenting in part at P 8) (disagreeing with the Commission that a full burn calculation of downstream GHG emissions reflects reasonably foreseeable GHG emissions and explaining that the applicant argued that a full burn estimate for downstream GHG emissions was "grossly inaccurate" and that a utilization rate of 38.6% should be used instead) (citation omitted); *see also N. Nat. Gas Co.*, 184 FERC ¶ 61,186 (2023) (Danly, Comm'r, concurring in part & dissenting in part at P 16).  *Cf. Tenn. Gas Pipeline Co., L.L.C.*, 179 FERC ¶ 61,041, at PP 49-51 (2022) ("For the proposed project, we find that the construction emissions, direct operational emissions, and the emissions from the downstream combustion of the gas transported by the project are reasonably foreseeable emissions.  With respect to downstream emissions, the record in this proceeding demonstrates that the natural gas to be transported by the project will be combusted by end-use customers. . . .  With respect to downstream emissions, the EIS calculates a full-burn of the project's design capacity would result in 2.22 million metric tpy of $CO_2$e.  However, Tennessee urges the Commission to estimate the potential downstream GHG emissions using the 'average utilization rate' in the relevant market area on Tennessee's system, Zone 5, which Tennessee states has a 77% utilization rate.  We decline to accept Tennessee's 77% average utilization rate without additional substantiation, especially in light of the contradictory 85% historical utilization rate provided in Tennessee's application used to support its proposed commodity charge.  Based on an assumed 85% utilization rate, the estimated GHG emissions related to the downstream use of the incremental capacity provided by the project is approximately 1,887,000 metric tpy.").

**46** It is beyond cavil that an agency must explain its departure from prior precedent and "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position.") (emphasis in original) (citation omitted).

**47** 28 F.4th 277 (D.C. Cir. 2022) (*Food & Water Watch*).

**48** 28 F.4th at 289.

Case: 24-60354    Document: 1-3    Page: 72    Date Filed: 07/15/2024

Document Accession #: 20231023-3042    Filed Date: 10/23/2023
USCA Case #24-1204    Document #2064211    Filed: 07/11/2024    Page 76 of 238

Docket No. CP22-2-000                                                        - 13 -

went on to state that "[o]n remand, *the Commission remains free to consider whether there is a reasonable end-use distinction* based on additional evidence, but it has not carried its burden before us at this stage," and the court explained that it "remand[ed] to the agency to perform a supplemental environmental assessment in which it must either quantify and consider the project's downstream carbon emissions *or explain in more detail why it cannot do so*."**⁴⁹** We have not yet acted on the *Food & Water Watch* remand and, even according to the court, the question remains open. There are explanations that the Commission can—and should—rely upon to provide "a reasonable end-use distinction"**⁵⁰** when the shippers are LDCs.**⁵¹**

_____

**⁴⁹** *Id.* (emphasis added).

**⁵⁰** *Id.*

**⁵¹** The LDCs at issue here and the discrete, known generators in *Sierra Club v. FERC*, are dissimilar enough that the *Sabal Trail* precedent cannot directly apply.  *Sabal Trail*, 867 F.3d 1357.  Additionally, as I have said before, *Sabal Trail*, which *Food & Water Watch* applies, is inconsistent with the Supreme Court's holding in *Public Citizen*, 541 U.S. at 767 ("NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause.  The Court analogized this requirement to the 'familiar doctrine of proximate cause from tort law.'") (citation omitted); *see id.* at 770 (holding that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect" and "under NEPA and the implementing CEQ regulations, the agency need not consider these effects in its EA when determining whether its action is a 'major Federal action.'").  My views are not idiosyncratic.  Both the partial dissenting statement in *Sabal Trail* and the U.S. Court of Appeals for the Eleventh Circuit agree. *See* 867 F.3d at 1383 (Brown, J., concurring in part and dissenting in part) ("Thus, just as FERC in the [Department of Energy (DOE)] cases and the Federal Motor Carrier Safety Administration in *Public Citizen* did not have the legal power to prevent certain environmental effects, the Commission here has no authority to prevent the emission of greenhouse gases through newly-constructed or expanded power plants approved by the Board."); *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1300 (11th Cir. 2019) ("[T]he legal analysis in *Sabal Trail* is questionable at best.  It fails to take seriously the rule of reason announced in *Public Citizen* or to account for the untenable consequences of its decision.").  Moreover, as I have previously explained, we could no more reasonably deny a pipeline for the effects of induced upstream production, which the statute places outside of our jurisdiction, than we could deny an NGA section 3 authorization, 15 U.S.C. § 717b, for an LNG export terminal because we do not like the effects that the expected exports would have on international gas markets.  *Transcon. Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,148 (2023) (Danly, Comm'r, concurring at P 5) (citing *Port Arthur LNG, LLC*, 181 FERC ¶ 61,024, at P 12

 

-------------------

& n.35 (2022) (stating in an extension of time proceeding that "[t]he Commission will not consider Sierra Club's assertion that we must examine the project's impact on domestic prices and supply as it is an attempt to re-litigate the issuance of the Authorization Order" and that "*[n]or could we consider impacts on domestic prices and supply as* the Commission's authority under the Natural Gas Act is limited to the authorization of the siting, construction, and operation of LNG export facilities, while *the consideration of the impact of export of LNG as a commodity is solely under the Department of Energy's authority*") (emphasis added) (citation omitted); *Commonwealth LNG, LLC*, 181 FERC ¶ 61,143, at P 13 (2022) (*Commonwealth*) ("The Commission's authority under NGA section 3 applies 'only to the siting and the operation of the facilities necessary to accomplish an export[,]' while 'export decisions [are] squarely and exclusively within the [DOE]'s wheelhouse.' Similarly, issues related to the impacts of natural gas development and production are related to DOE's authorization of the export and not the Commission's siting of the facilities . . . .") (citations omitted); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206, at PP 78, 80 (2022) (explaining for a NGA section 7 project that would provide incremental firm interstate natural gas transportation service to an LNG export facility that "the downstream GHG emissions are attributable to DOE's 'independent decision to allow exports—a decision over which the Commission has no regulatory authority'" and that "[w]e see no basis in the NGA for the Commission to encroach upon DOE's sole authority over the review and authorization of exports of natural gas"); *Tenn. Gas Pipeline Co., L.L.C.*, 180 FERC ¶ 61,205, at PP 62, 64 (2022) (same). That determination rests solely with the DOE, which is charged with authorizing "the export of natural gas as a commodity." *EarthReports, Inc. v. FERC*, 828 F.3d 949, 952-53 (D.C. Cir. 2016) (explaining that the DOE has "exclusive authority over the export of natural gas as a commodity"). The same holds for any induced upstream effects on production, even if they *could* be found traceable to the proposed project. In my view, this also applies to downstream end use, such as local distribution. The statute reserves those powers to the states. And it does so explicitly:

> The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

18.     As a factual matter, it is impossible to find any LDC's downstream GHG emissions reasonably foreseeable based on a full burn calculation. Suggestions to the contrary demonstrate a total misunderstanding of how LDCs and the interstate natural gas pipeline system work and, worse, ignore the basis upon which LDCs contract for capacity.**52**

19.     Residential and commercial demand for natural gas is highly dependent upon weather. No LDC expects contracted capacity to match actual utilization rates. Typically, LDCs do not contract for capacity to meet routine needs but instead, because of their legal obligation to serve their customers at all times, under all conditions, they instead contract to meet *peak demand*.**53** They also contract for peak demand as a hedge

---

15 U.S.C. § 717(b).

**52** As an aside, were the Commission to find that downstream GHG emissions are not reasonably foreseeable or otherwise depart from using a full burn estimate of downstream GHG emissions such a decision would not undercut the Commission's need determination. Any suggestion along those lines is ridiculous. Here, we have a project that has significant evidence of need demonstrated by precedent agreements for the project's full capacity. The inquiry under NEPA as to whether the downstream GHG emissions are reasonably foreseeable has *nothing* to do with the need inquiry. As the Commission has explained, NEPA and the NGA are distinct. *Commonwealth LNG, LLC*, 183 FERC ¶ 61,173, at P 37 (2023) ("[T]he Commission's NGA and NEPA responsibilities are separate and distinct.") (citation omitted); *Transcon. Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,148 at P 101 ("The NGA analysis is distinct from the NEPA analysis . . . .").

**53** *See, e.g.*, Application at 11 ("Cascade serves areas in Washington and Oregon. Cascade currently has transportation contracts on GTN that provide 90 percent of Cascade's demand in Central Oregon. Cascade is faced with peak day supply shortfalls in Oregon, expected as early as 2024, as well as an annual average load growth rate of 2.12% in Zone GTN of Cascade's system, a collection of citygates served by GTN. The Project will create the needed incremental firm transportation capacity necessary for Cascade to serve its growing load demand requirements and address its peak day supply shortfalls. Additionally, with the incremental capacity created by the Project, Cascade will have a continuous firm transportation path from the supply source in Alberta, Canada to Cascade's service area. This allows Cascade to control supply at the source in order to meet peak day loads while also providing supply diversity to mitigate constraints on other transportation options."); *id*. at 12 ("Intermountain's service area is located in Southern Idaho and its residential and commercial customers are forecasted to grow at an annualized rate of 3.3%. Intermountain has recently restructured its interstate firm transportation capacity portfolio by replacing firm transportation capacity on the Northwest Pipeline from the Rockies to Idaho with firm transportation capacity from

in order to avoid having to pay market prices at times of scarcity. Such planning is more prudent than having local authorities pinning the reliability of their systems on rain dances and hopes for a mild winter.[54]

20.     The irony, of course, is that we need not luxuriate in the facts of this (or any other) case in order to decline to assess downstream GHG emissions. In his prior separate statements, Commissioner Christie has pointed to the limits of our jurisdiction as the basis upon which to find that upstream GHG emissions are not reasonably foreseeable, arguing that upstream activities are non-jurisdictional; therefore, we have no legal obligation to either estimate the upstream GHG emissions or consider them.[55] He is absolutely correct. But the same logic applies, with equal force, to downstream GHG emissions. The Commission has no jurisdiction over the LDCs. Those are licensed and regulated by the states, and we should not consider the Commission to be the legal proximate cause of the GHG emissions of the gas ultimately used by their consumers.

### C.     The Commission Should Not Include Calculations of the Social Cost of GHGs in its Orders and Should Not Adopt Illogical Statements in Commission Staff's Environmental Documents

---

Northwest Pipeline's interconnect with GTN, located in Stanfield, Oregon, to Southern Idaho. With its Project capacity, Intermountain will be able to secure firm transportation capacity on GTN, which will create a continuous firm transportation path from the supply source in Alberta, Canada to Intermountain's service area. As with Cascade, this allows Intermountain to control supply at the source in order to meet peak day loads while also providing supply diversity to mitigate constraints on other transportation options.").

[54] *Cf. New England's Power Grid Prepared for Winter*, ISO New England (Dec. 5, 2022), https://www.iso-ne.com/static-assets/documents/2022/12/20221205_pr _winteroutlook_final.pdf ("Based on seasonal weather forecasts and information provided by generators about their fuel arrangements, the region's power system is prepared for mild and moderate weather conditions,' said Gordon van Welie, ISO New England's president and CEO. 'If long periods of severely cold weather develop, we'll lean on our forecasting tools to identify potential problems early enough to take proactive measures, such as calling for increased fuel deliveries or asking for public conservation.'").

[55] *See, e.g.*, *N. Nat. Gas Co.*, 184 FERC ¶ 61,186 (Christie, Comm'r, concurring at P 9) ("Today's order makes a finding of fact that the upstream GHG emissions are not reasonably foreseeable. . . . [T]he Commission has no legal obligation to estimate emissions from upstream, non-jurisdictional activities anyway . . . .") (citation omitted).

21.    I would not have included the calculations of the social cost of GHGs in the Commission's order.**56**  As I explained in my separate statement in *Boardwalk*, that issuance marked a change in the Commission's approach to the social cost of GHGs in its orders.**57**  In a break with this recent practice, *Boardwalk* and the orders voted on at the September 21, 2023 Commission meeting, while including language from the April Orders, *also* include calculations for the social cost of GHGs.**58**  I do not support their inclusion in this order both because their inclusion breaks with recent practice and

---

**56** *See GTN*, 185 FERC ¶ 61,035 at P 64.

**57** *See generally Boardwalk Storage Co., LLC*, 184 FERC ¶ 61,062 (2023) (*Boardwalk*) (Danly, Comm'r, concurring at PP 1-7).

**58** *See Boardwalk*, 184 FERC ¶ 61,062 at P 24.  Following the Commission's adoption at the April open meeting of our new social cost of GHGs language, our orders have not included those calculations when they have appeared in the Commission staff's environmental documents.  *See Equitrans, L.P.*, 183 FERC ¶ 61,200, at P 47 (2023) (*Equitrans*) (explaining that "[f]or informational purposes, Commission staff estimated the social cost of GHGs associated with reasonably foreseeable emissions from the project.").  Even before the April 20, 2023 Commission meeting, the calculations were not included in several orders where the environmental document already contained the calculations.  *See, e.g.*, *Cameron LNG, LLC*, 182 FERC ¶ 61,173, at P 37 (2023) ("Further, the EA, for informational purposes, disclosed the social cost of GHGs associated with the project's reasonably foreseeable GHG emissions.") (footnote omitted); *Commonwealth,* 181 FERC ¶ 61,143 at P 75 (stating that "the final EIS disclosed the social cost of GHGs associated with the project's reasonably foreseeable GHG emissions" and not including the calculations in the order) (citation omitted).  I note that there are some inconsistencies in this prior to the issuance of the orders voted on at the April open meeting, with occasional orders including the calculations.  In every circumstance, though, I have objected to the inclusion of the social cost of GHGs calculations in our orders and will continue to do so.  Instead, the Commission has included the disclosure of the social cost of GHGs in its orders "for informational purposes" when those calculations were not included as part of the EAs or EISs or when the calculation in the staff's environmental document included (improperly) downstream emissions that are *not* reasonably foreseeable, *e.g.*, the downstream emissions from exports.  *See Tex. LNG Brownsville LLC*, 183 FERC ¶ 61,047 at P 24 (including the calculations in the remand order because they were not in the environmental document); *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 at PP 98-99 (same); *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at PP 57 nn.109 & 112, 61-62 (disclosing a "revised estimate of the social cost of GHGs associated with the reasonably foreseeable emissions" in the Commission's order because the calculation in the final EIS included in the calculation downstream GHG emissions from exports, which are not reasonably foreseeable).

because the calculations are meaningless in light of the very finding, stated explicitly in the text of the Commission's order, that the social cost of GHGs cannot be used for any meaningful purpose to inform project-level analysis, including the assessment of significance. That is why those calculations are being disclosed solely "for informational purposes." Though I object to their inclusion, surplusage, even when *specifically declared* to be irrelevant to the reasoning of an order, is not, in itself, unlawful. The Commission has acknowledged, time and again, that the inclusion of these calculations in an environmental document is "[f]or informational purposes" only and has not included the calculations in several orders when they already appear in the NEPA document.**[59]** The Commission should not have changed course.

22.    Aside from the above, there is an obvious logical flaw in this order. Commission staff's Final EIS states that "[m]odifying and installing the Project facilities would increase the atmospheric concentration of GHGs in combination with past, current, and future emissions from all other sources globally and contribute incrementally to future climate change impacts."**[60]** My colleagues, in today's order, acknowledge this statement found in the Final EIS and then go on to state (in the order itself) that "[w]e clarify that, assuming that the transported gas is not displacing equal- or higher-emitting sources, we recognize that the project's contributions to GHG emissions globally contribute to future climate change impacts, including impacts in the region."**[61]**

23.    But the declaration that the project will "contribute to future climate change impacts" appears at the same time as we say that we have no means by which to assess the significance of GHG emissions. This is obviously problematic. First, it is unclear what, exactly, the majority means when it says that "the project's contributions to GHG emissions globally contribute to future climate change impacts." Second, this statement is only offered to respond to Commission staff's inclusion of statements in their NEPA documents indicating that the proposed project "would increase the atmospheric concentration of GHGs in combination with past, current, and future emissions from all other sources globally and contribute incrementally to future climate change impacts."**[62]** The reality of the matter is that staff has no idea whether that is the case. The Commission has declared as much. So why repeatedly include such statements? How

---

**[59]** *E.g.*, *Equitrans*, 183 FERC ¶ 61,200 at P 47.

**[60]** Final EIS at 4-47.

**[61]** *See GTN*, 185 FERC ¶ 61,035 at P 64 (citations omitted). I acknowledge that various formulations of this language have been included in orders that I have previously voted for, but I no longer support this language and object to its inclusion.

**[62]** Final EIS at 4-47.

does such speculation inform the Commission's decision making?  Quite simply, it does not.

### D.    The Commission Must Apply the Appropriate Statutory Standard.

24.    Finally, I want to address the majority's statement that the project "is an environmentally acceptable action."[63]  Admittedly, this language has appeared in several prior orders, including orders for which I have voted.  I no longer support the inclusion of this language in the Commission's NGA authorizations because the standard under NGA section 7 is whether a proposed pipeline is in the present or future public convenience and necessity,[64] not whether the proposed project "is an environmentally acceptable action."[65]

### III.    Conclusion

25.    When drafting our orders we must bear in mind—at all times—fidelity to the law, the timely discharge of the duties assigned to us by Congress, and the legal durability of

---

[63] *GTN*, 185 FERC ¶ 61,035 at P 98 ("Based on our consideration of this information, as supplemented or clarified herein, we agree with the conclusions presented in the [F]inal EIS and find that the project, if implemented as described in the [F]inal EIS, and further addressed herein, is an environmentally acceptable action."); *id*. P 100 ("As noted above, the project is an environmentally acceptable action . . . .").

[64] *See* 15 U.S.C. § 717f(e) ("[A] certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied.").

[65] *Cf. Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) (explaining that "it would not have violated NEPA if the Forest Service, after complying with [NEPA's] procedural prerequisites, had decided that the benefits to be derived from downhill skiing at Sandy Butte justified the issuance of a special use permit, notwithstanding the loss of 15 percent, 50 percent, or even 100 percent of the mule deer herd" and also explaining that "[o]ther statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action") (citations omitted).

Document Accession #: 20231023-3042    Filed Date: 10/23/2023
USCA Case #24-1204    Document #2064211    Filed: 07/11/2024    Page 83 of 238

Docket No. CP22-2-000                                                        - 2 -

our issuances so as to ensure that the industry we are charged with overseeing can operate free of the burdens (and costs) of regulatory uncertainty and litigation risk. Sadly, today's order falls short in all three respects.

For these reasons, I respectfully concur in part and dissent in part.

_____

James P. Danly
Commissioner

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Gas Transmission Northwest, LLC                    Docket No.  CP22-2-000

(Issued October 23, 2023)

CLEMENTS, Commissioner, *concurring in part and dissenting in part*:

1.    I concur with the decision to issue a certificate of public convenience and
necessity to Gas Transmission Northwest, LLC (GTN) for its GTN Xpress Project.[1]  I do
so reluctantly because the states of Washington, Oregon, and California have raised
serious questions concerning the present and future need for additional gas transportation
service for customers in their states.  Unfortunately, the Commission's superficial
approach to assessing the need for new gas infrastructure has left us with a skeletal
administrative record that raises more questions than it answers concerning the need for
the project.  Lacking a suitable policy framework or established procedures for fully
evaluating the need issue, the Commission practically forces itself to rely solely on
precedent agreements to find the GTN Xpress Project is needed.  As I recently explained
in a similar case, the Commission's approach is becoming increasingly untenable as a
combination of market forces and federal, state, and local climate protection policies
signal potentially flat or declining demand for natural gas over time.[2]  The circumstances
impacting the need for new pipeline capacity are far more complex than they were the
Commission adopted its 1999 Certificate Policy Statement[3] and we should update the
policy to address that complexity.  But today, given the Commission's governing
precedents on determining need[4] and our failure to develop a complete record on the need
issue in this case, I am compelled to concur in the Order's result.  However, as discussed
below, I dissent from the Order's language claiming the Commission is unable to

---

**[1]** *Gas Transmission Northwest, LLC,* 185 FERC ¶ 61,035 (2023) (Order).

**[2]** *See Transcontinental Gas Pipe Line Company, LLC*, 182 FERC ¶ 61,006 (2023)
(Clements, Comm'r, concurring).

**[3]** *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶
61,227, at 17 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094
(2000) (1999 Certificate Policy Statement).

**[4]** *See* Order at PP 26, 27, 31, 35 & cases cited at nn.59, 79.

Case: 24-60354    Document: 1-3    Page: 81    Date Filed: 07/15/2024

Document Accession #: 20231023-3042    Filed Date: 10/23/2023
USCA Case #24-1204    Document #2064211    Filed: 07/11/2024    Page 85 of 238
Docket No. CP22-2-000    - 2 -

determine the significance of the environmental impacts caused by the project's greenhouse gas (GHG) emissions.**[5]**

2.    The Commission's 1999 Certificate Policy Statement calls on us to "consider all relevant factors reflecting on the need for the project."**[6]**  The Statement specifies that these factors "might include, but would not be limited to, precedent agreements, demand projections, potential cost savings to customers, or a comparison of projected demand with the amount of capacity currently serving the market."**[7]**  Necessary evidence "will usually include a market study."**[8]**  With the conflicting arguments in this case concerning the need for the GTN XPress project, the Commission's decisional process would have greatly benefited from market studies focused on present and future demand for natural gas in the specific markets that the project would serve.  The Commission could have asked for those studies, as well as more specific information about the current and future effect of state laws, regulations, and public and private actions designed to reduce GHG emissions.  Unfortunately, the Commission did not do that, leaving us with many unanswered questions.

3.    The most critical unanswered question in the Commission's need analysis is what impact Washington, Oregon, and California's climate and energy policies will have on natural gas demand in the areas served by the GTN Xpress Project.  Those three states, and many cities within them, have implemented a suite of ambitious climate measures.**[9]**  The states have clearly stated their intention to transition to zero-emission electricity (over thirty percent of regional gas consumption today is used to generate electricity),**[10]** and state utility regulators have implemented policies anticipating declining gas use.**[11]**

---

**[5]** *See* Order at PP 71-72.

**[6]** *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, at 17 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (1999 Certificate Policy Statement).

**[7]** *Id.*

**[8]** *Id.* at 19.

**[9]** Washington, Oregon, and California Aug. 22, 2022 Joint Motion to Intervene and Protest at Ex. A.

**[10]** Washington, Oregon, and California Sep. 21, 2022 Answer and Request for Leave to Respond and Motion to Reject at 12.

**[11]** Washington, Oregon, and California Aug. 22, 2022 Joint Motion to Intervene and Protest at 18.

Unfortunately, the Commission is armed with neither the procedures, nor the data, nor seemingly the will, necessary to adequately assess how these state policies will impact need for the GTN Xpress Project in the specific markets it is designed to serve.

4.    The Commission's over-reliance on precedent agreements, though simple and expedient, prevents us from understanding the potential impact of climate-related laws and policies, as well as varied market factors, on natural gas demand and therefore on the need for new gas infrastructure.  In any given Natural Gas Act certificate matter, including this one, we have no meaningful ability to assess the risk of over-building and the concomitant risk of saddling ratepayers with the costs of underused facilities.  We have seen more frequent and active participation by states in our recent certificate proceedings as state climate policies have evolved, and we should expect that trend to continue.  The Commission should determine *as a matter of policy* how to consider and weigh relevant state laws, programs, and administrative determinations in future certificate proceedings.

5.    The Commission could readily address these deficiencies by adopting the need provisions of its draft revised Certificate Policy Statement issued in 2022.  Those provisions reaffirm the Commission's commitment to considering *all* relevant factors, provide for submission of information on the end use of the project's gas, encourage market studies for projects responding to increased demand, and detail other information relevant to the Commission's assessment of need.[12]  The draft revised Certificate Policy Statement also encourages applicants to "submit analyses showing how market trends as well as current and expected policy and regulatory developments would affect future need for the project."[13]

6.    The Commission could well deny a future section 7 certificate application if it became more inquisitive and considered evidence of need beyond precedent agreements.  Congress expressly provided for denial in enacting the Natural Gas Act in 1938, when the pipeline industry was in its infancy and just beginning to build an interstate natural gas pipeline network.  Section 7(e) of the statute provides that the Commission must affirmatively find that a proposed project "is or will be required by the present or future public convenience and necessity; *otherwise such application shall be denied*."[14]  Today, our country's interstate natural gas pipeline network spans more than 300,000 miles,[15]

---

[12] *See Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,107, at PP 53-61 (2022) (draft revised Certificate Policy Statement).

[13] *Id.* at P 59.

[14] 15 U.S.C. § 717f(e) (emphasis added).

[15] *See Annual Report Mileage for Natural Gas Transmission & Gathering Systems*, Pipeline and Hazardous Materials Safety Administration (last updated Oct. 2,

which is enough pipe to encircle the planet twelve times. To be sure, it is a good thing that the United States has such a robust natural gas pipeline system today. But the dramatic expansion of the pipeline system and the increasingly complex set of variables that bear on project need in 2023 should have made the Commission *more* discerning on the need question, not less, which has been the unfortunate consequence of our myopic focus on precedent agreements.

7.     Separately, I dissent from the Order's assertion that the Commission is incapable of determining the significance of GHG impacts.[16] As I have written before, the majority's insistence that there are no acceptable tools for determining the significance of GHG emissions remains unsupported and gains nothing through near-constant repetition in the Commission's recent orders issued under sections 3 and 7 of the Natural Gas Act. In my concurrence in *Transco*[17]*,* I explained the history of the language in Paragraphs 71 and 72 of the Order, which has come to be known as the "*Driftwood* compromise."[18] In *Driftwood,* the majority adopted unheralded new language declaring that there are no methods for assessing the significance of GHG emissions, and particularly criticizing the Social Cost of GHGs protocol.[19] I have dissented from this language in *Driftwood* and subsequent orders for two reasons: (1) it reflects a final Commission decision that it cannot determine the significance of GHG emissions, despite the fact the Commission has never responded to comments in the GHG Policy Statement docket[20] addressing methods for doing so; and (2) the language departs from previous Commission precedent without reasoned explanation, thereby violating the Administrative Procedure Act.[21] I dissent from Paragraphs 71 and 72 of this Order for the same reasons.

---

2023), https://www.phmsa.dot.gov/data-and-statistics/pipeline/annual-report-mileage-natural-gas-transmission-gathering-systems*.*

[16] *See* Order at PP 71-72.

[17] *See Transcon. Gas Pipe Line Co.,* 184 FERC ¶ 61,066 (2023) (Clements, Comm'r, concurring at PP 2-3) (*Transco*).

[18] *See id.* (Phillips, Chairman, and Christie, Comm'r, concurring at PP 1-2).

[19] *See Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at PP 61, 63 (2023) (*Driftwood*).

[20] Docket No. PL21-3.

[21] *See Driftwood*, 183 FERC ¶ 61,049 (Clements, Comm'r, dissenting at PP 2-3 & n.161); *see also Port Arthur LNG Phase II, LLC,* 184 FERC ¶ 61,184 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Venture Global Calcasieu Pass, LLC,* 184 FERC ¶ 61,185 (2023) (Clements, Comm'r, dissenting in part at PP 2-4)*; Northern Natural Gas*

8.     As I have said before, I do not know whether the Social Cost of GHGs protocol or another tool can or should be used to determine significance.  That is because the Commission has not seriously studied the answer to that question.  Rather, the majority simply decided there is no acceptable method, with no explanation of why the Commission departed from the approach taken in earlier certificate orders.[22]  I reiterate that the Commission should decide the important unresolved issues relating to our assessment of GHG emissions through careful deliberation in a generic proceeding with full transparency.

     For these reasons, I respectfully concur in part and dissent in part.


_____

Allison Clements
Commissioner


_____

*Company,* 184 FERC ¶ 61,186 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Texas Eastern Transmission, LP*, 184 FERC ¶ 61,187 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Equitrans, L.P.*, 183 FERC ¶ 61,200 (2023) (Clements, Comm'r dissenting at PP 2-3); *Commonwealth LNG, LLC*, 183 FERC ¶ 61,173 (2023) (Clements, Comm'r, dissenting at PP 5-8); *Rio Grande LNG*, *LLC*, 183 FERC ¶ 61,046 (2023) (Clements, Comm'r, dissenting at PP 14-15); *Texas LNG Brownsville LLC*, 183 FERC ¶ 61,047 (2023) (Clements, Comm'r, dissenting at PP 14-15).

[22] Before its decision in *Driftwood,* the Commission had explained that it was not determining the significance of GHG emissions because the issue of how to do so was under consideration in the GHG Policy Statement docket.  *See, e.g., Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,006, at P 73 & n.174; *Columbia Gas Transmission, LLC*, 182 FERC ¶ 61,171, at P 46 & n.93 (2023).  To depart from prior precedent without explanation violates the Administrative Procedure Act*. See, e.g., West Deptford Energy, LLC v. FERC*, 766 F.3d 10, 17 (D.C. Cir. 2014) ("[T]he Commission cannot depart from [prior] rulings without providing a reasoned analysis. . . .") (citations omitted).

Document Accession #: 20231023-3042      Filed Date: 10/23/2023

Document Content(s)

CP22-2-000.docx..........................................................................1

# EXHIBIT B

187 FERC ¶ 61,023
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Chairman;
                        Allison Clements and Mark C. Christie.

Gas Transmission Northwest LLC                    Docket No.  CP22-2-001

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING AND
DISMISSING STAY

(Issued April 16, 2024)

1.     On October 23, 2023, the Commission issued an order authorizing the installation, construction, modification, and operation of certain natural gas compression facilities designed to provide additional firm transportation service on Gas Transmission Northwest LLC's (GTN) mainline system (GTN XPress Project or Project).[1]  On November 21, 2023, Columbia Riverkeeper and Rogue Climate (together, Riverkeeper) filed a timely rehearing request of the Certificate Order and a motion for stay. Additionally, on November 22, 2023, the States of Washington, California, and Oregon (together, States) filed a timely rehearing request of the Certificate Order and GTN filed a timely request for rehearing or, in the alternative, clarification of the Certificate Order.

2.     Pursuant to *Allegheny Defense Project v. FERC*,[2] the rehearing requests filed in this proceeding may be deemed denied by operation of law.  However, as permitted by section 19(a) of the Natural Gas Act (NGA),[3] we are modifying the discussion in the Certificate Order and continue to reach the same result in this proceeding, as discussed below.[4]

---

[1] *Gas Transmission Nw. LLC*, 185 FERC ¶ 61,035 (2023) (Certificate Order).

[2] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[3] 15 U.S.C. § 717r(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[4] *Allegheny Def. Project*, 964 F.3d at 16-17.  The Commission is not changing the outcome of the Certificate Order.  *See Smith Lake Improvement & Stakeholders Ass'n v.*

Document Accession #: 20240416-3093    Filed Date: 04/16/2024
Docket No. CP22-2-001                                                                 - 2 -

## I.    **Background**

3.    GTN is a natural gas company, as defined by section 2(6) of the NGA,[5] engaged in the transportation of natural gas in interstate commerce and subject to the Commission's jurisdiction.[6]  GTN owns and operates a natural gas pipeline system extending from the Idaho border with British Columbia, through Washington, to the Oregon-California border.[7]

4.    As proposed, the GTN XPress Project would provide 150,000 dekatherms per day (Dth/d) of incremental firm transportation service from GTN's Kingsgate Meter Station, located at the Idaho border with British Columbia, Canada, to its Malin Meter Station, in Klamath County, Oregon.  To increase the capacity of its system, GTN proposed to modify existing compression facilities at its No. 5 Athol, No. 7 Starbuck, and No. 10 Kent Compressor Stations.[8]

5.    Specifically, GTN proposed to:

- modify the existing No. 5 Athol Compressor Station, located in Kootenai County, Idaho, to increase the total certificated horsepower (HP) from 49,300 International Organization for Standardization (ISO) HP to 58,470 ISO HP by uprating an existing Solar Turbine Titan 130 gas-fired turbine compressor from 14,300 ISO HP to 23,470 ISO HP by reprogramming the unit's software controls;

- modify the existing No. 7 Starbuck Compressor Station, located in Walla Walla County, Washington, to increase the total certificated horsepower from 54,000 ISO HP to 86,640 ISO HP by:  (a) installing a new 23,470 ISO HP Solar Turbine Titan 130 gas-fired turbine compressor and related appurtenant facilities, including piping, (b) uprating an existing Solar Turbine Titan 130 gas-fired turbine compressor from 14,300 ISO HP to

---

*FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

[5] 15 U.S.C. § 717a(6).

[6] Certificate Order, 185 FERC ¶ 61,035 at P 2.  GTN is a wholly owned direct subsidiary of TC Pipelines, LP.  *Id.* n.3.

[7] *Id.* P 3.

[8] *Id.*; *see also id.* P 4 (discussing the specific modifications proposed to be made at each of the three compressor stations).

Document Accession #: 20240416-3093    Filed Date: 04/16/2024
Docket No. CP22-2-001                                                          - 3 -

23,470 ISO HP by reprogramming the unit's software controls, and (c) installing three additional gas cooling bays and associated piping; and

- modify the existing No. 10 Kent Compressor Station, located in Sherman County, Oregon, to increase the total certificated horsepower from 47,900 ISO HP to 57,070 ISO HP by: (a) uprating an existing Solar Turbine Titan 130 gas-fired turbine compressor from 14,300 ISO HP to 23,470 ISO HP by reprogramming the unit's software controls and (b) installing auxiliary facilities including four additional gas cooling bays and associated piping.[9]

6.     GTN stated that it held a binding open season and request for turnback capacity from July 31, 2019, to September 6, 2019.[10] As a result of the open season, GTN signed precedent agreements with three shippers—Cascade Natural Gas Corporation (Cascade); Intermountain Gas Company (Intermountain); and Tourmaline Oil Marketing Corporation (Tourmaline)—for the entire 150,000 Dth/d of firm transportation service attributable to the expansion facilities.[11] The primary terms for the precedent agreements range from 30 to 33 years, at negotiated rates.[12] GTN did not receive any offers for turnback capacity.[13]

7.     The estimated cost of the GTN XPress Project is $75,138,691.[14] GTN proposed to use its existing system recourse reservation and commodity rates under Rate Schedule FTS-1 as the initial maximum recourse charges for transportation service.[15] GTN also requested a predetermination that it may roll the project costs into its existing rates in a future NGA section 4 rate case.[16]

---

[9] Certificate Order, 185 FERC ¶ 61,035 at P 4.

[10] *Id.* P 5.

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.* P 6.

[15] *Id.*

[16] *Id.* (citing 15 U.S.C. § 717c).

Docket No. CP22-2-001                                                              - 4 -

## II.    Procedural Issues

8.      On December 6, 2023, the States submitted a filing styled as an answer to GTN's request for clarification, a motion for leave to answer and an answer to GTN's request for rehearing, or a motion for leave for further briefing and supplementation of the States' request for rehearing (Supplemental Filing).  On December 8, 2023, GTN filed a motion for leave to answer and an answer in response to the States' and Riverkeeper's requests for rehearing.

9.      The Commission's Rules of Practice and Procedure prohibit answers to a request for rehearing.**[17]**  Accordingly, we deny the States' and GTN's motions for leave to answer and reject their answers.**[18]**  The States' Supplemental Filing is untimely and thus not properly before us.  NGA section 19(a) and Rule 713(b) of the Commission's Rules of Practice and Procedure require parties to file a request for rehearing within 30 days after the issuance date of any final decision or other final order in a proceeding.**[19]**  In this case, the due date was no later than November 22, 2023.  Both the Commission and the courts have consistently held that that the 30-day requirement in section 19(a) is a jurisdictional requirement that the Commission does not have discretion to waive, even for good cause.**[20]**  The Commission has repeatedly interpreted this jurisdictional limitation as

---

**[17]** 18 C.F.R. §§ 385.213(a)(2), 385.713(d)(1) (2023).

**[18]** *See Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,152, at P 7 (2023) (rejecting answer to request for clarification, or, in the alternative, request for rehearing); *N.Y. Indep. Sys. Operator, Inc.*, 163 FERC ¶ 61,047, at P 12 (2018) (same); *Ameren Ill. Co.*, 165 FERC ¶ 61,025, at P 9 (2018) (same).  We note that the States' filing does not respond to the issue on which GTN sought clarification.

**[19]** *See* 15 U.S.C. § 717r(a); 18 C.F.R. § 385.713.

**[20]** *Tenn. Gas Pipeline Co.*, 181 FERC ¶ 61,051, at P 13 (2022); *see also Assoc. Gas Distrib. v. FERC*, 824 F.2d 981, 1005 (D.C. Cir. 1987) (stating that "the Commission cannot waive the jurisdictional bar of [section] 19" of the Natural Gas Act.); *Cities of Campbell v. FERC*, 770 F.2d 1180, 1183 (D.C. Cir. 1985) (holding that an identical 30-day time requirement to file a request for rehearing in the Federal Power Act "is as much a part of the jurisdictional threshold as the mandate to file for a rehearing."); *Boston Gas Co. v. FERC*, 575 F.2d 975, 979 (1st Cir. 1978) (holding that the rehearing provision of the NGA is "a tightly structured and formal provision. Neither the Commission nor the courts are given any form of jurisdictional discretion.").  Although some of these cases were decided under the Federal Power Act, substantially identical provisions of the NGA and the Federal Power Act are to be interpreted consistently with each other.  *Granholm ex rel. Mich. Dep't of Nat. Res. v. FERC*, 180 F.3d 278, 280 n.2 (D.C. Cir. 1999) (citing *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981)).

precluding it from considering a late-filed supplement or amendment to a timely filed request for rehearing.**21**  Accordingly, we reject the Supplemental Filing.**22**

---

**21** *See, e.g.*, *Tenn. Gas Pipeline Co.*, 181 FERC ¶ 61,051 at P 13 ("[T]he Commission has interpreted this jurisdictional limitation as precluding it from considering a late-filed supplement or amendment to a timely field request for rehearing."); *ISO New England Inc.*, 172 FERC ¶ 61,251, at P 10 (2020) ("Consistent with Commission precedent, untimely supplements to timely filed requests for rehearing, i.e., supplements filed after the expiration of the statutory 30-day period, are not appropriate."); *CXA La Paloma, LLC v. Cal. Indep. Sys. Operator Corp.*, 169 FERC ¶ 61,045, at P 7 (2019) (rejecting supplemental rehearing request that was submitted after the 30-day deadline because that deadline is a jurisdictional requirement that the Commission does not have discretion to waive and that jurisdictional limitation precludes the Commission from considering a late-filed supplement or amendment to a timely filed request for rehearing); *Dominion Transmission, Inc.*, 163 FERC ¶ 61,128, at P 9 (2018) ("Both the Commission and the courts have consistently held that the 30-day requirement in section 19(a) is a jurisdictional requirement that the Commission does not have the discretion of waiving, even for good cause. Further, the Commission has interpreted this jurisdictional limitation as precluding it from considering a late-filed supplement or amendment to a timely filed request for rehearing."); *Tenn. Gas Pipeline Co.*, 162 FERC ¶ 61,167, at P 9 (2018) (same); *Tres Palacios Gas Storage LLC*, 162 FERC ¶ 61,255, at P 8 (2018) (quoting *Tex.-N.M. Power Co. v. El Paso Elec. Co.*, 107 FERC ¶ 61,316, at P 22 (2004)) ("Commission precedent is clear that untimely supplements to timely filed requests for rehearing, i.e., supplements filed after the expiration of the statutory 30-day period, will be rejected."); *Old Dominion Elec. Coop.*, 154 FERC ¶ 61,155, at P 8 (2016) (rejecting supplemental rehearing request because it was filed more than 30 days after issuance of the relevant order); *Re CMS Midland, Inc.*, 56 FERC ¶ 61,177, at 61,623 (1991) ("Any subsequent filing supplementing or revising that request is in essence a new request for rehearing and thereby precluded under section 313(a) of the [Federal Power Act]."); *Pub. Serv. Co. of N.H.*, 56 FERC ¶ 61,105, at 61,403 (1991) ("[T]he Commission lacks the authority to consider requests for rehearing filed more than thirty days after issuance of a Commission order. Commission precedent is clear that supplements to timely filed requests for rehearing, when filed after the expiration of the statutory thirty-day period, will be rejected."); *Commonwealth Elec. Co. v. Boston Edison Co.*, 46 FERC ¶ 61,253 (1987) ("Boston Edison has submitted for filing two late-filed supplements to its request for rehearing. We cannot accept these late-filed supplements to a timely filed request for rehearing because it is beyond our jurisdiction to do so under section 313(a) of the Federal Power Act."); *Columbia Gas Transmission Corp.*, 40 FERC ¶ 61,195, at 61,655 (1987) ("Mountaineer's 'supplemental' rehearing request was not timely filed. In accordance with section 19(a) of the [NGA], a party must seek rehearing within 30 days of the Commission order. This 30-day filing requirement is considered jurisdictional and the Commission is without authority to extend the time period, even for

Case: 24-60354    Document: 1-3    Page: 92    Date Filed: 07/15/2024

Document Accession #: 20240416-3093    Filed Date: 04/16/2024
USCA Case #24-1204    Document #2064211    Filed: 07/11/2024    Page 96 of 238
Docket No. CP22-2-001                                                        - 6 -

10.    Moreover, Rule 713 of our Rules of Practice and Procedure states that any rehearing request must "[s]et forth the matters relied upon by the party requesting rehearing, if rehearing is sought based on matters not available for consideration by the Commission at the time of the final decision or final order."**23**  The evidence that forms the basis of the States' new arguments in their late-filed supplement was available 48 days prior to the filing of their rehearing request and 18 days prior to issuance of the Certificate Order.**24**  The States' contention that they lacked notice of the ongoing rate case is unpersuasive.**25**  On October 5, 2023, Commission staff published notice of GTN's rate proceeding in the Federal Register,**26** which was sufficient legal notice to make the States aware of that proceeding.**27**  Additionally, on October 11, 2023, the California

good cause.  This jurisdictional limitation has been interpreted by the Commission as precluding it from considering a late-filed supplement to a timely filed petition for rehearing."); *Phoenix Hydro Corp.*, 26 FERC ¶ 61,389, at n.1 (1984) (rejecting supplemental rehearing request because it was not filed within the statutory 30-day time limit).

**22** The limited precedent to the contrary cited by the dissent is nearly twenty years old and runs counter to the overwhelming body of Commission precedent on this issue, as discussed in this paragraph, which we believe reflects the appropriate interpretation of the statutory time limit.  Regardless, the limited precedent is also inapposite in this case where, as discussed in section III(C)(2)(e), there are no compelling circumstances that warrant its untimely acceptance.

**23** 18 C.F.R. § 385.713(c)(3) (requiring justification that matters were not available for consideration at the time of the final decision); *see also All. Pipeline, L.P.*, 184 FERC ¶ 61,024, at PP 8-9 (2023) (rejecting claim that the Commission should have delayed the issuance of certificate order until after the Nuclear Regulatory Commission completed its review of the potential safety impact of the project because it could have been presented earlier but was raised for the first time on rehearing); *Tenn. Gas Pipeline Co.*, 181 FERC ¶ 61,051 at PP 38-39 (refusing to consider specific safety issues and incidents for the first time on rehearing because concerns were not previously raised despite occurring years before the Commission acted on the application).

**24** The States attempt to introduce evidence from GTN's ongoing section 4 rate case in Docket No. RP23-1099-000 that was submitted by GTN on September 29, 2023.

**25** *See* States December 6, 2023 Motion for Leave for Further Briefing and Supplementation of the States' Request for Rehearing, attach. A.

**26** *See* Combined Notice of Filings, 88 Fed. Reg. 69,174 (Oct. 5, 2023).

**27** *See State of Cal. ex rel. Lockyer v. FERC*, 329 F.3d 700, 707 (9th Cir. 2003) ("Publication in the *Federal Register* is legally sufficient notice to all interested or

Case: 24-60354    Document: 1-3    Page: 93    Date Filed: 07/15/2024

Document Accession #: 20240416-3093    Filed Date: 04/16/2024
USCA Case #24-1204    Document #2064211    Filed: 07/11/2024    Page 97 of 238
Docket No. CP22-2-001                                                    - 7 -

Public Utilities Commission and the People of the State of California intervened in GTN's rate proceeding, showing that one of the States seeking rehearing in the instant proceeding was actively participating in Docket No. RP23-1099-000 as of that date, 42 days prior to the filing of their rehearing request. Accordingly, even if there were not a jurisdictional bar to considering the Supplemental Filing, the States failed to show that the information contained in the supplemental filing could not have been timely submitted.[28] In any event, as discussed in subsection III(C)(2)(e), *infra*, we find that the substance of the evidence underpinning the States' arguments in the late-filed supplement "[would] not change the outcome of this proceeding."[29]

---

affected persons regardless of actual knowledge or hardship resulting from ignorance, except those who are legally entitled to personal notice."); *see also* 44 U.S.C. § 1507 (providing that Federal Register publication generally "is sufficient to give notice of the contents of the document to a person subject to or affected by it").

[28] *NO Gas Pipeline v. FERC*, 756 F.3d 764, 770 (D.C. Cir. 2014) ("FERC regularly rejects requests for rehearing that raise issues not previously presented where there is no showing that the issue is based on matters not available for consideration . . . at the time of the final decision.") (internal quotations omitted); *Dominion Transmission, Inc.*, 155 FERC ¶ 61,234, at P 10 (2016) (stating "we reject requests for rehearing that raise a new issue, unless we find that the issue could not have been previously presented, e.g., claims based on information that only recently became available or concerns prompted by a change in material circumstances"); *Tex. Gas Transmission, LLC*, 155 FERC ¶ 61,099, at P 23 (2016) (same).

[29] *Nev. Power Co. v. Enron Power Mktg., Inc.*, 105 FERC ¶ 61,185, at P 74 (2003) (declining to reopen the record based on a lack of good cause where the information sought to be entered would not change the outcome of the proceeding); *SFPP, L.P. v. FERC*, 967 F.3d 788, 797-98 (D.C. Cir. 2020) (quoting *Cities of Campbell*, 770 F.2d at 1191) ("Changes always occur after closing the record, so such discretion 'is reserved for extraordinary circumstances.'"); *Riverstart Solar Park LLC*, 185 FERC ¶ 61,101, at P 9 (2022) ("The Commission in this context interprets good cause as "consisting of extraordinary circumstances, that is, a change in circumstances that is more than just material, but goes to the very heart of the case."); *Chevron Prod. Co.*, Opinion No. 571, 172 FERC ¶ 61,207, at P 53 (2020) (cleaned up) ("The Commission has discretion in deciding whether to reopen the record and the general rule is that the record once closed will not be reopened.").

11.     Riverkeeper requests that the Commission stay the Certificate Order pending issuance of an order on rehearing.[30]  This order addresses the requests for rehearing; accordingly, we dismiss Riverkeeper's motion for stay as moot.

## III.     Discussion

12.     The rehearing petitioners allege that the Commission erred in the Certificate Order by:  (1) concluding that GTN appropriately replaced the three compressor units at the Athol, Kent, and Starbuck compressor stations with larger compressors under section 2.55(b) of the Commission's regulations; (2) rejecting GTN's request for a predetermination of rolled-in rate treatment for the costs associated with the Project; (3) finding that the project is needed; and (4) finding that the analysis under the National Environmental Policy Act (NEPA) was sufficient.  We conclude that each of these arguments lacks merit, as discussed below.

### A.     Replacement of Facilities Under Section 2.55(b)

13.     Section 2.55(b) of the Commission's regulations allows a pipeline company to replace existing facilities that "have or will soon become physically deteriorated or obsolete, to the extent that replacement is deemed advisable, if:

> (1) the replacement will not result in a reduction or abandonment of service through the facilities;
>
> (2) the replacement facilities will have a substantially equivalent designed delivery capacity . . .; [and]
>
> (3) . . . the company files notification of such activity with the Commission at least 30 days prior to commencing construction."[31]

Between 2020 and 2021, GTN undertook replacement activities of certain natural gas compressor facilities under section 2.55(b).[32]

---

[30] Riverkeeper Rehearing Request at 80-84.

[31] 18 C.F.R. § 2.55(b) (2023).

[32] *Id.* (the Commission's regulations allow a pipeline to replace physically deteriorated or obsolete facilities "if the replacement will have substantially equivalent designed delivery capacity").  *See* GTN, Advanced Notification of Natural Gas Facilities Replacement Pursuant to Section 18 CFR 2.55(b)(1)(iii) Athol Station, Docket No. CP20-82-000, at 1(filed Mar. 10, 2020) (Athol Station Section 2.55(b) Notice); GTN, Advanced Notification of Natural Gas Facilities Replacement Pursuant to Section 18 CFR 2.55(b)(1)(iii) Kent Station, Docket No. CP20-85-000, at 1 (filed Mar. 10, 2020) (Kent

14.     Specifically, GTN determined that the existing Rolls Royce Avon (Avon) compressor units originally installed at the stations in the early 1970s required replacement to prevent a potential reliability risk to the system.**[33]**  Accordingly, in March 2020, consistent with the requirements of section 2.55(b), GTN submitted advanced notice that it was planning to replace the Avon compressor units having a certificated ISO rating of 14,300 HP at the Athol, Kent, and Starbuck compressor stations with Solar Titan 130 gas turbine compressor units.**[34]**  In each advanced notice, GTN explained that there would be "controls put in place to govern horsepower such that the station operation can be controlled and will not exceed certificated horsepower" on the new Solar Titan 130 compressor units.**[35]**  In addition, GTN explained that:  the purpose of the replacement is to provide greater system reliability, flexibility, and security to existing shippers; the replacements were the nearest reliable size available to the original units; and the replacements would have substantially equivalent designed delivery capacity (with controls), would be located in the same site as the facilities being replaced, and would not result in a reduction or abandonment of service.**[36]**

15.     Commission staff concluded that the advanced notices "adequately address[ed] the requirements set forth under 2.55(b)(3)."**[37]**  Thereafter, the replacement units were put into service in October and November 2021.**[38]**

_____

Station Section 2.55(b) Notice); GTN, Advanced Notification of Natural Gas Facilities Replacement Pursuant to Section 18 CFR 2.55(b)(1)(iii) Starbuck Station, Docket No. CP20-86-000, at 1 (filed Mar. 10, 2020) (Starbuck Station Section 2.55(b) Notice).

**[33]** Athol Station Section 2.55(b) Notice at 1; Kent Station Section 2.55(b) Notice at 1; Starbuck Station Section 2.55(b) Notice at 1.

**[34]** *Id.*

**[35]** *Id.*

**[36]** *Id.*

**[37]** *See* Environmental Assessment Report, Docket No. CP20-82-000 (issued Mar. 12, 2020) (Athol EAR); Environmental Assessment Report, Docket No. CP20-85-000 (issued Mar. 12, 2020) (Kent EAR); Environmental Assessment Report, Docket No. CP20-86-000 (issued Mar. 12, 2020) (Starbuck EAR).

**[38]** GTN April 18, 2023 Response to Commission April 4, 2023 Data Request at 11 (GTN April 18, 2023 Response).  We note that any filing with the Commission must be signed and the signature on the filing constitutes a certificate that:  (i) the signer has read the filing signed and knows its contents; (ii) the contents are true as stated, to the best of the knowledge and belief of the signer; and (iii) the signer possesses full power and

16.     The States assert that the Commission failed to provide a reasoned explanation for its determination that GTN previously selected the closest available size for its new, upgraded compressors.**39**  More specifically, the States maintain that GTN's existing certificate did not allow it to exceed the certificated 14,300 HP for its compressor units and that the Solar Titan 130, which has a site rating of 23,470 HP, exceeded its certificated limit by more than 9,000 HP.**40**  The States argue that GTN could have satisfied its needs with the smaller Solar Mars 100 compressor units with a site rating of 15,900 HP, which is closer in size to the existing units.**41**  According to the States, the Solar Mars 100 unit was capable of meeting the certificated 14,300 HP with the altitude and temperature conditions at each station except the Kent compressor station, the larger Solar Titan 130 was not the nearest reliable size, and the Commission did not explain why section 2.55(b) allows GTN to install new compressors that exceeded its certificated horsepower.**42**  The States also assert that the Commission did not evaluate whether horsepower in excess of the certificated 14,300 HP is necessary to serve existing customers, nor did it inquire whether other smaller compressors were available, including electric compressors.**43**

17.     As an initial matter, and consistent with Commission precedent, we find the States' arguments related to the earlier categorization of these facilities, either under section 2.55 or GTN's Part 157 blanket certificate authority,**44** to be outside the scope of this proceeding under Commission regulations.**45**  Such challenges concern GTN's

---------------------------

authority to sign the filing.  18 C.F.R. § 385.2005(a) (2023); *see also* 18 C.F.R. § 157.6(a)(4)(i) (2023) ("The signature on a filing constitutes a certification that: The signer has read the filing signed and knows the contents of the paper copies and electronic filing; the paper copies contain the same information as contained in the electronic filing; the contents as stated in the copies and in the electronic filing are true to the best knowledge and belief of the signer; and the signer possesses full power and authority to sign the filing.").

**39** States Rehearing Request at 28.

**40** *Id.*

**41** *Id.*

**42** *Id.* at 28-30.

**43** *Id.* at 30.

**44** 18 C.F.R. pt. 157, subpt. F (2023).

**45** *Tenn. Gas Pipeline Co.*, 163 FERC ¶ 61,190, at P 48 & n.99 (2018) (addressing arguments that prior constructed facility did not properly qualify for exclusion under

compliance under its prior certificate authority and thus are not properly before us on rehearing.[46]

18.    Regardless, the States' arguments also fail on the merits.  We disagree that the Commission failed to provide a reasoned explanation for its determination that GTN selected the closest available size for its new, upgraded compressors.[47]  In the Certificate Order, the Commission explained that "GTN provides an adequate explanation for why it selected the Solar Titan units over the Solar Mars units—at cold weather site conditions the smaller Solar Mars units would not have supplied the required compression (i.e., the system design would have failed at colder temperatures)."[48]  GTN provided sufficient evidence that, under certain ambient temperatures, the Solar Mars 100 could not meet existing levels of transportation service at either the Athol, Kent, or Starbuck stations.[49]  The States appear to conflate the Avon compressor unit's ISO HP rating at sea level and under certain standard conditions with its site-rated horsepower.  At sea level, and under certain standard operating conditions, the Avon compressor unit performs at its nameplate ISO rating of 14,300 HP; however, at the Athol and Starbuck stations, the Avon compressor units could operate above their nameplate ISO rating at a net output power of 14,510 HP and 15,180 HP, respectively.[50]  Generally speaking, lower temperatures increase the efficiency of a compressor unit, increasing horsepower output; and the hotter the temperature, the less horsepower a compressor unit is capable of making.[51]

---

[46] *Id.*

[47] States Rehearing Request at 28.

[48] Certificate Order, 185 FERC ¶ 61,035 at P 16 (citing GTN April 18, 2023 Response at 12).

[49] GTN April 18, 2023 Response at 12-13.

[50] *Id.* at 13, tbl. 8-1.  For example, at an elevation of 2,440 feet and an ambient temperature of 34 degrees Fahrenheit, the Avon compressor unit operates at 14,510 HP. *Id.*  Similarly, at an elevation of 1,070 feet and an ambient temperature of 36 degrees Fahrenheit, the Avon compressor unit operates at 15,180 HP.  *Id.*

[51] *See High Island Offshore Sys.*, 3 FERC ¶ 61,253, at 61,683 (1978) ("The actual horsepower which each of these units can develop is a function of the firing temperature,

19.     Pipeline operators size compressor units by accounting for a range of
environmental conditions to select proper units.  The States' assertion that the Solar Mars
100 compressor unit, with a nameplate ISO rating of 15,900 HP, is sufficient to replace
the 14,300-HP Avon compressor unit at the Athol and Starbuck compressor stations
because it has a higher nameplate ISO rating does not take into account actual operating
conditions at the specified elevations and ambient temperatures.  Simply put, the Solar
Mars 100 cannot meet the required net output power to maintain service through the
Athol, Starbuck, and Kent compressor stations, and we disagree with the States' assertion
that GTN could have satisfied its needs with the smaller compressor units at each station
except the Kent compressor station.[52]  As GTN explained, the "system design would fail
with the [Solar] Mars 100 unit at colder temperatures routinely seen in this geographic
area of the United States."[53]  Under section 2.55(b), replacement facilities must not
"result in a reduction or abandonment of service through the facilities."[54]  Accordingly,
we are satisfied that the replacement of the Avon compressor units with the Solar Titan
130 compressor units, subject to software controls to govern horsepower and prevent an
exceedance of certificated horsepower, is consistent with section 2.55(b)'s requirements
that the replacement facilities would not result in a reduction or abandonment of service
and would have a substantially equivalent designed delivery capacity.

20.     We also disagree with the States' assertion that GTN exceeded its certificated limit
by more than 9,000 HP.[55]  GTN has shown that its horsepower restrictions on the new

---

speed of rotation, ambient temperature, altitude at location installed and certain design
features.").

[52] States Rehearing Request at 28-29; *see also* GTN May 12, 2023 Response to
Commission May 10, 2024 Data Request at 4 (outlining net power output of the
compressors at sea level and at each site elevation during winter and summer).
Accordingly, we further disagree that the Commission did not evaluate whether
horsepower in excess of the 14,300 certificated horsepower is necessary to serve existing
customers.  States Rehearing Request at 30.

[53] GTN April 18, 2023 Response at 12.  At colder temperatures, the Solar Mars
100 units would operate below the net output power level of the Avon units.

[54] 18 C.F.R. § 2.55(b)(1).

[55] States Rehearing Request at 28.

units enabled them to operate at the same horsepower as the old units.[56]  Thus, we are satisfied that GTN operated its compressors at certificated levels.

21.    Moreover, for the reasons explained above,[57] we find the States' argument that the Commission failed to inquire whether other smaller compressors were available as a section 2.55 replacement, including electric compressors,[58] to be outside the scope of this proceeding under Commission regulations.  As we explain further below,[59] replacement projects pursuant to section 2.55(b) are exempt from the environmental review, and, therefore, no consideration of alternatives would have been required.[60]

22.    The States next assert that the Commission erred in concluding that GTN appropriately replaced the three compressor units at the Athol, Kent, and Starbuck stations with larger compressors under section 2.55.[61]  More specifically, the States argue that section 2.55(b) only allows replacement of deteriorated or obsolete facilities that will result in substantially equivalent designed delivery capacity—replacements that result in an incidental increase in capacity do not qualify under section 2.55(b).[62]  The States further aver that "more extensive work, or work that results in an incidental increase in capacity, must be done under a pipeline's blanket certificate authority"[63] or be evaluated

---

[56] Certificate Order, 185 FERC ¶ 61,035 at P 16 (citing GTN April 18, 2023 Response at 9-10).

[57] *See supra* P 17.

[58] States Rehearing Request at 30.

[59] *See infra* P 150.

[60] 18 C.F.R. § 380.5(b)(1) (2023) (excluding projects constructed pursuant to section 2.55 from the environmental review requirement).

[61] States Rehearing Request at 30.

[62] *Id.* (citing 18 C.F.R. § 157.202(b)(2)(i) (2023)).

[63] On this point, the States argue that GTN's compressor upgrades would not have qualified under its blanket certificate authority because replacements "for the primary purpose of creating additional main line capacity" are not eligible under the blanket certificate and GTN did not follow the blanket certificate authority procedure.  States Rehearing Request at 30-31.  As discussed above, we find the characterization of these facilities to be outside the scope of this proceeding.  *See supra* P 17.

as a separate NGA section 7(c) certificate.**64**  The States maintain that the Commission's
conclusion that the replacements were appropriate under section 2.55(b) because the
upgraded compressors had software controls defied the intent and text of Commission
regulations, and that section 2.55(b) applies only to basic maintenance and repair of
facilities that have equivalent designed delivery capacity as the original facilities.**65**  The
States disagree that GTN can rely on section 2.55(b)'s narrow provision to significantly
change the horsepower at the three compressor stations and ultimately allow it to operate
the Project.**66**  In this regard, the States argue that the Commission failed to consider
evidence demonstrating GTN's intent to use the compressor replacements to expand its
capacity.**67**  The States assert that the replacement and expansion projects are not
independent and that the Commission should not allow GTN to rely on software and
piecemeal regulatory processes to circumvent the NGA's mandate that companies obtain
a certificate of public convenience and necessity prior to expanding facilities.**68**

23.     For the reasons explained above, we find the States' arguments related to the
categorization of these facilities under section 2.55 or GTN's Part 157 blanket certificate
authority to be outside the scope of this proceeding under the Commission regulations.**69**
Nonetheless, we find that GTN appropriately engaged in replacement activities pursuant
to section 2.55(b).  As the Commission explained in Order No. 790, "we expect
companies seeking to install, maintain, replace, repair, or upgrade facilities to look first
to section 2.55, and only if an activity is beyond the scope of that section then to turn to
blanket certificate authority, and only if an activity would exceed blanket authority, then
to file for case-specific section 7 authorization."**70**

24.     We first look to the provisions of section 2.55(b), which excludes certain
replacement facilities from the requirements of section 7(c) of the NGA.**71**  Replacement

---

**64** States Rehearing Request at 30.

**65** *Id.*

**66** *Id.*

**67** *Id.* at 32.

**68** *Id.*

**69** *See supra* P 17.

**70** Final Rule, *Revisions to Auxiliary Installations, Replacement Facilities, &
Siting & Maint. Reguls.*, Order No. 790, 145 FERC ¶ 61,154, at P 47 (2013).

**71** 18 C.F.R. § 2.55.

of facilities means "facilities which constitute the replacement of existing facilities that have or will soon become physically deteriorated or obsolete . . . if:  (1) the replacement will not result in a reduction or abandonment of service through the facilities; (2) the replacement facilities will have a substantially equivalent designed delivery capacity . . .; [and] (3) . . . the company files notification of such activity with the Commission at least 30 days prior to commencing construction."**72**  Although the replacement facilities must have a substantially equivalent designed delivery capacity, the Commission has "on occasion, and on a case-by-case basis, found cause to allow certain limited deviations . . . ."**73**  The Commission has found larger replacement facilities to be authorized under section 2.55(b) if:  (1) the original facility was not readily available, and the replacement constituted the closest off-the-shelf size, (2) the larger-sized replacement resulted in a substantially equivalent designed delivery capacity, and (3) the applicant did not operate the facility above authorized levels.**74**  Software controls and other system modifications are an appropriate tool to ensure that replacement facilities do not operate above authorized levels when installed pursuant to section 2.55(b).**75**  Moreover, the installation of larger facilities is appropriate as a replacement, even without software controls or modification, where it is the closest substitute available or otherwise advisable, so long as the replacement facilities will have a substantially equivalent designed delivery capacity.**76**  However, as stated in Order No. 603-A, the applicant must

---

**72** *Id.* § 2.55(b)(1).

**73** *Columbia Gas Transmission Corp.*, 68 FERC ¶ 61,043, at 61,143 (1994).

**74** *Id.* (discussing Panhandle's "Advance Notification of Replacement Project" in Docket No. CP94-299-000).

**75** *E.g., ANR Pipeline Co.*, 171 FERC ¶ 61,233, at P 4 (2020), *vacated in part*, *ANR Pipeline Co.*, 180 FERC ¶ 61,119 (2022) (replacing 12,000 HP compressor unit with a 15,000 HP compressor unit under section 2.55(b), but de-rated to operate at 12,000 HP); *Transwestern Pipeline Co.*, 79 FERC ¶ 62,102, at 64,309 (1997) (replacing compression unit under section 2.55(b) with 32.4% larger horsepower unit, from 3,550 HP to 4,700 HP, but with modifications to limit horsepower to certificated levels).

**76** *E.g.*, *Dominion Transmission, Inc.*, 129 FERC ¶ 61,048, at P 26 (2009) (explaining that Dominion could have installed a compressor with slightly higher horsepower rating under section 2.55); *Columbia Gas Transmission Corp.*, 44 FERC ¶ 61,338, at 62,146-48 (1988) (authorizing Columbia Gas to operate pipeline at a maximum authorized operating pressure of 1,000 pounds per square inch gauge (psig) where prior pipeline was replaced under section 2.55(b) with pipeline capable of withstanding 1,000 psig, but only operated at the 375 psig capability of the original pipeline); *Transwestern Pipeline Co.*, 81 FERC ¶ 61,172, at 61,752 (1997) (increasing certificated capacity where section 2.55(b) replacement increased horsepower of three

Document Accession #: 20240416-3093    Filed Date: 04/16/2024
Docket No. CP22-2-001                                                           - 16 -

be able to support its prudent decision to use any replacement facility that is not the closest available size or horsepower rating to the facility being replaced.[77]

25.     Here, we find that GTN has satisfied its burden.  As we explained in the Certificate Order and above, GTN provided an adequate explanation for why it selected the Solar Titan 130 compressor units over the Solar Mars 100 compressor units.[78] Moreover, and again as we stated in the Certificate Order, the undisputed evidence shows that GTN restricted the capacity of the new units through software controls such that the delivery capacity remained the same as the original units.[79]  Therefore, we find that the replacement compressors have a substantially equivalent designed delivery capacity and that GTN was not required to use its blanket certificate authority or to file an application under section 7 prior to replacing the compressors.[80]  In any event, once GTN identified additional need for pipeline capacity,[81] GTN appropriately sought the instant section 7(c)

---

compressor units from 6,500 HP each to 7,000 HP); *Transwestern Pipeline Co.*, 79 FERC at 64,309 (increasing certificated capacity where section 2.55(b) replacement increased horsepower of compressor unit from 3,550 HP to 4,700 HP); *NorAm Gas Transmission Co.*, 82 FERC ¶ 62,121, at 64,190 (1998) (increasing certificated capacity and horsepower of compressor unit where section 2.55(b) replacement increased horsepower from 4,000 HP to 4,700 HP).

[77] *Revision of Existing Reguls. Under Part 157 & Related Sections of the Comm'n's Reguls. Under the Nat. Gas Act,* Order No. 603, FERC Stats. & Regs. ¶ 31,073 (1999) (cross-referenced at 87 FERC ¶ 61,125), *order on reh'g,* Order No. 603-A, FERC Stats. & Regs. ¶ 31,081, at 30,927 (1999) (cross-referenced at 88 FERC ¶ 61,297), *order on reh'g,* Order No. 603-B, FERC Stats. & Regs. ¶ 31,094 (2000) (cross-referenced at 90 FERC ¶ 61,205).

[78] *See supra* PP 18-19; Certificate Order, 185 FERC ¶ 61,035 at P 16.

[79] Certificate Order, 185 FERC ¶ 61,035 at P 16.

[80] *Transcon. Gas Pipe Line Corp.*, 65 FERC ¶ 61,408, at 63,120 (1993) (finding that the installation of a turbocharger that would incidentally increase capacity of mainline would not be a facility that alters mainline capacity so long as the compressor was operated at its certificated capacity).

[81] GTN Application at 3-4 ("GTN formulated the Project in response to the rising demand for natural gas supplies in various areas served by GTN and its customers, and the need to provide a supply alternative to declining natural gas production in the Rockies supply basins. The increased demand is driven by residential, commercial, and industrial customer market growth in the Pacific Northwest region of the United States.").

Case: 24-60354    Document: 1-3    Page: 103    Date Filed: 07/15/2024

Document Accession #: 20240416-3093    Filed Date: 04/16/2024
USCA Case #24-1204    Document #2064211    Filed: 07/11/2024    Page 107 of 238
Docket No. CP22-2-001                                                    - 17 -

authorization prior to uprating the replaced compressor units. We find that this is consistent with prior Commission practice.[82]

26.    Next, the States point to evidence that they contend demonstrates GTN's intent from the beginning to use the compressor replacements to expand its capacity.[83] This evidence is outside the scope of our inquiry here and is not persuasive. The Commission's inquiry in this proceeding is whether to grant a certificate of public convenience and necessity under NGA section 7 and Part 157 of the Commission's regulations for authorization to install, construct, modify, and operate certain natural gas compression facilities at the existing No. 5 Athol, No. 7 Starbuck, and No. 10 Kent Compressor Stations.[84] Previously, GTN represented to the Commission that the purpose of the compression unit replacements under section 2.55(b) was to replace outdated units to avoid a potential reliability risk and provide greater system reliability, flexibility, and security to the system, and we find that the States have not provided sufficient evidence to the contrary.[85] Nevertheless, we find the evidence relied upon by the States to be unconvincing. First, to support the States' contention that GTN intended to expand capacity, they cite to GTN's 2019 investor announcement about pursuing the GTN Xpress Project to make additional firm transportation service available.[86] We note that

---

[82] *See ANR Pipeline Co.*, 171 FERC ¶ 61,233 at P 4; *Transwestern Pipeline Co.*, 79 FERC at 64,309; *see also Columbia Gas Transmission Corp.*, 44 FERC at 62,146-48; *Transwestern Pipeline Co.*, 81 FERC at 61,752; *Transwestern Pipeline Co.*, 79 FERC at 64,309; *NorAm Gas Transmission Co.*, 82 FERC at 64,190.

[83] States Rehearing Request at 32. As evidence of GTN's intent to use the replacement compressors to expand its pipeline capacity, the States point to an investor announcement, the sale of capacity prior to the installation of the compressors, GTN's failure to include the actual horsepower rating of the compressors or the relationship to the new expansion in its section 2.55(b) filings, and the proximity between when the new compressors were placed into service and the filing of the instant proceeding to increase the capacity. *Id.*

[84] Certificate Order, 185 FERC ¶ 61,035 at P 1.

[85] Although the States are correct that the Commission's blanket certificate regulations require that replacements not be "for the primary purpose of creating additional main line capacity," 18 C.F.R. § 157.202(b)(2)(i), GTN was not required to use its blanket authorization, and section 2.55(b) does not contain such a requirement. *Id*. § 2.55(b)

[86] States' Rehearing Request at 32 (citing States' August 22, 2022 Protest at Ex. D, 79-80 (November 1, 2019 press release for the GTN XPress Project), 85-86 (November 7, 2019 TC Pipelines, LP earnings call discussing GTN XPress Project)).

Case: 24-60354     Document: 1-3     Page: 104     Date Filed: 07/15/2024

Document Accession #: 20240416-3093     Filed Date: 04/16/2024
USCA Case #24-1204     Document #2064211     Filed: 07/11/2024     Page 108 of 238

Docket No. CP22-2-001                                                                - 18 -

such materials can reasonably be understood as marketing materials and promotional in nature.[87]  Additionally, it is not uncommon for companies to announce their intention to build facilities prior to seeking any necessary Commission approval.[88]  To the extent that GTN later sought to expand capacity by removing the software limitation restricting the compressors' capacity, that is properly brought as a section 7 application.[89]

27.     Second, the States claim that GTN sold the expansion capacity before it sought to replace the compressors as replacements under section 2.55(b).[90]  Similarly, it is not uncommon for pipeline companies to solicit or sell capacity prior to completing construction of the necessary facilities, or even prior to seeking Commission authorization.[91]  In fact, consistent with the Certificate Policy Statement, precedent agreements for 100% of a project's capacity is significant evidence of need for the proposed project, and precedent agreements are often submitted with section 7 applications.[92]  That GTN engaged with potential shippers very early in the process does not evince wrongful conduct.

28.     Third, the States assert that GTN failed to include the horsepower of the replacement units in its advanced notice filing to conceal the fact that the replacement

---

[87] *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 108 (D.C. Cir. 2014) (*Minisink*) (affirming the Commission's rejection of a PowerPoint presentation as evidence of intent); *Nat'l Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145, at P 155 (2017) (rejecting evidence, including press release, as evidence of impacts); *see also Columbia Gas Transmission, LLC*, 170 FERC ¶ 61,246, at P 45 (2020) (explaining that argument based on press release was speculative); *Mojave Pipeline Co.*, 83 FERC ¶ 61,267, at 62,117 (1998) (finding press releases speculative).

[88] In fact, many project sponsors do so to acquire precedent agreements or other information necessary for their application before the Commission.

[89] *See infra* P 28.

[90] States Rehearing Request at 32 (citing GTN Application at 4).

[91] *See, e.g.*, *Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,006 (2023) (open season conducted on March 8, 2019 and in April and May 2020, but section 7 application not filed until March 26, 2021).

[92] *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227, at 61,746 (1999), *clarified*, 90 FERC ¶ 61,128, at 61,391, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement); *Tex. E. Transmission, LP*, 184 FERC ¶ 61,187, at P 14 (2023).

compressor units could operate at a higher horsepower.[93]  But we note that nowhere in section 2.55 is such information required.[94]  Nevertheless, GTN stated in its advanced notice filing that it was replacing the existing 14,300 HP compressor units with Solar Titan 130 gas turbine compressor units that would be site rated.[95]  GTN's clear reference to the compressor brand provided sufficient information from which to ascertain the horsepower of the units.[96]  Last, we are unpersuaded that the timing of GTN's instant proceeding near in time with the installation of the replacement compressors demonstrates GTN's intent to use the replacement compressors to expand its capacity.  In order to utilize the de-rated capacity, GTN was required to seek Commission authorization under section 7 of the NGA, which it has done.  We find GTN's actions consistent with prior Commission proceedings.[97]

###     B.     Predetermination of Rolled-In Rate

29.     In the Certificate Order, the Commission stated that "it appears that a portion of the horsepower from the replacement compressors, which was not necessary or used to replicate the service provided by the old compressors that they were installed to replace, will be activated and used to provide expansion project service."[98]  Noting Commission policy that costs associated with existing capacity that is used for an incremental project should not be included in the incremental project's cost of service for purposes of establishing initial rates, and acknowledging that there was a question as to whether the portion of the horsepower being used to support the Project is currently in use, the Commission determined that parties should be free to argue in the next rate case that a portion of the compression costs should be assigned to the Project.  Therefore, the Commission denied GTN's request for a predetermination favoring rolled-in rate

---

[93] States Rehearing Request at 32.

[94] 18 C.F.R. § 2.55(b)(1)(iii) (requiring only a notification).  We note that 18 C.F.R. § 385.203(a)(6) (2023) cited by the States refers to pleadings, tariffs, or rate filings, not notices filed under section 2.55(b).

[95] Athol Station Section 2.55(b) Notice at 1; Kent Station Section 2.55(b) Notice at 1; Starbuck Station Section 2.55(b) Notice at 1.

[96] *See* Solar Turbines, Titan 130 Compressor Set (last visited Feb. 13, 2024), www.solarturbines.com/en_US/products/gas-compressor-packages/titan-130.htm (providing that the unit operates at 23,470 HP).

[97] *See supra* note 82.

[98] Certificate Order, 185 FERC ¶ 61,035 at P 53.

treatment in order to fully preserve the ability of the parties to address allocation of expansion and replacement costs in a future NGA section 4 rate case.**[99]**

30.     GTN asserts that the Commission erred in rejecting its request for a predetermination of rolled-in rate treatment for the costs associated with the GTN Xpress Project.**[100]** It maintains that the Commission consistently grants predeterminations for rolled-in treatment for replacement projects that improve the reliability of service to existing customers, including by replacing existing capacity.**[101]** GTN disagrees with the Commission's conclusion that a portion of the costs associated with the replacement compressor units (installed pursuant to section 2.55) could potentially be allocated to expansion shippers because the replacement units had the capability to provide more horsepower than the original units and therefore support higher throughput capacity than was necessary for it to maintain its existing services prior to the GTN Xpress Project.**[102]** According to GTN, the costs of the Solar Titan 130 compressor units do not vary based upon the amount of horsepower being utilized, and the Project does not increase the cost that GTN incurred in order to implement the replacements.**[103]** GTN states that any allocation of the replacement costs to expansion shippers would violate Commission policy.**[104]** Thus, GTN states that the Commission deviated from prior precedent.**[105]**

31.     We disagree. The Certificate Policy Statement "recognizes that existing customers should pay the costs of projects designed to improve their service by replacing existing capacity, improving reliability, or providing additional flexibility."**[106]** Since issuing the Certificate Policy Statement, the Commission has consistently found that

---

**[99]** *Id.*

**[100]** GTN Rehearing Request at 11.

**[101]** *Id.* at 12. GTN also asserts that Commission policy and precedent demonstrate that the full costs of replacement units should be borne by all shippers via rolled-in rate treatment, regardless of whether a subsequent expansion utilizes those facilities. *Id*. at 13 (citing Certificate Policy Statement, 88 FERC ¶ 61,227, *clarified*, 90 FERC at 61,391).

**[102]** *Id.* at 14.

**[103]** *Id.*

**[104]** *Id.* at 15.

**[105]** *Id.*

**[106]** *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,130, at P 61 (2023) (citing Certificate Policy Statement, 88 FERC ¶ 61,227 at n.12, *clarified*, 90 FERC at 61,393).

existing shippers generally should not pay for the costs of incremental expansions.**107**  In
proceedings involving replacements *and* expansions, including replacements of
deteriorating facilities such as the facilities at issue here, "the Commission generally
approves proposals that allocate the estimated cost of an in-kind replacement . . . to
existing customers and the remainder of estimated costs to the incremental expansion
shippers."**108**

32.     Here, GTN requested a predetermination that it may roll the GTN Xpress Project
costs into its existing rates in a future NGA section 4 rate case.**109**  But, a portion of the
horsepower from the replacement compressors that exceeded the horsepower required to
replicate the service provided by the old compressors will be used to provide additional
service for the Project.**110**  Commission policy is that costs associated with existing
capacity that is used for an incremental project should not be included in the incremental
project's cost of service for purposes of establishing initial rates since these costs are
already in rate base and the initial incremental recourse rates should be designed to reflect
only the incremental costs associated with the project.**111**  Because the GTN XPress
Project will involve the removal of the horsepower restrictions on the replacement
compressor units and it appears that a portion of the horsepower from the replacement
units will be used to support the Project, GTN will have the burden of proving that costs
should be rolled-in in a future general section 4 rate proceeding and the parties to that

---

**107** *Id.*

**108** *Paiute Pipeline Co.*, 104 FERC ¶ 61,078, at P 27 (2003); *see also Transcon.
Gas Pipe Line Co.*, 185 FERC ¶ 61,130 at P 62 (approving in-kind cost allocation
method); *Dominion Transmission, Inc.*, 129 FERC ¶ 61,048 at PP 26-27 (same).  We
further note that the precedent cited by GTN to support its assertion that allocating costs
of the replacement compressor units to Project shippers would violate Commission policy
all involved separated allocations based on replacement costs and expansion costs.  *See*
GTN Rehearing Request at 12, nn.37-38.  Accordingly, we find that GTN's cited
precedent is inapposite for its position and disagree that Commission policy dictates an
alternate determination.  *Id.*

**109** We note that GTN provides no accounting nor proposes any estimation of the
allocation of costs between those associated with the replacement of facilities and those
incurred to create incremental capacity.  *See ANR Pipeline Co*., 185 FERC ¶ 61,191, at
PP 44-46 (2023) (granting a predetermination and stating that the proposed allocation of
costs between the replacement and incremental expansion functions associated with the
project was consistent with Commission policy and precedent).

**110** Certificate Order, 185 FERC ¶ 61,035 at P 53.

**111** *See Tex. E. Transmission, LP*, 165 FERC ¶ 61,132, at P 19 (2018).

Case: 24-60354    Document: 1-3    Page: 108    Date Filed: 07/15/2024

Document Accession #: 20240416-3093    Filed Date: 04/16/2024
USCA Case #24-1204    Document #2064211    Filed: 07/11/2024    Page 112 of 238

Docket No. CP22-2-001                                                    - 22 -

proceeding may raise the question of whether some allocation of the compression costs to the GTN XPress Project is appropriate.[112]  We reiterate that we are making no determination whether or not rolled-in rate treatment is appropriate; all parties, including GTN, will be able to address the allocation issue in a future general NGA section 4 rate case.[113]  This is consistent with Commission policy, as outlined above, and we are unpersuaded that the precedent cited by GTN requires the Commission to deviate from its prior practice.[114]

33.    Next, according to GTN, the replacement compressor units were authorized, paid for, installed, and in service prior to the Commission's November 18, 2021 letter order in RP15-904-003 (2021 Rate Settlement Proceeding) approving GTN's September 29, 2021 filing of a stipulation and agreement (2021 Settlement Order).[115]  GTN asserts that the Certificate Order erroneously reopens the questions of the treatment of these costs by allowing parties to argue that some portion of those costs should be allocated to the Project in determining whether roll-in of project costs will be permitted.[116]  Accordingly, GTN asserts that the Commission did not explain why the issue of allocation should be subject to further litigation in a future rate case and did not explain how it would be possible to unwind the cost allocation given that the costs have been reflected in existing rates and have not been separately accounted for.[117]

34.    We are not persuaded by GTN's arguments.  As the Commission stated in the 2021 Settlement Order, "approval of the [s]ettlement does not constitute approval of, or

---

[112] Certificate Order, 185 FERC ¶ 61,035 at P 17; *see also id.* P 53 ("while the costs of the replacement compressors appear to be in existing rates, there is a question as to whether the portion of the horsepower being used to support the expansion project is currently in use").

[113] *Id.* P 53.

[114] *See supra* note 108.

[115] GTN Rehearing Request at 16; *Gas Transmission Nw. LLC*, 177 FERC ¶ 61,110 (2021) (2021 Settlement Order).  GTN asserts that the Commission recognizes this fact by acknowledging that the costs of the replacement compressor units "appear to be in existing rates[.]"  GTN Rehearing Request at 16 (citing Certificate Order, 185 FERC ¶ 61,035 at PP 16, 53).

[116] GTN Rehearing Request at 16.

[117] *Id.* at 16-17.

precedent regarding any principle or issue in this proceeding."**118**  In any future NGA
section 4 rate case, GTN will bear the burden of supporting its proposed rates.**119**  As
stated in GTN's Petition for Approval of Settlement in the 2021 Rate Settlement
Proceeding, "the term of the Settlement shall be from the Effective Date until the
Settlement Rates are superseded by new base tariff recourse rates pursuant to section 4 or
section 5 of the NGA or a superseding general rate settlement."**120**  The 2021 Rate
Settlement further requires GTN to file a general rate case pursuant to NGA section 4
such that the rates proposed therein will be effective no later than April 1, 2024.**121**  A
settlement provision requiring a pipeline to file a new rate case by a particular date
"benefits the pipeline's shippers by ensuring them that they will have an opportunity to
review whether the rates agreed to in the settlement continue to be just and
reasonable."**122**  Any issues related to cost allocation will be addressed in a future rate
proceeding, and the parties will be free to fully argue their positions.**123**  We will not
address or prejudge any rate case issues in this proceeding.**124**

35.     Last, GTN requests that if the Commission does not grant rehearing on the issue of
rolled-in rate treatment, the Commission should clarify that the "future general NGA
section 4 rate case," where allocation of a portion of the replacement compressor unit
costs to the Project should be explored, is not GTN's current general NGA section 4 rate
case in Docket No. RP23-1099-000.**125**  According to GTN, because the test period in that
proceeding will conclude on March 31, 2024, and the Project will not be placed in service

---

**118** 2021 Settlement Order, 177 FERC ¶ 61,110 at P 8.

**119** 15 U.S.C. § 717c(e); *Tenn. Gas Pipeline Co.*, 179 FERC ¶ 63,024, at P 34
(2022).

**120** GTN, Petition for Approval of Settlement, Amended and Restated Stipulation
and Agreement of Settlement, Docket No. RP15-904-003, at 7, Article IV(A) (filed
Sept. 29, 2021) (2021 Rate Settlement).

**121** *Id.* at 10, art. V(B).

**122** *S. Nat. Gas Co.*, 142 FERC ¶ 61,078, at P 27 (2013)

**123** Certificate Order, 185 FERC ¶ 61,035 at P 5; *cf. El Paso Nat. Gas Co.*,
110 FERC ¶ 61,259, at P 3 (2005) (stating that a ruling on how pipeline's rate cap would
apply in pipeline's next general rate case would be premature and beyond the scope of
the proceeding).

**124** *El Paso Nat. Gas Co.*, 110 FERC ¶ 61,259 at P 3.

**125** GTN Rehearing Request at 17-18.

Case: 24-60354    Document: 1-3    Page: 110    Date Filed: 07/15/2024

Document Accession #: 20240416-3093    Filed Date: 04/16/2024
USCA Case #24-1204    Document #2064211    Filed: 07/11/2024    Page 114 of 238

Docket No. CP22-2-001                                                    - 24 -

until after the end of the test period, it would not be appropriate to determine in Docket No. RP23-1099-000 what portion, if any, of the replacement compressor unit costs should be allocated to the Project.**126**  GTN maintains that the allocation question should be addressed in GTN's next general section 4 rate case subsequent to Docket No. RP23-1099-000.**127**  In the alternative, if the Commission does not grant the requested clarification, GTN requests rehearing on the issue.**128**

36.     We dismiss GTN's requested clarification and alternative request for rehearing and defer this issue for consideration in Docket No. RP23-1099-000.  The Commission has discretion to choose the proper procedural course to dispose of issues.**129**  On September 29, 2023, as amended, GTN filed revised tariff records reflecting a general system-wide rate increase and several changes to its general terms and conditions to be effective November 1, 2023.**130**  In its application, GTN proposed to include costs associated with the compressor replacement activities in its proposed rates.**131**  In response, parties argued that because the costs of the replacement units are included in the proposed rates, the Commission should set this issue for hearing to allow for further discovery and investigation to determine whether the compressors replacement costs are appropriately allocated to the existing system.**132**  On October 31, 2023, the Commission accepted and suspended the revised tariff records, subject to refund, and set all issues for

---

**126** *Id.* at 17.

**127** *Id.* at 17-18.

**128** *Id.* at 18-19.

**129** *Mobil Oil Expl. & Prod. Serv. v. United Distrib. Cos.*, 498 U.S. 211, 230-31 (1991) ("An agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures."); *Nader v. FCC*, 520 F.2d 182, 197 (D.C. Cir. 1975) (within agency discretion to consider issue in a second proceeding); *Stowers Oil & Gas Co.*, 27 FERC ¶ 61,001 (1984) (explaining that the Commission "is generally master of its own calendar and procedures").

**130** *Gas Transmission Nw. LLC*, 185 FERC ¶ 61,086, at P 1 (2023).

**131** GTN, Transmittal Letter, Docket No. RP23-1099, at 4 (filed Sept. 29, 2023 (explaining that GTN has undertaken work at various compressor stations to replace outdated, less efficient compressor units and that this, and other, expenditures are reflected in its proposed rates as part of the filing); *see also id.* Ex. No. GTN-0001, Prepared Direct Testimony of Sorana Linder at 6 (same).

**132** *See, e.g.,* Indicated Shippers, Protest, Docket No. RP23-1099, at 4, 7 (filed Oct. 11, 2023).

hearing.**<sup>133</sup>** Accordingly, we find that that the appropriate venue for consideration of questions regarding cost allocation for the replacement compressor stations is in RP23-1099-000; therefore, we dismiss GTN's request for clarification and its alternative request for rehearing.**<sup>134</sup>**

## C. Project Need

37. The States and Riverkeeper dispute the Commission's analysis and findings in the Certificate Order that GTN has demonstrated need for the Project and that the Project is consistent with the criteria set forth in the Certificate Policy Statement.**<sup>135</sup>** Specifically, the States and Riverkeeper argue that the Commission erred by: (i) determining that the Project is unsubsidized; (ii) determining that the precedent agreements demonstrate need for the Project; (iii) failing to consider the effect of state and local laws on future gas demand; (iv) improperly considering the Project's benefits; (v) failing to consider alternatives; and (vi) failing to balance all the relevant factors in determining the public interest.**<sup>136</sup>**

38. Under the Certificate Policy Statement, the Commission "will consider all relevant factors reflecting on need for the project," which may include, but are not limited to, "precedent agreements, demand projections, potential cost savings to consumers, or a comparison of projected demand with the amount of capacity currently serving the market."**<sup>137</sup>** As discussed below, upon further considering all evidence in the record and requests for rehearing, including the binding precedent agreements for 100% of the

---

**<sup>133</sup>** *Gas Transmission Nw. LLC*, 185 FERC ¶ 61,086 at P 15.

**<sup>134</sup>** *La. Pub. Serv. Comm'n*, 153 FERC ¶ 61,304, at P 23 (2015) ("the Commission has discretion to decide where and when to resolve an issue").

**<sup>135</sup>** Certificate Policy Statement, 88 FERC ¶ 61,227, *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094.

**<sup>136</sup>** States Rehearing Request at 25-68; Riverkeeper Rehearing Request at 7-35; *see also* Certificate Order, 185 FERC ¶ 61,035 at PP 13-39 (discussing Certificate Policy Statement matters including: (i) the "no subsidy" requirement; (ii) project need; and (iii) impacts on existing customers, existing pipelines and their customers, and landowners and surrounding communities).

**<sup>137</sup>** Certificate Policy Statement, 88 FERC at 61,747.

Case: 24-60354     Document: 1-3     Page: 112     Date Filed: 07/15/2024

Document Accession #: 20240416-3093     Filed Date: 04/16/2024
USCA Case #24-1204     Document #2064211     Filed: 07/11/2024     Page 116 of 238

Docket No. CP22-2-001                                                                                      - 26 -

project's capacity,**138** we continue to find that the project is required by the public convenience and necessity.

## 1.     No Subsidization by Existing Customers

### a.     Depreciation Rates

39.     The States argue that the GTN XPress Project will result in unrecovered costs that will be subsidized by existing customers.**139**  The States contend that the Commission erred by allowing GTN to recover $75.1 million in expansion costs over 50 years**140** despite record evidence showing that the Project's useful life will, at most, be the 30 to 33 years reflected in the precedent agreements.**141**  According to the States, this will leave approximately $20 million in unrecovered costs after the expiration of the precedent agreements.**142**  The States assert that if GTN is unable to sell the expansion capacity to new customers after 2050 when the precedent agreements expire, then all of GTN's customers will have to pay for the remaining costs; therefore, the States assert that the precedent agreements are not responding to the proper price signals and are not significant evidence of need.**143**  The States maintain that gas demand will decline in the longer term, based on the States' expert and GTN's own market analysis, and that the 47-year depreciation rate (i.e., 2.11%) places the responsibility for roughly $20 million in

---

**138** *Id.* at 61,748; *see also Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1311 (D.C. Cir. 2015) (*Myersville*) (recognizing the Commission's policy not to look behind precedent or service agreements and upholding the Commission's determination that evidence showing the project was fully subscribed was adequate to support the finding of market need); *Minisink*, 762 F.3d at 111 n.10 ("Petitioners identify nothing in the [Certificate Policy Statement] or in any precedent construing it to suggest that it requires, rather than permits, the Commission to assess a project's benefits by looking beyond the market need reflected by the applicant's existing contracts with shippers.  To the contrary, the policy statement specifically recognizes that such agreements 'always will be important evidence of demand for a project.'").

**139** States Rehearing Request at 33-37.

**140** We note that the Commission used a 47-year term.

**141** States Rehearing Request at 33 (citing States' August 22, 2022 Protest at Ex. C, 63; Certificate Order, 185 FERC ¶ 61,035 at n.85)

**142** *Id.*

**143** *Id.*

Case: 24-60354   Document: 1-3   Page: 113   Date Filed: 07/15/2024

Document Accession #: 20240416-3093   Filed Date: 04/16/2024
USCA Case #24-1204   Document #2064211   Filed: 07/11/2024   Page 117 of 238

Docket No. CP22-2-001                                                    - 27 -

costs on customers who will not benefit from the Project.[144]  The States argue that GTN, Cascade, Intermountain, and Tourmaline will not bear the risk for the Project, in conflict with the Certificate Policy Statement's prohibition on subsidization by existing customers.[145]  The States assert that if GTN were required to recover its costs over a shorter period, the annual cost-of-service would more than double, calling into question whether the project revenues would exceed costs.[146]  The States aver that the Commission failed to adequately address the issue of potential unrecovered costs and did not explain why the Project would serve a need beyond 2050 and why the policy of using the depreciation rate approved in the pipeline's last general NGA section 4 rate proceeding is appropriate in this proceeding, despite Commission precedent deviating from such policy and the fact that the last rate proceeding was a "black box" settlement.[147]  Accordingly, the States maintain that the Commission's failure to justify its decision to use a 47-year term is arbitrary, capricious, and not based on substantial evidence in violation of the NGA and the Administrative Procedure Act (APA).[148]

40.     We are unpersuaded by the States' assertions that the Project's useful life will be 30 to 33 years (i.e., the terms of the precedent agreements).[149]  To set depreciation rates,

---

[144] *Id.*

[145] *Id.* at 33-34.

[146] *Id.* at 34.

[147] *Id.* at 35-36 (citing *Wyo. Interstate Co.*, 119 FERC ¶ 61,251, at 62,416 (2007); *Equitrans, L.P.*, 153 FERC ¶ 61,381 (2015), *order on reh'g*, 155 FERC ¶ 61,194 (2016); *Gulf S. Pipeline Co. v. FERC*, 955 F.3d 1001, 1015 (D.C. Cir. 2020)).  A "black box" agreement is "a settlement in which the parties agree to the overarching terms without 'explain[ing] how the rates were derived.  In other words, parties to black box settlements agree to rates without identification or attribution of costs or adjustments for any particular component of those rates.'" *Gulf S. Pipeline Co. v. FERC*, 955 F.3d at 1014 (quoting *El Paso Nat. Gas Co.*, 132 FERC ¶ 61,139, at P 82 (2010); *see also El Paso Nat. Gas Co.*, 132 FERC ¶ 61,139 at P 82 (black box settlements "are the outcome of arms-length negotiations rather than the strict applications of formulas or policy").

[148] *Id.* at 36.

[149] *Id.*  We also find the precedent cited by the States is distinguishable.  As discussed below, this proceeding does not involve lateral facilities, nor does GTN propose to base the depreciation rate on the contract term.  *Wyo. Interstate Co.*, 119 FERC ¶ 61,251 at P 1 (involving lateral facilities); *Equitrans, L.P.*, 153 FERC ¶ 61,381 at P 17 & n.18 (proposing that the depreciation rate be based on the life of the 20-year contract terms, as opposed to the Commission requiring such term).

the Commission must "forecast[ ] the probable useful life of the specific pipeline systems in question, based both on wear and tear and on the exhaustion of natural resources."[150] While the Commission has, in some instances, allowed the depreciation rate to be based on the life of the contract, such instances generally involve delivery laterals built on behalf of specific customers.[151] Here, this project is an integrated expansion of GTN's existing system.[152] As the States acknowledge,[153] the Commission's general policy with respect to pipeline expansions that are integrated with the existing system is to use the depreciation rate approved in the pipeline's last general rate proceeding.[154] Accordingly, we disagree that the Commission should consider cost recovery over a shorter period.[155] The States provide no evidence to support the Commission deviating from its policy, and, therefore, we decline to do so here.[156]

41.     GTN's last Commission-approved depreciation rates of 1.80% for mainline transmission plant, 3.50% for the gas turbine unit, and 0.05% for the negative salvage rate were reaffirmed in Docket No. RP15-904-000.[157] Using GTN's last approved

---

[150] *Gulf S. Pipeline Co.*, 955 F.3d at 1015 (quoting *Petal Gas Storage, L.L.C. v. FERC*, 496 F.3d 695, 702 (D.C. Cir. 2007) (quotation marks omitted)).

[151] *Mountain Valley Pipeline, LLC*, 171 FERC ¶ 61,232, at P 59 (2020); *Gulf S. Pipeline Co.*, 166 FERC ¶ 61,089, at P 30 (2019), *vacated on other grounds, Gulf S. Pipeline Co.*, 955 F.3d 1001; *see also Gas Transmission Nw., LLC*, 142 FERC ¶ 61,186 (2013); *Millennium Pipeline Co.*, 157 FERC ¶ 61,096 (2016).

[152] *Id.* n.85.

[153] States Rehearing Request at 35.

[154] *Tenn. Gas Pipeline Co.*, 169 FERC ¶ 61,230, at P 34 (2019); *Gulf S. Pipeline Co.*, 166 FERC ¶ 61,089 at P 30; *see also* Certificate Order, 185 FERC ¶ 61,035 at P 40, n.85 ("The Commission's general policy with respect to pipeline expansions is to use the depreciation rate approved in the pipeline's last NGA section 4 general rate proceeding as GTN has done here.") (citing *Gulf S. Pipeline Co.*, 163 FERC ¶ 61,124, at P 23 (2018), *reh'g denied*, 166 FERC ¶ 61,089 at P 30; *Wyo. Interstate Co.*, 119 FERC ¶ 61,251 at P 22).

[155] States Rehearing Request at 34.

[156] *Gulf S. Pipeline Co.*, 955 F.3d at 1015 (citing *Memphis Light, Gas & Water Div. v. FPC*, 504 F.2d 225, 231 (D.C. Cir. 1974)).

[157] *See* Certificate Order, 185 FERC ¶ 61,035 at P 40 & n.85 (citing 2021 Settlement Order, 177 FERC ¶ 61,110).

depreciation rates, adjusted as weighted averages, we find that the useful life of the GTN XPress Project is approximately 47 years.[158]  Accordingly, we disagree that the Commission failed to justify its decision to use a 47-year term.[159]  We also disagree with the States' assertion that using the depreciation rate approved in GTN's last general NGA section 4 rate proceeding is inappropriate because the last rate proceeding was a "black box" settlement.[160]  That the last rate proceeding was a settlement has no bearing on the Commission's policy of using the depreciation rate approved in the pipeline's last general rate proceeding.[161]  In any event, the depreciation rates in GTN's last settlement were fully stated and agreed to by the parties.

42.    Next, we disagree with the States' contention that, because the precedent agreements are for terms less than the expected useful life of the Project, the Commission should have required GTN to recover the costs of the Project over the terms of the agreements, which, the States argue, could call into question the need for the Project.[162]  As explained below, we continue to find the precedent agreements for 100% of the Project's capacity to be significant evidence of need, and, after weighing the benefits with the adverse effects on landowners and surrounding communities, continue to conclude both that the Project is consistent with the Certificate Policy Statement and that the Project, when subject to the conditions in the Certificate Order, is required by the public convenience and necessity under NGA section 7.  It is speculative to assume that shippers Cascade, Intermountain, and Tourmaline will not continue as customers of GTN after their existing agreements expire, or that GTN will not be able to enter into new agreements with other shippers 30 years from now.[163]  Such speculation is not a basis for departing from Commission precedent regarding application of the last approved depreciation rate or for rejecting GTN's application which is fully subscribed under long-term precedent agreements.

---

[158] Useful Life (47.39 years) = 100% divided by Depreciation Rate of 2.11%.

[159] States Rehearing Request at 36.

[160] *Id.* at 35, 38-39.

[161] *Transcon. Gas Pipe Line Corp.*, 124 FERC ¶ 61,160, at P 9 & n.5 (2008) (utilizing depreciation rate established in a black box settlement).

[162] *N. Border Pipeline Co.*, 76 FERC ¶ 61,141, at 61,771 (1996) (rejecting need arguments based on expiration of precedent agreements prior to the end of the useful life of the project).

[163] *Id.*

43.     Moreover, we find that the States' concerns regarding unrecovered costs are premature. Although it is true that the precedent agreements may expire prior to the end of the Project's useful life, as we noted above, GTN may negotiate with the Project's shippers for additional extensions of their service agreements or, if unsuccessful, may remarket the incremental capacity. If in the future GTN seeks to roll in the costs associated with the expansion, GTN will have to demonstrate that such a change in pricing will not result in existing customers' subsidizing the expansion.[164] Thus, the Certificate Order appropriately required GTN to keep separate books and accounting of costs and revenues attributable to the capacity created by the Project in the same manner as required by section 154.309 of the Commission's regulations.[165] This accounting will protect existing non-Project shippers from cost overruns and from subsidization that might result from under-collection of the Project's incremental cost of service, as well as help the Commission and parties to future rate proceedings determine any unrecovered costs of the Project.

44.     Finally, the States next argue that the Commission did not correctly apply its own policy to use the depreciation rate from GTN's last section 4 general rate proceeding, asserting that the last approved depreciation rates were 3.50% for gas turbine compressor units and 1.80% for mainline transmission facilities.[166] The States assert that the Project does not increase or modify GTN's mainline facilities.[167] Therefore, the States maintain that GTN's application of the lower 1.80% to nearly all of the Project's costs, resulting in a weighted average 2.11% depreciation rate for the Project, was erroneous.[168] Accordingly, the States argue that the Commission failed to explain why it is not using the last-approved depreciation rate of 3.50% to the compressor-only project.[169]

---

[164] *Dominion Transmission, Inc.*, 129 FERC ¶ 61,012, at P 21 (2009).

[165] Certificate Order, 185 FERC ¶ 61,035 at P 54. *See Gulf S. Pipeline Co.*, 173 FERC ¶ 61,049, at P 6 (2020) (for projects that use existing system rates for the initial rates, the Commission's requirement for separate books and accounting applies only to internal books and records).

[166] States Rehearing Request at 36 (citing GTN, Petition for Approval of Settlement, Docket No. RP15-904-003 (filed Sept. 29, 2021)); *see also* 2021 Settlement Order, 177 FERC ¶ 61,110 (letter order approving GTN's September 29, 2021 filing of a stipulation and agreement).

[167] States Rehearing Request at 36.

[168] *Id.*

[169] *Id.* at 37.

45.     Contrary to the States' assertion, most of the Project costs are associated with
mainline transmission plant costs, which is the reason why the 1.80% depreciation rate
makes up a larger share of the overall weighted depreciation rate for the Project.  In fact,
GTN's weighted depreciation rates reflect the fact that the compressor unit costs of
$10,982,841 only make up a portion of the estimated $75,138,691 Project total.[170]  As we
stated above and in the Certificate Order, the Commission's general policy with respect
to pipeline expansions is to use the depreciation rate approved in the pipeline's last
general NGA section 4 rate proceeding as GTN has done here.[171]  The estimated cost of
service incorporates GTN's last Commission-approved depreciation rates of 1.80% for
mainline transmission facilities, 3.50% for the gas turbine unit, and 0.05% for the
negative salvage rate as established in Docket No. RP15-904-000.[172]  Here, GTN
incorporated its last approved depreciation and negative salvage rates, at a weighted
average, to calculate the annual depreciation and negative salvage expense.[173]  The
weighted average depreciation rates are calculated using the costs associated with the
proper facilities.  Although the States assert that the Project costs should reflect the
application of the higher 3.50% depreciation rate associated with gas turbine units to all
the Project components, they provide no evidence to support their contention.  The
Commission has approved similar rate structures and weighted averages in prior
proceedings,[174] and the States provide no evidence to rebut GTN's calculation of
weighted depreciation rates.

## b.    Rate Treatment

46.     In the Certificate Order, the Commission explained that GTN estimates a first-year
cost of service of $10,628,781 for the GTN XPress Project[175] and that, consistent with

---

[170] *Id.*  The remainder of the costs are associated with appurtenant facilities,
construction, and various materials.  *See id.* at Ex. K at 1 (outlining cost of facilities).

[171] Certificate Order, 185 FERC ¶ 61,035 at P 40 n.85; 2021 Settlement Order, 177
FERC ¶ 61,110.

[172] Certificate Order, 185 FERC ¶ 61,035 at P 40.

[173] GTN October 4, 2021 Application at Ex. N at 4.

[174] *See, e.g.*, *Tuscarora Gas Transmission Co.*, 175 FERC ¶ 61,147, at PP 17-18
(2021) (approving a weighted average of the last approved mainline transmission and
facilities depreciation rate of 1.30% and the compressor equipment depreciation rate of
3.38%, and a terminal negative salvage rate of 0.18%).

[175] Certificate Order, 185 FERC ¶ 61,035 at P 40.  GTN proposes to use its
mileage-based existing system recourse reservation charge of $0.250323 per Dth and a
system usage charge of $0.009799 per Dth under Rate Schedule FTS-1 as the initial

Commission policy, the estimated cost of service incorporates GTN's last
Commission-approved depreciation rates of 1.80% for mainline transmission plant,
3.50% for the gas turbine unit, and 0.05% for the negative salvage rate as established in
Docket No. RP15-904-000.**[176]**  Noting Commission policy that the applicable system
recourse rate is appropriate for a project if the estimated cost-based rate is less than the
current system rate, and acknowledging that GTN's calculated illustrative incremental
reservation charge and incremental usage charge for the Project are lower than the
currently effective system recourse Rate Schedule FTS-1 charges, the Commission
approved GTN's request to use its existing system charges under Rate Schedule FTS-1 as
the initial recourse charges for the Project and directed GTN to charge the applicable
system interruptible rate for the Project.**[177]**  As also explained in the Certificate Order,
GTN proposed to provide service on the Project to the Project shippers under negotiated
rate transportation agreements.**[178]**

47.     The States assert on rehearing that the Commission failed to engage with evidence
presented by the States that shows that project revenues likely do not exceed costs, and
that a subsidy exists  "(1) if even a portion of the compressor upgrade costs are included
[as project costs], or (2) if GTN recovers costs over the contract terms for the expansion
project . . . ."**[179]**  The States disagree with the Commission's decision to defer these issues
regarding cost allocation to a future rate case, and, instead assert that the Commission
must determine in this proceeding whether the Project inappropriately places costs on
existing customers who do not benefit from it.**[180]**

48.     The States assert that the precedent agreements are based on unreasonably low
rates because they do not reflect any previously incurred costs to replace and upgrade the
compressors required to operate the Project expansion and that existing customers will

---

maximum recourse charges for transportation service.  *Id.*

**[176]** *Id.*; *see also id.* n.85 (explaining that the Commission's general policy with
respect to pipeline expansions is to use the depreciation rate approved in the pipeline's
last NGA section 4 general rate proceeding as GTN has done here).

**[177]** *Id.* PP 41-42.  We further note that the Commission required GTN to keep
separate books and accounting of costs and revenues attributable to the capacity created
by the Project in the same manner as required by section 154.309 of the Commission's
regulations.  *Id.* P 54.

**[178]** *Id.* P 55.

**[179]** States Rehearing Request at 37.

**[180]** *Id.*

potentially have to pay millions of dollars in costs after the Project precedent agreements expire.**181** The States assert that because the unreasonably low rates do not reflect the proper price signals, they are not significant evidence of market need and are not due the same evidentiary weight as precedent agreements for an unsubsidized project or one with proper rates.**182** Therefore, the States argue that the Commission failed to justify its decision to rely on contracts that existing ratepayers subsidize or, even if GTN bears those costs, rely on unreasonably low rates.**183**

49.     The States also assert that the Commission's decision to defer issues related to rate treatment and potential cost allocation of the facilities replaced under section 2.55(b) is inconsistent with Commission policy that rates should be decided before construction begins.**184** The States argue that the Commission's reasoning that the costs of the replacement compressors already "appear to be in existing rates" is inappropriate since those rates are the product of a "black box settlement," which has no precedential value and "does not constitute approval of, or precedent regarding, any principle or issue."**185**

50.     First, we disagree with the States' assertion that the Commission failed to engage with evidence showing that if "even a portion" of the compressor upgrade costs are included in GTN's incremental rates, then the Project's revenues likely do not exceed costs and, therefore, constitutes a subsidy.**186** Commission policy "is that costs associated with existing capacity that is reserved for an incremental project should not be included in the incremental project's cost of service for purposes of establishing initial rates and the initial incremental recourse rates should be designed to reflect only the incremental costs associated with the project."**187** The States point to no evidence requiring the

---

**181** *Id.* at 38.

**182** *Id.* 37-38.

**183** *Id.* at 38.

**184** *Id.* (citing Certificate Policy Statement, 88 FERC at 61,746; *Tenn. Gas Pipeline Co.*, 140 FERC ¶ 61,120, at P 19 (2012)).

**185** *Id.* at 38-39 (citing Certificate Order, 185 FERC ¶ 61,035 at P 53; 2021 Rate Settlement at 15). We note that for the reasons discussed above, that the last rate proceeding was a settlement has no bearing on the Commission's policy. *See supra* at P 41.

**186** *Id.* at 37.

**187** Certificate Order, 185 FERC ¶ 61,035 at P 53 (citing *Tex. E. Transmission, LP*, 165 FERC ¶ 61,132 at P 19).

Commission to deviate from prior practice and consider the replacement costs in the incremental project's cost of service at this time.  As we explained in the Certificate Order and here on rehearing, consistent with Commission precedent, because it appears that a portion of the horsepower from the replacement units will be used to support the GTN Xpress Project, there remains a question regarding cost allocation that is more appropriately suited for a section 4 rate proceeding.**188**  Therefore, we make no determination whether or not rolled-in rate treatment is appropriate, and, instead, preserve the ability of the parties to address the cost allocation issue in a future general NGA section 4 rate case.**189**

51.     We also find the States' arguments that the shippers' decisions to enter into precedent agreements are based on an expectation of unreasonably low recourse rates that omit replacement facility costs are outside the scope of this proceeding.**190**  In any event, we find the States' arguments unpersuasive.  Absent a compelling reason, the Commission does not second-guess the business and economic decisions between knowledgeable business entities when they enter into negotiated rate contracts.**191**  Parties rely on their contracts and the integrity of the Commission's process in deciding whether to construct or take service on new facilities.**192**  Accordingly, "the Commission is reluctant to upset the expectations of pipelines when they make investment decisions in reliance on the commitments by their customers and the Commission's approval."**193**

---

**188** *Id.*

**189** We note that the Commission cannot change section 4 rates in a section 7 proceeding.  *Panhandle E. Pipe Line Co. v. FERC*, 613 F.2d 1120, 1133 (D.C. Cir. 1979) ("the Commission may not, however, order adjustments in previously approved rates for services not before it in the certificate proceeding").

**190** *Pac. Gas Transmission Co.*, 59 FERC ¶ 61,107, at 61,402 (1992) (stating that allegations related to the existing system rate are outside the scope of a section 7 certificate proceeding); *Transcon. Gas Pipe Line Co.*, 164 FERC ¶ 61,112, at P 10 (2018) ("[T]he proper forum for a protest of the negotiated rate is at the time the pipeline files the relevant contracts or tariff records containing the essential details of the agreement").

**191** *Transcon. Gas Pipe Line Co.*, 164 FERC ¶ 61,112 at P 16 (quoting *Marathon Oil Co. v. Trailblazer Pipeline Co.*, 111 FERC ¶ 61,236, at P 64 (2005)).

**192** *Id.*

**193** *Id.*; *Marathon Oil Co.*, 111 FERC ¶ 61,236 at P 64; *see also Dominion Transmission, Inc. v. FERC*, 533 F.3d 845, 852-53 (D.C. Cir. 2008) (noting that the Commission must "presume that the rate set out in a freely negotiated ... contract meets the 'just and reasonable' requirement imposed by law").

Here, the GTN Xpress Project is fully subscribed under long-term precedent agreements with Cascade, Intermountain, and Tourmaline under negotiated rates.[194]  GTN contracted for and accepted those rates and, therefore, assumes the risk of any under recovery until its next rate proceeding.[195]  In NGA section 7 certificate proceedings, the Commission reviews initial rates for service using proposed new pipeline capacity under the public convenience and necessity standard, which is a less rigorous standard than the just and reasonable standard under NGA sections 4 and 5.[196]  The less exacting standard of review used in a section 7 certificate proceeding is intended to mitigate the delay associated with a full evidentiary rate proceeding, and the Commission has discretion to approve initial rates that will "hold the line" while awaiting the adjudication of just and reasonable rates under NGA section 4 or 5.[197]  Therefore, as stated above, the proper forum to challenge rates is through an NGA section 4 or 5 proceeding.[198]

52.    As we explain above in response to GTN's rehearing request, we also disagree that the Commission must determine in this proceeding whether rolled-in rate treatment is appropriate for the costs associated with the GTN XPress Project.[199]  As we have done in prior proceedings, where the Commission rejects a predetermination favoring rolled-in rate treatment, the applicant must then, in its next section 4 rate case, bear the burden of proving that whatever treatment it proposes will not result in subsidization of project costs by non-project shippers.  With respect to the GTN XPress Project, parties in that rate case will be free to argue that some of the costs of the compression initially installed to replace existing capacity should be assigned to expansion shippers going forward.[200]  As stated previously, we are requiring GTN to keep separate books and accounting of costs and revenues attributable to the capacity created by the Project.  As we explained in the Certificate Order, GTN demonstrated that the illustrative incremental rates for the

---

[194] *Gulf S. Pipeline Co.*, 166 FERC ¶ 61,089 at P 25.

[195] *Id.*; *see also* Certificate Policy Statement, 88 FERC at 61,743 ("[I]f the project revenues fail to recover the costs, the pipeline rather than its customers will be responsible for the unrecovered costs.").

[196] *Transcon. Gas Pipe Line Co.*, 169 FERC ¶ 61,051, at P 34 (2019).

[197] *Transcon. Gas Pipe Line Co.*, 161 FERC ¶ 61,212, at P 6 (2017) (citing *Atl. Ref. Co. v. Pub. Serv. Comm'n of State of N.Y.*, 360 U.S. 378, 391-92 (1959)).

[198] *Id.*

[199] *See* PP 30-31.

[200] *See, e.g.*, *Transcon. Gas Pipe Line Co.*, 162 FERC ¶ 61,050, at P 17 (2018); *CenterPoint Energy Miss. River Transmission Corp.*, 109 FERC ¶ 61,007, at P 19 (2004).

GTN XPress Project are lower than its existing system rates under Rate Schedule FTS-1.**201** Accordingly, we determined that GTN's proposal to charge its existing applicable system reservation rates as the initial recourse rates for the Project will not result in existing customers subsidizing the GTN XPress Project.**202** Therefore, we disagree with the States both that there is a subsidy and that the shippers which have entered into precedent agreements are not responding to the "proper price signals."

53. We also disagree that the Commission's decision to defer issues related to rate treatment for the costs of the facilities replaced under section 2.55(b) is inconsistent with Commission policy that rates should be decided before construction begins. The Certificate Policy Statement changed the Commission's previous policy of giving a presumption for rolled-in rate treatment for pipeline expansions, and, instead, found that rolled-in pricing sends the wrong price signals by masking the true cost of capacity expansions to the shippers seeking the additional capacity.**203** The Commission's no-subsidy policy recognizes that existing customers should pay the costs of projects designed to improve their service by replacing existing capacity, improving reliability, or providing additional flexibility.**204** As the Commission stated in the Certificate Policy Statement, in most instances incremental pricing will avoid subsidies for the new project, but the situation may be different in cases of inexpensive expansibility that is made possible because of earlier, costly construction.**205** In that instance, because the existing customers bear the cost of the earlier, more costly construction in their rates, incremental pricing could result in the new customers receiving a subsidy from the existing customers because the new customers would not face the full cost of the construction that makes their new service possible. Although it is generally true that the Commission's Certificate Policy Statement encourages an up-front determination in the case of expansion projects, there are circumstances that "make it appropriate to depart from our general policy by deferring our decision on whether the costs of this [the] expansion should be rolled-in . . . ."**206** Here, because the rate analysis demonstrates that the

---

**201** Certificate Order, 185 FERC ¶ 61,035 at P 17.

**202** *Id.* We again note that GTN freely entered into the precedent agreements and will bear the risk of under recovery.

**203** Certificate Policy Statement, 88 FERC ¶ 61,227, *clarified*, 90 FERC at 61,391.

**204** *Id.* at 61,393.

**205** Certificate Policy Statement, 88 FERC at 61,746.

**206** *Wyo. Interstate Co.*, 91 FERC ¶ 61,006, at 61,029 (2000); *see also S. Nat. Gas Co.*, 115 FERC ¶ 61,328, at P 42 (2006) (refusing to make a predetermination on rolling in expansion's costs).

maximum Rate Schedule FTS-1 system recourse reservation and usage charges are greater than the illustrative incremental reservation and usage charges, respectively, the Commission approved GTN's request to use its existing system charges under Rate Schedule FTS-1 as the initial recourse charges for the Project.[207]  The parties disagree about the appropriate allocation of one portion of the costs associated with the GTN XPress Project, i.e., the costs attributable to the additional 27,510 HP of compression to be realized by reprograming software controls at the No. 5 Athol, No. 7 Starbuck, and No. 10 Kent Compressor Stations.  It appears that those costs are included in GTN's existing system rate.[208]  By denying GTN's request for a determination that rolled-in rate treatment is appropriate for all project costs, we are putting the burden on GTN to prove, in its next general section 4 rate proceeding, that leaving the costs of the additional compression in system rates will not result in existing shippers subsidizing the expansion.  Including those costs now in an incremental rate for GTN XPress Project service, as the States seem to be arguing, would put the company in a position to recover those costs twice – once in the system rate being paid by existing customers and again through the incremental rate which would be paid by project shippers.  The Commission's policy on providing pricing information in advance of construction is intended to enable shippers to make appropriate decisions to protect their interests in contracting [209]  Here, the shippers know the costs associated with the GTN XPress Project and they also know that there is the potential, in the next section 4 rate case, that a portion of the costs associated with the compression previously installed by GTN under section 2.55(b) may be allocated to an incremental rate for project service.  The shippers, who have not commented on the issue, took the initial step to protect their interests by entering precedent agreements for service at negotiated rates.  This is consistent with Commission precedent and the States have not persuaded us on rehearing to revisit this determination.

## 2.   Precedent Agreements

54.   In the Certificate Order, the Commission found that the existence of binding precedent agreements for 100% of the Project's capacity is significant evidence of

---

[207] Certificate Order, 185 FERC ¶ 61,035 at P 42.

[208] *See* GTN, Transmittal Letter, Docket No. RP23-1099, at 4 (filed Sept. 29, 2023) (explaining that GTN has undertaken work at various compressor stations to replace outdated, less efficient compressor units and that this, and other, expenditures are reflected in its proposed rates as part of the filing); *see also id.* Ex. No. GTN-0001, Prepared Direct Testimony of Sorana Linder at 6 (same).  The Commission does not have the ability to change that existing rate here, in a section 7 proceeding.

[209] Certificate Policy Statement, 88 FERC at 61,746-47.

need.[210]  The Commission also noted that the Project will likely decrease costs to consumers and increase supply diversity.[211]  The States and Riverkeeper question the probative value of precedent agreements for project need determinations, generally.[212]  The importance of precedent agreements as part of a project need determination is, however, well established by both judicial and Commission precedent,[213] and we decline to depart from that precedent in this proceeding.  The States and Riverkeeper also advance more targeted arguments challenging the evidentiary value of the precedent agreements for each of the Project's three shippers—Cascade, Intermountain, and Tourmaline—which we address in turn below.

55.    We first, however, address two erroneous claims by the States and Riverkeeper that:  (1) the Commission relied on the precedent agreements to the exclusion of other

---

[210] Certificate Order, 185 FERC ¶ 61,035 at PP 26, 36.

[211] *Id.* P 26.

[212] *See* Riverkeeper Rehearing Request at 19 ("Thus, in the modern era, precedent agreements do not represent a significant financial commitment that establishes public need for the gas, a prerequisite to a certificate under the NGA.  While the precedent agreements may well result in a benefit to the shippers and local distribution companies, that is not the standard for finding that the Project is in the public interest."); *see also* States Rehearing Request at 39 (questioning whether precedent agreements are sufficient without additional evidence).

[213] *See, e.g.*, *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 114 (D.C. Cir. 2022) (*Delaware Riverkeeper II*) ("Precedent agreements are important, and sometimes sufficient, evidence of market need for a pipeline project."); *Minisink*, 762 F.3d at 111 ("Petitioners identify nothing in the [Certificate Policy Statement] or in any precedent construing it to suggest that it requires, rather than permits, the Commission to assess a project's benefits by looking beyond the market need reflected by the applicant's existing contracts with shippers.  To the contrary, the [Certificate Policy Statement] specifically recognizes that such agreements 'always will be important evidence of demand for a project.'"); *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,133, at P 14 (2023) (collecting cases) ("A precedent agreement for 100% of the project's capacity is significant evidence of the need for the proposed project.").  At times the Commission and the courts have acknowledged the evidentiary value of precedent agreements where a project's capacity was not fully subscribed.  *E.g., Sierra Club v. FERC*, 38 F.4th 220, 230 (D.C. Cir. 2022); *City of Oberlin, Ohio v. FERC*, 937 F.3d 599, 605 (D.C. Cir. 2019) (*City of Oberlin I*); *Enable Gas Transmission*, LLC, 175 FERC ¶ 61,183, at P 30 (2021); *Double E Pipeline, LLC*, 173 FERC ¶ 61,074, at P 35 (2020).

valid evidence to find project need,[214] and (2) *Environmental Defense Fund v. FERC*[215] restricts the Commission's ability to rely on the precedent agreements in this case.[216]  As explained further below, the Commission reviewed the entire record and determined that there is public need for the Project.[217]  The D.C. Circuit has recognized the Commission's discretion to determine the extent to which precedent agreements constitute persuasive evidence of market demand.[218]  We find that *EDF* is inapposite on the facts of the instant proceeding.  In *EDF*, the court held that a single precedent agreement for 87.5% of the project's capacity, which was executed between the pipeline and an affiliate shipper, was insufficiently probative of market need and public benefits in light of additional evidence indicating possible self-dealing between the pipeline and its affiliate.[219]  Here, none of the shippers are affiliates of GTN, nor is there evidence of self-dealing; therefore, *EDF* does not undermine the otherwise extensive body of caselaw upholding the evidentiary value of precedent agreements to demonstrate project need.

---

[214] *See* States Rehearing Request at 39-41; Riverkeeper Rehearing Request at 11-13.

[215] 2 F.4th 953 (D.C. Cir. 2021) (*EDF*).

[216] States Rehearing Request at 39, 41.

[217] *See* Certificate Order, 185 FERC ¶ 61,035 at P 39 ("Accordingly, we find that GTN has demonstrated a need for the project."); *see also Delaware Riverkeeper II*, 45 F.4th at 114 (upholding the Commission's conclusion that "concrete obligations to purchase natural gas (as demonstrated by the precedent agreements) were better evidence of market need than the more speculative reports regarding overbuilding and future demand"); *CXA La Paloma, LLC v. Cal. Indep. Sys. Operator Corp.*, 165 FERC ¶ 61,148, at P 12 (2019) (rejecting an argument that the Commission disregarded relevant evidence and explaining that the Commission reviewed the evidence presented and determined that it did not substantiate the claims made).

[218] *See City of Oberlin I*, 937 F.3d at 605; *see also Minisink*, 762 F.3d at 111 ("[The Commission] 'enjoys broad discretion to invoke its expertise in balancing competing interests and drawing administrative lines.'") (quoting *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010)); *Columbia Gas Transmission Corp. v. FERC*, 750 F.2d 105, 112 (D.C. Cir. 1984) ("[A]s an expert agency, the Commission is vested with wide discretion to balance competing equities against the backdrop of the public interest[.]").

[219] 2 F.4th at 963, 972-75.

Document Accession #: 20240416-3093   Filed Date: 04/16/2024

### a.   Effect of State and Local Laws on Future Gas Demand

56.     The States allege that the Commission shifted the burden of demonstrating whether the Project is in the public interest from GTN to the States.[220]  Specifically, the States argue that GTN failed to provide the requisite information to determine whether the Project would be in the public interest in light of legislation that the States believe will reduce demand for natural gas over time.[221]

57.     We continue to find that GTN presented sufficient evidence of project need—it executed precedent agreements for 100% of the Project's capacity with unaffiliated shippers, each for a duration of 30 or more years[222]—notwithstanding the legislation and policies that the States argue will reduce demand.  These precedent agreements, as noted herein, are significant evidence of need.  Moreover, in addition to the precedent agreements, GTN provided the IHS Report and responded to Commission data requests regarding need for the Project.[223]  We accordingly disagree that the Commission

---

[220] States Rehearing Request at 52.

[221] *Id.*

[222] *See* Certificate Order, 185 FERC ¶ 61,035 at PP 18-19; GTN April 18, 2023 Response at 4.

[223] *See generally* IHS Report; *see also* April 18, 2023 Response at 2 ("GTN held a binding open season for the GTN XPress Project from July 31, 2019, through September 6, 2019.  GTN received overwhelming market interest in the Project and had to allocate its Project capacity proportionately because it could not meet all of the requested quantities in the binding open season."); *id.* at 4 ("GTN provided links to Integrated Resource Plans for both Cascade Natural Gas and Intermountain Gas Company that forecast load growth for the regions served by both LDC's supporting and subscribing to the Project.  All three (3) Project shippers provided multiple comments expressing their unwavering support and attesting to their need for the Project.  GTN notes that Intermountain, an LDC in Idaho, has contracted for over half of the Project's capacity (79,000 Dth/d) and the Project has the support from Idaho's governor as well as the entire U.S. congressional delegation representing Idaho."); *id.* at attach. A (explaining that because capacity from the Project was included in Cascade's 2020 IRP, the Project's capacity would not be incremental to that which is already included in Cascade's 2020 IRP); *id.* at attach. B (explaining that capacity from the Project is necessary for Intermountain to match firm Stanfield delivery capacity on GTN compared to firm Stanfield receipt capacity on the Northwest Pipeline); *id.* at attach. C (explaining that as production from the Rockies basin continues to decline, the Project enables Tourmaline to contract for additional capacity to meet demand in California and the Pacific Northwest with supply from Western Canada).

Case: 24-60354   Document: 1-3   Page: 127   Date Filed: 07/15/2024

Document Accession #: 20240416-3093   Filed Date: 04/16/2024
USCA Case #24-1204   Document #2064211   Filed: 07/11/2024   Page 131 of 238

Docket No. CP22-2-001   - 41 -

improperly alleviated GTN's burden to demonstrate project need. We continue to find that the totality of the evidence supports the Commission's finding of need.

58.    The States and Riverkeeper argue that the record evidence predicts that state laws in Washington, California, and Oregon will result in declining demand for natural gas.[224] However, as the Commission stated in the Certificate Order, these predictions are speculative, and the parties have not presented evidence that these laws have actually reduced demand for natural gas.[225] The speculative nature of the States' and Riverkeeper's projections is evinced through the language they use to discuss them.[226] Due to the inherently speculative nature of these laws' future effects on demand for natural gas, if any, the Commission has stated that the existence of such laws does not undercut the Commission's finding that need is demonstrated by precedent agreements.[227] Indeed, Riverkeeper concedes in its rehearing request that the Commission may be correct in this approach.[228] Moreover, the States and Riverkeeper focus on legislation in Washington, California, and Oregon; however, over 50% of the Project's capacity is subscribed by Intermountain, which serves customers in Idaho, a state that does not have

---

[224] States Rehearing Request at 54-58; Riverkeeper Rehearing Request at 19-25.

[225] *See* Certificate Order, 185 FERC ¶ 61,035 at P 27.

[226] *See, e.g.*, States Rehearing Request at 54 (stating that the Hill Report provided analysis "*forecasting* future energy demand in the region") (emphasis added); *id.* at 55 (providing a graph that "demonstrates the *potential* for reductions to methane gas for electric power generation by 2045") (emphasis added); *id.* (quoting the Hill Report discussing the "*expected* decline in demand for natural gas") (emphasis added); *id.* at 57 (quoting comments from the WUTC that that Washington's statutes and code changes "*should* result in zero customer growth by 2031") (emphasis added); Riverkeeper Rehearing Request at 20 (stating that various state laws will result in a decline on future demand of an unspecified amount, as opposed to providing any concrete evidence of the laws actual effect on demand); *id.* at 21 (arguing the Commission "failed to meaningfully engage with the evidence regarding local, state, and national policies that are *likely* to reduce demand for natural gas") (emphasis added); *id.* at 22 (referencing a study from the California Energy Commission *predicting* a decline in demand for natural gas in buildings by 2050).

[227] *See* Certificate Order, 185 FERC ¶ 61,035 at P 27 & n.59 (collecting cases).

[228] *See* Riverkeeper Rehearing Request at 24 (stating that "FERC may be correct that state policies do not, *by themselves*, limit FERC's authority to find that a project is required by the public convenience and necessity") (internal quotation marks omitted) (emphasis in original).

similar legislation in place.**[229]**  Accordingly, we continue to find that the evidence provided by the States and Riverkeeper does not undermine the evidence of project need as demonstrated by the three precedent agreements with unaffiliated shippers for 100% of the Project's capacity.

59.     The States argue that the Commission's role under the NGA is to determine whether the Project serves a current or future public need rather than a past one.**[230]**  The States assert that the Commission instead based its decision solely on past data.**[231]**  We disagree.  Given that each of the three precedent agreements is binding on the shippers for 30 or more years,**[232]** we find that those agreements constitute significant evidence of both present and future demand.

60.     Nor does our finding of public need run afoul of any state prerogatives for regulating natural gas.  The Commission is required by the NGA to determine whether proposed projects to transport natural gas in interstate commerce are required by the public convenience and necessity.**[233]**  The Commission's role under the NGA does not preclude states from making findings and taking action with respect to matters committed to state jurisdiction.**[234]**  We note, however, state policies do not, by themselves, limit the

---

**[229]** *See* Certificate Order, 185 FERC ¶ 61,035 at P 27.

**[230]** States Rehearing Request at 59.

**[231]** *Id.*

**[232]** *See* GTN April 18, 2023 Response at 4.

**[233]** *See* 15 U.S.C. § 717(b); *see also Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,148, at P 24 (2023).

**[234]** *See Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,148 at P 28 ("The Commission has held that oversight of the procurement decisions of LDCs is best left to state regulators.  The Commission's findings under the NGA regarding whether the project is required by the public convenience and necessity do not preclude New Jersey, or any other state, from undertaking an after-the-fact prudency review of any purchase agreement by an LDC, consistent with the state's jurisdiction.") (cleaned up); *Spire STL Pipeline LLC*, 164 FERC ¶ 61,085, at P 85 (2018), *order on reh'g*, 169 FERC ¶ 61,134, at P 27 (2019), *vacated on other grounds*, *Env't Def. Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021), *on remand*, 181 FERC ¶ 61,232 (2022), *order on reh'g*, 183 FERC ¶ 61,048 (2023) ("Despite the apparent discomfort evidenced by the protestors, we believe that oversight of the procurement decisions of local distribution companies is best left to state regulators.  The prudence and reasonableness of the considerations underlying Spire Missouri's decision to obtain transportation service from Spire and enter into the

Commission's authority to find that a project is required by the public convenience and necessity.**235**

### b. Cascade

61.     The States and Riverkeeper argue that the Commission failed to consider concerns raised by the Washington Utilities and Transportation Commission (WUTC) staff and the Oregon Citizens' Utility Board regarding the accuracy of Cascade's demand projection and its need for additional capacity on GTN's system, and should have given weight to these concerns, instead of uncritically relying on the Cascade precedent agreement.**236** For example, the States point to statements from WUTC staff that Cascade's projections are "likely inaccurate" and that Cascade's contract risks becoming a "stranded asset" and "lock[ing] in an unnecessary expense for the next 30 years."**237** Riverkeeper raises similar concerns, which it claims are largely tied to Cascade's failure to account for regulatory changes that will impact future natural gas demand.**238** The States and Riverkeeper argue that the Commission failed to consider evidence submitted by the States that similarly called Cascade's demand projections into question.**239** They also reference a declaration by Gregory Lander to support their claim that the Project is not needed to meet peak day needs because there is sufficient excess capacity on the system.**240**

62.     Consistent with the Certificate Order,**241** we continue to find that Cascade will need additional incremental capacity between now and 2040. We will not "second guess Cascade's decision to contract for the full amount of capacity that it anticipates it will

---

precedent agreement are squarely within the jurisdiction of the Missouri PSC.").

**235** 15 U.S.C. § 717(b).

**236** States Rehearing Request at 41-42; Riverkeeper Rehearing Request at 16.

**237** States Rehearing Request at 42.

**238** Riverkeeper Rehearing Request at 16.

**239** States Rehearing Request at 42-44; Riverkeeper Rehearing Request at 15.

**240** States Rehearing Request at 43 (citing States August 22, 2022 Protest Ex. B (Lander Declaration)); Riverkeeper Rehearing Request at 15 (same). Mr. Lander is the President of Skipping Stone, LLC and was retained by the State of Washington's Office of the Attorney General to review the Project's application.

**241** *See* Certificate Order, 185 FERC ¶ 61,035 at P 28.

need, and to do so now, when the capacity is being offered at certain terms and conditions, including price, rather than Cascade contracting for a smaller amount now with uncertainty about its ability to contract under similar terms at a later date to satisfy demand."**242** Moreover, the prudence and reasonableness of Cascade's decision to obtain transportation service from GTN and execute the precedent agreement fall within state jurisdiction.**243** Further, we note that the Lander Declaration acknowledges that Cascade could require 100% of its subscribed Project capacity to meet peak demand during the term of the contract.**244** The States and Riverkeeper dispute the Commission's conclusion in the Certificate Order, arguing that the Lander Declaration suggests that there may be alternative means of meeting peak day shortfalls including reducing demand and purchasing non-gas alternatives.**245** Whether such options would enable Cascade to meet peak day shortfalls is speculative and does not warrant disregarding Cascade's precedent agreement, which constitutes significant evidence of need.

63.      The States and Riverkeeper point to the Hill Report in support of their claim that Cascade's projections ignore evidence of market dynamics, customer choice, and state and local laws favoring electrification.**246** The States relatedly argue that Cascade's 2020 Integrated Resource Plan (2020 IRP) does not account for carbon legislation and building code changes that took effect after the 2020 IRP and precedent agreement were executed, specifically noting that an Oregon law directs Cascade to reduce its Oregon-wide greenhouse gas emissions by approximately 30% between 2022 and 2030.**247** They argue that the instant proceeding differs from *Transcontinental Gas Pipe Line*, in which the Commission similarly found that a New Jersey state law and Energy Master Plan did not

---

**242** *Id.*

**243** As noted in the Certificate Order, our "findings under the NGA regarding whether the project is required by the public convenience and necessity do not preclude state regulators from undertaking an after-the-fact prudency review of any purchase agreement by an LDC, consistent with the state's jurisdiction." Certificate Order, 185 FERC ¶ 61,035 at P 28 n.66 (citing *Transcon. Gas Pipe Line Co. LLC*, 182 FERC ¶ 61,148 at P 28).

**244** *See* Lander Declaration at 7 (stating that Cascade could require the full subscribed capacity by 2040, which is within the 31-year term of the contract).

**245** States Rehearing Request at 43-44; Riverkeeper Rehearing Request at 15.

**246** States Rehearing Request at 42-43 (citing Washington, Oregon, and California August 22, 2022 Protest Ex. C (Hill Report)); Riverkeeper Rehearing Request at 15 (same, referred to as Energy Futures Report).

**247** States Rehearing Request at 42-43.

undercut the Commission's finding of project need, noting that in *Transcontinental* there were "current shortages."**248** We disagree. The Commission's analysis of the relevance of state law and policies in *Transcontinental* did not depend on the existence of shortages. Rather *Transcontinental* is consistent with established Commission precedent that supports the proposition that the existence of state legislation intended to reduce greenhouse gases (GHG), by itself, does not undercut the Commission finding that need is demonstrated by a precedent agreement.**249** As the Commission stated in the Certificate Order and discussed above, we continue to find that the existence of legislation or other changes to the regulatory landscape do not undermine our finding that need is demonstrated by Cascade's precedent agreement.**250** Moreover, the States do not allege that the Oregon law bans Cascade from providing natural gas to meet end use demand, but rather establishes statewide GHG emissions reductions targets with which Cascade will need to comply. The enforcement of such emissions reductions in Cascade's energy portfolio is within the purview of the State of Oregon and is outside the Commission's jurisdiction; thus, these goals are insufficient to undermine our finding that GTN has demonstrated a need for the Project through precedent agreements for 100% of the Project's capacity.**251**

---

**248** *Id.* at 44 (citing *Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,148 at PP 27-28).

**249** *See* Certificate Order, 185 FERC ¶ 61,035 at P 27 & n.59.

**250** *See id.* P 27. Additionally, we note, as did the Commission in the Certificate Order, that Washington, Oregon, and California have not submitted evidence that their climate legislation has actually resulted in reduced demand for natural gas. *See id.*

**251** *See Tenn. Gas Pipeline Co.*, 179 FERC ¶ 61,041, at P 17 (2022).

### c.    **Intermountain**

64.    The States argue that Intermountain's precedent agreement:  (1) violates GTN's tariff[252] and (2) does not provide primary firm capacity to serve Intermountain's Idaho customers.[253]   Both claims are without merit.

65.    The States claim, based on a letter from Intermountain attached to a GTN data response, that Intermountain and GTN reached a "side agreement" that violates section 6.19.1(C), "Firm Scheduling Priorities Through Delivery Points," of GTN's tariff.[254]   As we stated in the Certificate Order, the States object to Intermountain's agreement to pay for service from GTN's Kingsgate Meter Station, located at the Idaho border with British Columbia, Canada, to the Malin Meter Station in Klamath County, Oregon, but receive service to Stanfield, Oregon,[255] and argue that Intermountain's representations in its letter contradict the terms of GTN's tariff.  This argument fails because Intermountain's precedent agreement, which is a binding contract,[256] is the document that governs the relationship between GTN and Intermountain and is consistent with GTN's tariff.  The language used in a letter attached to GTN's data request is inapposite for the purpose of imposing contractual obligations.  We therefore disagree that the letter referenced by the States detracts from the evidentiary value of Intermountain's precedent agreement with respect to Project need.[257]

---

[252] The States redact the entirety of this argument in their rehearing request, *see* States Rehearing Request at 44-47, yet they raised substantially the same argument in their publicly-available comment on the GTN April 18, 2023 Response.  *See* States May 5, 2023 Comment Regarding the GTN April 18, 2023 Response at 5; *see also* Certificate Order, 185 FERC ¶ 61,035 at PP 29, 32 (addressing the States' argument).  Accordingly, we address this argument using information that is publicly available.

[253] States Rehearing Request at 44.

[254] *Id.* at 45-46 (citing GTN April 18, 2023 Response, attach. B).

[255] *See* Certificate Order, 185 FERC ¶ 61,035 at P 29.

[256] *See Myersville*, 783 F.3d at 1310 ("A precedent agreement is a long-term contract subscribing to expanded natural gas capacity."); Certificate Order, 185 FERC ¶ 61,035 at P 26 (recognizing the existence of "binding precedent agreements").

[257] Any allegation of a tariff violation that does not bear directly upon the precedent agreement's relevance for determining project need is outside the scope of this proceeding.  *See ANR Pipeline Co.*, 86 FERC ¶ 61,039, at 61,152 (1999) (declining to consider matters that did not bear upon the instant certificate proceeding before the Commission).  To the extent an entity wishes to report a possible tariff violation, it can do

66.    The States, which do not include Idaho, argue that the Commission should have considered existing alternatives to serve Intermountain's need in that state.[258]  They contend that the Intermountain IRP states that, as an alternative to contracting for capacity on the Project, Intermountain could instead renew existing contracts on other pipelines to serve its customers in Idaho.[259]  The States assert that the Commission did not inquire whether Intermountain could have obtained the requisite capacity to serve Idaho customers by renewing existing contracts on other pipelines.[260]  They also argue that the Commission did not consider whether Intermountain could continue to use the secondary firm capacity on GTN that it uses now.[261]

67.    The Intermountain IRP explains that it "utilizes an optimization model that selects resource amounts over a predetermined planning horizon to meet forecasted loads by minimizing the present value of resource costs.  The model evaluates and selects the least cost mix of supply and transportation resources utilizing a standard mathematical technique called linear programming."[262]  The IRP states that the optimization model determined that several expiring contracts should be renewed, and other expiring contracts should not be renewed.[263]  As with the States' arguments concerning the Cascade precedent agreement, we will not second guess Intermountain's decision to contract for the capacity that it anticipates it will need and we will leave oversight of LDC purchase decisions to the states with appropriate jurisdiction.

68.    The States and Riverkeeper argue that Intermountain's plan to mitigate its costs by marketing unutilized capacity to third parties in the secondary capacity markets calls into question Intermountain's need for this contract.[264]  The States contend that Intermountain has a profit incentive to prefer the Project over other alternatives and the Commission should, therefore, consider whether existing capacity can satisfy Intermountain's need or

---

so by filing a complaint or by using the Commission's Enforcement Hotline.

[258] States Rehearing Request at 47.

[259] *Id.* at 47-48 (citing Intermountain Gas Company, *Integrated Resource Plan 2021-2026*, 165-66 (Intermountain IRP)).

[260] *Id.*

[261] *Id.* at 48.

[262] Intermountain IRP at 139.

[263] *Id.* at 166.

[264] States Rehearing Request at 48; Riverkeeper Rehearing Request at 25-26.

whether Intermountain would still prefer this contract absent being able to sell excess capacity.**265**

69.      We disagree that Intermountain's participation in the capacity release market casts doubt on its need for the Project.  To the contrary, the Commission created the capacity release program to promote the efficient use of firm pipeline capacity throughout the year.**266**  Intermountain states that it "obtains significant amounts of unutilized capacity mitigation on [Northwest Pipeline] and GTN via capacity releases" in addition to releasing excess capacity during periods of reduced demand.**267**  Indeed, the Intermountain IRP recognizes that an effect of the capacity release market is that pipelines are less inclined to build new capacity until the market recognizes it is truly needed and is willing to pay for new infrastructure.**268**  Moreover, Intermountain states that, through its capacity release process, IGI Resources, Inc. "has been able to generate several millions of dollars per year in released capacity mitigation dollars on behalf of Intermountain for pass-back to its core market customers and to reduce the cost of unutilized firm transportation capacity rights."**269**

70.      Riverkeeper argues that the Hill Report shows that Intermountain falsely equates growth in population, households, and businesses with increased gas consumption, and fails to account for customer choice, market dynamics, and shifts in construction markets to limit new gas service connections.**270**  The Hill Report references a study that indicated

---

**265** States Rehearing Request at 48-49; Riverkeeper Rehearing Request at 14.

**266** *See, e.g.*, *Promotion of a More Efficient Capacity Release Mkt.*, Order No. 712, 123 FERC ¶ 61,286, at PP 3-4 (2008) ("[T]he Commission also adopted a comprehensive capacity release program to increase the availability of unbundled firm transportation capacity by permitting firm shippers to release their capacity to others when they were not using it.  The Commission reasoned that the capacity release program would promote efficient load management by the pipeline and its customers and would, therefore, result in the efficient use of firm pipeline capacity throughout the year.").

**267** Intermountain IRP at 67.

**268** *Id.*

**269** *Id.* at 68.  We also note that the State of Idaho (i.e., the state that would be served by Intermountain's capacity) supports the Project and Intermountain contracting for such capacity.  *See* Certificate Order, 185 FERC ¶ 61,035 at P 25 & n.51.

**270** Riverkeeper Rehearing Request at 14 (citing Hill Report at 11).

a shift from gas to electricity in Washington's residential new construction market;[271] it would thus be inappropriate to draw conclusions from this study because Intermountain serves customers in Idaho, not Washington.[272]  Moreover, this fact pertains only to the residential new construction market and does not account for the other two categories of customers—residential customers who convert to natural gas from an alternative fuel and commercial customers—that the Intermountain IRP lists as part of its customer growth projection.[273]

71.      Riverkeeper argues that the Intermountain IRP indicates that any potential need for additional capacity during the planning horizon accounts for less than 10% of Intermountain's subscribed capacity under its precedent agreement.[274]  We disagree, as this ignores the fact that Intermountain entered into a replacement contract with Northwest Pipeline for 59,000 million British thermal units (MMBtu) of firm primary path capacity with a receipt point at Stanfield.[275]  The replacement capacity resulted in Intermountain being unmatched as to firm Stanfield *delivery* capacity on GTN compared to firm Stanfield *receipt* capacity on Northwest.[276]  Intermountain stated that, prior to the replacement contract with Northwest Pipeline, it already was unmatched at Stanfield by an additional 41,000 MMBtu per day and had been relying on either secondary firm capacity on GTN or direct purchase of gas supplies delivered from other suppliers at Stanfield to provide for ultimate delivery on Northwest to Southern Idaho.[277]  Intermountain accordingly participated in GTN's binding open season and was awarded 79,000 MMBtu per day of Project capacity to remedy any unmatched capacity.[278]

---

[271] Hill Report at 11.

[272] The Hill Report states that "[s]imilar shifts in the new construction markets and codes can be expected throughout the region," Hill Report at 11-12, however, it offers no support for the assertion.

[273] *See* Intermountain IRP at 11.

[274] Riverkeeper Rehearing Request at 14.

[275] GTN April 18, 2023 Response, attach B.

[276] *Id.*

[277] *Id.*

[278] *Id.*

### d.    Tourmaline

72.    The States and Riverkeeper maintain that Tourmaline's precedent agreement does not demonstrate public need.[279]  The States argue that a precedent agreement with Tourmaline, which is a Canadian gas producer, is not evidence of public need in United States markets.[280]  The core of the States' argument is that producers securing pipeline capacity to ship their gas does not necessarily demonstrate market need.[281]

73.    To the contrary, the Commission explained in the Certificate Order that precedent agreements with producers are significant evidence of need.[282]  Indeed, the Commission noted that it has previously found precedent agreements with Tourmaline in other cases to be evidence of need.[283]  The States offer no explanation as to why they believe that this established precedent is incorrect.

74.    The States and Riverkeeper argue that record evidence indicates that the West Coast markets that would be served by Tourmaline do not need the additional gas that its contract would supply.[284]  They argue that the IHS Report submitted by GTN shows that the Western United States is experiencing a reduction in gas demand in the power sector due to renewable energy replacing gas-fired generation, as well as the potential for

---

[279] The States briefly argue in this section that Tourmaline's downstream GHG emissions are reasonably foreseeable.  States Rehearing Request at 50.  We address this argument in section III(D)(2)(c), *infra*, and thus do not respond to it here.

[280] States Rehearing Request at 49.  We note that the States cite no authority, nor offer any additional explanation, for why the fact that Tourmaline is a Canadian entity should bear any significance, and we are aware of none.

[281] States Rehearing Request at 49-50.

[282] *See* Certificate Order, 185 FERC ¶ 61,035 at P 35 & n.79 (citing *Equitrans, L.P.*, 183 FERC ¶ 61,200, at PP 15-16 (2023) (finding that precedent agreements with natural gas producers are significant evidence of need); *see also NEXUS Gas Transmission, LLC*, 172 FERC ¶ 61,199, at P 17 (2020) ("We find transportation service for all shippers as providing public benefits, and do not weigh different prospective end uses differently for the purpose of determining need.").

[283] *ANR Pipeline Co.*, 179 FERC ¶ 61,040, at P 71 (2022) ("The proposed project will enable ANR to provide up to 165,000 Dth/d of firm transportation service, 100% of the project's capacity, to Tourmaline and TVA, which we find sufficient to demonstrate a need for the project.").

[284] States Rehearing Request at 50-52; Riverkeeper Rehearing Request at 17-18.

further electrification of residential and commercial space and water heating, especially in California.**[285]** The States and Riverkeeper also argue that the IHS Report shows that rising production in the Western United States demonstrates that additional supply is not needed to offset declining production from the Rockies.**[286]** Riverkeeper notes that the IHS Report states that gas exports to Mexico from the Western United States are expected to double over the next ten years.**[287]** The States point to a 2022 California Gas Report in support of their contention that California's gas utilities do not project a shortfall of gas supply.**[288]**

75.     We continue to find the States' and Riverkeeper's position unpersuasive.**[289]** GTN represented that it received "overwhelming market interest in the Project" such that it had to allocate the Project's capacity proportionately because it could not meet all of the requested quantities in the binding open season.**[290]** The fact that there was "overwhelming market interest" in the Project's capacity during the open season resulting in three executed precedent agreements for 100% of the Project's capacity substantially undercuts the States' and Riverkeeper's argument that there is not actually demand for the gas. As we noted in the Certificate Order, this is consistent with information submitted by Tourmaline, which shows that, notwithstanding consistent growth in renewable generation, demand for natural gas in the Western United States has remained consistent since 2010.**[291]** Moreover, with respect to Riverkeeper's arguments regarding the potential increase of gas exports to Mexico, we note that Tourmaline, unlike Cascade and Intermountain, is a producer and marketer of natural gas and may choose to subscribe for capacity on the Project or other pipelines to sell its gas to any number of destinations, including Mexico.**[292]**

---

**[285]** States Rehearing Request at 50; Riverkeeper Rehearing Request at 17 (citing GTN May 15, 2023 Supplemental Response to April 4, 2023 Data Request, attach. (IHS Report)).

**[286]** States Rehearing Request at 50-51; Riverkeeper Rehearing Request at 18.

**[287]** Riverkeeper Rehearing Request at 18.

**[288]** States Rehearing Request at 51.

**[289]** *See* Certificate Order, 185 FERC ¶ 61,035 at PP 34-35.

**[290]** GTN April 18, 2023 Response at 7.

**[291]** *Id.* at attach. C; Certificate Order 185 FERC ¶ 61,035 at P 34.

**[292]** Riverkeeper does not explain why it believes that a potential increase in exports to Mexico, even assuming Tourmaline markets some of its gas for such exports,

76.     Riverkeeper argues that a report submitted by Robert McCullough shows that the IHS Report is outdated and does not account for changes in the world market for natural gas and the effect of increased prices on development of additional gas supplies in the Niobrara-Codell and Bakken basins.[293]  This argument fails because it purports to show that world events, such as the war in Ukraine, will have downstream effects for natural gas demand and pricing in the United States to such an extent that Tourmaline essentially erred by entering into its contract with GTN.  We find this type of projection speculative.[294]  By making the decision that the market will support the additional capacity for which it contracted, Tourmaline assumed 100% of the financial risk for its subscribed capacity.  Thus, any risk of declining market demand will be borne by Tourmaline as a producer, rather than by a captive ratepayer.[295]  Accordingly, we continue to find that its precedent agreement is significant evidence of need and not undermined by the States' and Riverkeeper's arguments to the contrary.

### e.     States' Supplemental Filing

77.     In the Supplemental Filing, the States argue that evidence submitted by GTN in its ongoing rate proceeding contradicts evidence GTN provided in the instant proceeding and, therefore, undermines the Commission's finding of project need.  As discussed below, we disagree.

---

undermines the Commission's reliance on the Tourmaline precedent agreement here.  *See City of Oberlin v. FERC*, 39 F.4th 719, 726 (D.C. Cir. 2022) (*City of Oberlin II*) (finding that where gas bound for export is transported first in interstate commerce, the Commission "could lawfully consider the export precedent agreements because an assessment of the public convenience and necessity requires a consideration of all the factors that might bear on the public interest").

[293] Riverkeeper Rehearing Request at 17 (citing Riverkeeper June 7, 2023 Joint Comment Ex. A (McCullough Report)).

[294] *See, e.g.*, McCullough Report at 9 ("In the case of the Niobrara-Codell and Bakken basins, the expansion of Gulf Coast LNG *is likely* to be an incentive for expansion.") (emphasis added).

[295] *See* Certificate Order, 185 FERC ¶ 61,035 at P 35; *see also Atl. Coast Pipeline, LLC*, 164 FERC ¶ 61,100, at P 48 (2018) ("For those shippers that are not state-regulated utilities, such as producers or marketers, the Commission has chosen not to look behind the precedent agreements as these parties are fully at-risk for the cost of the capacity and would not have entered into the agreements had they not determined there was a need for the capacity to move their product to market."); *Mountain Valley Pipeline, LLC*, 163 FERC ¶ 61,197 at P 40 (same).

78.     We first reiterate that the Supplemental Filing is jurisdictionally barred and, therefore, the evidence and arguments contained therein are not properly before us.**296** Regardless, for the reasons listed below, even if the Supplemental Filing were not jurisdictionally barred, the evidence and arguments would not compel a different result in this proceeding.

79.     The States first assert that, contrary to GTN's claims in this proceeding, the costs of the replacement compressors are not in GTN's existing rates.**297**  Specifically, the States assert that, in its rate filing, GTN explains that "[t]he 2021 Settlement extended the terms of the 2015 and 2018 Settlements, and thus GTN's current rates were essentially established in the 2018 Settlement" and that the Commission should not approve the project without first allocating at least some of GTN's expenses to replace and upgrade compressors.**298**  As explained above, the appropriate venue for consideration of questions regarding cost allocation for the replacement compressor stations is in Docket No. RP23-1099-000.**299**

80.     The States next reference testimony from GTN witness Anul Thapa, which acknowledges that the existence of long-term contracts does not mitigate all of a pipeline's risk, and that the pipeline may still be exposed to certain operational and regulatory risks that may adversely impact its financial performance.**300**  The States also refer to testimony from GTN witness Alexander Kirk, which acknowledges the potential impact of federal, state, and local initiatives on demand for GTN's services in the future.**301**  Specifically, the States reference the Kirk Testimony's acknowledgment of a Department of Energy study which found that the *least-cost pathway* to achieve the federal government's goal of net-zero emissions by 2050 and a carbon-free electricity sector by 2050 would require natural gas demand to decline by 74%.**302**  Under this scenario (i.e., if the amount of natural gas transported on GTN were reduced by 74%), Mr. Kirk calculated that it would result in transportation rates increasing for remaining

---

**296** *See supra* PP 9-10.

**297** Supplemental Filing at 4-5.

**298** Supplemental Filing at 5-6 (citing Transmittal Letter, Docket No. RP23-1099-000, at 3 (Sept. 29, 2023)).

**299** *See supra* PP 36, 53 & note 208.

**300** Supplemental Filing at 8; *see also id.* at Ex. D at 4 (Thapa Testimony).

**301** *Id.* at 9-10; *see also id.* at Ex. F at 7-12, 16-19 (Kirk Testimony).

**302** *Id.* at 9-10; *see also* Kirk Testimony at 7-9 (emphasis added).

customers by almost 400%.**303** Mr. Kirk also acknowledged that achieving the goals of state and local laws and policies would impact GTN's system.**304** Finally, the States refer to testimony that indicates: (1) the price of gas in Western Canada is anticipated to rise due to increased demand;**305** (2) the cost of alternative energy, electrification, and battery storage are declining;**306** and (3) GTN is facing contract expirations through 2028 that represent nearly 50% of its mainline capacity, which, due to operational and regulatory risks, will make it more difficult for GTN to recontract the expiring capacity at *maximum tariff rates*.**307**

81.    As an initial matter, the evidence in question was included as exhibits to the revised tariff records that GTN submitted as part of a rate case reflecting a general, system-wide rate increase.**308** The Commission accepted and suspended the proposed tariff records, subject to refund and the outcome of hearing procedures.**309** Those hearing procedures are ongoing and will allow further assessment of that evidence in the context of the rate proceeding. Indeed, multiple parties have questioned some of the referenced evidence in their protests, while noting that GTN also acknowledges increasing

---

**303** Kirk Testimony at 8-9.

**304** *See generally* Kirk Testimony at 10-19.

**305** Supplemental Filing at 11-12; *see also id.* at Ex. E at 25 (emphasis added) (Kearley Testimony).

**306** *Id.* at 12-14; *see generally* Kirk Testimony at 25-34, 42.

**307** Supplemental Filing at 14-15; *see also* Kearley Testimony at 24-26, 28-31; Thapa Testimony at 21.

**308** We note that GTN's pipeline system, of which the modifications to the three existing compression stations that compose the Project are a part, consists of approximately 1,377 miles of interstate pipeline extending from the international boundary at Kingsgate, British Columbia to the Oregon-California border. GTN Application at 2.

**309** *See Gas Transmission Nw. LLC*, 185 FERC ¶ 61,086 (2023).

throughput and that its system is fully subscribed.[310]  Accordingly, we find any judgment related to the veracity and validity of statements made in that proceeding premature.[311]

82.     Even assuming the veracity of this evidence, however, GTN's statements in its rate case would not change the outcome of the Commission's project need analysis in this proceeding because of their speculative and conditional nature.  For instance, Mr. Thapa's assertion that precedent agreements do not mitigate all of a pipeline's risk is not unusual and does not apply in the context of determining project need.  Precedent agreements are not used in the context of a project need analysis to determine whether a pipeline's risk is completely mitigated (which would never be the case), but rather to demonstrate that there is sufficient need for a project by virtue of shippers' willingness to make *ex ante* commitments to purchase the project's capacity.[312]  Here, the fact that each precedent agreement was executed for a long term—at least thirty years—and all are with unaffiliated entities, indicates their relevance for demonstrating need for the Project.

83.     In addition, consistent with our discussion above finding that the effect of state and local laws is too speculative to outweigh the concrete evidence of demand for this particular project,[313] so too here we find Mr. Kirk's statements regarding the potential

---

[310] *See* Nw. Nat. Gas Co. October 11 2023 Motion to Intervene and Protest of Nw. Nat. Gas Co. at 4 (objecting to GTN's proposed rate increase and explaining that, since its last rate case, "GTN's mainline cost-of-service has decreased by roughly 10% while its mainline throughput has increased by nearly 40%"); Sierra Pac. Power Co. D/B/A NV Energy October 11, 2023 Motion to Intervene, Protest, Request for Suspension and Evidentiary Hearing Proceedings of Sierra Pac. Power Co. D/B/A NV Energy at 6-7 ("GTN has not demonstrated that its risks are greater than the proxy group.  Every pipeline faces certain risks associated with its system due to age, reliability, opposition to expansion, state and/or federal decarbonization policies or other regulatory compliance requirements…. Despite acknowledging that it is much closer to fully subscribed today than it has been over the last decade, GTN claims that these market developments could impact GTN's ability to attract WCSB supply and could lead to such being transported to Canadian markets or midwestern U.S. and/or eastern U.S. markets.  GTN acknowledges that the pipeline is fully subscribed so any potential market risks have not yet impacted GTN.").

[311] *See S.C. Pub. Serv. Auth.*, 55 FPC 641, 643 (1976) (finding that it was premature to consider the merits of an application in the absence of a hearing record); *see also Mystic Dev., LLC*, 116 FERC ¶ 61,168, at P 11 (2006) (rejecting motion as premature where matter was ordered for hearing before administrative judge).

[312] *See supra* notes 213 & 217.

[313] *See supra* section III(C)(2)(a).

effect of federal, state, and local laws on GTN as a company are too speculative.  Mr. Kirk's statements simply recounted a Department of Energy study that found *if* the United States were to achieve the current net-zero emissions goal by 2050, the "*least-cost pathway*" for doing so "*may*" require natural gas consumption to decline by more than 74%.[314]  And *if* such a decline in natural gas were to occur in accordance with the "*least-cost*" option for achieving the current goal, that decline would result in transportation rates increasing by almost 400% for remaining customers.[315]  This analysis reflects multiple layers of speculation.  First, whether or to what extent the current 2050 net-zero emissions goal will be achieved is not certain and is not relevant for determining whether there is demand for this Project's transportation capacity, which is entirely subscribed by three shippers.  Moreover, the referenced analysis does not represent what is certain to happen even if one were to assume the current 2050 net-zero goal were to be met, rather it represents one pathway for mathematically achieving the reductions—the lowest cost pathway.  There is no analysis about whether such a pathway is either technically achievable or likely.  Additionally, with Intermountain subscribing for 79,000 Dth/d of capacity  (which equates to more than 52% of the Project's overall capacity), Intermountain is the Project's largest shipper and its subscribed capacity is destined for use in Idaho.[316]  There is nothing in the record that indicates that Idaho has adopted any such emissions limitations; rather, the State of Idaho is on the record as arguing "that the project is needed to meet growing demand, increase supply diversity, provide low-cost and reliable natural gas, and provide economic benefits."[317]  Last, although Mr. Kirk discusses several state and local laws and policies that may impact the utilization of GTN's pipeline system,[318] Mr. Kirk also explains that these laws and policies "establish emissions targets similar to EO 14008" and that "achieving the renewable energy targets and reductions in [GHG] emissions of these magnitudes will require a significant decrease in natural gas use . . . ."[319]  As we have explained in prior Commission precedent, the existence of state legislation intended to reduce GHGs by itself, does not undercut the Commission finding that need is demonstrated by a precedent agreement.[320]  Although Mr. Kirk outlines a number of these goals, he does not fully explain whether

---

[314] Kirk Testimony at 7-8.

[315] *Id.* at 8-9.

[316] *See* Certificate Order, 185 FERC ¶ 61,035 at PP 19-20, 23.

[317] Certificate Order, 185 FERC ¶ 61,035 at P 25.

[318] Kirk Testimony at 9-17.

[319] *Id.* at 15.

[320] *Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,148 at P 26.

there are any mandated mechanisms to implement these goals or require conservation or replacement of gas equipment with non-gas alternatives.**[321]**

84.     The other GTN rate case testimony referenced by the States similarly lacks probative value for the purpose of determining project need in the context of this certificate proceeding.  The fact that demand increases in Western Canada are "*anticipated*" to cause a rise in prices does not undermine need for the Project.  The Project was not authorized based solely on the opportunity to increase access to lower cost gas, but also based on it being fully subscribed by non-affiliated shippers and to enhance reliability and supply diversity.**[322]**  Similarly, the fact that the cost of alternative energy, electrification, and battery storage is declining does not take away from the fact that the Project is responding to demonstrated shipper demand in the present, backed by 30-year financial commitments.  Finally, Mr. Kearley did not represent that GTN would not be able to recontract its expiring capacity, but rather that operational and regulatory risks will make it more difficult for GTN to recontract the expiring capacity at *maximum tariff rates*.**[323]**  We decline to override the independent judgment of Cascade, Intermountain, and Tourmaline, which thought it prudent to contract for the Project's capacity based on prevailing market forces.**[324]**

### 3.     **Alternatives**

85.     The States argue that the Commission, in making its public convenience and necessity determination, was required to consider:  (1) clean energy and (2) existing pipelines that could meet incremental demand as alternatives to the Project.**[325]**  Under NGA section 7(e), the Commission considers whether a project is required by the

---

**[321]** *Id.*; *see also Gas Transmission Nw. LLC*, 181 FERC ¶ 61,234, at PP 14, 15 (2022) (explaining that policy and legislation enacted by Washington, Oregon, and California were insufficient to undermine the findings of project need).

**[322]** *See infra* P 86; Certificate Order, 185 FERC ¶ 61,035 at P 24.

**[323]** *See* Kearley Testimony at 29.

**[324]** *See supra* note 310 (referencing protests in Docket No. RP23-1099-000 stating, among other things, that GTN's mainline cost-of-service has decreased by roughly 10% while its mainline throughput has increased by nearly 40%; that notwithstanding market risks, GTN's system is much closer to fully subscribed today than it has been over the last decade; and that GTN acknowledges that the pipeline is fully subscribed so any potential market risks have not yet impacted GTN).

**[325]** States Rehearing Request at 62-65.

"present or future" public convenience and necessity.[326]  Here, the project's purpose is to serve the firm natural gas transportation requirements of its shippers due to increased demand, provide access to lower-cost gas, enhance reliability, and increase supply diversity through three executed precedent agreements for the full capacity of the project.[327]  The States fail to adequately identify a specific clean energy or other alternative for the Commission's consideration that would meet this purpose and thus we continue to find that the States' argument is without merit.[328]  The Commission's "role under the NGA is to decide 'whether to adopt an applicant's proposal and, if so, to what degree, not to engage in resource planning for energy end users.'"[329]

86.    The precedent upon which the States rely is inapposite.  The States first point to a footnote in *City of Pittsburgh v. Federal Power Commission*[330] for the proposition that the Commission may determine that a project is not in the public interest if there is a "more desirable alternative," even if it lacks authority to command the alternative.[331]  The States have not identified a "more desirable alternative" that would meet the project purpose.  As discussed extensively in this order and the Certificate Order,[332] we find that there is public need for the gas that would be supplied by the Project such that we decline to "reject the proposal" in lieu of some unspecified alternative.[333]

---

[326] *See City of Oberlin II*, 39 F.4th at 728 (citing 15 U.S.C. § 717f(e) (emphasizing that NGA section 7(e) "allow[s] FERC to grant a certificate when the facility 'is *or will be* required by the present *or future* public convenience and necessity'") (emphasis added in original).

[327] Certificate Order, 185 FERC ¶ 61,035 at P 24 (citing Application at 3-4).

[328] *Id.*

[329] *Id.* (quoting *Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,148 at P 82).

[330] 237 F.2d 741 (D.C. Cir. 1956).

[331] States Rehearing Request at 62.

[332] *See* Certificate Order, 185 FERC ¶ 61,035 at PP 18-39.

[333] *See City of Pittsburgh v. FPC*, 237 F.2d 741,751 n.28 (D.C. Cir. 1956) ("That the Commission has no authority to command the alternative does not mean that it cannot reject the proposal.").

87.    The States next argue that in the Supreme Court's 1961 decision in *Federal Power Commission v. Transcontinental Gas Pipe Line Corporation***334** the Court held that it was a proper component of the Commission's public interest inquiry to consider whether use of methane gas was "wasteful."**335**  This case, however, had nothing to do with the Commission's obligation to consider alternative energy sources under the NGA, but rather dealt with the scope of the Commission's authority to consider conservation of natural gas—at that time thought to be a limited and dwindling resource—in its decisions under section 7.**336**  The fact that other types of energy may compete with natural gas does not preclude the Commission's authorization of a natural gas project where, as here, there is a demonstrated need for the project as evidenced by it being fully subscribed by unaffiliated shippers.

88.    The States also argue that the Commission failed to consider whether existing pipelines have capacity that could meet any incremental demand.**337**  Not so.  As discussed in section III(D)(1)(c), *infra*, the Final Environmental Impact Statement (EIS) explained that there are no pipeline systems other than GTN's pipeline system that originate at or near GTN's Kingsgate Meter Station and terminate at or near GTN's Malin Meter Station, and that the transportation of additional natural gas between Idaho and Oregon would involve at least two other natural gas pipeline systems and the movement of gas across several hundred additional miles.**338**  To do so, it is likely that additional compression and pipeline would need to be constructed.**339**  Commission staff accordingly concluded that there were no other pipelines that could be considered a viable system alternative,**340** and the States offer no support for their suggestion to the contrary.  Quite the opposite; the Project is designed to increase system capacity in order to deliver peak day contractual requirements of GTN's customers to various delivery

---

**334** 365 U.S. 1 (1961).

**335** States Rehearing Request at 62-63.

**336** *See FPC v. Transcon. Gas Pipe Line Corp.*, 365 U.S. at 6-7 (stating that a "principal question" before the Court is whether an "inferior use" of gas under industrial boilers would be wasteful of gas committed to the Commission's jurisdiction and preempt space in pipelines that might otherwise be used for transportation of gas for "superior uses").

**337** States Rehearing Request at 64-65.

**338** Final EIS at 3-3 to 3-4.

**339** *Id.* at 3-4.

**340** *Id.*

points on GTN's system as the result of the growing market demand and the fact that additional capacity is needed.[341]

### 4.    Project Benefits and Balancing the Relevant Factors

89.    The States and Riverkeeper claim that the Commission failed to support its finding of public benefits and balance the relevant factors when determining the public interest. The States argue that the Commission did not adequately support its statement that the Project will provide access to lower-cost gas and will enhance supply diversification and reliability.[342]  However, in the Certificate Order, the Commission found that the Project will likely decrease costs to consumers and increase supply diversity based on information provided by GTN.[343]  GTN provided evidence that natural gas supplies from the Rockies have declined in recent years, that the decline is forecast to accelerate in the next 30 years, and that the Project is necessary, in part, to replace that supply.[344] Moreover, the Project is also designed to help the local distribution companies meet peak day load requirements with lower-cost natural gas.[345]

90.    Riverkeeper relatedly argues that the Commission's conclusion that the Project will likely reduce costs to consumers conflicts with record evidence to the contrary.[346] Riverkeeper focuses on a line from the Certificate Policy Statement that suggests an applicant's market study would need to explain the basis for a projection that the project would result in lower rates for consumers.[347]  To clarify, the Certificate Policy Statement

---

[341] GTN April 18, 2023 Response at 8-9; Final EIS at 1-1.

[342] States Rehearing Request at 61 (citing Certificate Order, 185 FERC ¶ 61,035 at PP 36, 39).  The Certificate Order notes that prices have historically been substantially lower at the Kingsgate Hub (Canada) than at the Rockies hubs serving these markets. Certificate Order, 185 FERC ¶ 61,035 at P 36.

[343] Certificate Order, 185 FERC ¶ 61,035 at P 26.

[344] *Id.* P 21; *see also* GTN Application at 11-13; GTN April 18, 2023 Response, attach. D.

[345] Certificate Order, 185 FERC ¶ 61,035 at P 21; *see also* GTN Application at 11-12.

[346] Riverkeeper Rehearing Request at 28.

[347] *Id.*; *see also* Certificate Policy Statement, 88 FERC at 61,748.

Case: 24-60354     Document: 1-3     Page: 147     Date Filed: 07/15/2024

Document Accession #: 20240416-3093       Filed Date: 04/16/2024
USCA Case #24-1204    Document #2064211       Filed: 07/11/2024    Page 151 of 238

Docket No. CP22-2-001                                                      - 61 -

makes clear that a market study is not required to authorize a project.**348**  The Certificate
Policy Statement states that a project serving new demand—such as the GTN XPress
Project—may be approved on a lesser showing of need and public benefits than a project
serving markets already served by another pipeline.**349**  Where there are precedent
agreements for 100% of the Project's capacity, as here, neither the applicants nor the
Commission are required to rely on market studies to support a finding of reduced costs
to consumers, and those precedent agreements constitute significant evidence of demand
for the project.**350**

91.     Riverkeeper also argues the that the McCullough Report suggests that the Project
may result in increased costs to some consumers.**351**  The McCullough Report appears to
base this conclusion on the premise that the Project would enable consumers in
downstream markets to compete for supplies of natural gas that would otherwise only be
available to markets further upstream, which, in turn, could raise upstream prices.  The
fact that the Project could result in a greater number of consumers being able to compete
for natural gas is not a basis to reject it.  To the contrary, it is further evidence of the
scope of the demand for the Project's capacity.  We therefore decline to discredit the
significant evidence of demand exhibited by the precedent agreements in favor of the
speculative assertions referenced in the McCullough Report.**352**

---

**348** Certificate Policy Statement, 88 FERC at 61,748.

**349** *Id.*

**350** *Id.* (making clear that a market study is not required to authorize a project, but
can be one factor to demonstrate need for a project); *see also* Certificate Order, 185
FERC ¶ 61,035 at P 36 (explaining that lower-cost gas is only one factor in the
Commission's need determination, along with providing shippers additional flexibility,
and that "[p]recedent agreements for 100% of a project's capacity are significant
evidence of the need for the project"); *but see EDF*, 2 F.4th at 972 (noting that although
under established law precedent agreements are always important evidence of demand,
this does not necessarily mean they are always sufficient).

**351** Riverkeeper Rehearing Request at 29 (citing McCullough Report at 4).

**352** Riverkeeper also references the U.S. Environmental Protection Agency's
(EPA) comments on the Final EIS in which EPA recommended that the Commission
evaluate certain information from the U.S. Energy Information Administration related to
how energy sourced from renewable sources interacts with the natural gas markets.
Riverkeeper Rehearing Request at 29 (citing EPA December 15, 2022 Final EIS
Comments at 4).  The referenced information pertained to U.S. markets, generally, and
did not specifically bear upon any costs that would be realized by consumers as a result

92.     Riverkeeper next points to statements by the Oregon Citizens Utility Board and WUTC that existing customers would be required to absorb the costs of additional pipeline infrastructure through increased rates, and that the capacity may become a stranded asset upon the expiration of the 30 to 33-year contracts if demand declines.[353] As we explained in the Certificate Order, GTN demonstrated that the illustrative incremental rates for the GTN XPress Project are lower than its existing system rates under Rate Schedule FTS-1.[354]  Accordingly, the Commission found that GTN's proposal to charge its existing applicable system reservation rates as the initial recourse rates for the project will not result in existing customers subsidizing the GTN XPress Project.[355] Riverkeeper's claim that the Project will become a stranded asset is speculative, as discussed in detail above.[356]

93.     Riverkeeper argues that Intermountain and Cascade have private profit motives for entering into the precedent agreements; in other words, Riverkeeper is asserting that shippers are contracting for excess capacity that they can then sell on the open market for profit rather than such capacity being needed to satisfy demand from the shippers' consumers.[357]  We have already addressed this allegation with respect to Intermountain in section III(C)(2)(c), *supra*.  With respect to Cascade, Riverkeeper points to statements by WUTC and the McCullough Report that question Cascade's motives for contracting for the amount of gas that it did.[358]  However, as we explained in the context of Intermountain, Riverkeeper's statements do not demonstrate impropriety or lack of demand.[359]

---

of the Project.

[353] Riverkeeper Rehearing Request at 29-30.

[354] Certificate Order, 185 FERC ¶ 61,035 at P 17.

[355] *Id.*

[356] *See supra* P 42.

[357] Riverkeeper Rehearing Request at 25-26.

[358] *Id.* at 26-27

[359] Riverkeeper also repeats general arguments about Tourmaline's precedent agreement not reflecting market demand.  Riverkeeper Rehearing Request at 27.  We addressed arguments relating to Tourmaline's precedent agreement in section III(C)(2)(d), *supra*, and need say no more here.

94.     Riverkeeper also asserts that the Project may result in overbuilding or adversely affect other pipelines;**360** however, the extensive discussion and finding of project need in this order and the Certificate Order belie such a conclusion. Indeed, far from being overbuilt or adversely affecting other pipelines, the Project may reduce the potential for the natural gas supply constraints and price spikes seen in the Western Region of the United States during the winter of 2022-2023.**361** GTN demonstrated through three precedent agreements with unaffiliated shippers that there is demand for 100% of the Project's capacity on GTN's system. Further, this Project would require minimal new infrastructure. We are unpersuaded by Riverkeeper's arguments.

95.     The States argue that the Commission failed to consider and balance all relevant factors in determining the public interest.**362** Specifically, they allege that the Commission failed to properly consider environmental impacts, including GHG emissions and climate impacts, how the gas will be used, and whether alternative energy sources are more suitable for that use.**363** For the reasons discussed in this order, we are not persuaded by the States' arguments.**364** Additionally, as we have previously noted, the Commission is vested with broad discretion for balancing the factors that bear upon the public interest.**365** The Commission acted within its discretion in the Certificate Order, and we decline to deviate from that approach on rehearing.

96.     Finally, Riverkeeper argues that the Project will undermine the States' and its efforts to protect communities near the Project from the impacts of climate change.**366** Riverkeeper asserts that the Commission failed to weigh various considerations including the social cost of GHGs and mitigation costs.**367** This is incorrect. As discussed below,

---

**360** Riverkeeper Rehearing Request at 8, 31-32.

**361** *See* GTN April 18, 2023 Data Response at 1.

**362** States Rehearing Request at 65-68.

**363** *Id.* at 66-67.

**364** *See* section III(D) (discussing environmental impacts, including GHG emissions and climate change); section III(C)(3) and section III(D)(1) (discussing alternatives).

**365** *See supra* note 218.

**366** Riverkeeper Rehearing Request at 32-35.

**367** *Id.* at 33-34.

the Commission fully discussed both the social cost of GHGs and mitigation. Riverkeeper cites to no precedent that anything further is required.

## D.     NEPA

### 1.     Project Purpose and Alternatives

97.     The States and Riverkeeper raise several arguments alleging that the Commission did not properly define the project purpose and did not consider an appropriate array of alternatives, including that the Commission:  (i) defined the purpose and need too narrowly; (ii) failed to properly consider the no-action alternative; (iii) failed to consider efficiency and electrification alternatives; (iv) failed to consider utilizing existing capacity on other pipelines to meet some or all of the projected demand; and (v) failed to consider the electric compressor alternative.  We address each below.

#### a.     Purpose and Need

98.     The States and Riverkeeper argue that the Commission defined the purpose and need of the project to be evaluated in the Final EIS too narrowly, thus failing to comply with NEPA's requirements.**[368]**  According to the States and Riverkeeper, the definition of the purpose and need in the Final EIS hews too closely to the project purpose as described by GTN, which allegedly foreclosed any option other than GTN's preferred project.**[369]**

99.     Section 1502.13 of the Council on Environmental Quality's (CEQ) NEPA regulations requires an EIS to include a brief discussion of the need for the project.**[370]**  An agency uses the purpose and need statement to define the objectives of a proposed action and then to identify and consider reasonable alternatives.**[371]**  Courts have upheld federal agencies' use of applicants' project purpose and need in environmental documents and as the basis for evaluating alternatives.**[372]**  When an agency is asked to consider a specific

---

**[368]** States Rehearing Request at 111-15; Riverkeeper Rehearing Request at 39-41.

**[369]** States Rehearing Request at 111-12; Riverkeeper Rehearing Request at 39-40.

**[370]** 40 C.F.R. § 1502.13 (2023) (requiring an EIS to "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action").

**[371]** *See Colo. Env't Coal. v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999).

**[372]** *E.g.*, *City of Grapevine v. U.S. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994) (*City of Grapevine*); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991) (*Citizens Against Burlington*) (explaining that the evaluation of

proposal, the needs and goals of the parties involved in the application should be taken into account.[373] We recognize that a project's purpose and need may not be so narrowly defined as to preclude consideration of reasonable alternatives. Nonetheless, an agency need only consider alternatives that will bring about the ends of the proposed action, and the evaluation is "shaped by the application at issue and by the function that the agency plays in the decisional process."[374]

100. The Final EIS appropriately defined the project's purpose and need and used that statement to consider a reasonable range of alternatives.[375] It evaluated a no-action alternative and considered whether any system or design alternatives would satisfy the evaluation criteria.[376] The Final EIS made clear that the purpose of the proposed Project is to increase the capacity of GTN's existing natural gas transportation system to provide necessary firm transportation service for growing market demand from entities connected to its system.[377] Commission staff appropriately limited its consideration of alternatives to those that would further the Project's purpose. Specifically, as discussed further below, the Final EIS included a discussion of a pipeline looping alternative, an electrical compression alternative and the use of existing capacity.[378] The Commission is not obligated to analyze other alternatives that cannot satisfy the identified demand.

---

alternatives is "shaped by the application at issue and by the function that the agency plays in the decisional process").

[373] *Citizens Against Burlington*, 938 F.2d at 196.

[374] *Id.* at 199; *see also Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 598-99 (4th Cir. 2018) (finding that the statement of purpose and need for a Commission-jurisdictional natural gas pipeline project that explained where the gas must come from, where it will go, and how much the project would deliver, allowed for a sufficiently wide range of alternatives but was narrow enough that there were not an infinite number of alternatives).

[375] Final EIS at 1-1 to 1-2, 3-1 to 3-7.

[376] *Id.* at 3-1to 3-5.

[377] *Id.* at 1-1, 3-1.

[378] *See Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1182 (D.C. Cir. 2023) (*Alaska LNG*) (stating that an alternative is reasonable if it meets the purpose and need of the proposed action and that an agency may reject alternatives as unreasonable that do not further the proposed action's purpose).

101.    The States and Riverkeeper also assert that, when defining the purpose and need for the Project, Commission staff should have considered the market need for the Project and, by failing to do so, unreasonably constrained the Commission's consideration of alternatives in a manner that "does not allow for anything except the exact project that GTN seeks to pursue."[379]  This argument combines the description of the purpose and need for the Project under NEPA and the Commission's determination of public need under the public convenience and necessity standard of NGA section 7.[380]  The States and Riverkeeper's premise that the definition of purpose and need precluded consideration of alternatives other than the proposed project contradicts the Final EIS.  Rather, the Final EIS included a discussion of other potentially reasonable alternatives, including pipeline looping and electric compression – which both substantially differ from GTN's proposed project and which both were eliminated from further consideration because they did not offer a significant environmental advantage over the proposed action.  This approach reflects that the purpose of the Final EIS is to present Commission staff's independent analysis of the environmental issues for the Commission to consider when the Commission addresses the merits of all issues in its Certificate Order.[381]  Commission staff's analysis in the Final EIS focuses on impacts to environmental resources, not on economic issues, including need, that the Commission considers directly in its determination under NGA section 7(c) whether a project is required by the public

_____

[379] Riverkeeper Rehearing Request at 40; *see* States Rehearing Request at 114 ("Accordingly, the Commission should not limit the scope of the alternatives considered to only those that expand GTN's pipeline."); *see also* States Rehearing Request at 112-15; Riverkeeper Rehearing Request at 40-41.

[380] *Compare* 15 U.S.C. § 717f(e) (providing the Commission issues a certificate for a project that "is or will be required by the present or future public convenience and necessity"), *with* 40 C.F.R. § 1502.10(a)(4) (2023) (recommending that an EIS include a statement of "[p]urpose of and need for action").  The concepts are evaluated under different statutory frameworks.  The purpose of NEPA is to integrate environmental review into the agency decision-making process to ensure that "environmental values and consequences have been considered during the planning stage of agency actions."  *City of Dania Beach, Fla. v. F.A.A.*, 485 F.3d 1181, 1185 (D.C. Cir. 2007) (quoting *Andrus v. Sierra Club,* 442 U.S. 347, 350–51 (1979)).  The NGA is the Commission's "substantive statute."  *Baltimore Gas & Elec. Co. v. FERC*, 252 F.3d 456, 460 (D.C. Cir. 2001).  The Commission's scrutiny of need under the NGA's public convenience and necessity standard is to ensure that proposed projects are justified by demonstrated need for transportation service.  *E.g.*, Certificate Policy Statement, 88 FERC at 61,750 (describing a balance of concerns to authorize necessary new capacity).

[381] Final EIS at 3-1 to 3-2.

convenience and necessity.[382]  Accordingly, we find that the Final EIS's definition of the purpose and need was sufficient to support the required discussion in the Final EIS of the impacts of the project and reasonable alternatives.

### b.    No-Action Alternative; Efficiency and Electrification Options

102.   The States and Riverkeeper assert that Commission staff erred by rejecting the no-action alternative on the grounds that it did not meet the Project's purpose.[383]  The States and Riverkeeper argue that the no-action alternative is reasonable because it would decrease reliance on natural gas and that a "predictable effect" of denying the Project would be energy users increasingly turning to alternative energy sources to satisfy their energy needs.[384]

103.   We disagree; an agency does not err by rejecting a no-action alternative that would not fulfill the project's purpose.[385]  The Final EIS explicitly considered and rejected the no-action alternative in a manner consistent with NEPA.[386]  Because the no-action alternative would fail to meet the Project's purpose and need, we continue to find that the discussion and rejection of the no-action alternative was reasonable and appropriate.[387]

104.   Relatedly, the States' and Riverkeeper's argument that the Commission improperly dismissed alternative energy sources as a component of the no-action

---

[382] *Id*. at 1-2.

[383] States Rehearing Request at 116; Riverkeeper Rehearing Request at 42.

[384] States Rehearing Request at 117-118; Riverkeeper Rehearing Request at 42.

[385] *Alaska LNG*, 67 F.4th at 1182 (holding that the Commission did not err by concisely rejecting the no-action alternative when it would not fulfill the project's purpose to commercialize natural gas from Alaska's North Slope).

[386] Final EIS at 3-1 to 3-2.

[387] *See Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 837-38 (D.C. Cir. 1972) (stating that "the requirement in NEPA of discussion as to reasonable alternatives does not require 'crystal ball' inquiry" and that "[t]he statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious, that the resources of energy and research–and time–available to meet the Nation's needs are not infinite").

alternative that would obviate the need for the Project also fails.[388]  As explained above, an agency may eliminate alternatives that would not achieve a project's goals or are otherwise unreasonable.[389]  The Final EIS concluded that neither the no-action alternative nor any alternative energy source is capable of meeting the purpose of the Project, and were therefore eliminated from further consideration.[390]  We find this determination appropriate; for purposes of NEPA, an agency may take into account an applicant's needs and goals when assessing alternatives, so long as it does not limit the alternatives to only those that would adopt the applicant's proposal.[391]  Further, the States and Riverkeeper did not present the Commission with a specific energy alternative that could substitute for the transportation capacity of the Project.  The hypothetical development of non-gas alternatives to meet the energy needs the Project is intended to satisfy goes beyond NEPA's "rule of reason" applicable to the identification of alternatives and is not necessary to analyze the present proposal.  Although Commission regulations require an EIS to include a summary of an alternative that would have less severe environmental impacts,[392] the regulation assumes the existence of identified alternatives that could achieve a project's goals and are not otherwise unreasonable.

### c.   Existing Capacity on Other Pipelines

105.   The States and Riverkeeper argue that the Commission failed to consider whether existing pipeline systems could meet some or all of the demand for the Project.[393]  The States contend that there may be alternative means to satisfy demand in Idaho, including potential existing capacity on the Northwest Pipeline.[394]  Riverkeeper also assumes that gas supply could have been secured by accessing capacity on the Williams pipeline,

---

[388] States Rehearing Request at 118-120; Riverkeeper Rehearing Request at 43.

[389] *See Fuel Safe Wash. v. FERC*, 389 F.3d 1313, 1323 (10th Cir. 2004) (quoting *All Indian Pueblo Council v. U.S.*, 975 F.2d 1437, 1444 (10th Cir. 1992)); *see also Nat'l Wildlife Fed'n v. FERC*, 912 F.2d 1471, 1485 (D.C. Cir. 1990) (holding that the Commission properly concluded that a reasonable alternative needed to address water supply when the project proposal was designed to satisfy water supply needs).

[390] Final EIS at 3-1.

[391] *See Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 73-74 (D.C. Cir. 2011) (*Roosevelt*).

[392] *See* 18 C.F.R. § 380.7(b) (2023); States Rehearing Request at 116.

[393] States Rehearing Request at 120; Riverkeeper Rehearing Request at 43.

[394] States Rehearing Request at 120-121.

maximizing existing capacity on the GTN system through more efficient use of the short-term and spot markets, or increasing storage capacity along the system to meet periods of peak demand.**395**

106.    Neither the States nor Riverkeeper offer any support for these proposed options. For example, the parties do not show that there is available capacity on the other pipeline systems, much less that the capacity could be used to serve the requisite areas in a way that is less environmentally damaging than utilizing GTN's existing pipeline infrastructure.  Additionally, although the States dispute the premise that 150 million standard cubic feet per day must be transported between the Kingsgate Meter Station and Malin Meter Station,**396** this requirement is derived from the Project's stated purpose,**397** and, as we explain above, an agency acts reasonably when it rejects alternatives that do not meet a project's purpose.**398**

107.    The Final EIS considered and adequately explained why these are not viable alternatives.  The Final EIS states that the Department of Transportation's National Pipeline Mapping System shows that there are no pipeline systems, other than GTN's, that could fulfill the Project's purpose.**399**  Absent using GTN's system, the transportation of gas between Idaho and Oregon would involve using at least two other pipeline systems and the movement of gas across several hundred additional miles.**400**  It is also likely that additional compression and the construction of new pipeline infrastructure would be required.**401**  This would result in a net increase in the footprint for any alternative over that of the GTN XPress Project, which will only result in the disturbance of 1.2 acres.**402** Finally, we are unpersuaded by Riverkeeper's vague assertions related to the more

---

**395** Riverkeeper Rehearing Request at 43.

**396** States Rehearing Request at 120.

**397** Final EIS at 3-2 ("A preferable alternative must meet the stated purpose of the Project, which is to increase the capacity of GTN's existing natural gas transmission system by about 150 million standard cubic feet per day between its Kingsgate Meter Station in Idaho and its Malin Meter Station in Oregon.").

**398** *See supra* note 378.

**399** Final EIS at 3-3 to 3-4.

**400** *Id.*

**401** *Id.* at 3-4.

**402** *Id.*

efficient use of short-term and spot markets and increasing storage capacity as unsupported and hypothetical.[403]

### d.    Authorizing only a Portion of the Proposed Capacity

108.    Riverkeeper argues that the Commission should have considered alternatives that would authorize only a portion of GTN's proposed capacity, relying on *Friends of Animals v. Romero*[404] and *City of New York v. U.S. Department of Transportation*[405] for the assertion that it is inappropriate to disregard alternatives merely because they do not offer a complete solution to the problem.[406] These cases, however, belie Riverkeeper's position. *Friends of Animals* makes clear that "it is well-settled that under NEPA the range of alternatives that must be discussed is a matter within an agency's discretion,"[407] and *City of New York* explains that an agency must only "consider such alternatives to the proposed action as may partially or completely meet the proposal's goal."[408] As discussed in the Project Need section above, 100% of the GTN XPress Project's capacity is subscribed through precedent agreements. In these circumstances, where the proposed project satisfies the Project's goal completely, and the record lacks support for the proposition that limiting the Project to only part of the proposed capacity would be technically or economically feasible while meeting the purpose and need of the proposal, we decline to further consider a hypothetical alternative that might only partially satisfy the Project's goal.[409] For example, there is nothing in the record that reflects how such a

---

[403] *Commonwealth LNG, LLC*, 183 FERC ¶ 61,173, at P 19 (2023) ("The Commission has previously recognized that '[u]nsupported, hypothetical alternatives are not reasonable alternatives that warrant further NEPA consideration.'") (quoting *Mountain Valley Pipeline, LLC*, 163 FERC ¶ 61,197 at P 139).

[404] 948 F.3d 579 (2d. Cir. 2020) (*Friends of Animals*).

[405] 715 F.2d 732 (2d. Cir. 1983) (*City of New York*).

[406] Riverkeeper Rehearing Request at 43-44.

[407] 948 F.3d at 591 (quoting *Nat. Res. Def. Council v. FAA*, 564 F.3d 549, 558 (2d. Cir. 2009)).

[408] 715 F.2d at 742.

[409] *See* 42 U.S.C. § 4332(C)(iii) (requiring alternatives to be "technically and economically feasible, and meet the purpose and need of the proposal"); *see also Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 575 (D.C. Cir. 2016) (quoting 43 C.F.R. § 46.420(b) (2023) ("Reasonable alternatives....include[ ] alternatives that are technically and economically practical or feasible and meet the purpose and need of the proposed action."); *Roosevelt*, 661 F.3d at 69 (stating that the range of reasonable alternatives must

reduction in capacity would work (e.g., what the appropriate amount of capacity is to still meet the Project's purpose, and which compressors and subscriptions would need to be reduced). NEPA does not require such speculation.[410] Accordingly, we are unpersuaded by Riverkeeper's argument, which repackages the arguments disputing the Project's need.

### e.   Electric Compressor Alternative

109.   The States argue that Commission staff failed to adequately analyze the electric compressor alternative. Specifically, the States dispute Commission staff's use of EPA's Avoided Emissions and Generation Tool (AVERT) to analyze potential emissions and assert that the National Renewable Energy Laboratory's Cambium tool would be more appropriate.[411]   The States also allege that Commission staff should have accounted for the "climate harms and social costs" of not using electric compression.[412]

110.   The Final EIS provided a robust discussion of the emissions ramifications from selecting the electric compressor alternative, including explaining that use of electric compression would shift emissions impacts from the compressor station site to the electric power generation site(s).[413]   The States disagree with Commission staff's use of AVERT rather than the Cambium tool, arguing that the Cambium tool is superior because it factors in the impact of future national and regional plans to transition to renewable energy, whereas AVERT does not capture these factors because it uses historical data.[414] However, the impacts of such future policies are hypothetical and do not constrain the Commission's analysis to such an extent that it is precluded from choosing to use a generally-accepted tool such as AVERT, which was established by EPA specifically to

---

include those that are "technically and economically practical or feasible" and "this range is delimited by the agency's reasonably defined goals for the proposed action") (cleaned up).

[410] *See infra* P 137 & note 498.

[411] States Rehearing Request at 121-122.

[412] *Id.* at 122.

[413] Final EIS at 3-5.

[414] States Rehearing Request at 121.

analyze emissions resulting from various generation scenarios.[415] To the contrary, an agency's choice among reasonable analytical methodologies is entitled to deference.[416]

111.    The Final EIS also provided a fulsome discussion of non-emissions-related impacts that would result if electric compression were used.  First, in order to use an electric compressor, GTN would have to install a 38-mile-long high voltage transmission line and electric substation, which would impact at least 375 acres of land and require the crossing of at least 23 waterbodies.[417]  An electric compressor would also be cost and schedule prohibitive; with respect to the latter, Commission staff estimated it would take approximately 32-36 months from the engineering kick-off date to construct the high-voltage wire and electric substation required to employ an electric compressor.[418]  Based on this discussion in the Final EIS, the Commission was well within its discretion to conclude that this alternative did not offer a significant environmental advantage over the proposed action.[419]  Moreover, it is well-settled that NEPA does not mandate particular results or selection of the least environmentally damaging alternative so long as each alternative is adequately discussed and a brief explanation is provided for why an alternative is rejected.[420]  Accordingly, we continue to find that the Final EIS thoroughly

---

[415] *See* EPA, AVoided Emissions and geneRation Tool (AVERT), User Manual Version 4.2 (Oct. 2023), https://www.epa.gov/system/files/documents/2023-10/avert-user-manual-v4.2.pdf.

[416] *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004).

[417] Final EIS at 3-5.

[418] *Id.* at 3-6.

[419] Certificate Order, 185 FERC ¶ 61,035 at P 97; Final EIS at 3-6; *see also Minisink*, 762 F.3d at 111 ("[The Commission] 'enjoys broad discretion to invoke its expertise in balancing competing interests and drawing administrative lines.'") (quoting *Am. Gas Ass'n v. FERC*, 593 F.3d at 19).

[420] *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (*Methow Valley*) ("[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process.  If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.") (citations omitted); *see also* 40 C.F.R. § 1502.14(a) (2023) ("Evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination.").

analyzed the electric compressor alternative and adequately explained why it did not offer a significant environmental advantage over the proposed action.

### 2.    GHG Emissions

112.    The States and Riverkeeper allege that the Commission did not properly account for impacts from GHG emissions, stating that the Commission failed to:  (1) assess the significance of GHG emissions; (2) analyze the Project's upstream impacts; and (3) account for all downstream impacts.  As discussed below, the Commission did not characterize GHG emissions as significant or insignificant, found that upstream GHG emissions are not reasonably foreseeable, and found that downstream GHG emissions from Tourmaline's subscribed capacity are not reasonably foreseeable.

### a.    Significance

113.    The States and Riverkeeper raise several arguments that the Commission's disclosure of reasonably foreseeable emissions does not satisfy its obligations under NEPA because the Commission did not determine whether the GHG emissions are "significant."[421]  The States and Riverkeeper fail to cite any authority for the proposition that the Commission's NEPA analysis, which disclosed the Project's reasonably foreseeable GHG emissions,[422] is incomplete for lack of a significance determination.[423]  As discussed below, in light of the factual record in this proceeding, we find the Commission's analysis complete.[424]

---

[421] States Rehearing Request at 72-84; Riverkeeper Rehearing Request at 55-60.

[422] *See* Final EIS at 4-45 to 4-51.

[423] In addition, we note that the States and Riverkeeper have not proposed a methodology for assessing the significance of a discrete level of emissions.  *See Food & Water Watch v. FERC*, 28 F.4th 277, 290 (D.C. Cir. 2022) (*Food & Water Watch*) (affirming the reasonableness of the Commission's decision not to further assess significance where Food & Water Watch failed to identify any methodology by which the Commission could do so).

[424] *See Alaska LNG*, 67 F.4th at 1184 (holding that because the Commission took a reasonable approach to evaluating GHG emissions, including its rejection of the social cost of carbon for consistently stated reasons, "the Commission had no obligation in this case to consider the social cost of carbon"); *see also Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206, at P 88 (2022) ("Sierra Club asks that the Commission nonetheless assess whether the GHG emissions are significant, despite the Commission having already completed an EIS.  Sierra Club cites no caselaw to support its contention that the Commission's NEPA analysis is incomplete . . .  In light of this factual record, and the

Case: 24-60354   Document: 1-3   Page: 160   Date Filed: 07/15/2024

Document Accession #: 20240416-3093   Filed Date: 04/16/2024
USCA Case #24-1204   Document #2064211   Filed: 07/11/2024   Page 164 of 238
Docket No. CP22-2-001                                                      - 74 -

114.    The Final EIS for the project did not characterize the Project's potential GHG emissions as significant or insignificant, but rather disclosed reasonably foreseeable emissions; namely, construction emissions, operational emissions, and downstream combustion emissions associated with the capacity subscribed by Cascade and Intermountain (together, 99,000 Dth/d).[425]   The Final EIS also included detailed comparisons of those emissions to total GHG emissions in the United States and at the state level.[426]

115.    We clarify that, for informational purposes, Commission staff disclosed an estimate of the social cost of GHGs.[427]   While we have recognized in past orders that the social cost of GHGs may have utility in certain contexts such as rulemakings,[428] we have also found that calculating the social cost of GHGs does not enable the Commission to determine credibly whether the reasonably foreseeable GHG emissions associated with a project are significant or not significant in terms of their impact on global climate change.[429]   Currently, there are no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria.[430]   Nor are we aware of any other currently scientifically accepted

---

Commission's continued consideration of issues that include whether and how to assess the significance of GHG emissions, we disagree with Sierra Club that more was required of the Commission in this case."); *Tenn. Gas Pipeline Co.*, 180 FERC ¶ 61,205, at P 72 (2022) (same).

[425] *See* Certificate Order, 185 FERC ¶ 61,035 at P 64.

[426] Final EIS at 4-48 to 4-49.

[427] *Id.* at 4-50 to 4-51.

[428] *Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099, at PP 35-37 (2018).

[429] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 296 (2017), *aff'd sub nom*., *Appalachian Voices v. FERC*, 2019 WL 847199 (D.C. Cir. 2019) (*Appalachian Voices*); *see also Delaware Riverkeeper II*, 45 F.4th 104, 111.   The social cost of GHGs tool merely converts GHG emissions estimates into a range of dollar-denominated figures; it does not, in itself, provide a mechanism or standard for judging "significance."

[430] *Tenn. Gas Pipeline Co.*, 181 FERC ¶ 61,051 at P 37; *see also Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 296, *order on reh'g*, 163 FERC ¶ 61,197 at PP 275-297, *aff'd*, *Appalachian Voices*, 2019 WL 847199, at *2 ("[The Commission] gave several reasons why it believed petitioners' preferred metric, the Social Cost of Carbon tool, is not an appropriate measure of project-level climate change impacts and their significance under NEPA or the Natural Gas Act.   That is all that is required for NEPA purposes."); *EarthReports v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) (*EarthReports*)

method that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions.[431]  The D.C. Circuit has repeatedly upheld the Commission's decisions not to use the social cost of GHGs, including to assess significance,[432] and has affirmed the Commission's decision to not analyze it as part of the NEPA analysis.[433]

116.    Throughout their arguments, the States and Riverkeeper make various references to the CEQ Interim Guidance as a source of authority for their position on the Commission's analysis of GHG emissions.[434]  The CEQ Interim Guidance became

---

(accepting the Commission's explanation why the social cost of carbon tool would not be appropriate or informative for project-specific review, including because "there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes").

[431] *See LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14 (2023) ("[T]here are currently no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria").

[432] *See*, *e.g*., *Alaska LNG*, 67 F.4th at 1184 (holding that the Commission's decision not to use the social cost of carbon was "reasonable and mirrors analysis [the court] previously upheld"); *EarthReports*, 828 F.3d at 956 (upholding the Commission's decision not to use the social cost of carbon tool due to a lack of standardized criteria or methodologies, among other things).  The States' attempt to distinguish *Alaska LNG* is unavailing.  *See* States Rehearing Request at 78 (arguing that *Alaska LNG* does not apply because, in the instant proceeding, the Commission chose to calculate the social cost of GHGs for the Project's reasonably foreseeable emissions whereas the *Alaska LNG* court held that it was reasonable not to undertake a social cost of GHGs analysis at all).  It is nonsensical to suggest that it is reasonable to forgo a social cost of GHGs analysis entirely, but that if the Commission chooses to undertake such an analysis for the purpose of additional disclosure, it should then be penalized for reasonably concluding that it lacks any criteria for determining whether the resulting information translates to a significance determination under NEPA.

[433] *See Alaska LNG*, 67 F.4th at 1184 ("Rather than use the social cost of carbon, the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions.  It declined to apply the social cost of carbon for the same reasons it had given in a previous order. . . FERC's approach was reasonable and mirrors analysis we have previously upheld.").

[434] *See* Nat'l Env't Pol'y Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1196 (Jan. 9, 2023) (CEQ Interim Guidance).

effective on January 9, 2023, and states that "CEQ does not expect agencies to apply this guidance to concluded NEPA reviews and actions for which a final EIS or EA has been issued."**435**  As the Final EIS was issued in November 2022, the Commission reasonably did not apply the CEQ Interim Guidance in this proceeding.  Moreover, CEQ guidance generally does not impose requirements on the Commission, and the guidance at issue is an interim document that will be subject to public and interagency comment and possibly further review before being finalized.**436**

117.    The States argue that the Commission failed to explain why it cannot exercise its own judgment to evaluate the significance of climate costs in the absence of an outside tool.**437**  The States and Riverkeeper relatedly suggest that the Commission could have used the threshold of 100,000 tons per year of carbon dioxide equivalents ($CO_2e$) that was proposed in the Commission's Interim Draft GHG Policy Statement.**438**  The Interim GHG Policy Statement has been suspended,**439** and thus it does not provide a tool for assessing significance.  Moreover, based on our judgement, we are currently unable to determine the significance of the Project's GHG emissions because, as we explained above, there are no criteria or other currently scientifically accepted methods that would enable the Commission to make such a determination.  Nor have the States proposed a scientifically accepted method.

118.    The States and Riverkeeper argue that to the extent the threshold of GHG significance is uncertain or incomplete, the Commission did not comply with 40 C.F.R. § 1502.21(c), which requires that if information relevant to reasonably foreseeable significant adverse impacts cannot be obtained, the agency must provide an "evaluation of such impacts based upon theoretical approaches or research methods generally

---

**435** *Id.* at 1212.

**436** *Id.* at 1198 n.15.

**437** States Rehearing Request at 76-77 (citing *Duncan's Point Lot Owners Ass'n v. FERC*, 522 F.3d 371 (2008); *see also Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022) (Interim GHG Policy Statement)).

**438** States Rehearing Request at 79-80; Riverkeeper Rehearing Request at 56-57.

**439** On March 24, 2022, the Commission, upon further consideration made the Interim GHG Policy Statement a draft and stated that it would not apply the policy to pending or new projects until the Commission issues any final guidance after public comment. *See Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,197, at P 2 (2022).

accepted in the scientific community."[440] We disagree. As discussed above, Commission staff disclosed an estimate of the social cost of GHGs; however, there are currently no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria. The issue, therefore, is not one of incomplete information, but rather that the information provided by a method such as the social cost of GHGs does not provide a basis for a significance determination. Accordingly, we have taken the required "hard look" and have satisfied our obligations under NEPA.

119. The States and Riverkeeper argue that the Commission's analysis was insufficient because it did not acknowledge the extent to which GHG emissions that would result from the Project may be inconsistent with state and local emissions reduction goals.[441] The Certificate Order and the Final EIS provided context for the potential impacts of the Project on a state and national level.[442] Additionally, when states have GHG emissions reductions targets, we will compare a project's GHG emissions to those state targets to provide additional context. The Commission included this comparison in the Certificate Order.[443] However, the Commission is unable to determine whether a specific project's GHG emissions are consistent or inconsistent with state-wide goals or laws, given the many variables that bear upon that question.[444] The enforcement of such emissions reductions is within the purview of the states.[445]

---

[440] States Rehearing Request at 78-79; Riverkeeper Rehearing Request at 59-60; *see also* 40 C.F.R. § 1502.21(c) (2023).

[441] States Rehearing Request at 80-81; Riverkeeper Rehearing Request at 57.

[442] Certificate Order, 185 FERC ¶ 61,035 at PP 67-69; Final EIS at 4-48 to 4-49.

[443] *See* Certificate Order, 185 FERC ¶ 61,035 at P 69. The Certificate Order reflects different figures than the Final EIS due to Commission staff having updated the comparison after publication of the Final EIS. *Compare id.*, *with* Final EIS at 4-49.

[444] *See Tenn. Gas Pipeline Co.*, 186 FERC ¶ 61,113, at P 20 (2024); *Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,148 at P 107; *see also* States Rehearing Request at 100-102 (discussing various credits and offsets that may be used to satisfy GHG emissions reduction requirements). The Commission's determination about consistency or inconsistency with a state's goals or laws would not indicate whether or not project-related emissions are globally significant.

[445] *See, e.g., Tenn. Gas Pipeline Co.*, 179 FERC ¶ 61,041 at P 17 (recognizing that the New York Department of Environmental Conservation was responsible for enforcing the prescribed emissions targets).

120.    The States and Riverkeeper assert that the Commission should not rely on a comparison of individual project emissions to state and national emission inventories.[446] The parties point to precedent in the Ninth and Tenth Circuits that suggests that comparing a project's emissions to state and national inventories may be insufficient to inform the public and decisionmakers about the impacts of the emissions.[447]  However, unlike in those cases, this proceeding involves neither the "carbon budget" nor the discharge of pollutants under the Clean Water Act.  Moreover, the D.C. Circuit, addressing substantially similar arguments, has explicitly held that the Commission acts reasonably by comparing a project's emissions with nationwide and state inventories.[448] The fact that EPA and CEQ might not recommend this methodology in every instance does not preclude its utilization by the Commission.[449]  A lead agency has discretion whether to follow other agencies' suggestions.[450]  Here, the Commission determined, consistent with D.C. Circuit precedent, that it was appropriate to compare the Project's emissions to state and national inventories as part of its analysis.

121.    The States and Riverkeeper also argue that the Commission's declination to determine the significance of GHG emissions runs afoul of the NGA.[451]  The parties argue that, absent a significance determination, the Commission cannot properly balance the Project's benefits against its impacts, which precludes the Commission from determining whether the Project is in the public interest.

---

[446] States Rehearing Request at 82; Riverkeeper Rehearing Request at 58-59.

[447] States Rehearing Request at 82 (citing *Diné Citizens Against Ruining our Env't v. Haaland*, 59 F.4th 1016 (10th Cir. 2023); *350 Montana v. Haaland*, 50 F.4th 1254 (9th Cir. 2022)); Riverkeeper Rehearing Request at 58-59 (same).

[448] *Alaska LNG*, 67 F.4th at 1184 (discussing *EarthReports*, 828 F.3d 949) ("Rather than use the social cost of carbon, the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions …. [the Commission's] approach was reasonable and mirrors analysis we have previously upheld."); *WildEarth Guardians v. Jewell*, 738 F.3d 298, 310 (D.C. Cir. 2013) (upholding evaluation of GHG emissions as a percentage of state and nation-wide emissions).

[449] *See* States Rehearing Request at 83-84 (citing CEQ Interim Guidance and EPA Draft EIS comments); Riverkeeper Rehearing Request at 59 (same).

[450] *See Citizens Against Burlington*, 938 F.2d at 201 (stating that, under the rule of reason, a lead agency does not have to follow other agencies' comments, it just has to take them seriously).

[451] States Rehearing Request 71-72; Riverkeeper Rehearing Request at 60-62.

Case: 24-60354     Document: 1-3     Page: 165     Date Filed: 07/15/2024

Document Accession #: 20240416-3093     Filed Date: 04/16/2024
USCA Case #24-1204     Document #2064211     Filed: 07/11/2024     Page 169 of 238
Docket No. CP22-2-001                                                                    - 79 -

122.     The Commission has met its obligations under the NGA. The Commission's balancing under the public convenience and necessity standard reflects the appropriate considerations under the NGA and is afforded deference.**452** In the Certificate Order, the Commission concluded that the Project is an environmentally acceptable action.**453** As discussed above, the Commission quantified the GHG emissions and compared them to national and state emissions levels. The Commission, in reviewing the Final EIS, took the further analytical step of recognizing that the Project's contributions to GHG emissions globally contributes incrementally to future climate change impacts, and described those potential impacts in the region.**454** None of the information developed in the record undermines the Commission's determination that the Project is required by the public convenience and necessity.**455**

### b.     Upstream Emissions

123.     The States and Riverkeeper advance several arguments that upstream emissions associated with the production of natural gas to be transported on the additional capacity provided by the Project are reasonably foreseeable and thus indirect impacts that must be considered under NEPA.**456** We disagree.

124.     NEPA requires agencies to consider indirect effects or impacts that "are caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable."**457** The courts have found that an impact is reasonably foreseeable if it is

---

**452** *See Myersville*, 783 F.3d at 1308 ("Because the grant or denial of a Section 7 certificate of public convenience and necessity is a matter 'peculiarly within the discretion of the Commission, this court does not substitute its judgment for that of the Commission.") (cleaned up).

**453** Certificate Order, 185 FERC ¶ 61,035 at P 98.

**454** *Id.* P 64 (citing Final EIS at 4-47).

**455** *Id.* P 99; *see also Alaska LNG*, 67 F.4th at 1188 (rejecting the argument that the Commission was obligated to use the social cost of carbon as part of its NEPA analysis and stating that the argument "fare[s] no better when framed as NGA challenges" and that "[the Commission's] public interest determination was reasonable and lawful").

**456** *See* States Rehearing Request at 85-92; Riverkeeper Rehearing Request at 69-71.

**457** 40 C.F.R. § 1508.1(g)(2) (2023).

"sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision."[458]

125.    The environmental effects resulting from natural gas production are generally not reasonably foreseeable consequences of our approval of an infrastructure project, as contemplated by CEQ regulations, where the supply source is unknown.[459]  For example, the record lacks information that would help predict the number and location of any additional wells that would be drilled as a result of any production demand associated with the Project.[460]  The record also does not show from whom Cascade and Intermountain would source their gas and, indeed, those sources could regardless change throughout the Project's operating lifetime.[461]  It is unknown whether there will be any incremental development of production wells associated with the capacity subscribed by Tourmaline.[462]  The Certificate Order and Final EIS considered the record in this proceeding and concluded that any upstream GHG emissions would not be a reasonably foreseeable impact of this project.[463]  We sustain that conclusion on rehearing.

126.    The States and Riverkeeper each contend that it is reasonable to assume that the Project will result in additional amounts of natural gas being sent to market, the production of which, they assert, will result in additional GHG emissions.[464]  Both parties

---

[458] *EarthReports*, 828 F.3d at 955 (citations omitted); *see also Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992).

[459] *See, e.g.*, *Tenn. Gas Pipeline Co.*, 181 FERC ¶ 61,051 at P 27; *Cent. N.Y. Oil & Gas Co.*, 137 FERC ¶ 61,121, at PP 81-101 (2011), *order on reh'g*, 138 FERC ¶ 61,104, at PP 33-49 (2012), *pet. for review dismissed sub nom. Coal. for Responsible Growth v. FERC*, 485 F. App'x. 472, 474-75 (2d Cir. 2012) (unpublished opinion); *see also Adelphia Gateway, LLC*, 169 FERC ¶ 61,220, at P 243 (2019), *order on reh'g*, 171 FERC ¶ 61,049, at P 89 (2020).

[460] *See* Certificate Order, 185 FERC ¶ 61,035 at P 66; *see also Adelphia Gateway, LLC*, 169 FERC ¶ 61,220 at P 243 ("[T]here is no evidence that the information cited would help predict the number and location of any additional wells that would be drilled as a result of any production demand associated with the project.").

[461] Certificate Order, 185 FERC ¶ 61,035 at P 66; Final EIS at 4-44.

[462] *Id.*

[463] *Id.*

[464] States Rehearing Request at 85; Riverkeeper Rehearing Request at 69.

rely on *Eagle County, Colorado v. Surface Transportation Board*[465] for the proposition that upstream emissions may be reasonably foreseeable where the source of the gas is known and there is evidence that additional production will be induced.[466]  That case is distinguishable from the instant proceeding.

127.    *Eagle County* concerned an authorization by the Surface Transportation Board (STB) for the construction and operation of a new rail line for the transportation of crude oil from the Uinta Basin in Utah.[467]  The D.C. Circuit held that, on the facts of that case, upstream impacts from oil production were reasonably foreseeable and, accordingly, directed the STB to quantify and consider the project's upstream impacts or explain in more detail why it could not do so.[468]  However, in doing so, the court recognized and upheld its established precedent that such impacts are not *always* reasonably foreseeable as a categorical matter, but rather the analysis is necessarily contextual.[469]  The court made clear that "reasonable" is the operative word when determining what effects are "reasonably foreseeable"[470] and that agencies "need not foresee the unforeseeable."[471]

128.    In *Eagle County*, the STB had more certain information about the upstream impacts of its action than the Commission does in the instant proceeding.  Notably, the STB was able to estimate the number of oil wells that would need to be constructed and operated to satisfy the expected increase in oil production that would result from the project.[472]  Indeed, STB's Final EIS described its estimates of future oil production as "a reasonably foreseeable development scenario" based on the available information.[473]

---

[465] 82 F.4th 1152 (D.C. Cir. 2023) (*Eagle County*).

[466] States Rehearing Request at 86, 90; Riverkeeper Rehearing Request at 70.

[467] 82 F.4th at 1163-64.

[468] *Id.* at 1179.

[469] *Id.* at 1178 (citing *Birckhead v. FERC*, 925 F.3d 510, 519 (D.C. Cir. 2019) (*Birckhead*)).

[470] *Id.* (quoting *Sierra Club v. Dep't of Energy*, 867 F.3d 189, 198 (D.C. Cir. 2017) (*Freeport*)).

[471] *Id.* (quoting *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973)).

[472] *Id.*

[473] *Id.*

Contrast the instant proceeding, in which the Commission stated in the Certificate Order
that "the supply source associated with the capacity subscribed by Cascade and
Intermountain is unknown, and it is unknown whether there will be any incremental
development of production wells associated with the capacity subscribed by
Tourmaline."**474** The Commission also made clear that its approval of the Project will not
necessarily cause additional gas production and, accordingly, even knowing the identity
of a gas producer would not necessarily reveal whether additional wells would be
induced.**475** *Eagle County* is thus distinguishable and does not undermine the
Commission's finding that upstream impacts from the Project are not reasonably
foreseeable.

129.    The States and Riverkeeper dispute this conclusion, contending that there is record
evidence showing that the supply source is known and that the Project would induce
additional production.  They repeatedly assert, for instance, that the Project would result
in increased production from Western Canada.**476** The States argue that Tourmaline's
contract evinces its intent to "drill-to-fill" additional gas to supply its contracted
capacity.**477** The States also assert that the Commission's position necessarily means it is
adopting a "perfect substitution" argument by assuming that another pipeline would
necessarily take the place of GTN XPress, which it contends courts have rejected.**478** The
States and Riverkeeper then point to a dissenting Commissioner's statement in *Dominion
Transmission, Inc.*, which observed that certain prior Commission orders relied on
Department of Energy studies to provide generic estimates of upstream impacts.**479**

---

**474** Certificate Order, 185 FERC ¶ 61,035 at P 66.

**475** *Id.*; *see also* Final EIS at 4-44 ("As the Commission has stated in previous
proceedings, the environmental effects resulting from natural gas production are
generally neither caused by a proposed natural gas infrastructure project nor are they
reasonably foreseeable consequences of our approval of an infrastructure project, as
contemplated by CEQ regulations, where the supply source is unknown.  Here, the
specific source of the additional natural gas to be transported via the GTN Xpress Project
is currently unknown and may change throughout the project's operation.").

**476** States Rehearing Request at 88-91; Riverkeeper Rehearing Request at 70.

**477** States Rehearing Request at 88 (citing Lander Declaration at 9).

**478** *Id.* at 89 (citing *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d
1222, 1234-39 (10th Cir. 2017) (*WildEarth*); *Mid States Coal. for Progress v. Surface
Transp. Bd.*, 345 F.3d 520, 549 (8th Cir. 2003) (*Mid States*)).

**479** States Rehearing Request at 91 (citing *Dominion Transmission, Inc.*, 163 FERC
¶ 61,128 (2018) (LaFleur, Comm'r, dissenting in part) (*Dominion*)); Riverkeeper

Finally, the States and Riverkeeper argue that a report filed with Riverkeeper's comments on the Draft EIS provides a methodology for estimating GHG emissions associated with extracting and processing natural gas in Western Canada.[480]  We address each of these arguments in turn.

130.   The fact that the Commission recognized in the Certificate Order that gas would be transported from Western Canada does not render potential upstream impacts reasonably foreseeable.[481]  To the contrary, the Commission has found that upstream emissions were not reasonably foreseeable where shippers would source gas from unknown locations within large, diverse basins.[482]  Here, because the record makes clear that it is unknown what source will supply Cascade and Intermountain and it is unknown whether there will be any incremental development of production wells associated with the capacity subscribed by Tourmaline,[483] the fact that the gas would be sourced from Western Canada is insufficient to render the upstream emissions reasonably foreseeable.

131.   Nor did the States provide credible evidence for their claim that the Project would induce additional production in the region.  The States' reference to the Lander Declaration, which makes a generalization about producers subscribing for additional capacity and then increasing production, is unpersuasive.[484]  The Lander Declaration provides no support for this claim, other than the vague assertion that Tourmaline views the Project as a "critical element to its long-term business planning."[485]

132.   The States' argument that the Commission is wrongfully adopting a "perfect substitution" approach, for which they rely upon *WildEarth* and *Mid States*, is unpersuasive.  In *WildEarth*, the U.S. Bureau of Land Management (BLM) approved coal

---

Rehearing Request at 71 (same).

[480] States Rehearing Request at 70 (citing Riverkeeper August 22, 2022 Draft EIS Comments, Ex. A (Erickson Report)); Riverkeeper Rehearing Request at 69-71 (same).

[481] *See* Certificate Order, 185 FERC ¶ 61,035 at PP 23, 36.

[482] *See, e.g.*, *Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,148 at P 94 (finding upstream emissions not reasonably foreseeable despite the record indicating that gas would be sourced from the Marcellus shale); *Dominion*, 163 FERC ¶ 61,128 at PP 37-38 (same).

[483] *See* Certificate Order, 185 FERC ¶ 61,035 at P 66; Final EIS at 4-44.

[484] *See* States Rehearing Request at 88-89.

[485] Lander Declaration at 9.

Case: 24-60354   Document: 1-3   Page: 170   Date Filed: 07/15/2024

Document Accession #: 20240416-3093   Filed Date: 04/16/2024
USCA Case #24-1204   Document #2064211   Filed: 07/11/2024   Page 174 of 238

Docket No. CP22-2-001   - 84 -

leases for two existing surface mines in Wyoming's Powder River Basin, which together accounted for nearly 20% of the United States' annual domestic coal production.[486]  In evaluating the no-action alternative as part of its NEPA analysis, BLM concluded that selection of the no-action alternative would not decrease carbon dioxide emissions attributable to coal mining and coal-burning power plants because coal demand would remain static and, if it were to deny the leases, the forgone coal production at the two mines would be replaced by other domestic and international suppliers such that overall emissions would not be appreciably reduced.[487]  The Tenth Circuit held that this conclusion lacked record support because BLM did not point to any information indicating that the forgone coal under the no-action alternative could be supplied from somewhere else at a comparable price.[488]

133.    These facts are entirely different from those of the instant proceeding.  Unlike BLM's approval of coal leases in *WildEarth*, the Commission's certification of the GTN XPress Project in no way authorizes the additional production of natural gas.[489]  Here, the Commission only authorizes the provision of additional transportation service on GTN's system and has previously explained that it is unknown what source will supply the capacity subscribed by Cascade and Intermountain, and it is unknown whether there will be any incremental development of production wells to supply the capacity subscribed by Tourmaline.[490]  We thus disagree that the Commission is necessarily adopting a "perfect substitution" approach; rather, the Commission did not analyze upstream emissions because they are not reasonably foreseeable, which *WildEarth* does not address.

134.    *Mid States* is similarly inapplicable.  In that case, the court found an increase in coal consumption to be reasonably foreseeable where the STB authorized approximately 280 miles of new rail line to reach the coal mines in the Powder River Basin, which

---

[486] 870 F.3d at 1226-27.

[487] *Id.* at 1228-29.

[488] *Id.* at 1234.

[489] We note that the Natural Gas Wellhead Decontrol Act of 1989 removed the Commission's authority over first sales of natural gas.  *See* 15 U.S.C. § 3431(a)(1)(A), *amended by*, Pub. L. 101-60 § 3(a)(7)(A), 103 Stat. 157 (1989) ("For purposes of section 1(b) of the [NGA], the provisions of the [NGA], and the jurisdiction of the Commission under such Act shall not apply to any natural gas solely by reason of any first sale of such natural gas.").

[490] *See* Certificate Order, 185 FERC ¶ 61,035 at P 66.

would increase the supply of low-sulfur coal to power plants.[491]  As we explain above, the Commission is not authorizing an increase in natural gas production, nor does it have information about whether any increase in production would result from the Project.

135.    With respect to the *Dominion* dissent, we note that it is the duly issued order of a Commission majority, not a dissent, that carries precedential weight.[492]  In *Dominion*, the Commission majority found that upstream impacts were not reasonably foreseeable for multiple reasons, including the large geographic scope of the Marcellus and Utica Shale production areas and the impracticability of such an analysis given the lack of detailed information regarding the number, location, and timing of wells, roads, gathering lines, and other appurtenant facilities, as well as details about production methods.[493]  Thus, it did not find evaluation of Department of Energy studies to provide generic estimates of upstream impacts necessary or useful.  So too here, the Commission lacks sufficient information regarding whether there will be incremental development of production wells associated with the Project and from where the gas will be sourced.  Accordingly, the Commission's approach in this proceeding is consistent both with *Dominion* and other Commission precedent,[494] and we continue to follow it on rehearing.

136.    The States and Riverkeeper argue that the Commission erred by not relying on a report by Peter Erickson that purports to estimate the potential upstream GHG emissions associated with the Project and discern the source of supply.[495]  We disagree.  The Erickson Report states only that the gas would be sourced from Western Canada.  We have already explained that simply knowing that the gas may be sourced from Western Canada is insufficient to render potential upstream impacts reasonably foreseeable.[496]  Moreover, even if the Commission knew the identity of a producer of gas to be shipped on a pipeline and the general location of that producer's existing wells, this information would not necessarily reveal whether additional wells would be induced.  Accordingly,

---

[491] 345 F.3d at 532, 548.

[492] *See Nopetro LNG, LLC*, 180 FERC ¶ 61,057, at P 14 (2022).

[493] *Dominion*, 163 FERC ¶ 61,128 at PP 37-38.

[494] *See supra* note 459.

[495] States Rehearing Request at 91-92 (citing Riverkeeper August 22, 2022 Draft EIS Comments, ex. A (Erickson Report)); Riverkeeper Rehearing Request at 69-71 (same).

[496] *See supra* P 130 & note 482.

we find the assumptions in the Erickson Report to be speculative, and we cannot reasonably rely on the Report to inform our analysis.

137.    The States and Riverkeeper contend that, even in the absence of complete information, the Commission is not absolved from "reasonable forecasting" and should have requested additional information to the extent such information was necessary to discharge the Commission's statutory requirements.[497]  Although courts have held that NEPA requires reasonable forecasting, an agency is not required to engage in speculative analysis or do the impractical if not enough information is available to permit meaningful consideration.[498]  We also note that the supply source may change throughout the Project's operating lifetime,[499] and even if the Commission were to know the identity and general location of a producer, that information would not necessarily reveal whether the Project would induce additional wells.[500]  For these reasons, the suggestion from the States and Riverkeeper for an additional information request would not provide the information necessary to assess whether or how the Project might induce upstream GHG impacts.[501]  Accordingly, we decline to do so and continue to find that any indirect effects associated with upstream production of gas are not a reasonably foreseeable impact of the Project.

### c.    Downstream Emissions

138.    The States argue that the Commission erred by concluding that no emissions from Tourmaline's contract are reasonably foreseeable because the end use for the natural gas that will be transported by Tourmaline is not known.[502]  Specifically, the States argue that

---

[497] States Rehearing Request 90-92, 96-98; Riverkeeper Rehearing Request at 71.

[498] *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078 (9th Cir. 2011); *see also Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 534 (1978) (quoting *Morton*, 458 F.2d at 837) ("NEPA 'does not require a 'crystal ball' inquiry.'").

[499] *See* Final EIS at 4-44.

[500] *See* Certificate Order, 185 FERC ¶ 61,035 at P 66.

[501] *See E. Shore Nat. Gas Co.*, 181 FERC ¶ 61,233, at P 24 (2022).

[502] States Rehearing Request at 92.  We note that the States raised this argument in their comments on the Final EIS, *see* States December 19, 2022 Final EIS Comments at 1-4, and the Certificate Order explained that the downstream emissions associated with Tourmaline's subscribed capacity are not reasonably foreseeable because the end use for the natural gas that will be transported is not known, *see* Certificate Order, 185 FERC

Case: 24-60354     Document: 1-3     Page: 173     Date Filed: 07/15/2024

Document Accession #: 20240416-3093     Filed Date: 04/16/2024
USCA Case #24-1204     Document #2064211     Filed: 07/11/2024     Page 177 of 238
Docket No. CP22-2-001                                                              - 87 -

the Certificate Order and Final EIS departed from the Draft EIS in which Commission
staff included potential downstream emissions from Tourmaline's subscribed capacity in
its GHG analysis and made a general statement about Project shippers intending to serve
residential, commercial, and industrial users.[503]

139.   The Commission did not err by excluding potential downstream emissions
resulting from Tourmaline's transported capacity from its analysis in the Certificate
Order and Final EIS notwithstanding their inclusion in the Draft EIS.  To the contrary, it
is reasonable for changes to occur between a draft and final EIS as an agency analyzes a
project.[504]  After issuing the Draft EIS, Commission staff reasonably concluded that it
lacked the requisite information about the end uses of gas to be shipped by Tourmaline,
such that any resulting emissions are not reasonably foreseeable for the purposes of
NEPA and, accordingly, to ensure accuracy, updated its analysis in the Final EIS to
reflect only those emissions that are reasonably foreseeable.  The States question the
validity of this conclusion, arguing that the Commission did not explain why the location
and end use of the gas matters to a downstream emissions analysis.[505]  However, as this
conclusion is consistent with judicial precedent where the end use of gas is not known,
we continue to adhere to it on rehearing.[506]

140.   The States' reference to the sentence in the Draft EIS that Project capacity is
intended to serve residential, commercial, and industrial users does not undermine this
conclusion.  That sentence did not refer specifically to Tourmaline; rather, it referred to
all "Project shippers" and offered only a high-level summary of projected uses for the

---

¶ 61,035 at n.120.

[503] States Rehearing Request at 92-93; *see also* Draft EIS at 1-4 ("As provided in
its application, GTN has indicated that Project shippers which have executed precedent
agreements with GTN intend to serve residential, commercial, and industrial users.").

[504] *See City of Grapevine*, 17 F.3d at 1507 ("The very purpose of a [draft EIS] is to
elicit suggestions for change.  The resulting [final EIS] must be evaluated for what it is,
not for why the drafter may have made it so.").

[505] States Rehearing Request at 94-95.

[506] *See Delaware Riverkeeper II*, 45 F.4th at 109-10 ("[T]he the court has rejected
the notion that downstream emissions are always reasonably foreseeable effects of a
pipeline project.  The court defers to the informed discretion of the Commission,
especially where an issue requires a high level of technical expertise.") (cleaned up); *id.*
at 110-11 (holding that the Commission's "reasoning was sound" and deference was
owed where the Commission concluded that downstream emissions were not reasonably
foreseeable based uncertainty with the gas' destination and end use).

Project's capacity. The States read too much into the sentence by suggesting it is sufficient to identify the end uses of Tourmaline's capacity so as to render downstream emissions reasonably foreseeable.

141.   The States contend that the Final EIS ignored record evidence indicating the location and end use of Tourmaline's gas, citing general statements in GTN's application indicating that the gas would be delivered to West Coast markets.[507]  The Final EIS did not ignore this evidence. To the contrary, the Final EIS made an explicit finding that these general statements were insufficient to render Tourmaline's emissions reasonably foreseeable.[508]  This conclusion was a reasonable, technical judgment and, as such, is entitled to deference.[509]

### 3.   Other Laws and Policies

142.   The States and Riverkeeper argue that the Commission's NEPA analysis was deficient because it did not adequately discuss whether the Project is consistent with the laws, policies, and commitments of various jurisdictions.[510]  Specifically, the States argue that the Commission failed to analyze whether the Project is inconsistent with Washington's emission limits and the state's Climate Commitment Act,[511] Oregon's Climate Protection Program,[512] and several California policies and programs.[513]  The States also argue that the Commission should have considered whether the Project is

---

[507] States Rehearing Request at 96.

[508] *See* Final EIS at 4-44 ("Tourmaline is a Canadian natural gas producer and it's unclear where the gas would be delivered and for what end-use, aside from general statements about West Coast markets. Therefore, we cannot estimate the nature or location of end use of Tourmaline subscribed capacity, so, we conclude that downstream emissions from Tourmaline's subscribed capacity are not reasonably foreseeable."); *see also* Certificate Order, 185 FERC ¶ 61,035 at n.120 ("Tourmaline is a natural gas producer and the end use for the natural gas which will be transported using its subscribed capacity is not known.").

[509] *See supra* note 506.

[510] States Rehearing Request at 98-108; Riverkeeper Rehearing Request at 62-65.

[511] States Rehearing Request at 100-101.

[512] *Id.* at 101-102.

[513] *Id.* at 103-105.

consistent with international commitments and national policy.[514]  Riverkeeper relatedly argues that the Commission's NEPA analysis failed to explain whether the Project would be consistent with NEPA's overarching goals of environmental protection, as well as other unspecified environmental policies, standards, and laws.[515]  Riverkeeper asserts that meeting various policy commitments requires an immediate phase-out of the production and consumption of fossil fuels.[516]  The States and Riverkeeper argue that such analyses are compelled under NEPA's implementing regulations,[517] CEQ policy,[518] and caselaw.[519]

143.    These arguments fail because they call for analysis that is outside the scope of the Commission's NEPA review.  In the Final EIS, Commission staff explained that the Commission does not engage in regional resource planning, and thus such issues are outside the scope of the Final EIS.[520]  Commission staff also explained that information related to how the Project could increase reliance on fracked gas and how the Project could prolong the region's reliance on fossil fuels, as well as its impacts on the transition to renewable energy were similarly outside the scope of the Final EIS.[521]  Moreover, the Final EIS acknowledged the emissions reduction goals (or lack thereof) for each of the

---

[514] *Id.* at 106-108.

[515] Riverkeeper Rehearing Request at 62-63.

[516] *Id.* at 64-65.

[517] *See* States Rehearing Request at 98-99 (citing 40 C.F.R. §§ 1502.2, 1506.2(d)(2023)); Riverkeeper Rehearing Request at 63, 65 (citing 40 C.F.R. § 1502.2(d)).

[518] *See* Riverkeeper Rehearing Request at 63 (citing CEQ Interim Guidance; Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews, 81 Fed. Reg. 51,866 (Aug. 5, 2016)).

[519] *See id.* (citing *California ex rel. Imperial Cnty. Air Pollution Control Dist. v. Dep't of the Interior*, 767 F.3d 781, 798 (9th Cir. 2014); *Mont. Wilderness Ass'n v. McAllister*, 658 F.Supp.2d 1249, 1252–53 (D. Mont. 2009)).

[520] Final EIS at 1-5; *see also* Certificate Order, 185 FERC ¶ 61,035 at P 24 (quoting *Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,148 at P 82) ("The Commission's role under the NGA is to decide 'whether to adopt an applicant's proposal and, if so, to what degree, not to engage in resource planning for energy end-users.'").

[521] *Id.*

States of Washington, Idaho, and Oregon and identified the percentage that the Project's reasonably foreseeable emissions would constitute of Washington's and Oregon's reduction goals.**522** Because the Final EIS properly discussed the interaction with state and federal law to the extent it was relevant to the analysis being undertaken, the authorities cited by the States and Riverkeeper are inapposite. As we have previously explained, we are unable to determine whether a project's GHG emissions comply with those goals or laws.**523** We accordingly disagree that anything further was required.

### 4. Mitigation

144. The States argue that Commission staff failed to include a reasonably complete discussion of mitigation measures in its environmental review.**524** Specifically, the States allege that the Commission's declination to determine the significance of the Project's climate change impacts resulted in the omission of mitigation measures for those impacts.**525** The States argue that the Final EIS did not adequately respond to EPA's recommendation that the Commission consider and incorporate mitigation measures to reduce the Project's GHG emissions.**526** The States also allege that the Commission should have clarified which mitigation measures support its conclusion that the Project is environmentally acceptable.**527**

145. We continue to find the discussion of mitigation to be consistent with our obligations under NEPA. The courts have made clear that NEPA does not require the formulation of a specific mitigation plan, only that mitigation is discussed in "sufficient detail to ensure that environmental consequences have been fairly evaluated."**528** The

---

**522** *See* Final EIS at 4-49.

**523** *See supra* P 119.

**524** States Rehearing Request at 108-111.

**525** *Id.* at 108 (noting that none of the environmental conditions in the Certificate Order pertain to GHG emissions or climate change impacts).

**526** *Id.* at 109.

**527** *Id.* at 110.

**528** *Sierra Club v. FERC*, 38 F.4th at 233 (quoting *Methow Valley*, 490 U.S. at 352); *see also Mayo v. Reynolds*, 875 F.3d 11, 15-16 (D.C. Cir. 2017) (recognizing that the role of NEPA analysis is primarily information-forcing, imposes only procedural requirements, and does not impose a duty on agencies to include "a detailed explanation of the specific measures which will be employed to mitigate the adverse impacts of a proposed action") (quoting *Methow Valley*, 490 U.S. at 353); *Miss. River Basin Alliance*

Case: 24-60354     Document: 1-3     Page: 177     Date Filed: 07/15/2024

Document Accession #: 20240416-3093     Filed Date: 04/16/2024
USCA Case #24-1204     Document #2064211     Filed: 07/11/2024     Page 181 of 238

Docket No. CP22-2-001                                                    - 91 -

Supreme Court has made clear that NEPA does not mandate particular results, including specific mitigation measures to mitigate the adverse effects of major federal actions.[529]

146.    Here, Commission staff published a Final EIS that identifies baseline conditions for all relevant resources, assesses impacts that would result from construction and operation of the Project on those resources, assesses reasonable alternatives, and, as necessary, makes recommendations to mitigate impacts.  The Final EIS includes a fulsome discussion of construction and operational emissions impacts and their mitigation, downstream GHG emissions, the impact on climate change, and an analysis of the social cost of GHGs.[530]  Additionally, as acknowledged by the States, the Final EIS responds to the EPA's comments by noting that GTN represented that it is focused on modernizing its existing natural gas assets to facilitate a reduction in GHG emissions as well as minimizing GHG emissions during the construction and operation of new natural gas infrastructure.[531]  The Final EIS provided a list of staff's recommended mitigation measures and concluded that with these measures the Project as proposed is the preferred alternative to meet the Project's objectives.[532]  We find that a further discussion of mitigation measures would exceed the rule of reason and would not meaningfully inform the Commission's or the public's consideration of the proposed project and alternatives.[533]  We disagree with the States' argument that anything more was required to satisfy our obligations under NEPA.

147.    The States also argue that the Certificate Order failed to include a request from the Washington State Department of Fish and Wildlife discussed in the Final EIS that native

---

*v. Westphal*, 230 F.3d 170, 176-77 (5th Cir. 2000) (acknowledging that NEPA does not impose a substantive requirement that a complete mitigation plan be actually formulated and adopted).

[529] *See Methow Valley*, 490 U.S. at 350, 352.

[530] Final EIS at 4-37 to 4-51.

[531] Final EIS at 4-43; *see also* States Rehearing Request at 108 (acknowledging that the Final EIS contained a discussion of these mitigation measures).

[532] Final EIS at 5-1 to 5-6 (listing the mitigation measures recommended by Commission staff); *see also* Certificate Order, 185 FERC ¶ 61,035, app. (listing the environmental conditions with which GTN is required to comply).

[533] *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) ("[I]nherent in NEPA and its implementing regulations is a 'rule of reason.'"); *Mayo v. Reynolds*, 875 F.3d at 20 ("The rule of reason governs [a court's] review of an agency's environmental analysis.").

grasses and shrubs be used for restoration, and that it is unclear to what extent the Commission considered mitigation measures to reduce impacts to the surrounding communities.[534] These arguments are legally and factually infirm. As stated above, NEPA does not require the discussion or implementation of any specific mitigation measures. The Final EIS discussed GTN's willingness to use native grasses and shrubs for restoration[535] but this does not compel its inclusion as an environmental condition in the Certificate Order. Moreover, the Commission concluded that GTN has taken appropriate steps to minimize adverse impacts on any landowners and communities affected by the Project,[536] so it is unclear what impacts the States are referring to when they suggest that additional mitigation was required. As the States do not provide any support or explanation for this argument, and in light of the fact that mandated additional mitigation is inconsistent with established judicial precedent, we disagree that anything more was required.

### 5.    Connected Actions

148.    The States and Riverkeeper argue that the GTN XPress Project is a "connected action" with the 2.55 replacement facilities.[537] Specifically, Riverkeeper argues that the replacement facilities and the GTN XPress Project are functionally interdependent because the projects function together as a single whole.[538] According to Riverkeeper, since the replacement compressors have more horsepower than the previous compressors and were merely programmed to have operational limits equal to those of the replaced compressors, the replacement facilities were necessarily prerequisite actions to the GTN XPress Project, such that the projects are functionally part of a single expansion.[539] Riverkeeper also argues that the projects are temporally connected, asserting that GTN completed its replacement of the compressors near the time it filed its application for the GTN XPress Project, and that GTN held an open season for capacity that factored in the

---

[534] States Rehearing Request at 110-111.

[535] *See* Final EIS at 4-15 (stating that GTN should coordinate with Washington Department of Fish and Wildlife regarding the types of grasses and shrubs that would be used to restore affected lands for the ferruginous hawk).

[536] *See* Certificate Order, 185 FERC ¶ 61,035 at P 38; *see also id.* P 91 ("In addition, both the draft EIS and final EIS find that project impacts on environmental justice communities would be less than significant. We agree.").

[537] States Rehearing Request at 122-123; Riverkeeper Rehearing Request at 48-49.

[538] Riverkeeper Rehearing Request at 48.

[539] *Id.* at 48-49.

150,000 Dth/d that would be provided by the GTN XPress Project prior to replacing the compressors.[540]

149.    NEPA's implementing regulations provide that actions are "connected" if they:  (i) automatically trigger other actions that may require environmental impact statements; (ii) cannot or will not proceed unless other actions are taken previously or simultaneously; or (iii) are interdependent parts of a larger action and depend on the larger action for their justification.[541]  In the context of natural gas infrastructure projects, the D.C. Circuit has focused on the projects' "degree of physical and functional interdependence and their temporal overlap."[542]

150.    We disagree that the GTN XPress Project and the replacement facilities are connected actions for the purposes of NEPA.  As an initial matter, section 2.55 of the Commission's regulations provides pre-granted or automatic authority for the construction of qualifying auxiliary and replacement facilities.  Activities undertaken pursuant to section 2.55 may only use existing rights-of-way and previously used workspaces, and are limited to facilities that will replace existing facilities that were subject to environmental review and relatively minor auxiliary facilities to obtain more efficient operation or economical operation of other facilities that have been or will be subject to environmental review.[543]  Further, replacements under section 2.55(b) are limited to areas previously subject to the Commission's environmental review and approval and must conform to the mitigation measures resulting from that review.[544]  In light of these limitations, replacements under section 2.55 do "not require an individual, facility-specific section 7(c) certificate authorization."[545]  For these reasons, the Commission's regulations expressly do not require an environmental assessment for

_____

[540] *Id.* at 49.

[541] 40 C.F.R. § 1501.9(e)(1) (2023).

[542] *Food & Water Watch*, 28 F.4th at 291; *see also* Riverkeeper Rehearing Request at 46.

[543] 18 C.F.R. § 2.55(a), (b) (2023); *see also Tenn. Gas Pipeline Co.*, 156 FERC ¶ 61,157, at P 104 (2016).

[544] Order No. 790, 145 FERC ¶ 61,154 at PP 15, 27.

[545] *Id.* P 2; *see also id.* P 16 ("By providing non-case specific certificate authorization for limited classes of facilities, the section 2.55 and blanket certificate regulations permit companies to satisfy the requirements of section 7(c) without having to apply for individual case-specific certificates for each and every modification to their systems.").

section 2.55 replacement facilities,[546] reflecting that the Commission already made the determination beforehand in its rulemaking proceeding that the replacement facilities do not have significant environmental effects.[547] Here, as discussed above, we have found that GTN undertook replacement activities at certain previously-certificated natural gas compressor facilities as allowed under section 2.55(b). While GTN was required to notify the Commission of its planned section 2.55 replacement activities, no Commission action was required in response to that notification. The Commission, therefore, did not impermissibly segment its NEPA analysis, which involves an agency dividing a major federal action into smaller components to avoid the preparation of an EIS.[548]

151.   Additionally, in this case, Commission staff *did* produce a comprehensive EIS that considered the potential impacts of adding 150,000 Dth/d of capacity to GTN's system by modifying the replaced facilities with which Riverkeeper is concerned.[549]  Riverkeepers'

_____

[546] 18 C.F.R. § 380.5(b)(1) (2023) (excepting projects constructed pursuant to section 2.55 from the EA requirement); *see also Tenn. Gas Pipeline Co.*, 156 FERC ¶ 61,157 at P 104.  For each of the 2.55 compressor replacements, Commission staff issued an "Environmental Assessment Report."  *See* Athol EAR; Kent EAR; Starbuck EAR.  These are one-page documents that simply conclude that GTN adequately addressed the requirements set forth under section 2.55(b)(3).

[547] *See Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1097 (9th Cir. 2013) (explaining that a connected actions analysis only applies to EISs and is not required where an agency has made a prior determination that the proposed action will not have significant impacts).

[548] *See, e.g.*, *Save Barton Creek Ass'n v. FHWA*, 950 F.2d 1129, 1139 (5th Cir. 1992) ("Segmentation cases consider only whether a federal project has been improperly segmented to avoid compliance with NEPA."); *Coal. On Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 68 (D.C. Cir. 1987) (*Dole*) ("Agencies may not evade their responsibilities under NEPA by artificially dividing a major federal action into smaller components, each without 'significant' impact."); *City of W. Chicago, Ill. v. U.S. Nuclear Regul. Comm'n*, 701 F.2d 632, 650 (7th Cir. 1983) ("Segmentation allows an agency to avoid the NEPA requirement that an EIS be prepared for all major federal action with significant environmental impacts by segmenting an overall plan into smaller parts involving action with less significant environmental effects.").

[549] *See* Final EIS at ES-1 (stating that the proposed action being considered includes modifications to three existing compressor stations); *see also id.* section 4.0 Environmental Analysis (discussing potential impacts as the result of such modifications to:  (i) Geology; (ii) Soils; (iii) Groundwater; (iv) Vegetation; (v) Wildlife and Protected Species; (vi) Cultural Resources; (vii) Socioeconomics and Environmental Justice; (viii) Land Use; (ix) Air Quality and Climate Change; (x) Noise; (xi) Safety and Reliability;

reliance on *Delaware Riverkeeper I* throughout its argument is thus misplaced.**550**  In *Delaware Riverkeeper I*, the court held that the Commission impermissibly segmented its environmental review of four related pipeline upgrades by producing an EA for one of the upgrades that did not consider the three other projects, which were all constructed in rapid succession.**551**  Those facts differ markedly from the instant case where the Commission's regulations exempted the replacement facilities from environmental review and Commission staff produced a comprehensive EIS to analyze the potential impacts from increasing capacity on the system.  Thus, the Commission did not segment its environmental review.

### 6.    Environmental Justice

152.    The States and Riverkeeper raise several arguments related to the Commission's environmental justice analysis.  They first argue that the Commission failed to adequately assess both climate impacts on environmental justice communities and cumulative impacts because the Commission did not determine the significance of GHG emissions.**552**  As discussed above, the Commission satisfied its obligations under NEPA with respect to significance; we need not repeat the discussion here.

153.    The States next argue that the Commission's environmental justice analysis did not include sufficient information about existing public health disparities near Starbuck Station associated with high levels of certain air pollutants relative to other EPA regional percentiles.**553**  Specifically, the States assert that the Final EIS did not meaningfully consider data on particulate matter 2.5 (PM 2.5), ozone, and diesel particulate matter in the area within five miles of the Starbuck Station.**554**  This is incorrect.  The Final EIS

─────────────────────

and (xii) Cumulative Impacts).

**550** *See* Riverkeeper Rehearing Request at 47-50 (citing *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304 (D.C. Cir. 2014) (*Delaware Riverkeeper I*)).

**551** *See Delaware Riverkeeper I*, 753 F.3d at 1308-09.

**552** States Rehearing Request at 124; Riverkeeper Rehearing Request at 75.

**553** States Rehearing Request at 124-125.

**554** *Id.* at 125.  We are addressing the arguments explicitly made by the States in their rehearing request.  To the extent the States attempt to incorporate by reference arguments raised in their comments on the Draft EIS or EPA's scoping comments, those arguments are not properly before us on rehearing and are rejected.  *See Mountain Valley Pipeline LLC*, 163 FERC ¶ 61,197 at P 16 ("[T]he Commission 'has rejected attempts to incorporate by reference arguments from a prior pleading because such incorporation fails to inform the Commission as to which arguments from the referenced pleading are

provided a comprehensive discussion of the potential impacts from construction and operational emissions at Athol and Starbuck Compressor Stations where staff identified environmental justice block groups within the Project impact area. The Final EIS also discusses potential impacts for the pollutants referenced by the States in their rehearing request,[555] and found that both construction and operational air emissions would be below the National Ambient Air Quality Standards (NAAQS) for all pollutants.[556] Further, as noted in the Final EIS, in response to comments expressing concerns about emissions and impacts on air quality and environmental justice communities, the Commission requested that GTN model and identify the radius of impact for any pollutants that exceeded Significant Impact Level (SIL) air concentration values.[557] EPA has indicated that a modeled result predicting that a proposed source's maximum impact will be below the SIL value for a criteria pollutant is considered to be a sufficient demonstration that the proposed source will not cause or contribute to a violation of the applicable NAAQS.[558]

154. The Final EIS indicates that, in large part, emissions attributable to the Project facilities would not exceed SILs, and for the two pollutants that did exceed SILs, they would only do so within 0.25 mile of the Starbuck Compressor Station.[559] In the Final EIS, Commission staff indicated that the Starbuck Compressor Station is located in a remote part of southeast Washington, the closest residence is located approximately 0.5 miles from the Starbuck Compressor Station, and the nearest identified sensitive receptors to the station, a school and playground, are located approximately 16 miles away.[560] The Commission adopted these findings in the Certificate Order.[561] We disagree that anything more was required.

---

relevant and how they are relevant.'") (quoting *San Diego Gas & Elec. Co. v. Sellers of Mkt. Energy*, 127 FERC ¶ 61,269, at P 295 (2009)).

[555] *See* Final EIS at 4-37 to 4-44.

[556] *Id.* at 4-32.

[557] *Id.* at 4-23.

[558] *See* EPA, Legal Memorandum: Application of Significant Impact Levels in the Air Quality Demonstration for Prevention of Significant Deterioration Permitting under the Clean Air Act, at 9-13 (undated).

[559] Final EIS at 4-23 to 4-24.

[560] *Id.* at 4-30.

[561] *See* Certificate Order, 185 FERC ¶ 61,035 at P 86.

155.    The States argue that the Commission staff's finding in the Final EIS that the
"Project would not have a significant long-term adverse impact on air quality and would
not result in a significant cumulative impact on air quality" constituted an unlawful
reversal from the statement in the Draft EIS that "[o]peration of the [P]roject would result
in long-term impacts on air quality."**562**  These statements are not inconsistent and do not
reflect a reversal in the Commission's conclusion.  The statement referenced in the Final
EIS found "that the Project *would not have a significant long-term adverse* impact on air
quality"**563** whereas the statement in the Draft EIS spoke neither to whether the impact
would be significant nor adverse.  In fact, the Draft EIS recognized that the Project would
not "significantly contribute to operational air quality impacts" and that the Project would
not contribute to an exceedance of the NAAQS or to cumulative impacts on
environmental justice communities related to air quality.**564**  There is thus no reversal or
impermissible disconnect between the Draft EIS and Final EIS on this issue.
Consequently, we find that the air quality analysis for the Project, including analysis of
cumulative air quality impacts, provided sufficient information about existing public
health disparities near Starbuck Station associated with high levels of air pollutants,
including PM 2.5 and ozone relative to other EPA regional percentiles.

156.    The States dispute Commission staff's use of the NAAQS as a comparative metric
for analyzing air quality impacts, noting the acknowledgement in the Final EIS that the
NAAQS may not assure there is no localized harm from certain pollutants.**565**  The D.C.
Circuit has affirmed the Commission's use of the NAAQS, however, as a comparative
metric in its NEPA analyses and we continue to find use of the NAAQS to be a
reasonable choice here.  In *Sabal Trail*, the court stated that "the Commission
appropriately relied on EPA's NAAQS as a standard of comparison for air-quality
impacts," and "by presenting the project's expected emissions levels and the NAAQS
standards side-by-side, the EIS enabled decision makers and the public to meaningfully

---

**562** States Rehearing Request at 125-126 (citing Final EIS at 4-61; Draft EIS at 4-
31).

**563** Final EIS at 4-61 (emphasis added).

**564** Draft EIS at 4-31 ("The Project would not significantly contribute to
operational air quality impacts and all facilities would be required to be in compliance
with all applicable federal air quality permitting programs.  Therefore, we conclude that
the Project would not cause or significantly contribute to an exceedance of the NAAQS
and cumulative impacts on environmental justice communities related to air quality.");
*see also id.* at 4-35, 4-39 (stating that anticipated incremental and cumulative
construction and operational emissions would be below the NAAQS for all pollutants).

**565** States Rehearing Request at 126 (citing Final EIS at 4-32 to 4-33).

evaluate the project's air-pollution effects by reference to a generally accepted standard."**566**

157.    Riverkeeper also argues that the Final EIS's use of a one-mile radius for delineating the area potentially affected by the Project was unreasonable given the Project's alleged contribution to climate change, air quality, and safety risks.**567**  We disagree.**568**  As a threshold matter, we note both that Riverkeeper did not offer an alternative radius size that it believes would have rendered Commission staff's environmental justice analysis sufficient, and we note that the Commission's reasonable choice of radius size for an environmental justice analysis is entitled to deference.**569**

158.    As to Riverkeeper's allegation that the choice of radius size was unreasonable for purposes of climate change, the Final EIS explained that GHG emissions do not result in proportional local and immediate impacts, but rather it is the combined concentration in the atmosphere that affects the global climate system.**570**  In other words, a project one mile away emitting one ton of GHGs would contribute to climate change in a similar manner as a project 2,000 miles away also emitting one ton of GHGs.**571**  Accordingly, expanding the radius of review for the purpose of an environmental justice analysis in the

---

**566** *See Sierra Club v. FERC*, 867 F.3d 1357, 1370 n.7 (D.C. Cir. 2017) (*Sabal Trail*) (cleaned up).  In the same paragraph of their rehearing request, the States assert that "[i]t also remains unclear how the Commission factored gas releases and leaks into its air quality and environmental justice analyses."  States Rehearing Request at 126.  The States, however, provide no evidence, analysis, or citations to substantiate or explain this assertion and we accordingly reject it.  *See Commonwealth LNG, LLC*, 183 FERC ¶ 61,173 at P 23 (citing *Turlock Irrigation Dist.*, 140 FERC ¶ 61,207, at P 27 (2012) ("This is nothing more than a bald assertion…and is waived for lack of specificity.")).

**567** Riverkeeper Rehearing Request at 73-74.

**568** The Certificate Order explains that "[s]taff determined that a 1-mile radius was sufficiently broad considering the likely concentration of air emissions, noise, and traffic impacts proximal to the construction activities."  Certificate Order, 185 FERC ¶ 61,035 at n.157.

**569** *See Cmtys. Against Runway Expansion*, 355 F.3d at 689 (holding that the Federal Aviation Administration's reasonable choice of geographic area for its environmental justice analysis was entitled to deference).

**570** Final EIS at 4-46.

**571** *Id.*

context of GHG emissions would not provide additional useful information to the Commission or the public.**572**

159.   Riverkeeper's arguments for a wider radius with respect to air quality risks fare no better. These are simply a repackaged version of Riverkeeper's argument that using the NAAQS as a comparative metric for analyzing air quality impacts is insufficient.**573** However, as discussed above, the D.C. Circuit has explicitly held that such analysis is sufficient for the Commission to meet its NEPA obligations.**574**  To the extent Riverkeeper may be attempting to argue that its views with respect to the NAAQS could preclude the Commission from authorizing the Project, such an argument runs contrary to long-established NEPA precedent.**575**  Here, we find that the NAAQS provide an effective comparative standard to support the conclusion that construction and operational air emissions from the project will not have an adverse air quality impact on environmental justice communities beyond the one-mile radius of review.

160.   Finally, Riverkeeper argues for a wider radius of review for safety impacts based on its unsupported assertion that the GTN XPress Project will result in increased safety risks to environmental justice communities extending beyond one mile in the event of a failure along the pipeline connected to this Project.  Riverkeeper cites only to its own generalized discussion of safety impacts in a later section of its rehearing request.**576** Although we address Riverkeeper's arguments regarding the Project's safety impacts in the following subsection, we reject this argument within the context of Commission staff's environmental justice analysis as unsupported because Riverkeeper provides no alternative radius size that it believes would sufficiently address safety impacts to

---

**572** Riverkeeper includes as part of this argument an assertion that the Commission should have determined the significance of GHG emissions.  Riverkeeper Rehearing Request at 75.  We reject this argument for the reasons stated above.  *See supra* section III(D)(2)(a).

**573** *See id.* at 75-76 (arguing that a one-mile radius is improper because the fact that the Project's anticipated incremental and cumulative emissions are below the NAAQS is insufficiently protective).

**574** *See supra* P 156.

**575** *See Methow Valley*, 490 U.S. at 350 ("[I]t now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process.  If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.") (citations omitted).

**576** Riverkeeper Rehearing Request at 76.

environmental justice communities nor does it justify extending our radius of review to encompass safety concerns along GTN's entire mainline.[577]

161.   The States also argue that the Final EIS only considered cumulative impacts for the Kent Compressor Station and did not include the Starbuck or Athol stations in its analysis.[578]   To the contrary, the Final EIS explicitly found that "[n]o other projects were identified within the geographic scopes for the Starbuck Compressor Station and the Athol Compressor Station."[579]   The Final EIS discussion referenced in the States' rehearing request focused on the Kent Compressor Station because only one reasonably foreseeable project—the Kent Launcher/Receiver Project—was identified within the geographic scope for the cumulative impacts analysis and that project was within the scope of the Kent Compressor Station.[580]   Accordingly, it is not that the Final EIS omitted the Athol and Starbuck Compressor Stations from its analysis, but rather that only the Kent Compressor Station had another reasonably foreseeable project that could be included in the cumulative analysis for air emissions.   We also note that the Final EIS found, notwithstanding the presence of the Kent Launcher/Receiver Project, that the GTN XPress Project would not result in a significant cumulative impact on air quality.[581]

162.   Riverkeeper argues that the Commission failed to adequately include environmental justice communities, including Tribes, in the decision-making process.[582]   Riverkeeper specifically identifies comments on the Draft EIS from the Columbia River Inter-Tribal Fish Commission (CRITFC), in which it asserts that the CRITFC requested "proper tribal consultation."[583]   These comments, however, did not request Tribal consultation, but rather questioned whether there is public need for the GTN XPress Project and asserted that the Tribes may have provided additional analysis that could

---

[577] *See supra* P 157; *see also Minisink*, 762 F.3d at 112 ("In reviewing an agency's compliance with NEPA, the rule of reason applies, and we consistently decline to flyspeck an agency's environmental analysis.") (cleaned up).

[578] States Rehearing Request at 126.

[579] Final EIS at 4-59; *see also* Certificate Order, 185 FERC ¶ 61,035 at P 88.

[580] *Id.*

[581] Final EIS at 4-60 to 4-61.

[582] Riverkeeper Rehearing Request at 73.

[583] *Id.*

have borne upon the Commission's determination if additional Tribal consultation had occurred.[584]  CRITFC has not attempted to further press this argument on its own behalf.

163.    We disagree with Riverkeeper's broader position that environmental justice communities lacked the ability to adequately participate in this proceeding.  As stated in the Final EIS, Commission staff mailed the Notice of Application and Notice of Intent (NOI) to Prepare an EIS to "Federal and state resource agencies; elected officials; environmental groups and non-governmental organizations; Indian Tribes; potentially affected landowners; all residents (including members of environmental justice communities) within ½ mile of the compressor stations, local libraries and newspapers; and other stakeholders who had indicated an interest in the Project."[585]  Specifically with respect to Tribal consultation, Commission staff contacted and sent the NOI to Tribes that may attach religious or cultural significance to sites in the region or may be interested in potential Project impacts on cultural resources, including the four Tribes that compose the CRITFC; no Tribe filed a response to these communications in the record.[586]  GTN also conducted its own environmental justice community outreach,[587] including communications with Tribes.[588]  We believe this outreach enabled the public, including environmental justice communities and Tribes, to meaningfully participate in this proceeding and, accordingly, disagree that anything further was required.[589]

### 7.    Safety Impacts

164.    Riverkeeper argues that the Final EIS failed to adequately consider the safety impacts that may result from the Project.  Specifically, Riverkeeper points to three filings

[584] *See* CRITFC August 22, 2022 Draft EIS Comments.

[585] Final EIS at 4-21.

[586] *See id.* at 4-17.

[587] *See id.* at 4-21.

[588] *See id.* at 4-17.

[589] Meaningful involvement of potentially affected environmental justice community residents includes:  (1) people have an appropriate opportunity to participate in decisions about a proposed activity that may affect their environment and/or health; (2) the public's contributions can influence the regulatory agency's decision; (3) community concerns will be considered in the decision-making process; and (4) decision makers will seek out and facilitate the involvement of those potentially affected.  EPA, *Learn About Environmental Justice* (last updated Feb. 6, 2024), https://www.epa.gov/environmentaljustice/learn-about-environmental-justice.

that it alleges highlight safety and compliance concerns with TC Energy (of which GTN is a subsidiary) and thus undermines the sufficiency of analysis in the Final EIS.[590] Riverkeeper asserts that the Commission should have prepared a supplemental EIS as a result of the information in these filings.[591]

165.    We disagree as to both the probative value of the information in these filings and Riverkeeper's assertion that a supplemental EIS is required.  The filings reference a fire that occurred in July 2023 in Virginia on the Columbia Gas Transmission Pipeline and an oil spill in December 2022 in Kansas on the Keystone Pipeline as evidence for why the Commission should not trust that the GTN system will be safely operated when additional capacity is introduced.  None of the filings, however, offer any explanation for why a fire or oil spill on different pipeline systems, in different parts of the country, should bear upon the Commission's analysis of introducing additional natural gas capacity onto the GTN system.  Without further explanation of such a connection, we disagree that the Commission's analysis of the potential safety impacts was insufficient.

166.    Accordingly, a supplemental EIS is not required in this instance.  In *Marsh v. Oregon Natural Resources Council*, the Supreme Court explained that an agency's decision to prepare a supplemental EIS is governed by a "rule of reason" and that an agency need not supplement an EIS every time new information comes to light after an EIS is finalized, for to do so "would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."[592]  An agency's determination of whether a supplemental EIS is needed "implicates substantial agency expertise" and is thus governed by the arbitrary and capricious standard and is entitled to deference.[593]  The D.C. Circuit has made clear that a supplemental EIS "must only be prepared where new information provides a

---

[590] Riverkeeper Rehearing Request at 78-79 (citing Pipeline Safety Trust July 25, 2023 Comments; Riverkeeper et al. July 26, 2023 Emergency Request to Deny GTN XPress Project or Remove it from July FERC Agenda; Senators Jeffrey Merkley, Patty Murray, Maria Cantwell, Ron Wyden October 18, 2023 Letter).

[591] *Id.* at 79.

[592] 490 U.S. 360, 373 (1989) (*Marsh*).

[593] *Id.* at 375-76; *see also Friends of Cap. Crescent Trail v. FTA*, 877 F.3d 1051, 1059 (D.C. Cir. 2017) ("If an agency's decision not to prepare a [supplemental EIS] turns on a factual dispute the resolution of which implicated substantial agency expertise, the court defers to the agency's judgment.") (quoting *Marsh*, 490 U.S. at 376).

*seriously* different picture of the environmental landscape."[594]  The information in these filings does not rise to such a standard.

167.    Moreover, the Final EIS explains that it is the Department of Transportation (DOT), through the Pipeline and Hazardous Materials Safety Administration (PHMSA), that administers the national regulatory program to ensure the safe transportation of natural gas and other hazardous materials by pipeline.[595]  The Final EIS also states that the Project would be designed, constructed, operated, and maintained in accordance with the DOT Minimum Federal Safety Standards.[596]  PHMSA is the agency authorized by Congress to determine the pipeline safety standards that must be adhered to, and we appropriately rely on its expertise here to set the safety standards with which GTN is, and will continue to be, required to comply.[597]

168.    For this reason we also are unpersuaded by Riverkeeper's unsupported assertions that the record lacks evidence that GTN's existing facilities will function safely under increased capacity and that there is record evidence suggesting both that DOT's maintenance requirements are insufficient and that TC Energy and GTN have previously avoided compliance obligations.[598]  According to Riverkeeper, the Commission abdicated its duty to address the safety of the Project's facilities and improperly relied on DOT when it is unclear that DOT will adequately enforce compliance with its own regulatory

---

[594] *Stand Up for Cal.! v. U.S. Dep't of the Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021) (emphasis in original) (quoting *Friends of Cap. Crescent Trail*, 877 F.3d at 1060).

[595] Final EIS at 4-54.

[596] *Id.* at 4-55 (citing 49 C.F.R. pt. 192 (2023)).

[597] *See, e.g.*, *Murray Energy Corp. v. FERC*, 629 F.3d 231, 240 (D.C. Cir. 2011) (explaining that the Commission properly relied on compliance with PHMSA requirements in evaluating the need for additional safety measures); *Millennium Pipeline Co., LLC*, 161 FERC ¶ 61,229, at P 134 (2017) ("In carrying out its NEPA responsibilities, Commission staff relies on other agencies' expertise ...."); *Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048, at P 203 (2016) ("[T]he Commission is entitled to rely on an agency's expertise.  The Commission's capability to assess different types of environmental impacts, while extensive, is not infinite.  Accordingly, we routinely rely on the expertise of other agencies to evaluate the environmental or *safety impacts* of proposed projects, provided we are satisfied as to their competence and the validity of their basic data and analysis.") (emphasis added).

[598] Riverkeeper Rehearing Request at 79-80.

requirements.**599**  The Commission did no such thing.  Commission staff fully analyzed the Project's potential safety and reliability impacts and appropriately relied on PHMSA as the expert agency for pipeline safety to prescribe the necessary standards with which the Project will be obligated to comply.**600**  We disagree that anything more is required.

### 8.    Wildfire Risk and Climate Resilience

169.    The States advance several related arguments alleging deficiencies with the Commission's analysis of wildfire risks and climate resiliency, all of which lack merit.**601**  The States first argue that the Final EIS failed to analyze the wildfire risk or climate resiliency of other alternatives, including the no-action alternative.**602**  They also argue that the Final EIS improperly found that the Project facilities would not be subject to significant wildfires, which they claim runs counter to evidence presented in their comments on the Draft EIS.**603**  Finally, the States dispute the finding in the Final EIS that the Project facilities would not be subject to significant wildfires because they are in unforested areas.**604**

170.    Each of these arguments fails because the Final EIS adequately discussed risks from wildfires and climate resilience potentially associated with the Project.  As stated above, the Final EIS makes clear that the Project's facilities would be designed and installed in accordance with DOT's Minimum Federal Safety Standards, to provide adequate protection from hazards that could cause the facilities to move due to washouts, floods, subsidence, landslides and earthquakes.**605**  The Final EIS also explains that, according to the U.S. Forest Service, the Starbuck Compressor Station is in an area classified as having a low and moderate wildfire hazard potential; the Kent Compressor Station is located in areas classified as non-burnable and areas having moderate wildfire hazard potential; and the Athol Compressor Station is located in areas classified as

---

**599** *Id.* at 80.

**600** *See* Final EIS at 4-54 to 4-56.

**601** States Rehearing Request at 127-129.

**602** *Id.* at 127.

**603** *Id.* at 127-128.

**604** *Id.* at 128-129.

**605** Final EIS at 4-49.

non-burnable and areas having low and moderate wildlife hazard potential.**606**
Additionally, an existing rock apron also surrounds the compressor station facilities for a
break in the path of a potential wildlife and GTN Operations maintains an Emergency
Response Plan that includes wildfire response measures.  This plan is reviewed yearly
with local fire departments to ensure alignment in response to wildfires as well as to
maintain updated contact information.**607**  Although the States dispute the sufficiency of
these measures and argue there is greater potential for wildfire near the Project's facilities
than acknowledged in the Final EIS, we continue to find that relying on the expertise of
the U.S. Forest Service and GTN's Emergency Response Plan is appropriate to discharge
our NEPA obligations on this issue.  Additionally, Commission staff appropriately did
not analyze the potential for wildfire risks and climate resiliency for alternatives that
were rejected on other grounds.**608**

---

**606** *Id.*

**607** *Id.*

**608** *See Alaska LNG*, 67 F.4th at 1182 (recognizing that agencies may reject
alternatives that will be impractical or fail to further the proposed action's purpose after
only brief discussion).

Document Accession #: 20240416-3093    Filed Date: 04/16/2024
Docket No. CP22-2-001                                                                                    - 106 -

The Commission orders:

(A)    In response to the requests for rehearing, the Certificate Order is hereby modified and the result sustained, as discussed in the body of this order.

(B)    GTN's request for clarification and its alternative request for rehearing are hereby dismissed, as discussed in the body of this order.

(C)    Riverkeeper's motion for stay is hereby dismissed as moot, as discussed in the body of this order.

By the Commission.  Commissioner Clements is dissenting with a separate statement attached.

( S E A L )

Debbie-Anne A. Reese,<br>Acting Secretary.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Gas Transmission Northwest, LLC                     Docket No.  CP22-2-001

(Issued April 16, 2024)

CLEMENTS, Commissioner, *dissenting*:

1.      I dissent from today's order on rehearing[1] of the Commission's order issuing a
certificate of public convenience and necessity to Gas Transmission Northwest, LLC
(GTN) for its GTN Xpress Project.[2]  I do so for three principal reasons.  First, sworn
affidavits that GTN filed in its pending rate case[3] both contradict GTN's answer to an
important staff data request in the certificate proceeding and undermine key
determinations in the Certificate Order for the project.  GTN's rate case filing draws into
serious question both the need for, and purported benefits of, the GTN Xpress Project.
For reasons explained below, the Commission must reconsider the underlying certificate
decision to meet its obligations under section 7 of the Natural Gas Act (NGA)[4] and the
Administrative Procedure Act (APA),[5] as well as to conform with its own 1999
Certificate Policy Statement.[6]  Second, the Commission's incomplete analysis of
alternatives to the GTN XPress Project contravened the National Environmental Policy

---

[1] *Gas Transmission Northwest, LLC,* 187 FERC ¶ 61,023 (2024) (Rehearing
Order).

[2] *Gas Transmission Northwest, LLC,* 185 FERC ¶ 61,035 (2023) (Certificate
Order).

[3] Docket No. RP23-1099-000.

[4] 15 U.S.C. § 717f(e).

[5] 5 U.S.C. § 706(2)(A) (providing for agency action to be set aside where
arbitrary, capricious, abuse of discretion, or otherwise not in accordance with law).

[6] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶
61,227 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000)
(1999 Certificate Policy Statement).

Act (NEPA),**[7]** and therefore provided an inadequate basis for decision under the NGA. Specifically, the Commission arbitrarily rejected the no action alternative, and failed to meaningfully assess the alternative of a smaller sized project that would meet reduced demand for natural gas caused by state climate laws. Finally, I reject the Rehearing Order's assertion that the Commission is incapable of assessing the significance of greenhouse gas (GHG) emissions.**[8]**

### Commission's Duty to Reconsider Project Need and Benefits Determinations

2.     Contrary to the majority's view,**[9]** the Commission not only can, but must, revisit its NGA section 7 public convenience and necessity determination for the GTN Xpress Project because GTN submitted evidence in its rate case that fundamentally undermines the bases on which the Commission issued a certificate for the project. As a first principle, under the APA the Commission "has an affirmative duty to inquire into and consider all relevant facts."**[10]** It must act on the record before it, and if that record is insufficient, it must supplement it before acting.**[11]** Another basic legal principle is that the Commission has wide discretion over the procedures it employs to discharge its duties.**[12]** Indeed, the NGA expressly authorizes the Commission, before the administrative record is filed with the reviewing court, to "modify or set aside, in whole

---

**[7]** 42 U.S.C. § 4321 *et seq.*

**[8]** *See* Rehearing Order, 187 FERC ¶ 61,023 at PP 115, 117-118.

**[9]** *See id.* at PP 9-10.

**[10]** *Scenic Hudson Preservation Conference v. FPC*, 354 F.2d 608, 620 (2d Cir. 1965) (citing *Mich. Consol. Gas Co. v. FPC*, 283 F.2d 204, 224, 226 (D.C. Cir. 1960); *Isbrandtsen Co. v. United States*, 96 F. Supp. 883, 892 (S.D.N.Y.1951), aff'd by an equally divided court, *A/S J. Ludwig Mowinckels Rederi v. Isbrandtsen Co*., 342 U.S. 950 (1952); Friendly, The Federal Administrative Agencies 144 (1962); Landis, The Administrative Process 36-46 (1938)).

**[11]** *Id.* at 621; *see also R.R. Comm'n of Texas v. FERC*, 874 F.2d 1338, 1343 (10th Cir. 1989) (finding FERC had a duty to act only upon a complete record and acted correctly in requiring additional investigation to support a licensing decision); *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1037 (D.C. Cir. 1987) (noting FERC has a duty to develop an adequate record).

**[12]** *R.R. Comm'n of Texas*, 874 F.2d at 1343; *see also* NGA § 16, 15 U.S.C. § 717o ("The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this act.").

or in part, *any* finding or order made or issued by it under the provisions of this chapter."[13]  As discussed below, GTN's rate case filing makes clear that the Commission had a deficient record on project need and benefits when it issued the Certificate Order, leading us to reach erroneous conclusions on these fundamental issues.  The Commission therefore should set the Certificate Order aside and reconsider its public convenience and necessity determination—this time after developing a complete record.

3.     I disagree with the majority's assertion that the Commission is jurisdictionally barred from considering the evidence from GTN's rate case that the States submitted in their December 6, 2023, Supplemental Filing.[14]  Although the Commission has been inconsistent in its treatment of the issue, there is ample Commission authority holding that, in "compelling circumstances," the Commission may accept a supplement to a timely rehearing request after the 30-day rehearing period has expired.[15]  For example, in one case the Commission found compelling circumstances and accepted an untimely supplemental filing because staff transmitted to the parties relevant letters from state and wildlife agencies after the 30-day rehearing period had expired.[16]  In another, the Commission found compelling circumstances and allowed an untimely supplemental filing because the license order was mailed late to the parties, depriving them of half the

---

[13] NGA § 19(a), 15 U.S.C. § 717r(a) (emphasis added).

[14] *See* Rehearing Order, 187 FERC ¶ 61,023 at P 9.  Even if the States were barred from submitting the rate case information, the Commission has authority to consider it on its own initiative under sections 16 and 19(a) of the NGA, as discussed above.  Moreover, under Rule 716, the Commission may reopen a proceeding *sua sponte* when "warranted by any changes in conditions of fact or law or by the public interest."  18 C.F.R. § 385.716(c).  Contrary to the majority's conclusion, I demonstrate below that the rate case information contradicts the Commission's core public convenience and necessity determination and therefore would "change the outcome of the proceeding."  *See* Rehearing Order, 187 FERC ¶ 61,023 at P 10 & n.29.

[15] *See, e.g., Streamlining Comm'n Procedures*, Order No. 530, FERC Stats. & Regs. ¶ 30,906, at 31,863 (1990) (cross-referenced at 53 FERC ¶ 61,313) ("Under compelling circumstances it may be appropriate for the Commission to grant requests to supplement rehearing material on a timely basis after the 30 days has expired."); *see also Energie Group LLC*, 116 FERC ¶ 61,220, at P 7 & n.8 (2006); *Hydro Dev. Group,* 103 FERC ¶ 61,071, at P 13 (2003); *Upper Peninsula Power Co.,* 79 FERC ¶ 61,013, at 61,070 & n.5 (1997); *Ind. Mich. Power Co.,* 78 FERC ¶ 61,362, at n.5 (1997); *Fraser Papers, Inc.*, 78 FERC ¶ 31,346, at 62,476-62,477 (1997).

[16] *Hydro Dev. Group*, 103 FERC ¶ 61,071 at P 13.

30-day period for seeking rehearing of the order.[17]  The circumstances here are different, but even more compelling.  As explained below, the compelling circumstances in this case include (1) GTN's failure to supply the analyses that it later filed in its rate case when responding to a staff data request seeking the analyses, and (2) the centrality of the rate case information to the Commission's NGA section 7 public interest determination.

4.     Throughout this proceeding, the States of Washington, California, and Oregon (together, States) and other participants have contended that the GTN Xpress Project is not needed, including because the States' laws restricting GHG emissions and encouraging non-fossil energy alternatives will substantially reduce demand for natural gas in GTN's service area.[18]  On April 4, 2023, Commission staff propounded a data request to GTN requiring it to respond to the States' explanation in their Joint Protest and accompanying exhibits that "recent legislation" would substantially reduce consumption of natural gas.[19]  Rather than substantively addressing the future effect of the relevant state laws, as the data request asked, GTN's unsworn response dismissed the States' analysis as "mere speculation."[20]  The States promptly filed comments in the docket criticizing GTN's failure to respond.[21]  It turned out that GTN actually had quite a lot to say on the subject, but not in this docket.  Just a few months after filing its non-responsive answer to staff's data request, GTN submitted a voluminous set of sworn affidavits in its rate case contending that future demand for GTN's service is at serious risk because of the very same state laws referenced in staff's data request.

5.     Although GTN asserted in its data request response that the effect of state laws was too speculative to be considered for purposes of the certificate proceeding, its witnesses said the opposite for purposes of supporting an increase in GTN's rates.  For example, Anul Thapa, an expert witness from the Brattle Group, explained in his rate case testimony that GTN faces higher regulatory risk than peer pipelines because it

---

[17] *Fraser Papers, Inc.,* 78 FERC ¶ 61,346 at 62,476-62,477.

[18] *See, e.g.*, Oregon Citizens' Utility Board Comment (Jan. 27, 2023); Rogue Climate Comments on Draft EIS (Aug. 22, 2022); Joint Motion to Intervene and Protest by States of Washington, Oregon, and California and Ex. A-C (Aug. 22, 2022) (Joint Protest); Joint Comments on Draft EIS by States of Washington, Oregon, and California (Aug. 22, 2022); Columbia Riverkeeper and Sierra Club Joint Comments (Feb. 22, 2022).

[19] *See* April 4, 2023, letter to David A. Alonzo from Scott C. Merritt (Data Request No. 1).

[20] GTN Response to Staff Data Request No. 1 (Apr. 18, 2023).

[21] Comment by Washington, Oregon, and California Regarding Gas Transmission Northwest's April 18, 2023 Data Response at 1, 3-4 (filed May 5, 2023).

operates in Washington and Oregon, which have mandatory decarbonization requirements that the witness assesses as "very high" and "high" risk for GTN, respectively.[22] Another expert witness, Alexander Kirk, performed an analysis demonstrating that GTN would have a truncated economic life "based on the significant projected reductions in natural gas consumption and transportation necessitated if the requirements of public authorities are to be met and due to competitive pressure from the declining cost of alternative energy, electrification, and battery storage."[23] Mr. Kirk provided an over ten-page summary of the numerous federal, state, and local measures that would reduce demand for GTN's services.[24] He also found that the potential renewable energy available in Washington, Oregon, and California is sufficient not only to displace all natural gas consumption within those states, but all *energy* consumption.[25] Similarly, Alexander Kearley, Manager of Strategy and Joint Ventures for TransCanada Pipeline Ltd., testified to the high natural gas "demand risk" GTN faces from federal, state, and local initiatives that promote renewable energy sources and aim to reduce use of natural gas.[26] This testimony supports the States' position that the GTN Xpress Project is not needed and therefore does not satisfy the NGA section 7 public convenience and necessity standard.

6.    The evidence GTN submitted in its rate case undermines the Commission's public convenience and necessity determination for the GTN Xpress Project in two additional respects. First, Mr. Thapa testified that GTN's contracts for over 40% of the pipeline's capacity will expire by 2028.[27] Local distribution companies (LDCs) in California,

---

[22] Prepared Direct Testimony of Anul Thapa, Ex. 10 at 28-29, Docket No. RP23-1099-000 (filed Sept. 29, 2023) (Thapa Testimony). Mr. Thapa's analysis categorizes a state's risk level based on the mandatory nature and stringency of its requirements. *See id.* at 27-28. Mr. Thapa explains that his analysis only considered states that GTN's pipeline physically traverses and likely understates GTN's risk because it omitted risk from California's "aggressive decarbonization policies." *Id* at 29. He explains that California is a "major market for GTN" and has "some of the most stringent decarbonization policies in the U.S." *Id.*

[23] Prepared Direct Testimony of Alexander Kirk, Ex. 40, Summary of Prepared Direct Testimony at para 2., Docket No. RP23-1099-000 (filed Sept. 29, 2023) (Kirk Testimony).

[24] *See id.* at 6-19.

[25] *Id.* at 26.

[26] Prepared Direct Testimony of Alexander Kearley, Ex. 3 at 26, Docket No. RP23-1099-000 (filed Sept. 29, 2023) (Kearley Testimony).

[27] Thapa Testimony at 20-21. Over 1.4 Bcf/day of contracted capacity will expire,

Oregon, and Washington together hold 41% of the expiring capacity.**28** Of course, according to Mr. Thapa, these are the very states whose decarbonization laws pose a high or very high risk to GTN because they require economy-wide reductions in GHG emissions, including from the LDCs holding the expiring contracts. Thus, it is entirely possible (if not likely) that the three shippers who signed precedent agreements could access this existing capacity to meet their transportation needs as the current capacity holders reduce their reliance on natural gas pursuant to state legal mandates. Although no GTN shippers released capacity when the open season for the GTN XPress Project was held in 2019, that only meant no excess capacity was available at that time. The key question is what existing pipeline capacity will be available to shippers in the *future* (*i.e.*, over the 30-plus year term of the capacity agreements). Based on GTN's rate case testimony, it appears the answer is a lot—and soon. Before deciding the GTN XPress Project was needed to meet the precedent agreement holders' needs, the Commission should have required GTN to explain whether their needs could be met with the existing capacity covered by the soon-to-expire contracts.**29**

7.     Second, GTN's rate case testimony contradicts the Commission's finding in the Certificate Order that the GTN XPress Project would provide a "tangible benefit" to consumers by providing them access to relatively low-cost gas from Western Canada.**30** It turns out that purported benefit may be illusory. According to GTN witness Mr. Kearley, a variety of factors will cause the price of gas from Western Canada to *increase*, thereby making the gas less "economic" relative to gas from other areas and reducing GTN's "transportation value."**31**

8.     Although the Rehearing Order criticizes the States for their delay in filing GTN's rate case testimony in this proceeding, the blame properly rests with this Commission for failing to require GTN to respond to staff's data request before issuing the Certificate Order.**32** The States present "compelling circumstances" for considering this testimony

---

far more than the capacity covered by the three precedent agreements supporting the GTN Xpress Project.

**28** *Id.* at 21 fig. 6. Pacific Gas & Electric Co. has 26% of the expiring capacity, Portland General Electric Co. has 7%, and Puget Sound Energy Inc. has 8%. *Id*.

**29** I address the need for this analysis further in my discussion of alternatives below. *See infra* PP 26-27.

**30** *See* Certificate Order, 185 FERC ¶ 61,035 at P 36.

**31** *See* Kearley Testimony at 21-22, 25.

**32** As I explain below, the Commission has failed to implement the policy framework and procedures required to meet its obligation under the NGA to consider all

now and we should do so in accordance with our precedents allowing supplements to rehearing requests.  But even if the States were somehow barred from filing the information, the Commission can and should consider GTN's rate case testimony on its own initiative.  As I said at the beginning, the APA obligates the Commission to develop and act on a complete record.  And the NGA demands that we grant a certificate only when required by the public convenience and necessity.  To meet its statutory obligations, the Commission must consider GTN's rate case testimony.

9.     This is not a "would be nice to have" situation.  GTN's rate case testimony so undermines the foundations of the Certificate Order that it cannot rationally be sustained on rehearing.  Section 7(e) of the NGA provides that the Commission shall issue a certificate authorizing the construction and operation of a proposed new jurisdictional natural gas facility only if it determines that the facility "is or will be required by the present or *future* public convenience and necessity; otherwise such application *shall be denied*."**33**  As one court explained, "the public convenience and necessity for which regulatory agencies issue certificates are the convenience and necessity of the future…. Every new bus route, new airplane service, new radio station, new stock issue, new pipe line, new power project, and so on, seeks its permissive certificate upon the basis of future possibilities."**34**  The Commission's decision in this case clearly turns on the longer term need for the GTN Xpress Project given the 30-plus year term of the project's three precedent agreements and the 47-year depreciation period the Commission authorized for the project.  GTN simply has not met its burden of demonstrating the GTN Xpress Project will be needed in the *future* given that its own witnesses have testified in the company's rate case that (1) more than 40% of GTN's contracts for existing capacity will expire within four years, and (2) state laws so imperil future demand for GTN's services that it is entitled to a rate increase as compensation.**35**

---

factors bearing on the public interest, including the effect of state laws.  *See infra* P 20.

**33** 15 U.S.C. § 717f(e) (emphasis added).

**34** *City of Pittsburgh v. FPC*, 237 F.2d 741, 752 (D.C. Cir. 1956) (quoting *American Airlines, Inc. v. Civ. Aeronautics Bd.*, 192 F.2d 417 (D.C. Cir. 1951)).

**35** *See Mich. Consol. Gas Co. v. FPC*, 283 F.2d 204, 214 (D.C. Cir. 1960) ("[T]he applicant under § 7(c) for a certificate to commence service must bear the burden of proving that that public interest will be served."); *Mo. Interstate Gas, LLC*, 137 FERC ¶ 63,014, at P 161 (2011) ("In an NGA section 7(c) proceeding, the burden is on the applicant to show that its proposed pipeline acquisition is required by the public convenience and necessity."); *Tex. E. Transmission Corp.*, 95 FERC ¶ 61,367, at 62,388 (2001) ("[T]he burden was on the applicant, Texas Eastern, to show that its proposed construction and expansion is required by the public convenience and necessity."); *Boundary Gas, Inc.*, 21 FERC ¶ 61,114, at 61,322 (1982) ("The Commission has long

10.     The Rehearing Order purports to apply the Commission's 1999 Certificate Policy
Statement in continuing to find the GTN Xpress Project is required by the public
convenience and necessity.**36**  However, the Commission's myopic focus on precedent
agreements and its reflexive dismissal of any other evidence of future need as too
"speculative" run counter to the policy.**37**  The 1999 Certificate Policy Statement provides
that the Commission will "consider all relevant factors reflecting on the need for the
project."**38**  These factors "might include, but would not be limited to, precedent
agreements, *demand projections*, potential cost savings to consumers, or a comparison of
projected demand with the amount of capacity currently serving the market."**39**
Necessary evidence "will usually include a market study."**40**  In calling for demand
projections and market studies, the policy recognizes that it is the Commission's job,
however difficult, to make predictions in determining the *future* public convenience and
necessity.**41**  As discussed above, it is also the Commission's obligation under the APA to
consider all relevant information bearing on future need, not just precedent agreements.**42**

11.     Rather than objectively considering the States' evidence relating to future demand
and GTN's rate case testimony, the Rehearing Order unnecessarily ties the Commission's

---

held that there is an affirmative obligation on the part of an applicant to demonstrate a
market for the gas in question.").

**36** *See* Rehearing Order, 187 FERC ¶ 61,023 at P 38.

**37** By my count, the Rehearing Order applies the "speculative" label at least eleven
times.  *See, e.g.,* Rehearing Order, 187 FERC ¶ 61,023 at PP 58, 82-83.

**38** 1999 Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,747.  The policy in
this respect adopts the Supreme Court's interpretation of the NGA in *Atl. Refin. Co. v.
Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391 (1959) (holding the Commission must
"evaluate *all* factors bearing on the public interest" (emphasis added)).

**39** 1999 Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,747 (emphasis
added).

**40** *Id.* at 61,748.  I explained the value a market study would have provided in my
separate statement on the Certificate Order.  *See* Certificate Order, 185 FERC ¶ 61,035
(Clements, Comm'r, concurring in part and dissenting in part, at P 2).

**41** I am admittedly tempted to quote the old saw that "it is difficult to make
predictions, especially about the future."  But the Bluebook demands attribution, and I am
loathe to join the unwinnable battle over who first said it.

**42** *See supra* P 2.

hands procedurally and then offers a grab bag of reasons for dismissing the evidence. None of those reasons are persuasive. For example, the Rehearing Order says the parties have not presented evidence that state laws have reduced demand for natural gas to date.[43] But the key question is not how these relatively new laws have affected current demand, but how they will affect *future* demand. Based on the evidence that the States submitted in this proceeding and that GTN filed in its rate case, the parties agree that the relevant laws are mandatory, will have economy-wide effect in each state, and threaten to substantially reduce future demand for natural gas in GTN's service area and thereby the demand for GTN's transportation capacity. Surely all these agreed facts are relevant to the central issue of project need.

12. The Rehearing Order further contends that the language used in the States' and Riverkeeper's projections evinces their "speculative nature."[44] One of the States' expert reports offends by projecting future energy demand in the region.[45] Of course, as discussed above, the 1999 Certificate Policy Statement specifically calls for the submission of "demand projections." The majority does not explain whether or how one could analyze future impacts without using language reflecting that these events have not yet transpired. Even worse, there is no explanation for the discrepancy in the majority's apparent acceptance of Cascade's and Intermountain's integrated resource plans at face value,[46] when they too project future demand for natural gas. It is fair to ask whether the majority applies a double standard in assessing the probative value of record evidence, crediting only the evidence that supports the public interest finding in the Certificate Order.

13. The Rehearing Order next determines that the effect state decarbonization laws in Washington, California, and Oregon will have on demand is not important because Intermountain, an LDC based in Idaho, has subscribed to over 50% of the GTN XPress Project's capacity and Idaho does not have decarbonization legislation.[47] Whatever its surface rhetorical appeal, this argument is unavailing because legislation in neighboring states will likely drive gas demand down regionally, freeing up capacity on GTN that Intermountain could tap in place of the GTN XPress Project.

---

[43] Rehearing Order, 187 FERC ¶ 61,023 at P 58.

[44] *Id.* at P 58 & n.226.

[45] *Id.*

[46] *See id.* at P 57 & n.223.

[47] *Id.* at P 58. The Rehearing Order repeats this specious argument at P 83.

Document Accession #: 20240416-3093     Filed Date: 04/16/2024
USCA Case #24-1204     Document #2064211     Filed: 07/11/2024     Page 206 of 238
Docket No. CP22-2-001                                                          - 10 -

14.     As the Energy Futures Report filed by the States explains, "any need for incremental capacity on a system needs to account for trends and patterns in total system consumption."[48]  The GTN XPress Project would increase GTN's total system capacity by less than 5%, and the total regional gas pipeline capacity by approximately 1.5%.[49]  Thus, in determining future need for the project, the Commission must account for the effect of state decarbonization laws and renewable energy initiatives on the 95% to 98.5% of the consumption and capacity in the *rest* of the gas system.[50]  As the Energy Futures Report put it, one must "understand the size of the cake coming out of the oven before one can determine the 'need' for the 'icing.'"[51]  The report shows the cake is very large, and California is eating most of it.  Specifically, natural gas consumption in the region is dominated by California (75%), followed by Washington (11%), Oregon (9%), and Idaho (5%).[52]  Because Intermountain has a small sliver of the cake, it doesn't need much icing.  Indeed, Intermountain is unlikely to need any new capacity because, as GTN's own rate case witnesses predict, the stringent decarbonization laws and renewable energy initiatives in Idaho's neighboring states will drive down regional demand for gas and thereby demand for GTN's existing gas transportation capacity.[53]  The Energy Futures Report similarly projects a substantial decline in regional demand.[54]  And the IHS Markit Report filed by GTN in this proceeding forecasts the same thing.[55]  The APA

---

[48] David G. Hill and Earnest White, GTN Xpress Project, A Critical Review of Need, Cost and Impacts at 10 (Aug. 15, 2022) (Energy Futures Report) (filed as Ex. C to States' Joint Motion to Intervene and Protest (Aug. 22, 2022)).

[49] *Id.*

[50] The GTN XPress Project would increase the GTN pipeline system capacity and is not a proposal to build new or larger lateral pipelines connecting directly to the three shippers.

[51] Energy Futures Report at 10 (Aug. 15, 2022).

[52] *Id.* at 14.

[53] The same logic applies with respect to Tourmaline's need for capacity since it plans to sell its gas in Western U.S. markets.

[54] Energy Futures Report at 14 (Aug. 15, 2022)*.*

[55] IHS Markit, North American Natural Gas Long-Term Outlook at 50 (Aug. 2021) (IHS Markit Report) (filed in GTN's Supplemental Response to FERC's April 4, 2023 Data Request (May 15, 2023)) (projecting that in the U.S. West, total regional natural gas demand will fall to 7.4 Bcf/d in 2050, down by 3.6 Bcf/d from 2021.  The decrease will be steady after 2026.  The decline will be caused primarily by a steep drop

requires the Commission to engage with this evidence showing no new capacity is needed, rather than doubling down on what GTN's rate case testimony has shown to be a flawed need determination in the Certificate Order.

15.     The majority's reasons for concluding that consideration of GTN's rate case testimony would not "compel a different result" are equally unpersuasive.[56] The majority first observes that GTN's sworn testimony is subject to further "assessment" in the rate case and finds it therefore would be premature to make any judgment about its "veracity and validity."[57] The majority once again appears to apply a double standard.  On the one hand, it credits at face value GTN's *unsworn* statements in its certificate application and data request responses that support the need for, and benefits of, the GTN Express Project.[58] On the other hand, it rejects the same party's *sworn* testimony undercutting project need and benefits.[59] That is not reasoned decision-making.

16.     The Rehearing Order next asserts that Mr. Thapa's testimony that precedent agreements do not mitigate all the risks to the pipeline he identified is "not unusual and does not apply in the context of determining project need."[60] Whatever point this puzzling statement seeks to make, it misses the relevant ones.  Specifically, as discussed above,[61] Mr. Thapa's testimony establishes that contracts for more than 40% of GTN's existing capacity will expire in the next four years and may become available to the shippers who have subscribed to the GTN XPress Project, potentially eliminating any

---

in power sector demand).

[56] Rehearing Order, 187 FERC ¶ 61,023 at P 78.

[57] *Id.* at P 81.

[58] *See, e.g., id.* at P 75 (crediting GTN's statement in its data request response that it "received overwhelming market interest" in the project during the open season); Certificate Order, 185 FERC ¶ 61,035 at P 21 (crediting GTN's statement in its certificate application that the project will enable local distribution companies to meet demand with "low-cost" natural gas).

[59] I emphasize that GTN's rate testimony is sworn under oath before a notary because that fact may subject the witness to potential *criminal* penalties for perjury under 18 U.S.C. § 1621 if the testimony is deliberately false.  Moreover, it does not take a psychology degree to appreciate that swearing an oath helps focus a witness's attention on the accuracy of the sworn statement.

[60] Rehearing Order, 187 FERC ¶ 61,023 at P 82.

[61] *See supra* at PP 5-6.

need for the GTN Xpress Project. His testimony also supports the States' contention that their laws will reduce demand for GTN's services, which also undercuts the project's need case. Mr. Thapa's separate point that precedent agreements do not wholly mitigate a pipeline's risk is simply irrelevant to the project need issue.

17. The majority next dismisses Mr. Kirk's overall testimony as "too speculative," and asserts Mr. Kirk "does not fully explain whether there are any mandated mechanisms to implement [state GHG emissions reductions] goals."**62** This section of the Rehearing Order mischaracterizes Mr. Kirk's testimony, which discusses how *mandatory* state and local decarbonization requirements will reduce demand for natural gas in GTN's service area.**63** This is a prime example of failing to engage with relevant evidence, in violation of the Commission's duty under the APA.

18. In concluding its critique of GTN's rate case testimony, the Rehearing Order states "[w]e decline to override the independent judgment of Cascade, Intermountain, and Tourmaline, which thought it prudent to contract for the Project's capacity based on prevailing market forces."**64** Perhaps a reminder is needed that, under section 7 of the NGA, "the *Commission* is charged with the duty of protecting the ultimate consumer from 'exploitation at the hands of natural gas companies.'"**65** We do not have the luxury of outsourcing to shippers our statutory authority and responsibility to determine the public convenience and necessity.

---

**62** *See* Rehearing Order, 187 FERC ¶ 61,023 at P 83.

**63** Contrary to the Rehearing Order's suggestion that Mr. Kirk testified only to states' aspirational "targets," he spoke to state *mandates* for decarbonization and renewable energy use. *See, e.g.,* Kirk Testimony at 10-11 (discussing Washington state laws *mandating* that utilities be GHG neutral by 2030 and supply Washington customers with 100% renewable or non-emitting energy by 2045; explaining Oregon Renewable Portfolio Standard (RPS) *requiring* 50% of electricity Oregonians use come from renewable sources by 2040; describing California 100 Percent Clean Energy Act of 2018 setting an RPS that *requires* 60% of the state's electricity come from carbon-free sources by 2030 and 100% by 2045); *id.* at 16 (explaining that demand for transportation on GTN's system will be reduced because Washington's Climate Commitment Act *requires* covered businesses, including GTN, to acquire GHG emission allowances that will increase the cost of natural gas).

**64** *Id.* at P 84.

**65** *Mich. Consol. Gas Co. v. FPC*, 283 F.2d 204, 224 (D.C. Cir. 1960) (emphasis added) (quoting *FPC v. Hope Nat. Gas*, 320 U.S. 591, 610 (1944)).

19.     The Rehearing Order repeatedly returns to GTN's precedent agreements to reaffirm the Certificate Order and reject the States' and Riverkeepers' arguments and evidence.[66]  To be sure, precedent agreements are "significant evidence" of need, and I have voted for many certificate orders saying as much.  However, where, as here, there is credible evidence undermining the probative value of precedent agreements, the Commission must look behind those agreements and consider that evidence in its public interest determination under NGA section 7.[67]

20.     Overall, the Rehearing Order is striking for its dismissive approach toward the States.  It is perplexing that the order's sole focus is on defending the Certificate Order, rather than objectively examining new evidence going to the heart of the Certificate Order's public interest determination.  It is also surprising that there is no recognition that the States have the necessary information and expertise to interpret their own laws and explain how their implementation will affect demand for natural gas.  Rather than reflexively rejecting the States' arguments and evidence, the Rehearing Order should use the States' input to facilitate the Commission's compliance with its own legal obligations.  For example, the Rehearing Order says the Commission is "unable to determine whether a specific project's GHG emissions are consistent or inconsistent with state-wide goals or laws, given the many variables that bear upon that question."[68]  The Commission cannot avoid its obligation under NEPA to determine consistency with state laws simply by decrying the complexity of considering "variables."[69]  That is particularly so given that the Commission could readily fill the gap with the information the States already have

---

[66] *See, e.g.,* Rehearing Order, 187 FERC ¶ 61,023 at PP 54, 63, 67, 73, 75.

[67] *See Env't. Def. Fund v. FERC*, 2 F.4th 953, 975 (D.C. Cir. 2021) (vacating certificate order where Commission failed to look behind precedent agreement with affiliate and engage with evidence of self-dealing).  Although the specific facts of the cited case differ from those here, the principle the case establishes is directly applicable.  As in *Env't. Def. Fund,* there is credible evidence contradicting the need for the proposed GTN Xpress Project, and "FERC's failure to engage with this evidence did not satisfy the requirements of reasoned decisionmaking."  *Id.*

[68] Rehearing Order, 187 FERC ¶ 61,023 at P 119.

[69] As the States correctly observe in their Rehearing Request, "NEPA regulations require an EIS to 'discuss any inconsistency of a proposed action with any approved State, Tribal, or local plan or law (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law.'"  States Rehearing Request at 98 (citing CEQ's regulation implementing NEPA, 40 C.F.R. § 1506.2(d)).

provided relating to inconsistency with their laws.[70]  The Rehearing Order provides no explanation for the Commission's failure to do that, thereby violating the APA.[71]

21.     For all the reasons explained above, the evidence contradicting the Certificate Order's public interest determination makes the order unsustainable.[72]  Rather than waiting for a court to remand and potentially vacate the Certificate Order, the Commission should reopen the certificate proceeding, develop a complete record on the potential need for, and benefits of, the GTN Xpress Project, and objectively review that record.  In accordance with the 1999 Certificate Policy Statement, the Commission should require GTN to provide a market study, along with a "demand projection" (perhaps in in the form of a substantive answer to staff's April 4, 2023, data request seeking an analysis of the effects of state laws on demand).[73]  These steps are essential to

---

[70] The States explain the effect of the Projects' GHG emissions on their decarbonization and renewable energy laws in their Rehearing Request.  *See* States Rehearing Request at 99-105.

[71] *See, e.g., SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."); *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) ("[A]n agency action will be set aside as arbitrary and capricious if it is not the product of 'reasoned decisionmaking.'")*.

[72] To state the obvious, had GTN answered staff's data request consistent with its rate case testimony, I would have voted against the fatally flawed Certificate Order.  That is because the testimony shows, contrary to my understanding at the time I voted for the Certificate Order, that GTN *agrees* with the States that their laws and renewable energy initiatives will reduce demand for natural gas in GTN's service area and therefore reduce demand for capacity on GTN's system.

[73] Although the Rehearing Order fails to acknowledge it (*see* Rehearing Order, 187 FERC ¶ 61,023 at P 90), Riverkeeper correctly quotes the 1999 Certificate Policy Statement provision stating that "[i]f one of the benefits of a proposed project would be to lower gas or electric rates for consumers, then the applicant's market study would need to explain the basis for that projection."  Riverkeeper Rehearing Request at 28 (quoting 1999 Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,748.).  The Certificate Policy Statement goes on to warn that "[v]ague assertions of public benefits will not be sufficient."  1999 Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,748.  Contrary to the Rehearing Order's suggestion, nothing in the policy statement says or implies that a precedent agreement substitutes for the market study in evidencing claimed lower consumer rates.  Accordingly, if GTN continues to claim that consumers' cost of gas will

Case: 24-60354  Document: 1-3  Page: 207  Date Filed: 07/15/2024

Document Accession #: 20240416-3093  Filed Date: 04/16/2024
USCA Case #24-1204  Document #2064211  Filed: 07/11/2024  Page 211 of 238

Docket No. CP22-2-001                                    - 15 -

fulfilling the Commission's non-delegable duties under the APA and section 7 of the NGA.

22.     Finally, it is important to recognize the lessons this case teaches.  Since I first joined the Commission, I have advocated that we update the 1999 Certificate Policy Statement to account for the complexities of the modern energy industry and regulatory landscape.  I have consistently criticized the Commission's over-reliance on precedent agreements and argued that we must probe more deeply into the issue of project need to assure our decisions advance the *public* interest, and not just the interests of private project sponsors and their customers.  I have also urged the Commission to implement a policy framework and better procedures to assess the effect of state decarbonization laws and renewable energy initiatives on future demand for natural gas pipeline capacity.[74] The Commission took an important step in the right direction when it issued a draft revised certificate policy statement providing for a more in-depth assessment of need.[75]

---

be reduced because the GTN XPress Project will provide access to lower-priced gas from Western Canada, it must demonstrate as much in a market study.  Of course, that may prove impossible to do given that GTN's own witness testified in the pipeline's rate case that the price of gas produced in Western Canada will increase.

[74] *See, e.g., Transcon. Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,006 (2023) (Clements, Comm'r, concurring, at P 8) ("With so much at stake, and so many variables affecting future demand for natural gas, the Commission's relatively superficial approach to evaluating project need will become increasingly untenable, both legally and practically.  We should update our Certificate Policy Statement to provide for the full evaluation of *all* relevant information pertaining to need, including the effect of relevant federal, state, and local policies and programs on demand for natural gas to be transported by the proposed project.  The Commission also should clarify that data requests, independent Commission staff analyses, and evidentiary hearings are appropriate tools to include in our need evaluation toolbox.  In short, it is time for the Commission to implement policies and practices that reflect today's realities.").

[75] *Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,107 (2022). As I explained at the time, "the policy statement provides for a full analysis of project need as a gating question, rather than a check-the-box exercise relying solely on the existence of precedent agreements. Since the issuance of the 1999 policy statement, the Commission's need inquiry has devolved into a superficial determination of whether the project sponsor has entered into precedent agreements. The new policy rectifies this deficiency. It sets forth a need determination framework that provides guidance to the project sponsor and other parties on the evidence the Commission will consider in objectively assessing project need. The framework allows for consideration of important reliability and other benefits a project may offer, while ensuring that factors weighing against claimed benefits, that are provided on the record, get considered."  Allison

Since then, including in this case, I have continued to advocate that the Commission finish the job we started.[76] In the meantime, however, I have had to decide on many NGA applications for approval of pipeline and liquefied natural gas facilities. With growing concern about the thin administrative records presented to us, I nevertheless worked within the Commission's existing policy and procedural framework in voting to approve applications—while continuing to advocate for a generic and durable reform to an outdated and increasingly indefensible approach. Unfortunately, coloring within those lines caused the Commission to issue a deeply flawed certificate order in this case. As discussed above, we should correct our errors by reopening the certificate proceeding for the GTN XPress Project. To avoid repeating these mistakes, the Commission should finalize an updated certificate policy statement and implement enhanced procedures allowing us to fully evaluate *all* factors that actually do bear on the public interest in 2024, including the effect of state laws and renewable energy initiatives.

## Deficient Alternatives Analysis

23.    I also dissent from the Rehearing Order's determination that the Final Environmental Impact Statement for the GTN XPress Project (EIS) satisfied the Commission's obligations under NEPA.[77] For the reasons explained below, I agree with Riverkeeper and the States that the EIS adopted an impermissibly narrow definition of the project's purpose and need. Moreover, the EIS failed to evaluate the no action alternative in any meaningful way, directly contravening NEPA. The EIS's alternatives analysis also fell short by failing to consider whether a down-sized capacity expansion would meet any increased demand for natural gas in GTN's service area. Because the Commission's NGA section 7 authorization rested on an inadequate EIS, it cannot be

---

Clements, Commissioner, Federal Energy Regulatory Commission, February 2022 Commission Meeting Opening Remarks (Feb. 17, 2022), https://www.ferc.gov/news-events/news/february-2022-commission-meeting-opening-remarks-commissioner-allison-clements.

[76] *E.g.,* Certificate Order, 185 FERC ¶ 61,035 (Clements, Comm'r, concurring in part and dissenting in part, at P 5) ("The Commission could readily address these deficiencies by adopting the need provisions of the draft revised Certificate Policy Statement issued in 2022."); Allison Clements, Commissioner, Federal Energy Regulatory Commission, May 2022 Commission Meeting Opening Remarks (May 19, 2022), https://www.ferc.gov/news-events/news/may-2022-commission-meeting-opening-remarks-commissioner-allison-clements ("[A]s a matter of policy, I believe that the Commission should call for stronger evidence that a project is needed and will be built.").

[77] *See* NEPA § 102(C)(iii), 42 U.S.C. § 4332(C)(iii) (requiring EIS to evaluate a reasonable range of alternatives, including no action alternative).

sustained.**78**  Accordingly, the Commission should prepare a supplemental EIS with an alternatives analysis meeting NEPA's requirements, and then revisit its public interest determination under section 7 based on the supplemental EIS.

24.    NEPA requires that an agency "[e]valuate reasonable alternatives to the proposed action," including "the no action alternative."**79**  The alternatives must be "reasonable" in that they "meet the purpose and need for the proposed action,"**80** but the statement of purpose should not be so narrow as to "compel the selection of a particular alternative."**81** To ensure the appropriate alternatives are evaluated, the EIS must "specify the *underlying* purpose and need to which the agency is responding."**82**  Although the purpose and need statement appropriately considers the applicant's purpose, the agency cannot define the purpose so narrowly that only the applicant's proposal will fulfill it.**83**  Unfortunately, that is exactly what the EIS for the GTN Xpress Project did.

25.    The EIS recognized that the underlying purpose of the GTN XPress Project is to "serve the growing market demand [GTN's] system is experiencing."**84**  However, it went on to adopt a narrow statement of purpose and need parroting GTN's own description: "to increase the capacity of GTN's existing natural gas transmission system by about 150 million standard cubic feet per day between its Kingsgate Meter Station in Idaho and its

---

**78** *See Vecinos Para El Bienstar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021) (directing Commission to revisit NGA public interest determinations because EIS was deficient).

**79** 40 C.F.R. § 1502.14.

**80** 40 C.F.R. § 1508.1(z).

**81** *Conservation Law Found. v. Ross*, 374 F. Supp. 3d 77, 112 (D.D.C. 2019) (*quoting Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 73 (D.C. Cir. 2011)); *accord, Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir. 1997).

**82** 40 C.F.R. § 1502.13 (emphasis added).

**83** *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 73; *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).

**84** EIS at 1-1; *see also* Rehearing Order, 187 FERC ¶ 61,023 at P 100 ("[T]he purpose of the proposed Project is to increase the capacity of GTN's existing natural gas transportation system to provide necessary firm transportation service for growing market demand on its system.").

Malin Meter Station in Oregon."**85**  The EIS assumed, with no analysis whatsoever, that the 150 million standard cubic feet per day matched the underlying market demand the project was proposed to serve.  Indeed, the EIS—and the majority in the Rehearing Order—indicate that only the Commission can address what the demand is and will be because only the Commission can decide project need.**86**  Neither cites a shred of authority for the proposition that a Commission EIS cannot or should not analyze the existence or extent of the market demand a proposed project is intended to serve.  That the Commission ultimately decides whether a project is needed provides no excuse for a deficient purpose and need statement in the EIS or for the resulting truncated analysis of alternatives.

26.     Having accepted GTN's narrow project definition, both the EIS and the majority conclude that the no action alternative is unacceptable because it would not increase capacity on GTN's system.**87**  Indeed, rather than evaluating the no action alternative as both the Council on Environmental Quality's (CEQ) and the Commission's own NEPA regulations require,**88** the EIS dismissed the no action alternative out of hand.**89**  Though the States and other commenters advocated for it,**90** the EIS had no discussion of the

---

**85** EIS at 3-2; GTN's Resource Report 1 ("GTN proposes to increase the certificated capacity on the GTN system from the Kingsgate Meter Station to the Malin Meter Station, to up to 150,000 Dth/d and thus serve and meet the growing market demand that GTN's system continues to experience, benefiting local communities and providing operational flexibility.").

**86** *See* EIS at 3-1 to 3-2; Rehearing Order, 187 FERC ¶ 61,023 at P 101.

**87** EIS at 3-1 to 3-2; Rehearing Order, 187 FERC ¶ 61,023 at PP 102-103.

**88** The Commission's regulations implementing NEPA provide that it will comply with CEQ's NEPA regulations. 18 C.F.R. § 380.1.  The Commission's regulations also incorporate additional requirements, including the requirement for applicants to submit Resource Report 10 addressing alternatives.  *Id.* § 380.12(a)(1). Resource Report 10 must discuss the no action alternative and "the potential for accomplishing the proposed objectives through the use of other systems and/or energy conservation." *Id*. § 380.12(l)(1).  GTN's Resource Report 10 acknowledged that the use of alternative energy sources is an option to meet some of the short-term demand and long-term demand for energy in its market area.  Resource Report 10 at 10-2.  However, it concluded the no action alternative would not meet the project purpose since the purpose as defined by GTN was to increase the GTN pipeline's capacity.  *Id*.

**89** EIS at 3-1 (stating the no action alternative is "not considered in this EIS").

**90** *See* Joint Comments on Draft EIS by States of Washington, Oregon, and California at 19-21 (Aug. 22, 2022); Comments of Columbia Riverkeeper on Draft

effect of State decarbonization laws and renewable energy initiatives on future demand for natural gas. Given GTN's testimony in the rate case essentially agreeing with the States that demand will be *reduced*, and that 40% of GTN's existing capacity may become available by 2028,**91** it is now clear that the EIS is fundamentally deficient for failing to fully evaluate the no action alternative. For all the reasons explained in the need section of this dissent, that alternative may fully satisfy the actual demand for natural gas and natural gas transportation capacity on GTN's system.

27.      Depending on the outcome of a full analysis of future demand and available pipeline capacity, a smaller sized project than the one GTN proposed may be a reasonable alternative. In focusing solely on "on impacts to environmental resources, not on economic issues,"**92** the EIS provided no useful information on this score. The Rehearing Order correctly observes that there is "nothing in the record that reflects how such a reduction in capacity would work."**93** But that is the fault of our own deficient NEPA analysis. The Commission should prepare a supplemental EIS that evaluates this potential alternative, as well as the no action alternative.

## GHG Analysis

28.      I also dissent from the Rehearing Order's assertion that the Commission is incapable of determining the significance of GHG impacts.**94** In my concurrence in *Transco,***95** I explained the history of the language in Paragraphs 115, 117, and 118 of the Order, which has come to be known as the "*Driftwood* compromise."**96** In *Driftwood,* the majority suddenly adopted new language declaring that there are no methods for assessing the significance of GHG emissions, and particularly criticizing the Social Cost

---

Environmental Impact Statement at 19 (Aug. 22, 2022); Rogue Climate Comments on the Draft EIS at 8-9 (Aug. 22, 2022); Wild Idaho Rising Tide Comments on GTN Draft EIS at 3-4 (Aug. 22, 2022).

**91** *See supra* PP 6, 9.

**92** Rehearing Order, 187 FERC ¶ 61,023 at P 101.

**93** *Id.* at P 108.

**94** *See* Rehearing Order, 187 FERC ¶ 61,023 at PP 115, 117-118.

**95** *See Transcon. Gas Pipe Line Co.,* 184 FERC ¶ 61,066 (2023) (Clements, Comm'r, concurring, at PP 2-3) (*Transco*).

**96** *See id.* (Phillips, Chairman, and Christie, Comm'r, concurring at PP 1-2).

of GHGs protocol.[97]  I have dissented from this language in *Driftwood* and subsequent orders for two reasons: (1) it reflects a final Commission decision that it cannot determine the significance of GHG emissions, despite the fact the Commission has never responded to comments in the GHG Policy Statement docket[98] addressing methods for doing so; and (2) the language departs from previous Commission precedent without reasoned explanation, thereby violating the Administrative Procedure Act.[99]  I dissent from Paragraphs 115, 117, and 118 of this Order for the same reasons.

---

[97] *See Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at PP 61, 63 (2023) (*Driftwood*).

[98] Docket No. PL21-3.

[99] *See Driftwood,* 183 FERC ¶ 61,049 (Clements, Comm'r, dissenting in part at PP 2-3 & n.5); *see also E. Tenn. Nat. Gas, LLC*, 186 FERC ¶ 61,210 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,209 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *N. Nat. Gas Co.*, 186 FERC ¶ 61,064 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *Saguaro Connector Pipeline, LLC*, 186 FERC ¶ 61,114 (2024) (Clements, Comm'r, dissenting in part at PP 2-4); *Tenn. Gas Pipeline Co.*, 186 FERC ¶ 61,113 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,063 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *Columbia Gas Transmission, LLC*, 186 FERC ¶ 61,048 (2024) (Clements, Comm'r, dissenting in part at PP 2-4); *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,047 (2024) (Clements, Comm'r, dissenting at PP 8-9); *Tenn. Gas Pipeline Co.*, 186 FERC ¶ 61,046 (2024) (Clements, Comm'r, dissenting in part at PP 1-2); *ANR Pipeline Co.*, 185 FERC ¶ 61,191 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,133 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,130 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Tex. LNG Brownsville LLC*, 185 FERC ¶ 61,079 (2023) (Clements, Comm'r, dissenting at PP 9-10); *Rio Grande LNG, LLC*, 185 FERC ¶ 61,080 (2023) (Clements, Comm'r, dissenting at PP 9-10); *Gas Transmission Nw., LLC,* 185 FERC ¶ 61,035 (2023) (Clements, Comm'r, concurring in part and dissenting in part at PP 7-8); *WBI Energy Transmission, Inc.*, 185 FERC ¶ 61,036 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Venture Global Plaquemines LNG, LLC*, 185 FERC ¶ 61,037 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Tex. E. Transmission, LP*, 185 FERC ¶ 61,038 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Trailblazer Pipeline Co.*, 185 FERC ¶ 61,039 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Equitrans, L.P.*, 185 FERC ¶ 61,040 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Port Arthur LNG Phase II, LLC*, 184 FERC ¶ 61,184 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Venture Global Calcasieu Pass, LLC*, 184 FERC ¶ 61,185 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *N. Nat. Gas Co.*, 184 FERC ¶ 61,186 (2023) (Clements,

Document Accession #: 20240416-3093      Filed Date: 04/16/2024

Docket No. CP22-2-001                                                      - 21 -

For these reasons, I respectfully dissent.

_____

Allison Clements
Commissioner

_____

Comm'r, dissenting in part at PP 2-3); *Tex. E. Transmission, LP*, 184 FERC ¶ 61,187
(2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Equitrans, LP*, 183 FERC ¶
61,200 (2023) (Clements, Comm'r dissenting at PP 2-3); *Commonwealth LNG, LLC*, 183
FERC ¶ 61,173 (2023) (Clements, Comm'r, dissenting at PP 5-8); *Rio Grande LNG,
LLC*, 183 FERC ¶ 61,046 (2023) (Clements, Comm'r, dissenting at PP 14-15); *Tex. LNG
Brownsville LLC*, 183 FERC ¶ 61,047 (2023) (Clements, Comm'r, dissenting at PP 14-
15).

Document Accession #: 20240416-3093     Filed Date: 04/16/2024
USCA Case #24-1204     Document #2064211     Filed: 07/11/2024     Page 218 of 238

Document Content(s)

CP22-2-001.docx.........................................................................1

USCA Case #24-1204   Document #2064211   Filed: 07/11/2024   Page 219 of 238

# EXHIBIT C

Case: 24-60354    Document: 1-3    Page: 216    Date Filed: 07/15/2024

Document Accession #: 20240617-3011    Filed Date: 06/17/2024
USCA Case #24-1204    Document #2064211    Filed: 07/11/2024    Page 220 of 238

187 FERC ¶ 62,160
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Gas Transmission Northwest LLC                    Docket No. CP22-2-002

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(June 17, 2024)

Rehearing has been timely requested of the Commission's order issued on
April 16, 2024, in this proceeding. *Gas Transmission Nw. LLC*, 187 FERC ¶ 61,023
(2024). In the absence of Commission action on a request for rehearing within 30 days
from the date it is filed, the request for rehearing may be deemed to have been denied.
15 U.S.C. § 717r(a); 18 C.F.R. § 385.713 (2023); *Allegheny Def. Project v. FERC*,
964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 15 U.S.C. § 717r(a), the request for rehearing of the above-cited
order filed in this proceeding will be addressed in a future order to be issued consistent
with the requirements of such section. As also provided in 15 U.S.C. § 717r(a), the
Commission may modify or set aside its above-cited order, in whole or in part, in such
manner as it shall deem proper.

Debbie-Anne A. Reese,
Acting Secretary.

Document Accession #: 20240617-3011     Filed Date: 06/17/2024
USCA Case #24-1204   Document #2064211     Filed: 07/11/2024   Page 221 of 238

Document Content(s)

CP22-2-002.docx.........................................................1

**IN THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| STATE OF WASHINGTON, and | ) |
| STATE OF OREGON, | ) |
| | )    No. 24-1204 |
| *Petitioners*, | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL ENERGY REGULATORY | ) |
| COMMISSION, | ) |
| | ) |
| *Respondent*. | ) |
| _____ | ) |

### CERTIFICATE OF SERVICE

I, Megan Sallomi, hereby certify that, in accordance with Federal Rule of

Appellate Procedure 15(c), I caused to be served a copy of the foregoing Petition

for Review on June 17, 2024 by U.S. mail on all parties admitted to the proceeding

before the Federal Energy Regulatory Commission for docket numbers CP22-2-

000, CP22-2-001, and CP22-2-002 as listed below:

*Counsel for the American Gas Association:*
Matthew Agen
400 N. Capitol Street N.W., Ste. 450
Washington, DC 20001

*Counsel for the Canadian Association of Petroleum Producers:*
James Holt
Betts & Holt LLP
1101 Connecticut Avenue, N.W., Suite 450
Washington, DC 20036

*Counsel for the Center for Biological Diversity:*
Jason Rylander
1411 K Street NW, Ste. 1300
Washington, DC 20005

*Counsel for Columbia Riverkeeper:*
Audrey Leonard
6810 SE 67th Ave.
Portland, OR 97206

*Counsel for Earthjustice:*
Moneen Nasmith
48 Wall St. Fl. 15
New York, NY 10005

*Counsel for Gas Transmission Northwest LLC:*
Sean Marotta
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004

*Counsel for the Natural Resource Defense Council:*
Morgan Johnson
1152 15th St. NW, Ste. 300
Washington, DC 20005

*Counsel for Pacific Gas & Electric Company:*
Lindsey How-Downing
3060 El Cerrito Plaza #175
El Cerrito, CA 94530

*Counsel for Puget Sound Energy, Inc.:*
Pamela Anderson
Perkins Coie LLP
10885 NE Fourth St., Ste. 700
Bellevue, WA 98004

*Counsel for the Sierra Club:*
Nathan Matthews
2101 Webster St., Ste. 1300
Oakland, CA 94612

*Counsel for Tourmaline Oil Marketing Corp.:*
Sherra Aspin
Tourmaline Oil Marketing Corp.
2900, 205 6th Ave SW
Calgary, AB T2P 3H7
CANADA

I also caused to be served a copy of the foregoing Petition for Review via

U.S. mail on the Federal Energy Regulatory Commission at:

Robert H. Solomon
FERC Solicitor
888 First St. NE
Washington, DC 20426

Debbie-Anne A. Reese
Office of the Secretary
Federal Energy Regulatory Commission
888 First St. NE
Washington, DC 20426

Executed this 17th day of June, 2024 in Seattle, Washington.

 *s/ Megan Sallomi*
MEGAN SALLOMI
D.C. Cir. Bar No. 64513
Assistant Attorney General
Washington State Attorney General's Office
Environmental Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Tel: (206) 389-2437
Megan.Sallomi@atg.wa.gov

3